# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

WAYMO LLC,

*Plaintiff,*

*v.*

UBER TECHNOLOGIES, INC.,
OTTOMOTTO LLC, and OTTO TRUCKING LLC,

*Defendants.*

Appeal from the United States District Court for the
Northern District of California in case no. 3:17-CV-00939,
Judge William H. Alsup.

## INTERVENOR-APPELLANT ANTHONY LEVANDOWSKI'S
## EMERGENCY MOTION TO STAY PENDING RESOLUTION OF APPEAL

ISMAIL RAMSEY
MILES EHRLICH
AMY CRAIG
RAMSEY & EHRLICH LLP
803 Hearst Avenue
Berkeley, CA 94710
Phone: (510) 548-3600
Facsimile: (510) 291-3060

*Counsel for Intervenor-Appellant Anthony Levandowski*

June 27, 2017

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, counsel of record for Intervenor-Appellant Anthony Levandowski certifies as follows:

1. The full name of every party represented by our firm is: Anthony Levandowski.

2. The names of the real parties in interest represented by our firm are: *Not applicable*.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties represented by our firm are: *Not applicable*.

4. The names of all law firms and the partners or associates that appeared for the parties represented by us in the trial court, or are expected to appear in this Court, and who have not or will not enter an appearance in this case are:

   *Not applicable*.


Dated:  June 27, 2017          Respectfully submitted,

                        */s/ Amy Craig*
                        Miles Ehrlich
                        Ismail Ramsey
                        Amy Craig
                        Ramsey & Ehrlich LLP
                        803 Hearst Avenue
                        Berkeley, CA 94710
                        Tel: (510) 548-3600

                        ***Counsel for Intervenor-Appellant Anthony Levandowski***

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

CERTIFICATE OF INTEREST .................................................................. ii

TABLE OF CONTENTS ........................................................................... iii

TABLE OF AUTHORITIES ..................................................................... iv

INDEX OF EXHIBITS ............................................................................. vii

INTRODUCTION ..................................................................................... 1

STATEMENT OF COMPLIANCE WITH FED. R. APP. PRO. 8(a)(1) ................ 3

BACKGROUND ....................................................................................... 4

    A.    Factual Background ......................................................................... 4

    B.    Procedural History ........................................................................... 6

JURISDICTION ....................................................................................... 8

ARGUMENT ........................................................................................... 10

    I.    LEGAL STANDARD .................................................................. 10

    II.    DISCUSSION .............................................................................. 11

        A.    Mr. Levandowski's Appeal is Likely to Succeed .................................... 11

            1.    Standard of Review on Appeal .................................................. 11

            2.    Mr. Levandowski's Privilege Claims .......................................... 12

            3.    The District Court Misconstrued the Law Governing the Common Interest Privilege ................................................................... 12

            4.    The District Court Erred in Finding that the Common Interest Group Was Not Pursuing a Common Legal Interest ...................................... 14

        B.    Mr. Levandowski Will Be Irreparably Harmed Without a Stay ................ 21

        C.    A Temporary Stay Will Not Significantly Injure Other Involved Parties .21

        D.    A Temporary Stay Will Not Harm the Public ..................................... 21

CONCLUSION ........................................................................................ 22

STATEMENT OF CONSENT OR OPPOSITION ........................................... 23

STATEMENT OF COMPLIANCE WITH FED. R. APP. PRO. 27 ...................... 24

CERTIFICATE OF SERVICE .................................................................... 25

# TABLE OF AUTHORITIES

**Page**

## Cases

*Cheney v. United States District Court*,
542 U.S. 367 (2004).................................................................................10

*Church of Scientology v. United States*,
506 U.S. 9 (1992)......................................................................................9

*Doe v. United States*,
749 F.3d 999 (11th Cir. 2014) ...................................................................9

*Hilton v. Braunskill*,
481 U.S. 770 (1987)..................................................................................11

*In re MSTG, Inc.*,
675 F.3d 1337 (Fed. Cir. 2012).................................................................10

*In re Optical Disk Drive Antitrust Litigation*,
801 F.3d 1072 (9th Cir. 2015) ..................................................................12

*In re Regents of Univ. of California*,
101 F.3d 1386 (Fed. Cir. 1996)................................................. 10, 17, 20

*Mohawk Industries, Inc. v. Carpenter*,
558 U.S. 100 (2009)...................................................................................8

*Montgomery Ward & Co. v. Zenith Radio Corp.*,
69 C.C.P.A. 96 F.2d 1254 (C.C.P.A. 1982)...............................................9

*Morvil Tech., LLC v. Ablation Frontiers, Inc.*,
2012 U.S. Dist. LEXIS 30815 (S.D. Cal. Mar. 8, 2012) ........................20

*Nidec Corp. v. Victor Co.*,
249 F.R.D. 575 (N.D. Cal. 2007)..............................................................13

*Nken v. Holder*,
556 U.S. 418 (2009)..................................................................................11

*Pacific Pictures Corp. v. United States District Court*,
679 F.3d 1121 (9th Cir. 2012) ...............................................................14

*Perlman v. United States*,
247 U.S. 7 (1918)...................................................................................9

*Rayman v. Am. Charter Fed. Sav. & Loan Ass'n*,
148 F.R.D. 647 (D. Neb. 1993)..............................................................20

*Rembrandt Patent Innovations, LLC v. Apple Inc.*,
2016 U.S. Dist. LEXIS 13749 (N.D. Cal. Feb. 4, 2016) ........................17

*Ross v. City of Memphis*,
423 F.3d 596 (6th Cir. 2005) ...................................................................9

*UMG Recording, Inc. v. Bertelsmann AG (In re Napster Copyright Litig.)*,
479 F.3d 1078 (9th Cir. 2007) ...............................................................21

*United States v. Austin*,
416 F.3d 1016 (9th Cir. 2005) ...............................................................13

*United States v. Gonzalez*,
669 F.3d 974 (9th Cir. 2012) ............................................... 13, 14, 17, 19

*United States v. Griffin*,
440 F.3d 1138 (9th Cir. 2006) ...............................................................21

*United States v. Henke*,
222 F.3d 633 (9th Cir. 2000) ......................................................... 12, 14

*United States v. Krane*,
625 F.3d 568 (9th Cir. 2010) ...................................................................8

*United States v. McPartlin*,
595 F.2d 1321 (7th Cir. 1979) ...............................................................13

*United States v. Schwimmer*,
892 F.2d 237 (2d Cir. 1989)...................................................................13

*Velsicol Chemical Corp. v. Parsons*,
561 F.2d 671 (7th Cir. 1977) ...................................................................9

*Wi-LAN, Inc. v. LG Elecs., Inc.*,
684 F.3d 1364 (Fed Cir. 2012)................................................................11

*Zenith Elecs. Corp. v. Exzec, Inc.*,
182 F.3d 1340 (Fed. Cir. 1999)................................................................8

## **Statutes**

28 U.S.C. § 1291 .....................................................................................8

28 U.S.C. § 1295(a)(1).............................................................................8

28 U.S.C. § 1651(a) ...............................................................................10

# INDEX OF EXHIBITS

**EXHIBIT**   **DESCRIPTION**

1    Waymo Motion to Compel  Production of Withheld Documents
(Dkt. 321)

2    Declaration of Eric A. Tate in Support of Defendants' Opposition to
Motion to Compel (Dkt. 370);

3    Exhibit 2 to Declaration of Eric A. Tate in Support of Defendants'
Opposition to Motion to Compel: Joint Defense, Common  Interest,
and Confidentiality Agreement, dated April 11, 2016 (Dkt. 370-2);

4    Exhibit 3 to Declaration of Eric A. Tate in Support of Defendants'
Opposition to Motion to Compel: Stroz Engagement Letter dated
March 4, 2016 (Dkt. 370-3);

5    Declaration of Alisa J. Baker in Support of Defendants' Opposition
to Motion to Compel (Dkt. 375)

6    Declaration of Adam Bentley in Support of Uber's  Opposition to
Waymo's Motion to Compel (Dkt. 376)

7    Declaration of Justin Suhr in Support of Defendants' Opposition to
Waymo's Motion to Compel (Dkt. 378)

8    Non-Party Anthony Levandowski's Opposition to Motion to
Compel (Dkt. 379)

9    Declaration of Eric Friedberg in Support of Defendants' Opposition
to Waymo's Motion to Compel (Dkt. 380)

10    Declaration of John F. Gardner in Support of Defendants'
Opposition to Waymo's Motion to Compel (Dkt. 381)

11    Declaration of Jamie Leigh (Dkt. 383)

12    Plaintiff Waymo's Reply In Support of Its Motion to Compel
Production of Withheld Documents, Public Redacted Version (Dkt.
445)

| EXHIBIT | DESCRIPTION |
|---|---|
| 13 | Term Sheet dated February 22, 2016 (Dkt. 598, redacted version of Dkt 510-3 (filed under seal per minute order at Dkt. 509)) |
| 14 | Magistrate Judge Corley's Order re: Waymo's Motion to Compel (Dkt. 549, 566 (identical docket entries)) |
| 15 | Non-Party Anthony Levandowski's Notice Of Motion And Motion for Relief from Nondispositive Pretrial Order of Magistrate Judge (Dkt. 574) |
| 16 | Plaintiff Waymo LLC's Consolidated Response to Motions for Relief from Nondispositive Pretrial Order (Dkt. 585) |
| 17 | Non-Party Anthony Levandowski's Reply in Support of Motion for Relief from Nondispositive Pretrial Order of Magistrate Judge Corley (Dkt 607) |
| 18 | Order Denying Motions For Relief From Judge Corley's Nondispositive Pretrial Order Re Due Diligence Report (Dkt. 685) |
| 19 | Non-Party Anthony Levandowski's Notice of Appeal (Dkt. 719) |
| 20 | Magistrate Judge Corley's Order re: Uber Privilege Log (Dkt. 731) |

# **INTRODUCTION**

This is an appeal from an order requiring production of records protected by Anthony Levandowski's common interest, attorney-client, and attorney work product privileges.

Mr. Levandowski is an intervenor and witness in an ongoing civil suit between Waymo LLC ("Waymo") and Uber Technologies, Inc. ("Uber"). The complaint alleges misappropriation of trade secrets and patent infringement after Mr. Levandowski and Lior Ron—both former Google employees working on its driverless vehicle project—left Google to found Ottomotto LLC ("Ottomotto") and Otto Trucking LLC ("Otto Trucking," and, collectively, "Otto"), and then joined Uber as part of an acquisition of Ottomotto. *See generally Waymo v. Uber Technologies, Inc.* et al., No. 17-cv-00393-WHA (N.D. Cal.) Dkt. 23.[1]

In February 2016, Uber and the Otto entities signed a "term sheet" stating their intent to enter into the acquisition deal. Once the term sheet was signed, the parties began bracing themselves for potential litigation with Google. (Waymo, a Google affiliate, was founded later, in December 2016). The parties, including Mr. Levandowski, formed a common interest agreement—at first, the agreement was

---

[1] Attached to this motion as exhibits, designated herein as "Ex. __," are copies of the district court filings and orders that will be central to this appeal. This motion will refer to other, less significant entries in the district court docket using the designation "Dkt." As Mr. Levandowski has not had time to perfect the entire record on appeal, he asks the Court to take judicial notice of the records and filings in the district court docket.

oral, but it was later recorded in formal writings—to prepare for that potential litigation.  As part of the common interest effort, Uber and Otto hired an outside consultant, Stroz Friedberg, LLC ("Stroz"), to conduct a factual investigation, which included interviews of Mr. Levandowski and other former Google employees and a review of materials provided by those individuals.  Stroz created a report, which was intended by counsel to help develop a defense strategy in case Google and/or Waymo sued.

During discovery in the underlying litigation, Waymo has sought production of materials related to the Stroz investigation using two separate mechanisms:

(1)    Waymo demanded production of Stroz's report from the party defendants in the case, Uber and Ottomotto; and

(2)    Waymo propounded a subpoena directly to Stroz seeking materials related to Stroz's work for the common interest group, including any materials Mr. Levandowski had provided for Stroz to examine.

Mr. Levandowski intervened in each of these discovery matters to protect his privileges and object to the production of certain records.  The instant appeal relates to the litigation over the first discovery mechanism—Waymo's demand for production of the Stroz report.  The litigation over the subpoena served directly

2

upon Stroz is ongoing in the district court.[2]

The district court referred both discovery disputes to Magistrate Judge Jacqueline Corley.  The magistrate judge overruled Mr. Levandowski's privilege claims, although she has since stated that the questions before her were issues of "first impression and complicated."  Dkt. 734, 6/23/2017 Tr. at 40:11-12.   The district court affirmed the magistrate's order compelling production of the Stroz report, and stayed its order **only until June 30, 2017, at noon**, after which the party defendants will be obligated to produce the report.

These records should not be produced.  The district court's resolution of the privilege issues was erroneous, and Mr. Levandowski is likely to prevail in this appeal.  But unless this Court issues a stay of the district court's order, the issues under consideration will become moot on June 30 at noon, when the district court's own stay expires.  Mr. Levandowski therefore requests that this Court issue an emergency stay of the district court's order.

## STATEMENT OF COMPLIANCE WITH FED. R. APP. PRO. 8(a)(1)

Under Federal Rule of Appellate Procedure 8(a)(1), an appellant seeking a stay "must ordinarily move first in the district court" for relief.  Mr. Levandowski did so.  Ex. 15 at 5 n.4; Ex. 17 at 3.

---

[2] As the issues presented significantly overlap, to the extent the subpoena to Stroz gives rise to an appeal—as appears likely—Mr. Levandowski will ask this Court to consolidate the two matters.

3

# BACKGROUND

## A.    Factual Background

In 2016, Uber considered acquiring Ottomotto and Otto Trucking.  Ex. 2, ¶ 2.  Mr. Levandowski and Mr. Ron were former Google employees who formed the Otto entities after leaving Google.  *Id.* ¶ 3.  Uber, the Otto entities, Mr. Levandowski, and Mr. Ron (together, the "Common Interest Group") were concerned that Uber's acquisition could spark intense litigation from Google (or its sister company, Waymo).  Ex.  10, ¶ 3; Ex. 2, ¶¶ 3, 5, 9.

Members of the Common Interest Group retained counsel to provide legal advice concerning the transaction and prepare for litigation that might occur as a result of the transaction.  Mr. Levandowski retained John F. Gardner to "evaluate [litigation] risks, anticipate defenses, and assess legal strategies."  Ex. 10, ¶ 4.  Mr. Ron retained attorney Alisa Baker for similar purposes.  Ex. 5, ¶ 5.  Uber retained Morrison & Foerster LLP to advise on "potential claims that could be brought by Google against . . . Anthony Levandowski and Lior Ron, who had left Google to create the target companies that ultimately became Ottomotto and Otto Trucking."  Ex. 2, ¶ 3.  Otto retained O'Melveny & Myers LLP.  *Id.* ¶ 4.  Notably, *separate* corporate lawyers were employed to advise the parties with respect to the business aspects of the corporate acquisition.  *Id.* ¶ 3, 9-10, 20; *see also* Ex. 5, ¶ 3; Ex. 7 ¶¶ 2-5; Ex. 10, ¶¶ 4-6; Ex. 11. 383 ¶¶ 2-3.

From the beginning, the Common Interest Group recognized their shared interest in defending against potential legal claims. Ex. 10, ¶¶ 3–4. They also recognized that to prepare defenses, they needed to ensure that communications between them remained confidential and privileged. *Id*. ¶ 4. Accordingly, the Common Interest Group orally entered into a common interest agreement, sent emails documenting their understanding, and later memorialized the oral agreement by executing a written joint-defense agreement. Ex. 2, ¶¶ 6–8, 10; Ex. 10, ¶¶ 8–10. At all times, the Common Interest Group operated within the boundaries of the common interest privilege—namely, with the understanding that information gathered and documents shared would remain privileged and confidential among the Common Interest Group. *See, e.g*., Ex. 2, ¶¶ 16, 18, 20; Ex. 10, ¶¶ 9, 12.

As part of the joint-defense efforts, Uber and Otto retained Stroz to conduct a detailed investigation. The purpose of the Stroz retention was to help the Common Interest Group prepare for potential litigation by collecting relevant facts and information. Ex. 2, ¶¶ 9-10; Ex. 5, ¶ 3; Ex. 6, ¶ 11; Ex. 7, ¶¶ 2-3, 5-6, 9; Ex. 9, ¶ 3; Ex. 10. ¶¶ 3-6. Stroz summarized its findings in a report issued in August 2016 (the "Stroz report"). Ex. 2, ¶ 18. The report was *not* shared with separate corporate counsel working on the business aspects of the transaction. Ex. 2, ¶¶ 3, 9-10, 20; Ex. 5, ¶ 3; Ex. 7, ¶¶ 2-5; Ex. 10, ¶¶ 4-6; Ex. 11, ¶¶ 2-3.

5

### B.      Procedural History

The underlying litigation commenced in February 2017.  Dkt. 1.  At a

hearing on March 29, 2017, it was revealed that the Common Interest Group had

hired a third party to perform an investigation.  Dkt. 131 at 12-13.  Mr.

Levandowski moved to prevent, based on his Fifth Amendment privilege, the

revelation of the identity of this third party.  The district court denied the motion,

and Mr. Levandoswki appealed the matter to this Court.  The Court construed Mr.

Levandowski's appeal as a petition for mandamus, and denied the petition.  *See*

*Waymo LLC v. Uber Technologies, Inc.*, No. 17-1904, Docket No. 9.

After the conclusion of the prior proceedings in this Court, the identity of

Stroz was revealed to Waymo, and on May 1, 2017, Waymo filed a motion to

compel production of the Stroz report from the party defendants.  Ex. 1.  Mr.

Levandowski and other litigants filed opposition briefs and supporting

declarations.  Ex. 8; *see also* Ex. 2; Ex. 5-7; Ex. 9-10; Ex. 11; Dkt. 369.  Magistrate

Judge Corley issued an order granting Waymo's motion to compel.  Ex. 14.[3]  After

Mr. Levandowski and other litigants filed motions for relief from the magistrate's

order, Ex. 15; Dkt. 572 & 575, the district court denied relief and ordered

production of the Stroz report unless this Court intervenes by June 30, 2017 at

12:00 noon.  Ex. 18 at 13-14.

---

[3] The magistrate's order was initially filed under seal, and thus has two separate
docket entries, Dkt. 549 and 566, but the documents in question are identical.

Separately, on May 10, 2017, Waymo served on Stroz itself a subpoena seeking a variety of records relating to the investigation it conducted for the Common Interest Group. Dkt. 570-1. Stroz objected to the subpoena. Pursuant to an agreement between the parties, Waymo filed on June 8, 2017 a motion to compel production of the records demanded in the subpoena, Dkt. 570, and Mr. Levandowski filed on June 9, 2017 a motion to quash the subpoena insofar as it would require production of materials covered by his own privileges. Dkt. 583. In an order issued on June 21, 2017, Magistrate Judge Corley granted Waymo's motion to compel and denied Mr. Levandowski's motion to quash. Dkt. 670. Mr. Levandowski sought review of that order, Dkt. 726, and this matter remains pending before the district court.

On June 23, 2017, Mr. Levandowski filed a notice of appeal seeking review of the district court's order concerning the Stroz report. Ex. 19.

In resolving a related discovery dispute, Magistrate Judge Corley recently shed further light on the reasoning underlying her order concerning the common interest privilege. On June 26, 2017, the magistrate expressly found that the Common Interest Group *did* have a valid joint-defense agreement beginning on April 11, 2016—the date on which the various parties signed a "put call" agreement obligating Uber to indemnify Mr. Levandowski and others against any misappropriation lawsuit by Google or Waymo—and that the common interest

privilege therefore applied to any subsequent communications between the parties. Ex. 20 at 3-4.

## JURISDICTION

Jurisdiction lies in this Court pursuant to 28 U.S.C. § 1295(a)(1) because Waymo's complaint includes claims of patent infringement. *See* Dkt. 23; *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1346 (Fed. Cir. 1999).

The Court has appellate jurisdiction under 28 U.S.C. § 1291 because the district court's determination of the motion below constituted a "final order" subject to review. Although the order resolved a discovery matter, it is nonetheless among the "small class" of interlocutory orders that are considered final for purposes of appellate jurisdiction. *See Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100, 106 (2009). In *Mohawk*, the Court determined that a court of appeals should not hear an interlocutory appeal *by a party* to a civil matter who is ordered to produce records over an objection that the records are privileged. *Id.* at 107-14. "*Mohawk* forecloses interlocutory appeal of some district court orders in reliance on the fact that 'postjudgment appeals generally suffice to protect the rights of litigants and assure the vitality of the attorney-client privilege.'" *United States v. Krane*, 625 F.3d 568, 572 (9th Cir. 2010) (quoting *Mohawk*, 558 U.S. at 109). But the same rationale does not apply to interlocutory orders that *cannot* be cured with a post-judgment appeal; when an order requiring production of information would

8

deprive the privilege holder "of the opportunity to challenge the subpoena" because she is not a party to the underlying litigation, the so-called *Perlman* doctrine permits an immediate appeal. *Id*. at 573; *see also Church of Scientology v. United States*, 506 U.S. 9, 18 n.11 (1992); *Perlman v. United States*, 247 U.S. 7 (1918); *Montgomery Ward & Co. v. Zenith Radio Corp.*, 69 C.C.P.A. 96, 103, 673 F.2d 1254 (C.C.P.A. 1982).

Here, the targets of the discovery demand in question are parties to the underlying litigation. But, because *Mr. Levandowski* is not a party, the order erroneously requiring the production of privileged records cannot be remedied by a post-trial appeal. As the Eleventh Circuit recently explained in a carefully-reasoned opinion, the "logic" of the *Perlman* doctrine is to create an exception to the general bar against interlocutory appeals when a privilege holder such as an intervenor would be unable to remedy the disclosure of privileged information by appealing from a final judgment. *Doe v. United States*, 749 F.3d 999, 1004-07 (11th Cir. 2014); *see also Ross v. City of Memphis*, 423 F.3d 596, 599-600 (6th Cir. 2005); *c.f. also Velsicol Chemical Corp. v. Parsons*, 561 F.2d 671, 674 (7th Cir. 1977) ("Basically the rationale behind the *Perlman* exception is that the second party (appealing party), who has not received the order or subpoena, should not be expected to rely on the recipient to risk contempt in order to exercise the intervenor-second party's rights."). Here, as in *Doe*, Mr. Levandowski is an

intervenor and "[a]bsent an interlocutory appeal . . . would be left with no recourse to appeal the disclosure order" under consideration. *Id.* at 1006.[4]

For the above reasons, this Court has jurisdiction to hear this interlocutory appeal, and we ask the Court to exercise that jurisdiction. However, should the Court find that it does not have appellate jurisdiction, Mr. Levandowski requests that the Court construe this matter as seeking a writ of mandamus. *See* 28 U.S.C. § 1651(a); *Cheney v. United States District Court*, 542 U.S. 367, 380-81 (2004); *In re MSTG, Inc.*, 675 F.3d 1337, 1341 (Fed. Cir. 2012); *In re Regents of the Univ. of Cal.*, 101 F.3d 1386, 1387 (Fed. Cir. 1996).

## <u>ARGUMENT</u>

A stay of the district court's order is necessary to permit Mr. Levandowski to obtain the relief to which he is entitled in this appeal. Without a stay, on June 30, 2017, the party defendants will be required to produce the Stroz report to Waymo. If the information is disclosed, the issues raised by Mr. Levandowski's appeal will be rendered moot.

### I.    LEGAL STANDARD

Because this appeal does not raise issues that are unique to patent law, this

---

[4] In the previous litigation before this Court, Waymo erroneously suggested that the *Perlman* doctrine applies only in criminal cases. *Waymo LLC v. Uber Tech., Inc. et al.*, No. 17-1904, Docket No. 4 at 10. But the doctrine applies in civil cases, as well. *See In re Optical Disk Drive Antitr. Litig.*, 801 F.3d 1072, 1076 (9th Cir. 2015); *Ross v. City of Memphis*, 423 F.3d 596, 599-600 (6th Cir. 2005); *Montgomery Ward*, 69 C.C.P.A. at 103.

Court applies the law of the regional circuit—in this case, the Ninth Circuit. *See Wi-LAN, Inc. v. LG Elecs., Inc.*, 684 F.3d 1364, 1368 (Fed Cir. 2012).

The Court balances four factors in determining whether to grant a stay of a district court order: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). The first two factors are the most important. *Nken v. Holder*, 556 U.S. 418, 434 (2009).

## II.    DISCUSSION

The four-factor *Hilton* test requires issuance of a stay in this matter.

### A.    Mr. Levandowski's Appeal is Likely to Succeed

The heart of the matter is the district court's erroneous resolution of Mr. Levandowski's privilege claims. As the district court—adopting the reasoning of the magistrate—both misapplied the law and misconstrued the facts, this appeal is likely to succeed on the merits.

#### 1. Standard of Review on Appeal

This Court must overturn the denial of Mr. Levandowski's motion to reconsider the magistrate judge's pretrial discovery order if the denial was clearly erroneous or contrary to law. *In re Optical Disk Drive Antitrust Litigation*, 801

F.3d 1072, 1076 (9th Cir. 2015).

### 2. Mr. Levandowski's Privilege Claims

Mr. Levandowski asserts that he was a member of a common interest agreement, along with the other members of the Common Interest Group, and that his confidential communications with Stroz were privileged under that agreement. *See, e.g.,* Ex. 8 at 3-9; Ex. 15, *passim*; *see also* Dkt. 583 at 4-6.

### 3. The District Court Misconstrued the Law Governing the Common Interest Privilege

The orders below each rested fundamentally on a misapprehension of the law relating to the common interest privilege. The thrust of each order is that the common interest privilege protects a communication only if it is already *otherwise* protected by a separately-applicable attorney-client privilege. *See* Ex. 14 at 11-13; Ex. 18 at 6-7; *see also* Dkt. 670 at 2-3 & n.1. This cramped construction of the common interest privilege was mistaken under controlling Ninth Circuit law.

A joint-defense or common interest agreement "establishes an implied attorney-client relationship" between each of the attorneys and parties involved. *United States v. Henke*, 222 F.3d 633, 637 (9th Cir. 2000). Once the joint defense relationship is established, "[t]he joint defense privilege . . . protects not only the confidentiality of communications passing from a party to his or her attorney but also 'from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their

12

respective counsel.'"  *United States v. Austin*, 416 F.3d 1016, 1021 (9th Cir. 2005) (quoting *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989)); *see also United States v. Gonzalez*, 669 F.3d 974, 978 (9th Cir. 2012) (citing *Austin* and the principle set out above); *Nidec Corp. v. Victor Co.*, 249 F.R.D. 575, 578 (N.D. Cal. 2007) ("Participants in a joint or common defense or individuals with a community of interests 'may communicate among themselves and with the separate attorneys on matters of common legal interest, for the purpose of preparing a joint strategy, and the attorney-client privilege will protect those communications to the same extent as it would communications between each client and his own attorney.'"). "[T]he rationale for the joint defense rule" is that "persons who share a common interest in litigation *should be able to communicate with their respective attorneys and with each other* to more effectively prosecute or defend their claims." *Gonzalez*, 669 F.3d at 978 (emphasis added).  Thus, for example, for the common interest privilege to apply, it is not "necessary for the attorney representing the communicating party to be present when the communication is made to the other party's attorney." *Schwimmer*, 892 F.2d at 244; *see also United States v. McPartlin*, 595 F.2d 1321, 1336-37 (7th Cir. 1979).

The district court erred when it found that the common interest privilege applies only where an independent attorney-client privilege already exists. *See, e.g.,* Ex. 18 at 7.  As the Ninth Circuit held in a case cited by the district court

itself, *id.*, the privilege applies when parties make a "communication in pursuit of a joint strategy in accordance with some form of agreement—whether written or unwritten." *Pacific Pictures Corp. v. United States District Court*, 679 F.3d 1121, 1129 (9th Cir. 2012). This holding accords with the teachings of *Gonzalez* and *Henke*, which hold that common interest agreements create an "extended" form of the attorney-client privilege that permit the joint-defense parties to communicate amongst themselves on the subject of the agreement without causing a waiver. *Gonzalez*, 669 F.3d at 978; *Henke*, 222 F.3d at 637.

Here, as discussed below, the record plainly established that there was a joint-defense agreement between Mr. Levandowski and the other members of the Common Interest Group, and that his confidential communications with Stroz were made in pursuit of a joint strategy. Those facts establish a common interest privilege—as noted, a form of the attorney-client privilege—and the court below erred by requiring Mr. Levandowski to establish that his communications to Stroz were *also* protected by a separate, or independently-applicable, attorney-client privilege.

4. The District Court Erred in Finding that the Common Interest Group Was Not Pursuing a Common Legal Interest

The district court also found that the Common Interest Group lacked a common legal interest at the time of Mr. Levandowski's communications with Stroz, and that during that period the Stroz investigation was not conducted to

14

further any joint effort, but instead to help Uber determine whether to purchase the Otto entities. *See, e.g.,* Ex. 14 at 9, 15-21; Ex. 18 at 8, 10-12; *see also* Dkt. 670 at 3-5. However, the magistrate recently clarified that a common interest privilege *did* validly apply to communications that occurred after April 11, 2016, the date on which the parties signed a "put call" agreement obligating Uber to indemnify Mr. Levandowski and the other members of the Common Interest Group against lawsuits by Google or Waymo. Ex. 20 at 4. Thus, the true dispute is whether a valid common interest agreement extended the privilege to communications predating April 11, 2016. For the following reasons, the district court's conclusion that no privilege applied during that time period was clearly erroneous.

*First*, numerous persons (including the participating attorneys) in the Common Interest Group attested under oath that (a) by the time Stroz was retained, there was already an oral common interest agreement between the members of the Common Interest Group; and (b) the purpose of the Stroz retention was to help the group prepare for potential litigation by collecting relevant facts and information. Ex. 2, ¶¶ 9-10, 12-14; Ex. 10, ¶¶ 3-6, 8-9; Ex. 5, ¶¶ 3, 5-8; Ex. 6, ¶¶ 8-9, 11; Ex. 7, ¶¶ 2-3, 5-9; Ex. 9, ¶¶ 3, 5. The district court, without sufficient basis, declined to credit those uncontradicted, sworn attestations.

*Second*, as its ground for sweeping aside the declarations, the district court proclaimed them "unpersuasive." Ex. 18 at 12-13; *see also* Ex. 14 at 20; Dkt. 670

15

at 5.  This conclusion rested primarily on the magistrate's perception that the declarations failed to specifically address certain aspects of the February 22, 2016 term sheet agreement between Uber and the Otto entities.  Ex. 14 at 20.  But any purported imperfections in the language cannot outweigh the declarations' express attestations that the parties retained Stroz as part of an effort to prepare for potential litigation.  Ex. 2, ¶¶ 9-10, 12-14;  Ex. 10, ¶¶ 3-6, 8-9; Ex. 5, ¶¶ 3, 5-8; Ex. 6, ¶¶ 8-9, 11; Ex. 7, ¶¶ 2-3, 5-9; Ex. 9, ¶¶ 3, 5.

*Third*, the term sheet agreement actually constitutes strong evidence in favor of the privilege.  The agreement created a potential obligation for Uber to indemnify Mr. Levandowski and others against trade-secret misappropriation claims arising from the transaction under consideration; the indemnity obligation would arise if the parties later executed the contemplated "put call" agreement. Ex. 14 at 2-3.  This potential indemnity obligation (a) demonstrates that by February 22, 2016, the parties were already concerned about potential litigation, and (b) gave Uber and the other parties a joint legal interest—for it was then at least reasonably foreseeable that Uber would have to defend Mr. Levandowski and others against a misappropriation lawsuit.

In a recent order, Magistrate Judge Corley agreed that once Uber signed the "put call" agreement on April 11, 2016, thereby accepting the indemnity obligation and agreeing to purchase Ottomotto, the parties had a joint legal interest and the

16

common interest privilege could apply. Ex. 20 at 4; *see also* Dkt. 734 (6/23/2017 Tr.) at 27-43. But, according to the magistrate, before they signed the put call agreement, the parties were adverse and could not have a valid common interest agreement. Ex. 20 at 4; *see also* Dkt. 734, 6/23/2017 Tr., at 27-43. The principles that undergird these findings are faulty. As an initial matter, "parties to an asserted JDA need not have identical interests and may even have some adverse motives." *Gonzalez*, 669 F.3d at 980. Moreover, if an *actual* indemnity obligation can create a common legal interest, there is no reason why a *potential* indemnity obligation— which the parties foresaw at least as of the signing of the term sheet in February 2016—would not create the same joint legal interest. *See, e.g., In re Regents of the University of California*, 101 F.3d at 1390 (holding that an *option* to purchase a patent gave the purchaser and inventor a common legal interest in protecting the patent); *Rembrandt Patent Innovations, LLC v. Apple Inc.*, No. C 14-05094 WHA, 2016 U.S. Dist. LEXIS 13749 at *23-24 (N.D. Cal. Feb. 4, 2016) (same).

*Fourth*, the district court misconstrued the importance of letters sent in March 2016 by Mr. Levandowski's counsel to Stroz. Ex. 18 at 13; Dkt. 670 at 4. The letters noted that Mr. Levandowski and Ottomotto shared a "common legal interest in the subject matter of the Stroz Examination." Ex. 14 at 4, 17. As the magistrate observed, Stroz was hired by both Uber *and* Ottomotto. *Id.* at 4. The March 2016 letters are thus "contemporaneous evidence," *see* Ex. 18 at 12, that

17

Mr. Levandowski and his counsel believed at the time that they had a common legal interest with Uber, Stroz' client. And further, Ottomotto plainly had a joint interest with Uber in the Stroz engagement from the beginning, since Ottomotto joined Uber in undertaking the engagement. And the letters demonstrate that Mr. Levandowski believed he had a legal interest in the engagement that was consonant with that of his company, Ottomotto. Moreover, if Uber and Mr. Levandowski were, as the magistrate contended, merely adversarial parties on different "side[s] of [a] proposed transaction," Dkt. 670 at 4, then the phrase in the letter would make no sense: Mr. Levandowski would have no "common legal interest" at all in the Stroz investigation.

*Fifth*, contrary to the district court's conclusion, the letter in which Uber and Ottomotto engaged Stroz *does* "support Levandowski's assertion of a March 2016 joint defense agreement." Dkt. 670 at 4; *see also* Ex. 18 at 12-13. The engagement letter expressly recited that the engagement was designed to help the parties "understand certain factual matters potentially related to potential litigation." Ex. 4 at 2. The magistrate found that the engagement was executed in April 2016—not, as reflected in the letter, March 4, 2016—and concluded that the letter was therefore "not probative of an earlier common interest" agreement. Ex. 14 at 18-19; Dkt. 670 at 4. But this would imply that in April 2016, the Common Interest Group (1) for the first time anticipated jointly defending litigation; (2)

drafted a letter reciting a false joint legal interest; and (3) backdated the letter in a cynical attempt to retroactively apply a privilege where none had previously existed.  No evidence supports a finding that the joint-defense parties acted in such a dishonest and devious manner, and the finding was contradicted by the numerous sworn declarations before the court.

*Sixth*, the district court faulted Mr. Levandowski for failing to point to "contemporaneous" or "objective" evidence of the existence of the common interest agreement in March 2016.  Ex. 18 at 12; Dkt. 670 at 4.  As discussed above, this conclusion is factually incorrect—Mr. Levandowski *did* cite contemporaneous evidence, including the term sheet agreement, Mr. Levandowski's counsel's March 2016 letters, and the Stroz engagement letter. More broadly, the district court's approach runs counter to the Ninth Circuit's holding that a common interest agreement may be established orally or even "implied from conduct and situation."  *Gonzalez*, 669 F.3d at 979.  By definition, of course, an oral agreement will not be evidenced by contemporaneous formal writings.  The only way to properly implement *Gonzalez* is to permit parties to prove a common interest agreement through subsequent declarations—which is precisely the evidence that was before the district court.  Indeed, as discussed, in this case the record contains more evidence than would be present in the usual oral joint-defense case.

*Seventh*, the attorneys who engaged Stroz were *litigation* counsel, *not* the separate corporate transactional counsel who had been engaged to handle the Uber-Otto deal, and the Stroz materials were not shared with transactional counsel. *See, e.g.*, Ex. 2, ¶¶ 3, 9-10, 20; Ex. 10, ¶¶ 4-6; Ex. 5, ¶ 3; Ex. 7, ¶¶ 2-5; Ex. 11, ¶¶ 2-3. This is strong evidence that Stroz was engaged from the beginning to gather information relevant to potential litigation, not to guide the decision on whether to enter into the business deal.

*Eighth*, even if the parties had both business and legal purposes at the same time, the privilege would still apply. *In re Regents of Univ. of California*, 101 F.3d 1386, 1390 (Fed. Cir. 1996) (an overlap of a commercial and legal interests does not negate the effect of the legal interest for purposes of the common interest doctrine); *Morvil Tech.*, *LLC v. Ablation Frontiers, Inc*., No. 10-CV-2088-BEN (BGS), 2012 U.S. Dist. LEXIS 30815, at *8 (S.D. Cal. Mar. 8, 2012) (same); *Rayman v. Am. Charter Fed. Sav. & Loan Ass'n*, 148 F.R.D. 647, 654-55 (D. Neb. 1993). Thus, even if, as found by the court below, Uber engaged Stroz in part in an effort to help it decide whether to purchase Ottomotto, that fact alone is not dispositive. Because—for the reasons discussed above—from the beginning the Common Interest Group plainly had as one important goal preparing for potential litigation with Google, the common interest privilege validly applies and the Stroz report should not be produced.

20

### B.   Mr. Levandowski Will Be Irreparably Harmed Without a Stay

"[O]nce privileged materials are ordered disclosed, the practical effect of the order is often 'irreparable by any subsequent appeal.'" *UMG Recording, Inc. v. Bertelsmann AG (In re Napster Copyright Litig.)*, 479 F.3d 1078, 1088 (9th Cir. 2007) (quoting *United States v. Griffin*, 440 F.3d 1138, 1142 (9th Cir. 2006)), *abrogated in part on other grounds by Mohawk*, 558 U.S. 100.  That would certainly be true here; if this Court does not order a stay, then the privileged Stroz report will be disclosed to Waymo on June 30, 2017 at noon, and the cat will be out of the proverbial bag.

### C.   A Temporary Stay Will Not Significantly Injure Other Involved Parties

A delay in resolving the questions at issue in this appeal will not substantially injure the other parties in the underlying litigation.  The district court intends to begin the trial in this matter on October 10, 2017.  *See* Dkt. 563 at 4.  If this Court sets an expeditious briefing schedule, any decision could be rendered long before that trial date.

### D.   A Temporary Stay Will Not Harm the Public

Finally, we can discern no reason why a temporary stay of the district court's order would harm the public.

## CONCLUSION

For all of the above reasons, the Court should stay the district court's order pending the litigation of this appeal.

Dated:  June 27, 2017

Respectfully submitted,

*/s/ Amy Craig*
Miles Ehrlich
Ismail Ramsey
Amy Craig
Ramsey & Ehrlich LLP
803 Hearst Avenue
Berkeley, CA 94710
Tel: (510) 548-3600

**Counsel for Intervenor-Appellant**
**Anthony Levandowski**

22

## STATEMENT OF CONSENT OR OPPOSITION

Pursuant to Federal Circuit Rule 27(a)(5), I hereby certify that counsel for Mr. Levandowski conferred with counsel for Uber and Ottomotto concerning the relief requested in this motion. Uber and Ottomotto will not object and will not file a response to the position of Mr. Levandowski with respect to the requested relief. Counsel for Mr. Levandowski also conferred with counsel for Otto Trucking.  Otto Trucking will not object and will not file a response to the position of Mr. Levandowski with respect to the requested relief.  In addition, counsel for Mr. Levandowski conferred with counsel for Waymo.  Waymo opposes the relief requested in this motion, and intends to file a brief in opposition.

Dated:   June 27, 2017                                 */s/ Miles Ehrlich*

                                                          Miles Ehrlich
                                                          Attorney for Intervenor-Appellant
                                                          Anthony Levandowski

## STATEMENT OF COMPLIANCE WITH FED. R. APP. PRO. 27

This brief is 5,112 words in length, and therefore complies with Federal Rule of Appellate Procedure 27(d)(2)(A).


Dated:   June 27, 2017                         */s/ Amy Craig*

                                               Amy Craig
                                               Attorney for Intervenor-Appellant
                                               Anthony Levandowski

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing Brief for Intervenor-Appellant Anthony Levandowski with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system and served a copy on counsel of record, this 27th day of June, 2017, by the CM/ECF system and by electronic mail to the parties on service list below.

| Recipient | Email Address: |
|---|---|
| Charles K. Verhoeven<br>David A. Perlson<br>Melissa Baily<br>John Neukom<br>Jordan Jaffe<br>QUINN EMANUEL<br>URQUHART & SULLIVAN,<br>LLP<br>50 California Street, 22nd Floor<br>San Francisco, CA 94111<br><br>*Attorneys for Plaintiff*<br>*Waymo LLC* | qewaymo@quinnemanuel.com |

| | |
|---|---|
| Arturo J. Gonzalez<br>Daniel Pierre Muino<br>Eric Akira Tate<br>Esther Kim Chang<br>Matthew Ian Kreeger<br>Michael A. Jacobs<br>MORRISON & FOERSTER<br>LLP<br>425 Market Street<br>San Francisco, CA 94105<br><br>Michelle Ching Youn Yang<br>MORRISON FOERSTER LLP<br>2000 Pennsylvania Avenue, NW<br>Washington, DC 20006<br><br>Rudolph Kim<br>MORRISON & FOERSTER<br>LLP<br>755 Page Mill Road<br>Palo Alto, CA 94304<br><br>Wendy Joy Ray<br>MORRISON & FOERSTER<br>LLP<br>707 Wilshire Boulevard<br>Suite 6000<br>Los Angeles, CA 90017<br><br>*Attorneys for Defendants*<br>*Uber Technologies. Inc. and*<br>*Ottomotto LLC* | UberWaymoMoFoAttorneys@mofo.com |

| | |
|---|---|
| Michael Darron Jay<br>BOIES SCHILLER<br>FLEXNER LLP<br>401 Wilshire Boulevard, Suite 850<br>Santa Monica, CA 90401<br><br>Meredith Richardson Dearborn<br>BOIES SCHILLER<br>FLEXNER LLP<br>435 Tasso Street<br>Suite 205<br>Palo Alto, CA 94301<br><br>Hamish Hume<br>Jessica E Phillips<br>Karen Leah Dunn<br>Kyle N. Smith<br>Martha Lea Goodman<br>BOIES SCHILLER FLEXNER LLP<br>1401 New York Ave., NW<br>Washington, DC 20005<br><br>*Attorneys for Defendant*<br>*Uber Technologies, Inc.* | BSF_EXTERNAL_UberWaymoLit@bsfllp.com |
| I. Neel Chatterjee<br>GOODWIN PROCTER LLP<br>135 Commonwealth Drive<br>Menlo Park, CA 94025<br><br>*Attorneys for Defendant*<br>*Otto Trucking LLC* | nchatterjee@goodwinlaw.com |
| Brett M. Schuman<br>Shane Brun<br>Rachel M. Walsh<br>GOODWIN PROCTER LLP<br>Three Embarcadero Center<br>San Francisco, CA 94111<br><br>*Attorneys for Defendant*<br>*Otto Trucking LLC* | bschuman@goodwinlaw.com<br>sbrun@goodwinlaw.com<br>rwalsh@goodwinlaw.com |

| | |
|---|---|
| John L. Cooper<br>Matthew Cate<br>FARELLA BRAUN +<br>MARTEL LLP<br>235 Montgomery Street,<br>17th Floor<br>San Francisco, CA 94104<br><br>*Special Master* | jcooper@fbm.com<br>MCate@fbm.com |
| Robert Burkart Ellis<br>KIRKLAND AND ELLIS LLP<br>300 North LaSalle<br>Chicago, IL 60654<br><br>Kevin K Chang<br>KIRKLAND AND ELLIS LLP<br>555 California Street, Suite 2700<br>San Francisco, CA 94104<br><br>*Attorneys for Respondent*<br>*Stroz Friedberg, LLC* | robert.ellis@kirkland.com<br>kevin.chang@kirkland.com |
| Jonathan Alan Patchen<br>TAYLOR & PATCHEN, LLP<br>One Ferry Building, Suite 355<br>San Francisco, CA 94111<br><br>*Attorneys for Intervenor*<br>*Lior Ron* | jpatchen@taylorpatchen.com |
| Carolyn Hoecker Luedtke<br>MUNGER, TOLLES & OLSON<br>LLP<br>560 Mission Street, 27th Floor<br>San Francisco, CA 94105<br><br>*Attorneys for Lyft, Inc.* | carolyn.luedtke@mto.com |

Dated:  June 27, 2017

/s/ Amy Craig
AMY CRAIG
RAMSEY & EHRLICH LLP
*Counsel for Intervenor-Appellant*
*Anthony Levandowski*

# EXHIBIT 1

1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
     Charles K. Verhoeven (Bar No. 170151)
2    charlesverhoeven@quinnemanuel.com
     David A. Perlson (Bar No. 209502)
3    davidperlson@quinnemanuel.com
     Melissa J. Baily (Bar No. 237649)
4    melissabaily@quinnemanuel.com
     John Neukom (Bar No. 275887)
5    johnneukom@quinnemanuel.com
     Jordan Jaffe (Bar No. 254886)
6    jordanjaffe@quinnemanuel.com
   50 California Street, 22nd Floor
7  San Francisco, California 94111-4788
   Telephone:     (415) 875-6600
8  Facsimile:     (415) 875-6700

9  Attorneys for Waymo LLC

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12               SAN FRANCISCO DIVISION

13 WAYMO LLC,                          | CASE NO. 3:17-cv-00939-WHA

14             Plaintiff,              | **PLAINTIFF WAYMO'S MOTION TO
                                        COMPEL PRODUCTION OF
15        vs.                           WITHHELD DOCUMENTS**

16 UBER TECHNOLOGIES, INC.;
   OTTOMOTTO LLC; OTTO TRUCKING
17 LLC,

18             Defendants.

19

20

21

22

23

24

25

26

27

28

TO DEFENDANTS UBER TECHNOLOGIES, INC., OTTOMOTTO LLC, AND OTTO TRUCKING LLC, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that at 8:00 a.m. on June 8, 2017, or as soon as the matter may be heard, in the courtroom of the Honorable William H. Alsup at the United States District Court for the Northern District of California, Courtroom 8, 19th Floor, 450 Golden Gate Avenue, San Francisco, California (94102), Plaintiff Waymo LLC ("Waymo") shall and hereby does move the Court for an Order compelling production of documents withheld under a claim of privilege or work product.

Plaintiff Waymo LLC respectfully submits this Motion in response to the Court's April 25, 2017 Order (Dkt. 271) that "By **MAY 1 AT NOON**, plaintiff shall move, if it wishes to do so at all, to compel production of the due diligence report that was the subject of Levandowski's motion." Defendants respectfully request that the Court compel production of the withheld report and attachments in addition to all other relevant information, files, and electronic media currently in the possession of Stroz Friedberg.

This Motion is based on this notice of motion and supporting memorandum of points and authorities, reply briefing in further support of this motion, as well as other written or oral argument that Waymo may present to the Court.

DATED: May 1, 2017                    QUINN EMANUEL URQUHART & SULLIVAN, LLP

                                      By      */s/ Charles K. Verhoeven*

                                      Charles K. Verhoeven
                                      Attorneys for Plaintiff Waymo LLC

# **TABLE OF CONTENTS**

Page

I.     DEFENDANTS' PRIVILEGE LOG IS FACIALLY DEFICIENT ......................................5

    A.     Defendants Failed To Identify Each Author/Sender And Recipient Of Every
        Communication That Disseminated The Due Diligence Report..............................6

    B.     Defendants Failed To Provide Information Sufficient To Confirm That The
        Asserted Privileges Have Not Been Waived.............................................................6

    C.     Defendants Failed To Provide Information Showing That The Asserted
        Work Product Protection Is Justified .......................................................................7

II.    EITHER THERE IS NO COMMON INTEREST PRIVILEGE OR THE CRIME
       FRAUD EXCEPTION TO THAT PRIVILEGE APPLIES................................................10

    A.     Defendants Have Not Satisfied Their Burden To Demonstrate A Common
        *Legal* Interest In The Context Of A Typical Due Diligence Investigation ..............10

    B.     Defendants' Only Shared Interest Was In Concealing Trade Secret
        Misappropriation, Demonstrating That The Crime-Fraud Exception Applies ........12

III.   THE COURT SHOULD COMPEL PRODUCTION OF THE "ATTACHMENTS"
       TO THE REPORT (ENTRIES 13-16 AND 18-42) AND ANY OF MR.
       LEVANDOWSKI'S DOCUMENTS OR FORENSIC DATA IN THE
       POSSESSION OF STROZ FRIEDBERG ......................................................................14

IV.    THE COURT SHOULD COMPEL PRODUCTION OF ALLEGED WORK
       PRODUCT DUE TO WAYMO'S SUBSTANTIAL AND COMPELLING NEED...........16

V.     THE COURT SHOULD ORDER DISCOVERY CONCERNING DEFENDANTS'
       PRIVILEGE AND WORK PRODUCT ASSERTIONS ....................................................18

CONCLUSION ..........................................................................................................................19

# INTRODUCTION

Defendants have finally served Waymo with an un-redacted version of their 42-entry privilege log related to the "due diligence report" prepared by third-party Stroz Friedberg.  As demonstrated below, Defendants are not justified in withholding that due diligence report or its attachments.  And it is simply unfathomable that Uber has not produced any of the "information," "files," or "electronic media collected from A. Levandowski" by Stroz Friedberg in connection with its due diligence efforts (or, alternatively, provided a log regarding the destruction of such information/files/media) in response to this Court's expedited discovery Order.  Defendants' attempt to use a constellation of inapplicable privileges to conceal the theft of trade secrets under the rubric of "due diligence" must be rejected.  Defendants should be compelled to produce all 42 of the due diligence documents listed on its log in addition to all copies of information/files/media obtained from Mr. Levandowski or Otto that are still located at Stroz Friedberg.

# BACKGROUND

On March 16, 2017, this Court ordered expedited discovery in connection with Waymo's motion for a preliminary injunction. (Dkt. 61.)  Among other things, the Court ordered Defendants to produce by March 31:  "all files and documents downloaded by Anthony Levnadowski, Sameer Kshirsagar, or Radu Raduta before leaving plaintiff's payroll and thereafter taken by them"; "the card reader, thumb drive, or other media used for the downloads"; and all subsequent materials that have "forwarded, used, or referred to any part" of the downloaded material.[1] (*Id.* at 2.)  The Order also required Defendants to state the extent to which any of the downloaded material "has been deleted, destroyed, or modified."  (*Id.*)

On March 28, Defendants requested a non-public conference to address a "confidential matter."  (Dkt. 122 at 2.)  At that conference, Defendants indicated that Uber was in possession of a report, prepared by a "third party," regarding "due diligence" that Uber had conducted on Otto. (Dkt. 131, 3/29/17 Hearing Tr. at 12-13.)  Defendants alleged that the due diligence report was covered by a

---

[1]  Defendants' continued failure to comply with this Order is detailed elsewhere.  (*See* Dkt. 135, 206, 278, 279, 314, 315.)  This submission focuses only on Defendants' privilege logs.

joint defense or common interest privilege and that Uber intended to list the report on a privilege log associated with its March 31 production of documents responsive to the Court's March 16 expedited discovery Order. (*Id.* at 25.)

On April 4, Mr. Levandowski moved for "a modification of the Court's standing privilege log requirement" with respect to any reference to the due diligence report on Uber's privilege log. (Dkt. 147 at 1.) Specifically, Mr. Levandowski – invoking his personal privilege against self-incrimination – requested that Defendants "be relieved of any obligation to provide detail concerning (1) the identity of the third-party who conducted any such due diligence review, (2) whether Mr. Levandowski possessed any documents that were reviewed by the third party, or (3) the identity of any of Mr. Levandowski's possessions that may have been reviewed." (*Id.* at 2.)

On April 6, the Court held a hearing on Mr. Levandowski's motion, at which time Waymo received (for the first time), a redacted version of a 42-entry privilege log related to the due diligence report and its attachments. (Dkt. 169, 4/6/17 Hrg. Tr. at 45.) At the hearing, Defendants clarified that "hundreds of e-mails, possibly thousands" (*id.* at 15) would be implicated by the Court's ruling on Mr. Levandowski's motion regarding the logging of the due diligence report.

On April 10, the Court issued an Order denying Mr. Levandowski's motion. (Dkt. 202.) The Court ordered Defendants to:  (i) serve a privilege log complete as to all items unaffected by Mr. Levandowski's motion by 11 p.m. that same day; and (ii) serve a privilege log complete as to all items affected by Mr. Levandowski's motion by April 13. (*Id.*)  The Court further set a briefing schedule for any motion to compel production of the due diligence report. (*Id.* at 12.)  When Mr. Levandowski appealed this ruling to the Federal Circuit, Defendants' obligation to serve a privilege log complete as to all items affected by Mr. Levandowski's motion was temporarily stayed. (Dkt. 242.)

On April 10, Defendants partially complied with the remainder of the Court's Order – *i.e.*, to produce a privilege log complete as to all items unaffected by Mr. Levandowski's motion.[2]  At 11:00 p.m. that day, Defendants produced a "Privilege Log Associated with March 31, 2017 Production of

---

[2]  Defendants were still providing logs regarding documents unaffected by Mr. Levandowski's motion as of 11:44 p.m. on April 28. (*See infra.*)

Documents," with 2,428 entries related to documents maintained at Morrison & Foerster, LLP.[3]  (Dkt. 272-2.)  This log asserted the attorney-client, work product, and common interest protection over documents dated as early as January 29, 2016 – only two days following Mr. Levandowski's resignation from Waymo, but more than two months before the April 2016 joint defense agreement and more than six months prior to the official acquisition of Otto by Uber.  (*Id.* at No. 2060.)

The log produced on April 10 suffered from significant deficiencies.  For example, some entries identified four entire law firms as the author or sender of a logged document.  (*E.g.*, *id.* at pp. 104-122.)  Other entries referred to communications made by one person "and/or" another.  (*Id.* at *passim*.)  There was no meaningful description of the purported "common interest privilege" being asserted.  (*Id.*)  There was no meaningful showing that the asserted privileges had not been waived. (*Id.*)  And all entries contained boilerplate language for the description of the "subject matter" of the logged document, rending such description essentially meaningless – for example, documents dated after Uber's acquisition of Otto were still described as relating to a "potential" acquisition.  (*E.g.*, *id.* at Nos. 2061, 2062, 2066.)

On April 13, Defendants produced (i) Defendants' Supplemental Privilege Log Associated with March 31, 2017 Production of Documents, with 313 entries related to documents maintained at O'Melveny & Myers (counsel for Otto) (Dkt. 272-4) and (ii) Defendants' Second Supplemental Privilege Log Associated with March 31, 2017 Production of Documents with 589 entries related to documents maintained at Uber (Dkt. 272-6).  These logs suffered from many of the same deficiencies as the Morrison & Foerster log that had been produced previously.

Waymo sought to meet and confer with Defendants about the deficiencies obvious from the face of the logs.  (Ex. 4.)[4]  In light of the assertions of a common interest privilege over documents

---

[3]    Logs of documents maintained at Uber and at O'Melveny & Myers (counsel for Otto) would not be served for another two days.  (*See infra.*)  No logs of documents maintained at Cooley (corporate counsel for Uber), Donahue Fitzgerald LLP (counsel for Anthony Levandowski), Levine & Baker (counsel for Lior Ron), or Stroz Friedberg (the third party who prepared the due diligence report) have been produced to date.

[4]    All Exhibits are attached to the May 1, 2017 Declaration of Kevin Smith.

dated as early as January 29, 2016, Waymo also asked that Defendants identify any oral common interest agreement that may have preceded the April 2016 written common interest agreement. (*Id.*) And, in light of Defendants' assertions of the work product privilege over documents dated as early as January 29, 2016, Waymo asked Defendants to provide information regarding when they first issued litigation hold notices for the purpose of preserving evidence relevant to purportedly anticipated litigation. (*Id.*) More generally, Waymo expressed its view that the common interest privilege was not well founded and/or was being used for an improper purpose. (*Id.*)

Defendants were slow to respond, and their responses were far from straightforward. For example, Defendants asserted that there was an oral common interest agreement prior to April 2016, but they would not identify when it was made, who made it, or who it was intended to cover. (*Id.*) Similarly, Defendants "declined to answer questions about a litigation hold," refusing to "confirm or deny the date any litigation hold issued." (*Id.*) And, during the deposition of Mr. Levandowski, Defendants improperly objected to questions seeking to test the scope and nature of the asserted common interest privilege on the grounds of the same purported privilege. (*E.g.*, Dkt. 273, at 32-44.) Only after Waymo submitted a letter brief to Special Master John Cooper regarding issues related to the privilege logs did Defendants start to provide some additional information: Defendants conceded, for example, that they did not issue litigation hold notices to preserve evidence related to anticipated litigation until October 2016, even though they have now asserted the work product protection over documents purportedly created in anticipation of litigation as early as January 29, 2016. (Ex. 5; Dkt. 272-2 at 648.) Nonetheless, Defendants have still not provided other information relevant to its privilege claims, including any details regarding a purported oral joint defense agreement predating April 2016.

On April 25, the Federal Circuit denied Mr. Levandowski's appeal of this Court's Order requiring that the due diligence report be properly logged to the extent Defendants are claiming any privilege over it. (Dkt. 271.) On the same day, this Court issued an Order requiring Defendants to "serve a privilege log complete as to all items, including those affected by Levandowski's Fifth Amendment motion" by April 27 at noon. (*Id.*)

That deadline came and went without Defendants producing an un-redacted version of the 42-entry log describing the due diligence report and its attachments.[5] Waymo asked for the log after the deadline had passed on April 27 and again on the morning of April 28. (Ex. 2.) Defendants finally served the log at 10:59 a.m. on April 28. (*Id.*) The only changes Defendants made to the log since Mr. Levandowski's counsel provided a redacted version to Waymo on April 6 were (i) removing the redactions and (ii) adding a page purporting to be "a table that lists the individuals at each firm, Uber, and Otto who received the report before the complaint in this action was filed."[6] (Ex. 1; Ex. 2.) Notably, the log does not address any of the questions previously posed by the Court, including "why the report was prepared" (other than for "due diligence") and "for what purpose each recipient used it." (Dkt. 202 at 5.)

At 11:44 p.m. on April 28, Defendants produced yet another log – Defendants' Third Supplemental Privilege Log Associated With March 31, 2017 Production of Documents – with 74 additional entries related to documents maintained at Morrison & Foerster.[7] Then, at 8:44 a.m. on May 1, approximately three hours before Waymo's deadline to file this Motion, Defendants served an updated log describing the due diligence report and attachments, adding five additional recipients of the report – three Uber in-house counsel, Mr. Levandowski, and Mr. Ron – to their original list of thirty-two recipients. (Ex. 7.)

## ARGUMENT

## I.     DEFENDANTS' PRIVILEGE LOG IS FACIALLY DEFICIENT

The Court's "Supplemental Order to Order Setting Initial Case Management Conference In Civil Cases Before Judge William Alsup" states that "[p]rivilege logs shall be promptly provided and must be sufficiently detailed and informative to justify the privilege." The Order makes clear that the

---

[5]  Defendants did produce un-redacted versions of its other three logs on April 27. (Ex. 2.)

[6]  Defendants state that "[t]he names of individuals from Stroz Friedberg" – the third-party vendor who prepared the report – "are those we believe contributed to or received the report." (Ex. 2.)

[7]  Waymo is reviewing the more than 1,000 pages of privilege logs that have been produced to date and respectfully reserves its rights to move to compel the production of logged documents beyond the due diligence report and attachments addressed here.

"[f]ailure to furnish [the requisite] information at the time of the assertion will be deemed a waiver of the privilege or protection." The Court re-emphasized these requirements in its April 10, 2017 Order, directing that any privilege logs "must be sufficiently detailed and informative to justify the claimed privilege(s)." (Dkt. 202 at 3.) Defendants' log listing the due diligence report and attachments still does not include some of the most basic information required to justify the asserted privileges.

### A. Defendants Failed To Identify Each Author/Sender And Recipient Of Every Communication That Disseminated The Due Diligence Report

Just a few hours before Waymo's deadline to file this Motion, Defendants added five individuals to its list of "recipients" of the due diligence report: three Uber in-house counsel, Mr. Levandowski, and Lior Ron. (Ex. 7.) But the log does not list a single communication by which any Uber in-house counsel, Mr. Levandowski, or Mr. Ron received the report. (Ex. 1.) Waymo has repeatedly requested that Defendants identify the **_persons_** who authored, sent, and received purportedly privileged documents, rather than listing entire firms as authors, senders, or receivers or providing aggregated lists of those who purportedly saw a document. (Ex. 4.) Without providing the specifics of each communication, Defendants simply cannot establish that the asserted privileges apply, and Waymo is left with an ambiguous record that is a moving target.

### B. Defendants Failed To Provide Information Sufficient To Confirm That The Asserted Privileges Have Not Been Waived

Defendants bear the burden of showing that they have not waived privilege. _Weil v. Investment/Indicators, Research and Mgmt., Inc._, 647 F.2d 18, 25 (9th Cir. 1981). "[V]oluntarily disclosing privileged documents to third parties will generally destroy the privilege." _In re Pacific Pictures Corp._, 679 F.3d 1121, 1126-27 (9th Cir. 2012). And disclosure of work product to a person not bound to maintain its confidence waives protection. _Skynet Elecs. Co. Ltd. v. Flextronics Int'l, Ltd._, No. 12-6317-WHA, 2013 WL 6623874, at *3 (N.D. Cal. Dec. 16, 2013). Defendants' privilege log fails to include information needed to show that the claimed privileges and protections have not been waived.

According to Defendants, the due diligence report was received by at least thirty-seven people. (Ex. 1 at 17.) Despite its wide dissemination, Defendants' log contains nothing but a blanket, boilerplate assertion that, to Uber's "knowledge no unauthorized persons have received the

Investigation Report," with a citation to "a common interest agreement dated April 11, 2016." (Ex. 1 at 1.) But that common interest agreement was not even signed by Stroz Friedberg, the third party who prepared the report. (Dkt. 147-1; Ex. 1 at 17.) And, from the face of the log itself, it appears that Stroz Friedberg began preparing memoranda as part of its due diligence "investigation" before the cited common interest agreement even existed. (*E.g.*, Ex. 1 at No. 2.) As noted above, Defendants have refused to provide any information about an alleged oral common interest agreement entered into by unidentified parties at an unidentified time before April 11, 2016. (Ex. 4.) Having failed to even *allege* that a common interest agreement encompasses all of the persons to whom the due diligence report was admittedly disclosed, Defendants have not made out even a prima facie position that any privilege was maintained without waiver.

Furthermore, Defendants' log affirms only that *Uber* has no knowledge of a waiver. The log makes no representation as to the other Defendants. And the log makes no representation concerning what steps non-Defendant authors or recipients of the due diligence report took – or did not take – to prevent further disclosures of the report to third parties. As the Court noted at the April 6, 2017 hearing: "Ordinarily if there's a claim of privilege, we look to see every single person who got the information because there could easily be a waiver. It happens all the time." (Dkt. 169, 4/6/17 Hearing Tr. at 36.) Defendants have not made any representation at all (never mind a sufficient representation) regarding "every single person who got" the due diligence report. For this reason as well, the log describing the due diligence report and attachments is deficient on its face.

C. **Defendants Failed To Provide Information Showing That The Asserted Work Product Protection Is Justified**

Defendants' log is not "sufficiently detailed and informative to justify" the asserted work product protection. (Dkt. 202 at 3.) The party asserting the work product protection bears the burden of proving that the material withheld is properly classified as work product. *Skynet Elecs.*, 2013 WL 6623874, at *2. Defendants have not provided information necessary to determine if they could possibly satisfy that burden.

As an initial matter, Defendants have refused to disclose the date and author of the majority of documents listed in the log, contending that such disclosure of dates and authors "would reveal the

work product over which privilege is being asserted." (Ex. 1 at n.**.)  Such tautological reasoning is nonsensical on its face and only highlights that these documents – which are described as "file[s] collected from A. Levandowski" – are not work product (or privileged) at all and must be produced. (*See infra* Part III.)

Moreover, with respect to all the documents in the log, Defendants have not disclosed the requisites for asserting the work product protection:

> (1)  Defendants have identified no evidence and have not explained their contention that, at the time the withheld documents were created, there was a substantial probability that litigation would commence.[8]  Indeed, any such contention is belied by Defendants' failure to implement litigation holds to preserve relevant documents until months after the due diligence report was created.  (*See infra*.)

> (2)  Defendants have identified no evidence and have not explained why the due diligence report "would not have been created in substantially similar form but for the prospect of litigation."[9]  An acquirer conducting due diligence of a potential target is a typical business practice independent of the prospect of litigation.  (*See infra*.)

Waymo repeatedly sought explanations of Defendants' work product contentions, but Defendants have not been forthcoming. (Ex. 4; Ex. 5.) Indeed, despite a specific request to produce "retention agreements between Stroz Friedberg and Defendants" (Ex. 8, at RFP No. 2), Defendants have not produced any agreement engaging Stroz Friedberg to conduct the due diligence investigation – an agreement likely to shed light on the purpose of that investigation, the circumstances surrounding it, and the purpose of the resulting report's dissemination.  (*See* Dkt. 202 at 5.)  By refusing to provide such information in their log and in response to specific discovery requests, Defendants have essentially abdicated their burden of establishing work product protection for any entry on the privilege log.

---

[8]  The work product rule does not come into play merely because there is a remote possibility of future litigation.  *See Fox v. California Sierra Fin. Servs.,* 120 F.R.D. 520, 524 (N.D. Cal. 1988).

[9]  *In re Grand Jury Subpoena*, 357 F.3d 900, 908 (9th Cir. 2004); *Kintera, Inc. v. Convio, Inc.*, 219 F.R.D. 503 (S.D. Cal. 2003) ("In determining whether documents were prepared in anticipation of litigation, the court should consider whether the documents 'would not have been generated but for the pendency or imminence of litigation.'") (quoting *Griffith v. Davis*, 161 F.R.D. 687, 699 (C.D. Cal. 1995)).

1    What is more, this is not an instance in which Defendants have merely failed to provide the

2 information necessary to support the assertion of the work product protection.  In this case, the

3 evidence shows that Defendants **cannot** meet their burden of establishing the factual predicates for

4 work product protection.  The due diligence investigation occurred between March and August 2016.

5 (Ex. 1.)  So Defendants contend, as they must, that they were anticipating litigation at that time.  (Ex.

6 1; Ex. 6 at 2 ("The investigation was performed in anticipation of litigation . . . .").)  Yet Defendants

7 have now conceded that they did not implement any litigation hold to prevent the destruction of

8 relevant documents until after Waymo filed an arbitration demand in October 2016, months after the

9 due diligence investigation was completed.  (Ex. 4, 6 at 3.)  According to authority that Defendants

10 themselves cite, "[t]he duty to preserve documents attaches 'when a party should have known that the

11 evidence may be relevant to future litigation.'"  (Ex. 6 at 3 (quoting *In re Napster Litig.*, 462 F. Supp.

12 2d 1060, 1068 (N.D. Cal. 2006).)  Defendants, therefore, simultaneously contend that (1) the due

13 diligence report is entitled to work product protection because it was prepared "in anticipation of

14 litigation" but that (2) Defendants had no obligation to preserve documents because they did not know

15 that any documents "may be relevant to future litigation."  These positions are facially inconsistent.

16 Either Defendants' failure to take efforts to preserve evidence at the time of the due diligence

17 investigation fatally undermines their assertion of work product protection or Defendants must

18 investigate and describe the spoliation of documents relevant to this case prior to October 2016.[10]

19

20

21

22

---

23   [10] *See PacifiCorp v. Nw. Pipeline,* 879 F. Supp. 2d 1171, 1189-90 (D. Or. 2012) (holding that

24 plaintiff was judicially estopped from taking the position that documents were entitled to work product protection before the plaintiff had a duty to preserve evidence); *Sinai v. State Univ. of N.Y. at Farmingdale,* No. CV09-407, 2010 WL 3170664, at *5 (E.D.N.Y. Aug. 10, 2010) (holding that if

25 litigation was foreseeable "for work product purposes," it was foreseeable for the defendants' "duty to preserve purposes"); *Sanofi-Aventis Deutschland GmbH v. Glenmark Pharm. Inc., USA,* No. 07-CV-

26 5855, 2010 WL 2652412, at *5 (D. N.J. Jul. 1, 2010) ("Defendants' argument that the duty to impose a litigation hold did not arise until mid–2007 upon the filing of the Paragraph IV certification is also

27 misguided, especially where Defendants' claim privilege with respect to documents from 2006.").

28

## II.     EITHER THERE IS NO COMMON INTEREST PRIVILEGE OR THE CRIME FRAUD EXCEPTION TO THAT PRIVILEGE APPLIES

Defendants have not clearly specified the nature of the purported common interest privilege that they have now asserted over thousands of documents spanning more than a year, from January 2016 (when Mr. Levandowski was downloading Waymo confidential documents) through August 2016 (when Uber officially acquired Otto) and continuing through February 2017 (when Waymo commenced this action). Typically, one would ***not*** expect there to be a common legal interest between an acquirer and a potential target while the former is conducting due diligence of the latter in order to determine whether a deal should proceed and on what terms. (*Infra* Part II.A.) Here, however, it appears that the common interest is being asserted to shield from discovery the misappropriation of Waymo's trade secrets. (*Infra* Part II.B.)

### A.     Defendants Have Not Satisfied Their Burden To Demonstrate A Common *Legal* Interest In The Context Of A Typical Due Diligence Investigation

Defendants' log asserts a "joint defense" privilege for every document. A joint defense privilege "protects ***only*** those communications that are part of an on-going and joint effort to set up a common defense strategy." *Holmes v. Collection Bureau of Am., Ltd.,* C 09–02540 WHA, 2010 WL 143484 at *2 (N.D. Cal. Jan. 8, 2010) (emphasis in original). The proponent of the privilege must show that the parties actually pursued a common legal strategy and that the logged communications were made in furtherance of that strategy.[11]

Defendants contend that they shared a common legal interest when the due diligence report was prepared – *i.e.*, ***before*** Uber's acquisition of Otto. But the recipients of the report – including counsel for Uber (the acquirer), counsel for Otto (the target), Mr. Levandowski (a co-founder of the target), and Mr. Ron (a co-founder of the target) – typically would not have shared any common legal interest prior to the completion of the acquisition. Indeed, as a matter of law, the ***legal*** interests of the

---

[11]   *E.g.*, *Holmes*, 2010 WL 143484, at *2; *In re Rivastigmine Patent Litig.*, No. 05 MD 1661 (HB/JCF), 2005 WL 2319005, at *4-*5 (S.D.N.Y. Sept. 22, 2005); *Corning Inc. v. SRU Biosystems, LLC,* 223 F.R.D. 189, 190 (D. Del. 2004) (privilege waived where disclosures were, not made to further joint defense, but to persuade third party to invest in disclosing party).

parties to a business deal like this are **adverse** such that the same attorneys cannot ethically represent

both sides, absent a conflict waiver.[12]  *See* Cal. R. Prof'l Conduct 3-310(c).

Further, even an acquirer's **economic** interest typically diverges from that of the target's

during due diligence.  An acquirer's economic interest is to emphasize any significant risk from future

litigation that it would face if it purchased the target, so as to obtain better terms and a lower price.

The target's interest, on the other hand, is the exact opposite, namely to downplay any such risk so

that it can obtain more favorable deal terms.

Accordingly, courts commonly hold that parties to a potential merger or acquisition do not

share a common legal interest.  For example, *In re JP Morgan Chase & Co. Securities Litigation*,

MDL No. 1783, 2007 WL 2363311 (N.D. Ill. Aug. 13, 2007), found waiver in the context of merger

negotiations.  In that case "Defendants' privilege log indicates that various documents for which

Defendants claim the attorney-client privilege or the work product doctrine, or both, were shared

between Bank One and JP Morgan and their respective outside counsel before and after these two

organizations signed the 2004 merger agreement."  *Id*. at *2.  The court held that, prior to the

completion of the merger, Bank One and JP Morgan did **not** share a common legal interest, reasoning:

> Fundamentally, the Court does not understand how Bank One and JP Morgan can be
> said to share a common legal interest prior to their signing the merger.  Prior to the
> merger, these organizations stood on opposite sides of a business transaction. From a
> business standpoint and from a legal standpoint, the merger parties' interests stood
> opposed to each other.  They had no common interest, and indeed, their interests were
> in conflict-each company wanted to get the best deal from the other company, and to
> the extent that one succeeded in its goal, the other suffered.  The Court is also
> persuaded that JP Morgan's and Bank One's pre-merger interests are at odds in light of
> the practical implications of Defendants' argument.  If Defendants' argument holds
> true, nothing would prevent a single attorney from representing both the buyer and the
> seller in a real estate transaction, for example.  The reason such a situation does not
> occur-and is most likely ethically prohibited-is that the buyer and seller maintain
> opposite legal positions with respect to the transaction.  With this in mind, the Court
> does not see how Bank One and JP Morgan can share a common legal interest prior to
> the signing of the merger agreement.  At most, the companies had a similar business

---

[12]  The joint defense/common interest doctrine has its origins where one attorney acts for two clients.  The doctrine, therefore, has little application where, as here, a single attorney or firm would be ethically barred from representing the members of the "joint defense" group with respect to the contemplated transaction.

interest, in that each desired the merger negotiations to come to fruition. But even if JP Morgan and Bank One had a similar business interest, a common legal interest is required, and the Court cannot conclude from the existence of a common business interest that the parties' legal interests were identical.

*Id.* at *5[13].

Here, if Defendants are contending that a typical due diligence process took place, in which Uber evaluated Otto at arms-length in order to inform its position with respect to a potential deal, Defendants cannot establish a common legal interest to support their assertion of a common interest privilege.

### B. Defendants' Only Shared Interest Was In Concealing Trade Secret Misappropriation, Demonstrating That The Crime-Fraud Exception Applies

To the extent there **was** any shared common legal interest among those who received copies of the due diligence report, that interest could only have been in jointly concealing the theft of Waymo's trade secrets. Thus, to the extent the Court concludes that Defendants can meet their burden of proving that the due diligence report is privileged or protected, it should nevertheless be produced pursuant to the crime-fraud exception.

"Under the crime-fraud exception, communications are not privileged when the client 'consults an attorney for advice that will serve him in the commission of a fraud' or crime." *In re Grand Jury Investigation*, 810 F.3d 1110, 1113 ( 9th Cir. 2016) (quoting *In re Napster, Inc. Copyright Litig.,* 479 F.3d 1078, 1090 (9th Cir. 2007)); *see also Roe v. White*, No. 03-cv-4035, 2014 WL

---

[13] *See also Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 579 (N.D. Cal. 2007) (holding that the joint defense doctrine did not apply to communications between a company and potential purchasers of that company); *Libbey Glass v. Oneida, Ltd.*, 197 F.R.D. 342, 348 (N.D. Ohio 1999) (rejecting application of the common interest doctrine to communications shared in course of joint business venture because "[t]he parties were formulating not a 'common legal' strategy, but a joint commercial venture"); *Bank Brussels Lambert v. Credit Lyonnais*, 160 F.R.D. 437, 447 (S.D.N.Y. 1995) (denying party's attempt to invoke the common interest doctrine in context of joint commercial transaction because there no evidence of a "coordinated legal strategy" between the parties); *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc*., 152 F.R.D. 132, 141 (N.D. Ill. 1993) ("A fundamental prerequisite to a use of the common interest doctrine is that the interest involve more than just business matters."); *Oak Indus. v. Zenith Indus.,* No. 86 C 4302, 1988 WL 79614, at *4 (N.D. Ill. July 27, 1988) ("declin[ing] to expand the coverage of the attorney-client privilege to information which a party freely shares with other business persons").

842790, at *2 (N.D. Cal. Feb. 28, 2014) (crime-fraud exception also applies to work product). To invoke the crime-fraud exception, the movant must satisfy a two-part test:

> First, the party must show that "the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme." Second, it must demonstrate that the attorney-client communications for which production is sought are "sufficiently related to" and were made "*in furtherance of* [the] intended, or present, continuing illegality."

*Id.* (emphasis added) (quoting *Napster*, 479 F.3d at 1090).

Trade secret theft is a crime, Cal. Penal Code § 499c, and can provide the basis for the application of the crime-fraud exception, *Jasmine Networks, Inc. v. Marvell Semiconductor, Inc.*, 12 Cal. Rptr. 3d 123 (Cal. App. 6th Dist. 2004), *as modified on denial of reh'g*, (Apr. 29, 2004) and *review granted and opinion superseded on other grounds*, 94 P.3d 475 (Cal. 2004). And there is substantial evidence that Defendants and Mr. Levandowski were engaged in or planning a crime. As the Court has summarized, Waymo has submitted evidence that, before the due diligence report was prepared in August 2016:

> [N]on-party Anthony Levandowski downloaded over 14,000 files containing its trade secrets and proprietary information pertaining to self-driving cars to his company-issued laptop, transferred them to a portable storage device, wiped the laptop clean, then promptly left his position at Waymo with the downloads to start his own competing autonomous-vehicle ventures, defendants Ottomotto LLC and Otto Trucking LLC. Shortly thereafter, defendant Uber Technologies, Inc., acquired the new ventures for $680 million. Uber then quickly progressed in its own development of competing self-driving vehicles.

(Dkt. 202 at 1; *see also* Dkt. 24.)

Further, Mr. Levandowski has asserted the Fifth Amendment privilege against self-incrimination to avoid disclosing whether he was even "aware of the existence of a due diligence report." (Dkt. 273 at 17 & 43.) When Mr. Levandowski was asked why Uber would not want to share with the Court a due diligence report that provided "a clean bill of health on Otto," he pleaded the Fifth Amendment again. (*Id.* at 46). In fact, Mr. Levandowski apparently contends that answering any questions about the report could expose him to criminal prosecution. The Court may infer from these invocations of the Fifth Amendment that Mr. Levandowski and Defendants had a common interest in planning, engaging in, or concealing the misappropriation of Waymo's trade secrets. *See Amusement Indus., Inc. v. Stern*, 293 F.R.D. 420, 428 (S.D.N.Y. 2013) ("Courts have drawn such an

inference when determining if the crime-fraud exception applies to evidence protected by the attorney-client privilege or work product doctrine."); *S.E.C. v. Herman,* No. 00Civ.5575, 2004 WL 964104, at *6-7 (S.D.N.Y. May 5, 2004) (similar); *see also United States v. Saccoccia,* 898 F. Supp. 53, 62 (D.R.I. 1995) (stating that a claim of attorney-client privilege is logically inconsistent with a Fifth Amendment claim over the same information because the crime-fraud exception would vitiate the attorney-client privilege).

There is also substantial evidence that the withheld due diligence report is related to and in furtherance of at least concealing that trade secret theft. Defendants' privilege log states that the report is based on an analysis of "information ascertained from A. Levandowski" and "electronic media collected from A. Levandowski" (Ex. 1) – information and media that Mr. Levandowski is refusing to produce on Fifth Amendment grounds. Indeed, as the Court recently observed: "Evidently, some or all of the 14,000-plus files downloaded from Waymo were then disclosed to the third party [author of the due diligence report] or to Uber, although that is an interpretation of the circumstances and not a direct admission." (Dkt. 202 at 2.) The Court may draw such an inference based on Mr. Levandowski's invocation of the Fifth Amendment (Dkt. 273 at 11-12, 17, 31, 43-47; Dkt. 147). *See Amusement Indus.*, 293 F.R.D. at 428; *Herman*, 2004 WL 964104, at *7; *Saccoccia,* 898 F. Supp. at 62.

To the extent Defendants continue to assert that there was a common interest at the time of the due diligence investigation, that common interest was – at a minimum – to hide Defendants' misappropriation of Waymo's trade secrets. In such a circumstance, any common interest "privilege" should be pierced pursuant to the crime-fraud exception.

**III.  THE COURT SHOULD COMPEL PRODUCTION OF THE "ATTACHMENTS" TO THE REPORT (ENTRIES 13-16 AND 18-42) AND ANY OF MR. LEVANDOWSKI'S DOCUMENTS OR FORENSIC DATA IN THE POSSESSION OF STROZ FRIEDBERG**

Defendants' privilege log asserts work product protection over entries 13-16 and 18-42, which it describes as "attachments" to the due diligence report. The only apparent basis for the assertion of work product protection over these "attachments" is that the "[s]election of documents for inclusion in report reflects thought process of investigators retained to perform investigation." (*See* Ex. 1 at entries

13-16 & 18-42.)  Defendants do not contend that the **contents** of these attachments contain any attorney work product or that these attachments were drafted by an attorney or anyone working at an attorney's direction (indeed, Defendants have provided neither the author nor the date of these attachments).  Instead, Defendants contend that producing these attachments could reveal what Stroz Friedberg thought were appropriate documents to attach to the report.  Defendants' position, in short, is that if a third-party working at an attorney's direction deems a document significant enough to attach to a report, and the report was prepared at the direction of an attorney, then the attached document can forever be shielded as the attorney's work product.  Defendants' position fails as a matter of law.

The mere fact that an attorney (or a person working at an attorney's direction) selects documents to attach to a memorandum does not render those attachments work product, even if the memorandum is itself work product.  *O'Connor v. Boeing N. Am., Inc.*, 185 F.R.D. 272, 280 (C.D. Cal. 1999) ("As to documents subject to the attorney-client privilege or work product doctrine, the plaintiffs are correct in contending that not all attachments to, or enclosures with, such documents are necessarily protected by the privilege.").  Instead, the party claiming the privilege must show that the attached document is independently protected.  *See id.* ("Rather, to claim the attorney-client privilege or work product doctrine for an attachment to, or enclosure with, another privileged document, the attachment or enclosure must be listed as a separate document on the privilege log; otherwise, such attachment or enclosure must be disclosed.").  Defendants have made no such showing here, affirmatively choosing instead to withhold the date and author of the attachments (which would presumably show that they were authored by Waymo employees prior to Mr. Levandowski's departure from Waymo).  There is no basis for Defendants to withhold the attachments to the due diligence report, and those attachments should be produced.

Moreover, the Court should require Defendants to produce **all** documents and forensic data that Stroz Friedberg received from Mr. Levandowski.  Stroz Friedberg was purportedly Uber's agent in the due diligence process and is Uber's agent in this litigation.  Documents held by Stroz Friedberg are therefore within Uber's control.  *Allen v. Woodford,* No. 05-1104, 2007 WL 309945, *2 (E.D. Cal. Jan. 30, 2007) ("'Control' may be established by the existence of a principal-agent relationship.").

Uber should have produced any and all of Mr. Levandowski's information, files, and media that remain in the possession of Stroz Friedberg in response to this Court's March 16 expedited discovery Order. In the alternative, Uber should have provided a statement regarding the extent to which such materials have been deleted, destroyed, or modified by Stroz Friedberg, as also required by the March 16 Order.[14] Uber must do one of these two things now.

## IV. THE COURT SHOULD COMPEL PRODUCTION OF ALLEGED WORK PRODUCT DUE TO WAYMO'S SUBSTANTIAL AND COMPELLING NEED

Defendants assert work product protection over every document on their privilege log. Even assuming, *arguendo*, that Defendants' assertion is correct, the Court should nevertheless order production of these documents. The Court may order production of ordinary work product if there is a substantial need for the information and an inability to obtain the substantial equivalent without undue hardship. Fed. R. Civ. P. 26(b)(3)(A) (attorney work product materials may be produced if they are discoverable under Rule 26(b)(1) and a party "has [a] substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means"). If the materials sought are opinion work product then the Court may compel discovery if there is a compelling need for the information. *Holmgren v. State Farm Mutual Auto Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992). Here, there is a substantial and compelling need and undue hardship.[15]

First, these standards are met to the extent Defendants contend they do not have or cannot produce the underlying, factual exhibits that are attached to the Due Diligence Report (Ex. 1, entries

---

[14] To the extent Stroz Friedberg no longer has copies of such information, files, and media, an adverse inference will be appropriate due to spoliation. *See Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993) ("[A] trial court also has the broad discretionary power to permit a jury to draw an adverse inference from the destruction or spoliation against the party or witness responsible for that behavior.").

[15] Defendants' log fails to state whether they contend that these documents are ordinary work product or opinion work product. Because the authors of the due diligence report are not attorneys, the Court should deem the Report to be ordinary (not opinion) work product. This is especially true as to entries 13-16 & 18-42, which are attachments to the Report that Uber claims work product over simply because they were "select[ed] for inclusion" and not because they contain any opinions. To the extent the Court believes resolution of the issues raised turns on whether any withheld document is "opinion" as opposed to "ordinary" work product, or whether the record as it stands does not warrant production, Waymo respectfully requests that the Court review the withheld documents *in camera*.

13-16 & 18-42).  As noted elsewhere in this Motion, Defendants assert that these documents are work product, not because they were drafted by an attorney or their contents contain any attorney opinion, but instead solely because they were "select[ed] . . . for inclusion" as attachments to the report.  Waymo disagrees that this assertion renders these documents work product, but to the extent the Court adopts Defendants' position and Defendants contend they no longer possess versions of these documents that were not attached to the report, Waymo has a substantial and compelling need for production.  The failure to produce these documents would potentially leave no other source for them, working an undue hardship on Waymo.

Second, Mr. Levandowski's assertion of his Fifth Amendment privilege creates a substantial and compelling need for production.  The documents Defendants are withholding are all part of a due diligence report that apparently relates to Mr. Levandowski's downloading of thousands of confidential Waymo files.  During his deposition, Mr. Levandowski invoked the Fifth Amendment and refused to answer questions concerning his negotiations with Uber (Dkt. 273 at 11-12), his formation of Otto (*id.* at 12-13), his plan to replicate Google's LiDAR technology at Otto and Uber (*id.* at 13-14), his taking of confidential documents and the use of those documents at Otto and Uber (*id*. at 14-15 & 20), and his discussions with Uber concerning use of Google's confidential information at Otto and Uber (*id.* at 18-19 & 22-26), among countless other topics.   Mr. Levandowski's refusal to answer the vast majority of questions at his deposition means that Waymo's ability to investigate Defendants' misappropriation of Waymo's trade secrets is hampered.  Defendants' withheld due diligence report likely contains information that is responsive to many of the questions Mr. Levandowski refused to answer.  Indeed, the withheld report may be the only source of much of this information.  Under these circumstances, courts have often found a substantial need justifying disclosure of alleged work product.[16]   The Court should do likewise here and order production.

---

[16]    *See In re John Doe Corp.*, 675 F.2d 482, 492 & n.10 (2d Cir. 1982) (substantial need shown where "potential witnesses have invoked the privilege against self-incrimination"); *In re Vitamins Antitrust Litig.*, No. 99-197, 2003 WL 1867908, at *1 (D.D.C. Jan. 24, 2003) (district court found a substantial need where "witnesses whose testimony was recorded in the materials have now

## V.  THE COURT SHOULD ORDER DISCOVERY CONCERNING DEFENDANTS' PRIVILEGE AND WORK PRODUCT ASSERTIONS

The Court's April 25, 2017 Order (Dkt. 271) directed the parties to "address the possibility that discovery into the predicates for any privilege be allowed." Waymo believes that no further discovery is necessary because the withheld documents should be produced for the reasons stated. To the extent the Court believes the record is not already sufficient to grant Waymo's Motion, however, Waymo respectfully requests the opportunity to take the following discovery[17]:

First, Defendants should be required to make a knowledgeable witness available for a Rule 30(b)(6) deposition on Defendants' privilege log, the basis for any claimed privileges or protections, the sharing of the withheld documents among Defendants and with third parties, and efforts to maintain the confidentiality of the withheld documents.

Second, Defendants should be required to produce any and all agreements with Stroz Friedberg, as Waymo already requested.

Third, Waymo should be permitted to take a Rule 30(b)(6) deposition of Stroz Friedberg regarding the circumstances surrounding its analysis of Mr. Levandowski's files and electronic media, the dissemination of the due diligence report, and its preparation of the due diligence report.

Fourth, Defendants should make available for deposition any witnesses that provide declarations in opposition to this Motion.

Fifth, the Court should require Defendants to serve a revised privilege log that corrects the deficiencies identified in this Motion.

At that point, Waymo should be permitted to supplement the record regarding evidence that further supports this Motion.

---

asserted their Fifth Amendment rights"); *In re Crazy Eddie Sec. Litig.*, No. 87-cv-33, 1991 WL 17287, at *1 (E.D.N.Y. Jan. 28, 1991) (finding that movant had demonstrated a substantial need where third party "witnesses have either invoked their Fifth Amendment privilege and not answered the questions or they have invoked the work product privilege to avoid answer the questions posed").

[17]  Like depositions conducted during the preliminary injunction phase of this case, the depositions described herein should not count toward Waymo's overall deposition limit.

**<u>CONCLUSION</u>**

For the foregoing reasons, the Court should order Uber to produce (i) the withheld due diligence report and attachments and (ii) all documents and media in the possession of Stroz Friedberg that are responsive to the Court's March 16 Order (or, alternatively, a statement regarding the extent to which such materials have been deleted, destroyed, or modified by Stroz Friedberg).

DATED: May 1, 2017          QUINN EMANUEL URQUHART & SULLIVAN, LLP

By _/s/ Charles K. Verhoeven_
         Charles K. Verhoeven
         Attorneys for WAYMO LLC

# EXHIBIT 2

1   MICHAEL A. JACOBS (CA SBN 111664)
    MJacobs@mofo.com
2   ARTURO J. GONZÁLEZ (CA SBN 121490)
    AGonzalez@mofo.com
3   ERIC A. TATE (CA SBN 178719)
    ETate@mofo.com
4   RUDY Y. KIM (CA SBN 199426)
    RKim@mofo.com
5   MORRISON & FOERSTER LLP
    425 Market Street
6   San Francisco, California  94105-2482
    Telephone:     415.268.7000
7   Facsimile:     415.268.7522

8   KAREN L. DUNN (*Pro Hac Vice*)
    kdunn@bsfllp.com
9   HAMISH P.M. HUME (*Pro Hac Vice*)
    hhume@bsfllp.com
10  BOIES SCHILLER FLEXNER LLP
    1401 New York Avenue, N.W.
11  Washington DC  20005
    Telephone:     202.237.2727
12  Facsimile:     202.237.6131

13  Attorneys for Defendants
    UBER TECHNOLOGIES, INC.
14  and OTTOMOTTO LLC

15              UNITED STATES DISTRICT COURT

16             NORTHERN DISTRICT OF CALIFORNIA

17                SAN FRANCISCO DIVISION

18  WAYMO LLC,                          | Case No.      3:17-cv-00939-WHA

19              Plaintiff,              | **DECLARATION OF ERIC A. TATE
                                        | IN SUPPORT OF DEFENDANTS'
20      v.                              | OPPOSITION TO MOTION TO
                                        | COMPEL**
21  UBER TECHNOLOGIES, INC.,
    OTTOMOTTO LLC; OTTO TRUCKING LLC,   | Date:     June 8, 2017
22                                      | Time:     10:00 a.m.
                Defendants.             | Ctrm:     F, 15th Floor
23                                      | Judge:   Hon. Jacqueline Scott Corley

24                                      | Trial Date: October 2, 2017

25

26

27

28

1        I, Eric A. Tate, declare as follows:

2        1.     I am a member of the bar of the State of California and a partner with Morrison &

3  Foerster LLP ("MoFo"), counsel of record for Defendants Uber Technologies, Inc. and Ottomotto

4  LLC in this action.  I am admitted to practice before this Court.  I am the co-chair of MoFo's

5  Global Employment and Labor Group and regularly litigate employee mobility cases.  I submit

6  this declaration in support of Defendants' Opposition to Motion to Compel Production of the

7  Stroz Due Diligence Report.  I have personal knowledge of the facts stated herein and, if called as

8  a witness, I could and would testify competently as to these facts.

9        2.     I was contacted in late January 2016 by in-house counsel for Uber Technologies,

10  Inc. ("Uber"), to provide legal advice regarding a potential corporate transaction.  That

11  transaction turned out to be Uber's acquisition of two target companies, Ottomotto LLC

12  ("Ottomotto") and Otto Trucking LLC ("Otto Trucking"), (collectively referred to as "Otto").[1]

13        3.     Uber had retained counsel, Cooley LLP, to advise it on the standard diligence,

14  negotiation and other corporate aspects of the potential transaction.  Uber contacted me and my

15  law firm seeking legal advice as to potential litigation exposure arising out of the transaction.

16  Specifically, Uber sought legal advice regarding potential claims that could be brought by Google

17  against two of its founders, Anthony Levandowski and Lior Ron, who had left Google to create

18  the target companies that ultimately became Ottomotto and Otto Trucking.  Uber retained MoFo

19  for this purpose in late January 2016.

20        4.     Other parties to the potential transaction were represented by separate counsel.

21  The law firm O'Melveny & Myers LLP ("OMM") represented Otto.  Two of Otto's founders,

22  Anthony Levandowski and Lior Ron, were separately represented by individual counsel.  John

23  Gardner of Donahue Fitzgerald LLP ("Donahue") represented Mr. Levandowski, and Alisa Baker

24  of Levine & Baker LLP ("Levine") represented Mr. Ron.

25        5.     On or about February 22, 2016, Otto and Uber signed a term sheet for the potential

26  acquisition.  The term sheet set forth the agreed economic terms of Uber's potential acquisition of

27

28         [1] While Uber acquired Ottomotto in August 2016, it has not acquired Otto Trucking.

Otto. In light of the possibility of litigation by Google, Uber agreed to indemnify certain employees under certain circumstances regardless of whether the deal closed.

6.  MoFo had been authorized, on behalf of Uber, to enter into a joint defense and common interest agreement ("JDA") with Otto and we did so as of at least February 24, 2016, and later with Messrs. Levandowski and Ron.

7.  Specifically, on February 24, 2016, I confirmed with counsel for Otto at OMM, that Uber and Otto would proceed with investigating and obtaining facts necessary for MoFo and OMM to advise our respective clients as to potential litigation arising out of the transaction under a JDA that would later be memorialized.

8.  On February 25, 2016, I received an email from OMM confirming the "discussed plan on JDA." A true and correct copy of this email is attached hereto as **Exhibit 1**.

9.  Uber and Otto authorized MoFo and OMM to jointly engage a third-party consultant to conduct an investigation regarding the activities of Mr. Levandowski, Mr. Ron, and certain other former Google employees who had joined Otto, surrounding their respective departures from Google and onboarding to Otto. The purpose of the investigation was to aid MoFo and OMM in providing legal advice to their respective clients about litigation risks and potential claims that could be brought by Google in connection with Uber's acquisition of Otto.

10.  On February 25, 2016, Adam Bentley of OMM and I contacted Stroz Friedberg LLC ("Stroz"), a third-party risk management firm, to engage its professional services in conducting an investigation to ascertain facts, that, in the opinion of MoFo and OMM, informed the potential legal exposure and claims that could be brought by Google related to Uber's potential acquisition of Otto.

11.  The Joint Defense, Common Interest, and Confidentiality Agreement was executed on April 11, 2016 and states that it "memorialize[s]" the parties "understanding and oral agreement." Attached to this Declaration as **Exhibit 2** is a true and correct copy of the Joint Defense, Common Interest, and Confidentiality Agreement.

12.  Each of the parties needed the assistance of Stroz in order to provide legal advice to their respective clients on their joint litigation risk, and jointly retained Stroz on March 4, 2016.

Attached to this Declaration as **Exhibit 3** is a true and correct copy of the Stroz Engagement

Letter, with information protected by the attorney-client privilege redacted. The Stroz

Engagement Letter memorialized that Uber, Otto, and Messrs. Levandowski and Ron (the "Joint

Defense Parties") were parties to a Joint Defense and Common Interest Agreement, and that all

information received by Stroz and Stroz's work product was to be treated as covered by joint

defense, common interest, attorney-client privilege and/or work product doctrine.

13.     The Stroz Engagement Letter also memorialized the parties' understanding of the

purpose of the investigation, which was to gather and synthesize information to provide to

counsel to assist in their assessment of possible legal claims that could be brought by Google.

14.     On March 13, 2016, Alisa Baker confirmed her agreement that Mr. Ron and Levin

were parties to the JDA. Similarly, John Gardner confirmed his agreement that he and Mr.

Levandowski were parties to the JDA on March 22, 2016. From that point forward, I considered

my communications with counsel from OMM and for the individual parties to be confidential and

treated them as such.

15.     The joint defense parties and their respective counsel agreed upon a protocol and

parameters for Stroz's investigation. OMM, MoFo, Donahue, and Levine all discussed with Stroz

what topics to investigate and various issues related to how Stroz should investigate those topics

based upon each firm's legal judgment and reasoning about potential litigation arising from

Uber's acquisition of Otto.

16.     As set forth in the engagement letter, Stroz agreed to provide all substantive

communications about the investigation to both MoFo and OMM, and further agreed to keep

confidential all information and data it received from MoFo, OMM, Uber, Otto, and Messrs.

Levandowski and Ron, and not to disclose any such information or data to any person other than

MoFo or OMM. To the best of my knowledge, Stroz complied with its obligations to provide all

substantive communications about its investigation to MoFo and OMM, and has kept confidential

all information and data it has received from MoFo, OMM, Uber, Otto, and Messrs. Levandowski

and Ron.

17.     Uber and Otto signed the final merger agreement on April 11, 2016.

18. On August 5, 2016, Stroz provided its final report (the "Report") to OMM, MoFo, Donahue, and Baker. Stroz transmitted the Report securely with password protection. Under the Joint Defense and Common Interest Agreement, the parties were required to keep the Report in the strictest of confidence. To my knowledge, the Report was not and has not been shared with anyone other than the Joint Defense Parties, their clients and counsel, and Stroz.

19. I have checked with the MoFo attorneys and staff who I understand received a copy of the Report, and I understand that MoFo has, at all times, treated the Report, exhibits thereto, information learned from it, and all communications pertaining to it, as privileged and confidential.

20. Additionally, I understand that MoFo has not shared any such information or materials with any person other than in-house counsel at Uber, counsel at OMM, Donahue, and Levine, and Messrs. Levandowski and Ron, as well as MoFo's co-counsel in the above-captioned matter at Boies Schiller Flexner LLP, Otto Trucking's counsel in the above-captioned matter at Goodwin Procter LLP, and counsel for intervenor Mr. Levandowski in the above captioned matter at Ramsey & Erlich LLP.

21. The Report reflects areas of inquiry that OMM and MoFo identified as important to their provision of legal advice regarding their clients' potential litigation exposure. The Report also reflects the directives and protocols that OMM, MoFo, Donahue, and Levine provided to Stroz to govern its investigation. Furthermore, the Report was prepared by Stroz for the purposes of potential litigation and reflects mental impressions, conclusions, and opinions of the Stroz investigators.

22. MoFo, OMM, Donahue, and Baker received the Appendix of Exhibits to the Report on August 11, 2016, which was transmitted securely. MoFo received the actual Exhibits referenced in the Appendix of Exhibits on August 13, 2016. MoFo did not send a copy of the Appendix of Exhibits to Uber until after this litigation commenced, and has not provided to Uber a copy of the actual Exhibits referenced in the Appendix of Exhibits.

23. As mentioned above, 159 exhibits are appended to the Report. The exhibits can be grouped into four categories: (1) documents pertaining to the scope of Stroz's investigation and

protocols governing it; (2) interview memoranda prepared by Stroz investigators; (3) work

product prepared by Stroz investigators which analyzes information provided confidentially by

Messrs. Levandowski, Ron, and other Otto employees; and (4) documents collected by Stroz.  An

additional category of documents are not relevant for purposes of Waymo's motion because they

were not responsive to the Court's March 16, 2017 Order (Dkt. 61) ¶ 4 and therefore were not

logged on Uber's privilege log, attached hereto as **Exhibit 4**.

   24. Documents in category (1) reflect the directives and protocols that OMM, MoFo,

Donahue, Levine, and Stroz decided upon to govern Stroz's investigation.

   25. Documents in categories (2) and (3) reflect communications and information that

Messrs. Levandowski and Ron, as well as certain employees of Otto, provided and made

available to Stroz in the course of its investigation, and such communications were sought from

these individuals confidentially and for the purpose of obtaining legal advice regarding potential

litigation exposure and claims that could be brought by Google arising out of Uber's acquisition

of Otto.  These documents also reflect mental impressions, conclusions, and opinions of the Stroz

investigators.

   26. Finally, Stroz's judgment in selecting the documents reflected in category (4)

supports the assertion of attorney-client privilege and work product protections.

   27. We have learned during discovery in this case that Google was already

investigating Mr. Levandowski's computer at least as early as March 2016.   We also have

learned that Google's investigation continued through the summer of 2016 and included

discussion of potential litigation against Uber on at least August 23, 2016.  Attached is a true and

correct copy of excerpts from the deposition transcript of Gary Brown, attached hereto as

**Exhibit 5**.

   28. Uber's merger with Ottomotto closed effective August 23, 2016.

   29. It was not until October 28, 2016, three days after Otto publicly released video of

the world's first commercial delivery by a self-driving truck, that Google filed confidential

arbitrations against the founders of Otto.

30.     The only non-lawyers to receive the Report, aside from the individuals at Stroz who compiled the Report and three members of MoFo's legal staff, were Mr. Levandowski and Mr. Ron.

I declare until penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 8th day of May, 2017, in San Francisco, California.

/s/ _____
Eric A. Tate

# EXHIBIT 3

# EXHIBIT 2

## JOINT DEFENSE, COMMON INTEREST AND
## CONFIDENTIALITY AGREEMENT

This JOINT DEFENSE, COMMON INTEREST AND CONFIDENTIALITY AGREEMENT (this "Agreement") is hereby entered into by and among Ottomotto LLC ("Ottomotto"), Otto Trucking LLC ("Otto Trucking"), Anthony Levandowski ("Levandowski"), Lior Ron ("Ron") and Uber Technologies, Inc. ("Uber"), and their respective attorneys (hereinafter referred to individually as a "Party" and collectively as the "Parties"), in contemplation of potential investigations, litigation, and/or other proceedings relating to the proposed transactions between Ottomotto, Otto Trucking and Uber and/or any affiliates of Uber (hereinafter termed as the "Transaction").

WHEREAS, the Parties and their respective legal counsel have recognized and have discussed that certain third parties may be notified of the Transaction and such parties may conduct investigations and proceedings (collectively, "Potential Proceedings") that may require submission of additional information. The purpose of this Agreement is to confirm terms and conditions for the Parties' common interest in opposing, and, if necessary, engaging in a joint defense against Potential Proceedings; and

WHEREAS, the Parties have undertaken and may undertake factual, legal and economic research, investigation and analysis (including any such analysis performed by third parties), and the Parties are of the opinion that it is in the best interests of the Parties to exchange certain information, pool individual work product, and cooperate in connection with any filings, submissions, or Potential Proceedings; and

WHEREAS, cooperation in such a joint defense and/or common interest effort necessarily involves the exchange of confidential business, financial, technical and other information, as well as information that is otherwise a privileged attorney/client communication and/or attorney work product; and

WHEREAS, the Parties have confidential and proprietary documents containing financial, operating and planning data, which they have shared with each other and may wish to disclose to retained lawyers, economists and/or consultants for the Parties; and

WHEREAS, the Parties recognize that they share a common interest in resolving any issues concerning the Transaction under all applicable laws and that a joint defense effort will promote evaluation and preparation of their respective defenses; and

WHEREAS, the Parties by their joint defense and common interest efforts (i) do not intend to diminish in any way the confidentiality of any materials exchanged between the Parties and (ii) intend to rely on the joint defense and common interest exceptions to the waiver of the attorney/client and attorney work product privileges; and

WHEREAS the Parties wish to pursue their common interests and to avoid any suggestion of waiver of the confidentiality or immunity of communications and documents protected by the attorney-client privilege, the attorney work product doctrine, or any other

applicable privileges or immunities under applicable statutes, rules, regulations and common law.

NOW, THEREFORE, in consideration of the mutual terms and covenants herein, the Parties memorialize their pre-existing understanding and oral agreement and further agree as follows:

1.     All non-public information, documents, data, opinions, strategies or other materials in any form, including oral, written or electronic communications, exchanged or communicated in the past or future by whatever means between or among the Parties in connection with the joint defense efforts pursuant to and in connection with any Potential Proceedings, the defense of the Transaction and any actions related to or arising out of the Transaction (hereinafter referred to collectively as "Joint Defense Information"), shall be deemed subject to the terms of this Agreement. Wherever possible, the party providing the Joint Defense Information (the "Producing Party") shall label the materials "Joint Defense Information - Privileged and Confidential," although materials may be Joint Defense Information subject to the terms of this Agreement even if not labeled.

2.     Each Party affirms that Joint Defense Information includes information that has been communicated to counsel in confidence, by one or both of the Parties, for the purpose of securing legal advice and representation and attorney-work product and that all such Joint Defense Information is therefore subject to the attorney/client and/or work product privilege belonging to the client or an attorney, which privilege may not be waived by any Party without the prior written consent of the client or attorney entitled to assert such privilege. Any disclosure, whether inadvertent or purposeful, by any Party of information exchanged pursuant to this Agreement shall not constitute a waiver of any privilege or protection of any other Party. No Party has or will have authority to waive any applicable privilege or doctrine on behalf of another Party.

3.     The Parties hereby agree that to the extent that Joint Defense Information is disclosed to them (the "Receiving Party"), it will be kept confidential and disclosed by the Receiving Party only to the following persons who will maintain its confidentiality: (i) the signatories to this Agreement and the partners, associates, staff and other employees of their respective law firms who are working on the joint defense effort and/or any Potential Proceeding in connection with the Transaction; (ii) experts retained by any Party to assist in the joint defense effort and any related Potential Proceeding in connection with the Transaction; (iii) any outside copying service or other outside vendor retained by any Party that is necessary to assist in the joint defense effort and any related Potential Proceeding in connection with the Transaction, so long as such outside copying service or other outside vendor is subject to a written obligation to not use or disclose Joint Defense Information other than for the purpose of assisting the Parties in a Potential Proceeding in connection with the Transaction; (iv) except as provided in Paragraph 4, each other Party; and (v) subject to Paragraph 7, as required by law. It is expressly understood that, except as expressly provided for herein, Joint Defense Information shall not be further disclosed to any other person, unless authorized in writing by the Producing Party.

- 2 -

#688754.2

4.      Nothing in this Agreement shall preclude any Producing Party from designating material "Outside-Counsel Only" or "Attorneys Eyes Only." The term "Outside Counsel" shall refer to any law firm that is or may become a signatory to this Agreement. Joint Defense Information provided on an "Outside-Counsel Only" basis may be exchanged among outside counsel, attorneys within the outside counsel's law firm, and employees or agents of such firm, and may be provided to any experts or vendors (and including any employees or agents of their firms) retained in connection with the Transaction, but shall not be divulged to any other person. All Joint Defense Information that a Producing Party intends to be provided on an "Outside-Counsel Only" basis shall be clearly marked or otherwise designated "Outside-Counsel Only." The term "Attorneys Eyes Only" shall include (i) Outside Counsel, including employees or agents of such firm; (ii) in-house lawyers for the Parties; and (iii) any experts and vendors (and including any employees or agents of their firms) retained in connection with the Transaction so long as such experts and vendors are subject to a written obligation to not use or disclose Joint Defense Information other than for the purpose of assisting the Parties in a Potential Proceeding in connection with the Transaction.

5.      Except as otherwise provided for herein, Joint Defense Information will be used by the Receiving Party only for purposes of the joint defense effort and any Potential Proceeding in connection with the Transaction, as identified above, and shall not be used for any other purpose without the prior written consent of the Producing Party.  Notwithstanding the foregoing, in any proceeding between the Parties, the fact that a Party provided the other Party with information or a document as Joint Defense Information under this Agreement will not (i) preclude or limit in any way the Producing Party's ability to reference or use such information or documents; or (ii) affect the discoverability or use of such information or documents by the Receiving Party, provided that (a) such information or documents would otherwise have been subsequently discoverable or obtainable from the Producing Party without asserting that there has been a waiver of attorney client privilege or attorney work product protection for such documents or information as a result of being provided to the Receiving Party as Joint Defense Information; or (b) is otherwise obtained by the Receiving Party from other sources outside of this Agreement without violating this Agreement.

6.      Joint Defense Information shall not include documents and information that: (a) were generally publicly available prior to the date hereof; (b) become publicly available subsequent to the date hereof other than through an unlawful act or breach of the Receiving Party under this Agreement; (c) are in the possession of a Party that were lawfully obtained from a source other than the Producing Party; and (d) are obtained from a third party or were received or developed outside of this joint defense effort subsequent to the date hereof without violating this Agreement.  Joint Defense Information includes, however, communications between or among the Parties forwarding, discussing, or relating to the information in categories (a)-(d) of this paragraph.

7.      If any person or entity requests or demands from a Receiving Party access to Joint Defense Information that the Receiving Party obtained from a Producing Party by subpoena, court order, arbitral order or otherwise, the Party receiving the demand, subpoena or order shall notify the Producing Party in writing within forty-eight (48) hours. Each Party agrees that, except as required by law, the Producing Party shall have the opportunity promptly, and in any event no more than ten (10) days after receiving notice of the subpoena or order, to

- 3 -

assert any rights or privileges against the request to obtain the material, and that the Producing Party and the Party who received the request shall take all steps necessary and appropriate to assist in the assertion of applicable rights and privileges with regard to said Joint Defense Information in the appropriate forum. The Producing Party shall bear the legal costs, including attorneys' fees, in asserting such rights and privileges, subject to Uber's obligation to provide indemnification to Ottomoto, Otto Trucking, Levandowski and Ron pursuant to any written agreement among the Parties. If the return date on the subpoena or order is less than ten (10) days, the Party receiving the subpoena or order shall take all reasonable steps to secure an extension of time for the Producing Party to have a reasonable opportunity to assert any applicable rights or privileges prior to the return date.

8.      The existence of this Agreement or of a joint defense or common interest effort in connection with the Transaction shall not be used in any fashion against any of the Parties to this Agreement, except that nothing herein shall prohibit the use of the foregoing to enforce the obligations, rights, and remedies of the Parties under this Agreement.  No Party to this Agreement will claim (i) that any counsel is disqualified in such litigation or any other matter by reason of the joint defense or common interest effort or such counsel's access to confidential, privileged, or work product documents or (ii) that this Agreement creates any attorney-client relationship that did not exist prior to the earlier of any prior understanding of the Parties regarding their common interests with respect to the Transaction, or the execution of this Agreement.

9.      At any time, any Producing Party may request of any Receiving Party in writing that it return to the Producing Party or destroy any Joint Defense Information provided to the Receiving Party pursuant to this Agreement and the Receiving Party will promptly comply with such request except as prohibited by law, legal duty or legal obligation. Upon request of the Producing Party, a Receiving Party will redact (i.e., permanently delete) from any retained work product all statements and disclosures of Joint Defense Information provided by the Producing Party; provided, however, that each Party's Outside Counsel may retain an original (i.e., non-redacted) copy of any such work product on the condition that it will not provide the original work product to its client without making any necessary redactions unless it has obtained the prior written consent of the Producing Party. The Parties agree that a failure to return, destroy, or redact such materials upon request provides adequate grounds for the Producing Party to seek a court order directing return, destruction, or redaction of the materials. If a Receiving Party is unable to ensure the destruction or redaction of any Joint Defense Information, it will take reasonable measures to make such Joint Defense Information permanently inaccessible to employees of the Receiving Party. Any such destruction or redaction shall, upon the written request of the Producing Party, be certified in writing to the Producing Party by an authorized person supervising the same. Even after the conclusion of the joint defense effort, Joint Defense Information will be treated as confidential. The Parties acknowledge that they and others permitted access to Joint Defense Information pursuant to this Agreement may maintain archived or back-up tapes and other media not accessed in the ordinary course of business but used only to restore inadvertently destroyed or otherwise lost data ("Back-up Systems") that may include such Joint Defense Information. Notwithstanding the foregoing, the Parties acknowledge that it would be burdensome to remove information from such Back-up Systems or to render the information permanently inaccessible. The Parties shall not be required to engage in such steps but agree that they shall take no steps to retrieve such information from

- 4 -

Back-up Systems in the absence of any need to use those Back-up Systems more generally to restore destroyed or lost data. Such Back-up Systems will be erased or destroyed in accordance with the Parties' normal course document preservation and destruction policies. Further, in the event such Back-up Systems are used to restore data destroyed or lost for other reasons, any Joint Defense Information will be removed from such restored systems and destroyed or rendered permanently inaccessible.

10.     Nothing in this Agreement shall obligate any Party to provide any information to any other Party or exchange any information with any other Party.  The Parties each recognize their respective rights to separately confer, and to elect not to share such communications with the other Party.

11.     Nothing in this Agreement shall restrict any Party from using or disclosing in any manner it chooses materials, whether confidential or otherwise, originating with that Party so long as such materials do not contain or disclose Joint Defense Information that was received from another Party.

12.     Any Party may withdraw from the Agreement upon written notification (electronic or otherwise) to the other Parties. All Parties agree that in the event any Party withdraws, such Party will promptly return or destroy (pursuant to Paragraph 9) all Joint Defense Information provided by any of the other Parties and any such destruction shall, upon the request of the Producing Party, be certified in writing to the Producing Party by an authorized person supervising the same. The Parties agree that a failure to return or destroy such materials provides adequate grounds for the Producing Party to seek a court order directing return or destruction of the materials. Notwithstanding any withdrawal, each Party remains subject to the provisions of Paragraphs 2-9 and 13-14 of this Agreement.

13.     Each Party acknowledges and agrees that money damages would not be a sufficient remedy for any breach of any provision of this Agreement by any Party, and that in addition to such remedies which any non-breaching Party may have, such non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy for such breach.

14.     Each Party agrees to assume liability for any breach of this Agreement by it or any third-party it retains in conjunction with its representation related to the Transaction. Each Party hereby agrees that it assumes liability for any breach of this Agreement.

15.     Any modifications to this Agreement must be in writing and signed by all Parties.

16.     Any and all disputes concerning the validity, construction, interpretation, and effect of this Agreement shall be resolved under the laws of the State of Delaware applicable to agreements made and to be performed entirely with the State of Delaware, without regard to the conflict of law provisions thereof that would result in the application of the law of any other jurisdiction.  Each party hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the Delaware Court of Chancery in and for New Castle County, or in the event (but only in the event) that such Delaware Court of Chancery does not have subject matter jurisdiction over such matter, the United States District Court for the District of Delaware (as

#688754.2

applicable, the "Chosen Court"), for any actions, suits or proceedings arising out of or relating to this Agreement and the transactions contemplated hereby (and each party agrees not to commence any action, suit or proceeding relating thereto except in such courts, and further agrees that service of any process, summons, notice or document by registered mail to such party's address in the notice provision of the Transaction Agreement shall be effective service of process for any action, suit or proceeding brought against it in any such court). Each Party hereby irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

17. The Parties (or any successor entity to such Parties), together with any other signatories thereto, executed a Mutual Non-Disclosure Agreement, dated as of February 1, 2016 (as amended, the "NDA"). This Agreement is intended to supplement, not replace, the NDA and this Agreement should be read consistently with the NDA. To the extent there is any conflict between this Agreement and the NDA, this Agreement shall control.

18. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

*[signatures only to follow]*

- 6 -

JOINT DEFENSE PRIVILEGED

Ottomotto LLC:

Uber Technologies, Inc.:

By: _____

By: _____

Date: _____

Travis Kalanick, President, Chief Executive Officer
and Secretary

Otto Trucking LLC:

Date: __April 11, 2016_____

By: _____

Date: _____

Counsel for Ottomotto LLC/Otto Trucking LLC: Counsel for Uber Technologies, Inc.:

By: _____

By: _____

    Eric Amdursky
    O'Melveny & Myers LLP

    Eric Tate
    Morrison & Foerster LLP

Date: _____

Date: _____

Anthony Levandowski:

By: _____

Date: _____

Counsel for Levandowski:

By: _____

    John F. Gardner
    Donahue Fitzgerald LLP

Date: _____

Lior Ron:

By: _____

Date: _____

JOINT DEFENSE PRIVILEGED

Ottomotto LLC:                              Uber Technologies, Inc.:

By: _____        By: _____

Date: _____        Date: _____

Otto Trucking LLC:

By: _____

Date: _____


Counsel for Ottomotto LLC/Otto Trucking LLC: Counsel for Uber Technologies, Inc.:

By: _____        By: *Eric Tate* by AP
    Eric Amdursky                        Eric Tate
    O'Melveny & Myers LLP                Morrison & Foerster LLP

Date: _____        Date: April 11, 2016

Anthony Levandowski:

By: _____

Date: _____


Counsel for Levandowski:

By: _____
    John F. Gardner
    Donahue Fitzgerald LLP

Date: _____


Lior Ron:


By: _____

Date: _____

JOINT DEFENSE PRIVILEGED

Ottomotto LLC:                                    Uber Technologies, Inc.:

By: _____          By: _____
Date: ____April 11, 2016____              Date: _____

Otto Trucking LLC:
By: _____
Date: ____April 11, 2016____


Counsel for Ottomotto LLC/Otto Trucking LLC:  Counsel for Uber Technologies, Inc.:


By: _____          By: _____
    Eric Amdursky                              Eric Tate
    O'Melveny & Myers LLP                  Morrison & Foerster LLP
Date: _____        Date: _____

Anthony Levandowski:
By: _____
Date: _____


Counsel for Levandowski:
By: _____
    John F. Gardner
    Donahue Fitzgerald LLP
Date: ____April 11, 2016____


Lior Ron:

By: _____
Date: ____April 11, 2016____


#688754.2

**JOINT DEFENSE PRIVILEGED**

Ottomotto LLC:                                    Uber Technologies, Inc.:

By: _____          By: _____

Date: _____        Date: _____

Otto Trucking LLC:

By: _____

Date: _____

Counsel for Ottomotto LLC/Otto Trucking LLC: Counsel for Uber Technologies, Inc.:

By: _____          By: _____
    Eric Amdursky                          Eric Tate
    O'Melveny & Myers LLP                   Morrison & Foerster LLP

Date: ___April 11, 2016____          Date: _____

Anthony Levandowski:

By: _____

Date: _____

Counsel for Levandowski:

By: _____
    John F. Gardner
    Donahue Fitzgerald LLP

Date: _____

Lior Ron:

By: _____

Date: _____

#688754.2

Counsel for Ron:

By: _____
    Alisa J. Baker
    Levine & Baker LLP

Date: _____April 11, 2016_____

# EXHIBIT 4

# EXHIBIT 3

**PRIVILEGED AND CONFIDENTIAL**

ENGAGEMENT LETTER

VIA EMAIL

As of March 4, 2016

Eric Akira Tate
Partner
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105

Paul Sieben
Partner
O'Melveny & Myers LLP
2765 Sand Hill Road
Menlo Park, CA 94025

Dear Counsel:

Thank you to Morrison & Foerster LLP ("Morrison") and its client Uber Technologies, Inc. ("Uber"), to O'Melveny & Myers LLP ("O'Melveny") and its client Ottomotto LLC ("Ottomotto") for jointly engaging Stroz Friedberg, LLC ("Stroz Friedberg"). This letter (the "Agreement") will serve to document the terms and conditions of our engagement.

Services

Morrison and O'Melveny (each a "Client", and together "Clients") on behalf of their clients Uber and Ottomotto, respectively, have requested that Stroz Friedberg, LLC ("Stroz Friedberg"), among other things, provide ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Stroz Friedberg will use criteria provided to us by Clients to aid Clients in their review of documents for potential relevance or potential privilege, it being understood that the ultimate decision to assert a privilege and/or the relevance of any particular document will be made by Clients pursuant to the protocol attached hereto as Exhibit A. Stroz Friedberg will report the results of its factual investigation to Clients pursuant to the protocol attached hereto as Exhibit A. These services constitute the "Engagement". Uber agrees to pay all fees, charges and disbursements incurred in connection with the Services, in accordance with the terms set forth in this Agreement. Stroz Friedberg is not authorized to practice law or provide legal services and that the services offered by Stroz Friedberg as part of the Engagement are limited to non–legal services.

Fees

a) General Rates. Stroz Friedberg charges for the time devoted to the Engagement on an hourly fee basis, at the rates in effect when the work is performed. The current hourly rates are set forth as follows: Chairmen and Executive Managing Directors: $1,000 - $1,150; Managing Directors and Vice Presidents: $680 - $850; Directors and Assistant Directors: $600 - $715; Consulting and Forensics

Professionals: $250 - $600; Data Discovery Professionals: $275 - $375; and Administrative Professionals: $110 - $275. These rates apply generally, as well as to travel. The use of subcontractors, if needed, will be charged at Stroz Friedberg's rates.

b) <u>Machine Time and Specialized Solutions</u>. The rate for machine time devoted to running a forensic process is $95 per hour. The rate for use of our proprietary host interrogation tool is $100 per host (capped at $150,000 per incident); our network traffic capture tool $1,500 per week; our proprietary incident response tool $5,000 per week per platform; the OmniPeek Network Analyzer $5,000 per week per platform; and our high speed, on-site malware analysis and forensic hosting tool, $2,500 per week per platform. Use of our mobile electronic disclosure/discovery processing, hosting and production unit will be charged at an amount to be structured depending upon the circumstances of the deployment.

c) <u>Electronic Discovery Services</u>. Any electronic discovery consulting services will be billed at the hourly rates set forth above. All other electronic discovery charges are detailed in Exhibit B.

d) <u>Intelligence and Investigations Division</u>. Forensic accounting, due diligence, or investigation services requested by Clients will be performed by our Intelligence and Investigations division at the rates in effect when the work is performed.

e) <u>Testimony</u>. Written testimony or reports will be provided at normal hourly rates. Internal peer review is part of an Engagement, and normal hourly rates will apply to any supervision of oral testimony and any internal peer review of proposed reports, affidavits, declarations or oral testimony.

f) <u>Retainer</u>. Stroz Friedberg requests an initial retainer of $75,000 to begin work in this Engagement. In cases where Stroz Friedberg's fees and charges approach the limit of the initial or a later retainer amount, Stroz Friedberg will request funds to replenish the retainer. At the end of the Engagement, Stroz Friedberg agrees to refund to Uber any amount of the retainer or replenishment, not properly applied to fees and costs incurred as of the date of termination.

g) <u>Miscellaneous Charges</u>. Stroz Friedberg may charge for other miscellaneous expenses, fees, and costs including, but not limited to, use of forensically-prepared thumb drives or hard drives (at $50 - $420 depending on size); other computer hardware and digital media; transportation, meals, and lodging; copies or printed documents; overnight delivery charges; storage fees for original media provided to Stroz Friedberg, after 30 days at rates up to $50 per month per item; credit check fees, and database searches. Stroz Friedberg reserves the right to pass on any reasonable legal fees and expenses that are incurred as the result of the Engagement but will notify Uber before such fees and expenses are incurred.

h) <u>Invoices</u>. The charges will be billed 100% to Uber. Stroz Friedberg will send invoices directly to Uber with a copy to Morrison. Invoices are due within 30 days of the invoice date. Morrison and Uber shall notify Stroz Friedberg in writing of any disputed charges within these 30 days; otherwise Stroz Friedberg's invoices shall be deemed payable in full. Any charges that remain undisputed and unpaid 30 days after the invoice date will accrue interest at 1.5 percent per month. Stroz Friedberg reserves the right to terminate its services at any time if Uber fails to pay Stroz Friedberg's invoices on time or fails to pay the requested refresher of a retainer. Any provided estimates of fees and expenses are only estimates and are not binding.

<u>Confidentiality</u>

The purpose of the Engagement is to enable Uber, Ottomoto, Anthony Levandowski and Lior Ron (who are parties to a Joint Defense and Common Interest Agreement), along with their respective counsel, to understand certain factual matters potentially relevant to potential litigation and related matters; therefore, Stroz Friedberg's communications with Clients, Uber, Ottomoto, (and Messrs. Levandowski and Ron (including their respective counsel), Stroz Friedberg's work product, and all information and data received from Clients, Uber, and Ottomoto(including its employees and/or their respective counsel) are covered by common interest, attorney-client privilege and/or attorney work product doctrine. Accordingly, Stroz Friedberg will maintain as confidential all information and data it receives from Clients, Uber, Ottomoto (including its employees), and Messrs. Levandowski and Ron (including their respective counsel) (the

2

"Confidential Information"), and not disclose any Confidential Information to any parties other than Clients, Uber, Ottomotto, or Messrs. Levandowski and Ron (including their respective counsel). Any such disclosures of Confidential Information disclosures of data from Ottomotto or Messrs. Levandowski and Ron (including through their respective counsel) to Uber shall be governed by the protocol attached hereto as Exhibit A.

Stroz Friedberg agrees all communications (including emails) by it relating to the Engagement will be sent to all Clients together. In addition, all phone calls relating to the Engagement must include all Clients, unless otherwise agreed to in writing by all Clients. However, communications concerning general administrative or billing matters may be dealt with individually. In performing the Engagement, Stroz Friedberg agrees that only information relating to the Services and purpose of the Engagement may be disclosed to Morrison and Uber, provided, however, that in the event such information includes or may include confidential or proprietary information of a former employer of an Ottomotto employee, or there is any potential question or uncertainty whether information relates to the Services and purpose of the Engagement, such information will be disclosed to Clients only on an outside counsel attorney's eyes only (AEO) basis. Notwithstanding the foregoing, under no circumstances will Stroz Friedberg disclose to Uber or Morrison or any of their representatives any attorney-client privileged communications between Ottomotto and/or any of its employees, stockholders, officers, members, managers or directors, on the one hand, and counsel for Ottomotto or counsel to any of such persons, on the other hand, that are disclosed to or discovered by Stroz Friedberg in its performance of the services. For the avoidance of doubt, communications between Ottomotto and/or any of its employees, stockholders, officers, members, managers or directors, on the one hand, and any of the following attorneys and law firms, on the other hand, is attorney-client privileged communication and will not be disclosed by Stroz Friedberg to Uber or Morrison or any of their representatives: O'Melveny & Myers LLP, Fenwick & West LLP (including text messages with Ted Wang at        ), Orrick, Herrington & Sutcliffe LLP, Donahue Fitzgerald LLP (including emails with John Gardner at       ), Ognen Stojanovski at ognen@alumni.stanford.edu, Doug Mandell at dmandell@mlawgroup.com, Maureen Dorney at maureen@paradigmcounsel.com, GCA Law Partners LLP, or Levine & Baker LLP or any other attorney or law firm with whom such persons had attorney-client privileged communications.

Confidential Information does not include (1) information that has been or is, prior to the Engagement, in the public record, or is placed in the public record by Clients, Uber, or Ottomotto after the Engagement begins, through no unlawful act of anyone; (2) indications of compromise (i.e., data, configurations, specifications, and other conditions that are identified as malware, vulnerabilities, anomalies, compromises, or potentially harmful conditions) identified by Stroz Friedberg; or (3) facts necessary to set forth in proceedings for non-payment of invoices. If Stroz Friedberg encounters what it deems to be any child pornography on any computer media delivered to it in the course of the Engagement, Stroz Friedberg reserves the right to disclose such contraband to the appropriate authorities.

Authority to Access Data and Indemnification

Uber and Ottomotto each authorize Stroz Friedberg to access the data related to this Engagement and represents that such access does not violate any applicable law or treaty. Uber and Ottomotto agree to hold harmless and indemnify Stroz Friedberg, including its officers, employees, and agents against all third-party claims, damages and costs including attorneys' fees and disbursements arising from the Engagement, except for actions by Stroz Friedberg, its officers, employees, and/or agents that are adjudicated to constitute willful misconduct or gross negligence.

Limitation of Liability and Damages

Stroz Friedberg for itself and its officers, employees, or agents will not assume responsibility for damage that may occur to prior to or during Stroz Friedberg's efforts to complete the Engagement. As such, other than due to its willful misconduct of Stroz Friedberg will not be liable for direct or indirect damages arising from harm that may occur to . Any data, especially data restored from unknown sources, may contain viruses or

other malware; therefore, Clients, Uber and Ottomotto assume responsibility to protect themselves with respect to the receipt of data from Stroz Friedberg or any other party and shall advise its agents and third-party recipients to take similar precautions. Other than due to its and their willful misconduct, in no event shall Stroz Friedberg, its officers, employees, or agents be liable for damages, under any theory, beyond the amount paid to Stroz Friedberg under this Engagement.

Return of Client Materials

Prior to the end of the Engagement, Stroz Friedberg and Clients will confirm the disposition of any original materials provided by Client or Uber or Ottomotto, to Stroz Friedberg. In the event that, after using its reasonable efforts to do so, Stroz Friedberg is not able to return to Clients, Uber, or Ottomotto original materials provided by Clients, Uber, or Ottomotto to Stroz Friedberg, Stroz Friedberg reserves the right to destroy such original materials pursuant to its then-current destruction policy (subject to the preceding sentence).

Conflicts

This Engagement pertains to a discrete matter and would not preclude Stroz Friedberg from rendering services to other clients adverse to Clients or Uber or Ottomotto on matters that are not specifically related to this Engagement.

Miscellaneous

Clients, Uber, Ottomotto and Stroz Friedberg agree that the Engagement shall be governed by and construed and enforced in accordance with the internal laws of the State of California (as opposed to the conflict of law provisions) as an agreement made and to be performed entirely within such State. Clients, Uber, Ottomotto, and Stroz Friedberg agree that this Agreement (1) may not be modified or amended, except by a writing signed by each party; (2) shall be binding upon each party, its successors and permitted assigns; and (3) contains the entire agreement and understanding among Clients, Uber, Ottomotto, and Stroz Friedberg with respect to the subject matter hereof and supersedes all prior agreements and understandings, written or oral, among Clients, Uber, Ottomotto, and Stroz Friedberg with respect to the subject matter hereof. No provision of this Agreement may be waived except in writing by the party against whom such waiver is sought to be enforced. No express or implied waiver, breach or default by any party of any provision of this Agreement shall constitute a continuing waiver of such provision or of any other provision of this Agreement. Clients, Uber, Ottomotto, and Stroz Friedberg hereby consent to the jurisdiction of the Superior Court of the State of California for the County of Santa Clara and the United States District Court for the Northern District of California for all purposes in connection with the Engagement, and further consent that any process or notice of motion may be served as a notice, if in writing and given by (1) prepaid certified or regular first class mail, (2) personal delivery, or (3) nationally recognized overnight delivery service at the addresses set forth at the beginning of this letter, and shall be deemed given when sent, within or without the State of California, provided a reasonable time for appearance is allowed. This letter, along with the protocol attached hereto, amends, restates, and supersedes all previous communications between the undersigned regarding the Engagement.

4

If you find this letter satisfactory, kindly return an executed copy together with Uber's check or wire transfer in the amount of $75,000. Stroz Friedberg looks forward to working with you. Very truly yours,

STROZ FRIEDBERG, LLC

By: _____
Eric Friedberg
Executive Chairman

AGREED TO AND ACCEPTED:
**Morrison & Foerster LLP**

By: _____
Eric Akira Tate
Partner

ACKNOWLEDGED AND AGREED TO:
**Uber Technologies, Inc.**

By:_____
Name:
Title:

AGREED TO AND ACCEPTED:
**O'Melveny & Meyers**

By: _____
Paul Sieben
Partner

ACKNOWLEDGED AND AGREED TO:
**Ottomotto LLC**

By:_____
Name: LIOR RON
Title: PRESIDENT

If you find this letter satisfactory, kindly return an executed copy together with Uber's check or wire transfer in the amount of $75,000. Stroz Friedberg looks forward to working with you. Very truly yours,

STROZ FRIEDBERG, LLC

By: _____

Eric Friedberg
Executive Chairman

AGREED TO AND ACCEPTED:
**Morrison & Foerster LLP**

By: _____

Eric Akira Tate
Partner

AGREED TO AND ACCEPTED:
**O'Melveny & Meyers**

By: _____

Paul Sieben
Partner

ACKNOWLEDGED AND AGREED TO:
**Uber Technologies, Inc.**

By:_____
  Name:
  Title:

ACKNOWLEDGED AND AGREED TO:
**Ottomotto LLC**

By:_____
  Name:
  Title:

If you find this letter satisfactory, kindly return an executed copy together with Uber's check or wire transfer in the amount of $75,000. Stroz Friedberg looks forward to working with you. Very truly yours,

STROZ FRIEDBERG, LLC

By: _____
Eric Friedberg
Executive Chairman

AGREED TO AND ACCEPTED:
**Morrison & Foerster LLP**


By: _____
Eric Akira Tate
Partner

AGREED TO AND ACCEPTED:
**O'Melveny & Meyers**


By: _____
Paul Sieben
Partner


ACKNOWLEDGED AND AGREED TO:
**Uber Technologies, Inc.**

By: _____
Name: Angela Padilla
Title: Associate General Counsel,
Employment and Litigation

ACKNOWLEDGED AND AGREED TO:
**Ottomotto LLC**


By: _____
Name:
Title:

**EXHIBIT B**

| EARLY CASE ASSESSMENT – FIRST GLANCE | |
|---|---|
| • First Glance Processing (*concept clustering, searching, visual data analysis, ability to cull data/promote docs for full processing to review platform*) | $ 125/GB |
| **PROCESSING** | |
| • Data culling (*de-NIST, dedupe, date and/or keyword filtering,*) | $ 75/GB |
| • Processing (*de-NIST, dedupe, extract text/metadata & embedded objects, promote to review*) | $ 295/GB |
| • Foreign Language Translation to English (*machine translation*) | $ 295/GB or $ .03/page |
| **PRE-PROCESSED DATA** | |
| • Ingestion of Pre-Processed Data (*Paper/ 3rd Party Productions/ Migrated Data*) | $ 75/GB |
| • OCR or other text extraction | $ 100/GB |
| **REVIEW ANALYTICS** | |
| • Relativity Analytics Bundle (*Near Duplication & Email Threading, Conceptual Search, Clustering, Categorization (Predictive Coding), Keyword Expansion*) | $175/GB |
| • Stroz Analytics Bundle (*Near Duplication & Email Threading, Conceptual Search, Clustering, Categorization (Predictive Coding), Keyword Expansion*)  Note: Near dupe and threading can be unbundled upon request at $ 75/GB  Note: Privilege Analytics can be unbundled upon request at $ 50/GB | $ 150/GB |
| **HOSTING** | |
| • Standard Hosting | $ 35/GB/month |
| • Near-line "In"/Active "Out" Hosting | $ 10/$ 35/GB/month |
| • User Licenses | $ 100/user/month |
| **PRODUCTION** | |
| • Tiff Generation | $ .03/page |
| • Tiff Bundle (Production including Bates Stamping, Branding & Watermarking) | $ .05/page |
| • Load File Delivery | $ 75/load file |
| • Output to Hard Drive | $ 175 to $ 400 per drive |
| • Output to CD/DVD | $ 35/$ 55 per media |
| **DATA STORAGE** | |
| • Data Deletion | No Charge |
| • Full Archiving | $ 35/GB |
| • Near Line Storage | $ 10/GB/month |
| **CONSULTING & ENGINEERING SERVICES** | |
| • Expert Consulting & Forensic Analysis | Per Engagement Letter |
| • Project Management & Exception Handling | Per Engagement Letter |
| • Customized Engineering Services | Per Engagement Letter |

# EXHIBIT 5

1  MICHAEL A. JACOBS (CA SBN 111664)
   MJacobs@mofo.com
2  ARTURO J. GONZÁLEZ (CA SBN 121490)
   AGonzalez@mofo.com
3  ERIC A. TATE (CA SBN 178719)
   ETate@mofo.com
4  RUDY Y. KIM (CA SBN 199426)
   RKim@mofo.com
5  MORRISON & FOERSTER LLP
   425 Market Street
6  San Francisco, California  94105-2482
   Telephone:     415.268.7000
7  Facsimile:      415.268.7522

8  KAREN L. DUNN (*Pro Hac Vice*)
   kdunn@bsfllp.com
9  HAMISH P.M. HUME (*Pro Hac Vice*)
   hhume@bsfllp.com
10 BOIES SCHILLER FLEXNER LLP
   1401 New York Avenue, N.W.
11 Washington DC  20005
   Telephone:     202.237.2727
12 Facsimile:      202.237.6131

13 Attorneys for Defendants
   UBER TECHNOLOGIES, INC.
14 and OTTOMOTTO LLC

15                 UNITED STATES DISTRICT COURT

16                 NORTHERN DISTRICT OF CALIFORNIA

17                    SAN FRANCISCO DIVISION

18 WAYMO LLC,                          Case No.       3:17-cv-00939-WHA

19              Plaintiff,             **DECLARATION OF ALISA J.**
                                       **BAKER IN SUPPORT OF**
20        v.                           **DEFENDANTS' OPPOSITION TO**
                                       **MOTION TO COMPEL**
21 UBER TECHNOLOGIES, INC.,
   OTTOMOTTO LLC; OTTO TRUCKING LLC,   Date:      June 8, 2017
22                                     Time:      10:00 a.m.
              Defendants.              Ctrm:      F, 15th Floor
23                                     Judge:     Magistrate Jacqueline Scott
                                       Corley
24
                                       Trial Date: October 2, 2017
25

26

27

28

I, Alisa J. Baker, declare as follows:

1.      I am a member of the bar of the State of California and a partner with Levine & Baker LLP ("L&B").  I submit this declaration in support of Defendants' Opposition to Plaintiff Waymo's Motion to Compel Production of Withheld Documents.  I have personal knowledge of the facts stated herein and, if called as a witness, I could and would testify competently as to these facts.

2.      Beginning in late January or early February 2016, I served as counsel to Lior Ron in his personal capacity in connection with the proposed acquisition of Ottomotto LLC ("Otto"), a company that I understood Mr. Ron to have co-founded with Anthony Levandowski, by Uber Technologies, Inc. ("Uber").  I provided Mr. Ron legal advice and representation on matters pertaining to him personally in connection with that proposed acquisition.  Separate counsel at the law firm O'Melveny & Myers LLP ("OMM") represented Otto in connection with the proposed transaction.  I interacted with Eric Amdursky of OMM related to potential litigation by Google arising out of the proposed acquisition.

3.      Uber was represented by counsel at the law firm Morrison & Foerster LLP ("MoFo") and Cooley LLP ("Cooley").  I understand that MoFo represented Uber on a discrete issue presented by the proposed transaction; that is, to provide legal advice as to potential claims that could be brought by Google arising out of the transaction related to Mr. Ron and Mr. Levandowski's departure from Google.

4.      On February 22, 2016, Uber and Otto executed a term sheet setting forth the basic terms to govern the proposed transaction.

5.      During the entirety of my communications with OMM and MoFo with respect to the matter described in Paragraph 2 after that term sheet was executed, my understanding was that counsel and the parties had agreed that our communications would be subject to a joint defense and common interest agreement that would ultimately be put into writing, as the parties were sharing information pertaining to potential litigation by Google, which might be brought against any or all of them.  On March 13, 2016, I became aware that Uber and Otto were preparing a written joint defense and common interest agreement to memorialize the above agreement.

6.　　On the basis of my information at that time, I understood that all parties were in agreement that it was in all of their interests that their respective counsel should be in a position to share communications under the attorney-client privilege and the attorney work product protections without compromising the confidential nature of the communications and work product.

7.　　On or about April 11, 2016, I signed the final joint defense, common interest and confidentiality Agreement ("JDA").  Mr. Ron signed the agreement as well.  I understand that Mr. Levandowski became a party to that written agreement on or about that same day.  The Joint Defense, Common Interest, and Confidentiality Agreement also stated that it was memorializing the parties' "pre-existing understanding and oral agreement."

8.　　It was my understanding both prior to and after April 11, that both Mr. Ron and Mr. Levandowski, as well as Uber and Otto, contemplated the specific possibility that Google could bring claims against any or all of them arising out of Uber's acquisition of Otto, including claims arising from the fact that other former Google employees had chosen to (or indicated that they might wish to) join Otto.  That understanding was the result of information I had received from the various counsel involved and from attorney client communications.

9.　　From the time that Mr. Ron joined the joint defense and common interest agreement, I continued to consider my communications with counsel for Uber, counsel for Otto, and counsel for Mr. Levandowski, pertaining to potential legal exposure arising out of the proposed transaction, as covered by the attorney-client privilege, attorney work product doctrine, and common interest doctrine.

10.　　I came to understand based on conversations with other lawyers involved with the acquisition of Otto by Uber that MoFo and OMM intended to jointly retain a third-party consultant, Stroz Friedberg, LLC ("Stroz"), to conduct an investigation and develop a report about the activities of Mr. Levandowski, Mr. Ron, and certain other former Google employees who had joined Otto.  I had communications with and reviewed correspondence among the lawyers for Uber, Otto, and Mr. Levandowski in connection with draft terms for the retention of Stroz on behalf of Mr. Ron.  I understood, based on those conversations, that the purpose of this

1  joint retention of Stroz was to aid MoFo's and OMM's provision of legal advice to their

2  respective clients about potential litigation that might arise as a result of the anticipated

3  acquisition of Otto by Uber.  I regarded all of these communications as confidential work product

4  within the terms of the JDA.

5      11.    The joint defense team agreed upon a protocol and parameters for Stroz's

6  investigation.  We collectively provided instructions to Stroz as to what topics to investigate and

7  how Stroz should investigate those topics.  The directives and protocols were decided upon based

8  upon each firm's legal judgment and reasoning about potential litigation arising from Uber's

9  acquisition of Otto.  We also used the information developed by Stroz to advise our clients on

10  various legal matters, including potential litigation risks that might result from the proposed

11  merger and development of a defensive strategy in connection with those potential litigation risks.

12  These conversations in which we provided legal advice to our respective clients happened

13  repeatedly throughout the time of Stroz' engagement as we gathered more information.

14      12.    The protections I understood to be afforded by the joint defense and common

15  interest agreement were material to my advice to Mr. Ron in connection with the Stroz

16  investigation.  I had understood the JDA was intended to protect the confidentiality of

17  information Stroz learned from him during the investigation.   The protections we had sought to

18  establish in the JDA were facts I considered material in connection with providing legal advice to

19  Mr. Ron regarding participation in the Stroz process.  I understood Stroz to be retained by counsel

20  to act for those counsel to develop facts and a report for the use of such counsel in anticipated

21  litigation.

22      13.    I have no reason to believe, and I do not believe, that Stroz failed to comply with

23  its obligation to keep confidential all information learned from Mr. Ron during its investigation or

24  that Stroz has disclosed any such information to any third party other than the parties to the joint

25  defense and common interest agreement and their respective counsel.

26      14.    On August 5, 2016, Stroz provided its final report (the "Due Diligence Report") to

27  OMM, Morrison, Donahue, and L&B.  I also separately received the exhibits appended to the

28  Due Diligence Report.  The Due Diligence Report and the exhibits were transmitted securely to

1    me and were password protected.  Under the Joint Defense and Common Interest Agreement, the

2    parties were and are required to keep the Due Diligence Report in the strictest of confidence.  My

3    firm has fully complied with the requirements of the Joint Defense and Common Interest

4    Agreement.

5           15.    I have no reason to believe, and I do not believe, that the Due Diligence Report has

6    been shared with anyone other than counsel for Uber, Otto, Mr. Ron, and Mr. Levandowski (or

7    Mr. Ron and Mr. Levandowski themselves).

8           16.    I have, at all times, kept confidential the Due Diligence Report and exhibits thereto

9    confidential and have not disclosed it or its contents to anyone other than my client, Mr. Ron, and

10   my law partner, Richard Levine.

11          17.    I have no reason to believe, and do not believe, that Mr. Ron has, at any time,

12   failed to keep the Due Diligence Report and exhibits thereto confidential.  I have no reason to

13   believe, and do not believe, that he has disclosed them or their contents to anyone other than in-

14   house counsel at Uber, MoFo, OMM, Donahue, L&B, or Mr. Levandowski.

15          I declare under penalty of perjury under the laws of the United States that the foregoing is

16   true and correct.  Executed this 8th day of May, 2017, in San Francisco, California.

17

18                                          /s/ _____

19                                                     Alisa J. Baker

20

21

22

23

24

25

26

27

28

BAKER DECL. ISO DEFTS' OPPOSITION TO MOTION TO COMPEL
Case No. 3:17-cv-00939-WHA
sf-3766432

4

# EXHIBIT 6

1   MICHAEL A. JACOBS (CA SBN 111664)
    MJacobs@mofo.com
2   ARTURO J. GONZÁLEZ (CA SBN 121490)
    AGonzalez@mofo.com
3   ERIC A. TATE (CA SBN 178719)
    ETate@mofo.com
4   RUDY Y. KIM (CA SBN 199426)
    RKim@mofo.com
5   MORRISON & FOERSTER LLP
    425 Market Street
6   San Francisco, California 94105-2482
    Telephone:    415.268.7000
7   Facsimile:    415.268.7522

8

9   KAREN L. DUNN (*Pro Hac Vice*)
    kdunn@bsfllp.com
10  HAMISH P.M. HUME (*Pro Hac Vice*)
    hhume@bsfllp.com
11  BOIES SCHILLER FLEXNER LLP
    1401 New York Avenue, N.W.
12  Washington DC 20005
    Telephone:    202.237.2727
13  Facsimile:    202.237.6131

14  Attorneys for Defendants
    UBER TECHNOLOGIES, INC.
    and OTTOMOTTO LLC

15

16                UNITED STATES DISTRICT COURT

17              NORTHERN DISTRICT OF CALIFORNIA

18                 SAN FRANCISCO DIVISION

| | |
|---|---|
| 19  WAYMO LLC, | Case No.     3:17-cv-00939-WHA |
| 20              Plaintiff, | **DECLARATION OF ADAM BENTLEY IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION TO COMPEL** |
| 21        v. | |
| 22  UBER TECHNOLOGIES, INC., OTTOMOTTO LLC; OTTO TRUCKING LLC, | Date:    June 8, 2017 |
| 23              Defendants. | Time:    10:00 a.m. |
| 24  | Ctrm:    F, 15th Floor |
|     | Judge:   Magistrate Jacqueline Scott Corley |
| 25  | Trial Date: October 2, 2017 |
| 26  | |
| 27  | |
| 28  | |

I, Adam Bentley, declare as follows:

1.     I am a member of the bar of the State of California and am in-house counsel at Uber Technologies, Inc. ("Uber").  I submit this declaration in support of Defendants' Opposition to Plaintiff Waymo's Motion to Compel Production of Withheld Documents.  I have personal knowledge of the facts stated herein and, if called as a witness, I could and would testify competently as to these facts.

2.     From May 2014 to April 2016, I was counsel at the law firm O'Melveny & Myers LLP ("OMM").

3.     In January or February 2016, I began working on a matter in which OMM was hired by Ottomotto LLC ("Ottomotto") and Otto Trucking LLC ("Otto Trucking") (collectively referred to as "Otto"), to provide legal advice regarding a potential acquisition of Otto by Uber.

4.     OMM was hired to perform the negotiation and related corporate representation of Otto in connection with the potential transaction.  In addition, OMM advised Otto regarding the risk of potential litigation by Google arising out of Uber's acquisition of Otto against Uber, Otto, and two of its founders, Anthony Levandowski and Lior Ron, who had left Google to found the target companies that ultimately became Otto.

5.     OMM attorneys who primarily advised on this engagement included Paul Sieben, Eric Amdursky, and myself.

6.     Other parties to the potential transaction were separately represented by counsel. The law firm Morrison & Foerster LLP ("MoFo") represented Uber for litigation due diligence purposes and Cooley LLP represented Uber in the negotiation of the potential transaction.  Mr. Levandowski and Mr. Ron were separately represented by individual counsel.  John Gardner of Donahue Fitzgerald LLP ("Donahue") represented Mr. Levandowski, and Alisa Baker of Levine & Baker LLP ("Levine") represented Mr. Ron.

7.     On or about February 22, 2016, Otto and Uber signed a term sheet for the potential acquisition.  The term sheet set forth, among other things, the agreed economic terms of Uber's potential acquisition of Otto and an indemnification construct.

8. On or about February 24, 2016, I spoke with Eric Tate, counsel for Uber from MoFo regarding engaging a third party firm to conduct a due diligence investigation, and on February 25, 2016, I sent Mr. Tate an email confirming that Uber and Otto should proceed with the investigation under the joint defense and common interest arrangement that would later be memorialized. The email I sent to Mr. Tate on February 25, 2016 confirmed the "discussed plan re JDA."

9. I considered my communications with counsel from MoFo and for the individual parties to be confidential and treated them as such.

10. The Joint Defense, Common Interest, and Confidentiality Agreement was executed on April 11, 2016.

11. Uber and Otto authorized MoFo and OMM to jointly engage Stroz Friedberg, LLC ("Stroz"), a third-party consultant to conduct an investigation regarding the activities of Mr. Levandowski, Mr. Ron, and certain other former Google employees who had joined Otto, surrounding their respective departures from Google and onboarding to Otto. The purpose of the investigation was for Stroz to gather facts related to counsel's provision of legal advice regarding possible litigation by Google in connection with Uber's acquisition of Otto. Consistent with the belief that there was a possibility of litigation by Google, the parties agreed to an indemnity of Otto and certain Otto employees under certain circumstances. OMM and MoFo jointly retained Stroz on March 4, 2016.

12. The joint defense parties and their respective counsel agreed upon a protocol and parameters for Stroz's investigation. OMM, MoFo, Donahue, and Levine all provided directives to Stroz as to what topics to investigate and how Stroz should investigate those topics. The directives and protocols were decided upon based upon each firm's legal judgment and reasoning about potential litigation arising from Uber's acquisition of Otto.

13. As set forth in the engagement letter, Stroz agreed to provide all substantive communications about the investigation to both MoFo and OMM, and further agreed to keep confidential all information and data it received from MoFo, OMM, Uber, Otto, and Messrs.

1  Levandowski and Ron, and not to disclose any such information or data to any person other than

2  MoFo or OMM.

3        14.    Uber and Otto signed the merger agreements on April 11, 2016.

4        15.    In late April 2016, I left OMM and became in-house counsel at Ottomotto.

5        16.    On August 5, 2016, Stroz provided its final report (the "Due Diligence Report") to

6  OMM, MoFo, Donahue, and Baker.  I received the report in my capacity as in-house counsel for

7  Ottomotto.  I never received the attachments to the report.

8        17.    I have at all times treated the Due Diligence Report as privileged and confidential.

9        18.    I have never shared the Due Diligence Report with any person.

10        19.    Uber's acquisition of Ottomotto closed effective August 23, 2016.

11        I declare until penalty of perjury under the laws of the United States that the foregoing is

12  true and correct.  Executed this 8th day of May, 2017, in San Francisco, California.

14  /s/ _Adam Bentley_
                  Adam Bentley

# EXHIBIT 7

MICHAEL A. JACOBS (CA SBN 111664)
MJacobs@mofo.com
ARTURO J. GONZÁLEZ (CA SBN 121490)
AGonzalez@mofo.com
ERIC A. TATE (CA SBN 178719)
ETate@mofo.com
RUDY Y. KIM (CA SBN 199426)
RKim@mofo.com
 MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone:    415.268.7000
Facsimile:     415.268.7522

KAREN L. DUNN (*Pro Hac Vice*)
kdunn@bsfllp.com
HAMISH P.M. HUME (*Pro Hac Vice*)
hhume@bsfllp.com
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, N.W.
Washington DC 20005
Telephone:    202.237.2727
Facsimile:     202.237.6131

Attorneys for Defendants
UBER TECHNOLOGIES, INC.
and OTTOMOTTO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>Plaintiff,<br><br>v.<br><br>UBER TECHNOLOGIES, INC.,<br>OTTOMOTTO LLC; OTTO TRUCKING LLC,<br><br>Defendants. | Case No.      3:17-cv-00939-WHA<br><br>**DECLARATION OF JUSTIN SUHR IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION TO COMPEL**<br><br>Date:      June 8, 2017<br>Time:      10:00 a.m.<br>Ctrm:      F, 15th Floor<br>Judge:    The Hon. Jacqueline Scott Corley<br><br>Trial Date: October 2, 2017 |

I, Justin Suhr, declare as follows:

1.      I am a member of the bar of the State of California and am in-house counsel at, and serve as Legal Director, Employment for Uber Technologies Inc. ("Uber"). I have served in that position since April 2015. I submit this declaration in support of Defendants' Opposition to Waymo's Motion to Compel Production of the Stroz Due Diligence Report. I have personal knowledge of the facts stated herein and, if called as a witness, I could and would testify competently as to these facts.

2.      In late January 2016, Uber contacted Morrison & Foerster LLP ("MoFo") seeking to retain MoFo to provide legal advice in connection with a potential corporate transaction, which would ultimately become Uber's planned acquisition of two target companies, Ottomotto LLC ("Ottomotto") and Otto Trucking LLC ("Otto Trucking")[1] (collectively, "Otto"). Uber retained MoFo for the purpose of obtaining legal advice regarding potential litigation exposure arising out of the transaction, including and in particular, claims that could potentially be brought by Google against two of its founders, Anthony Levandowski and Lior Ron, who had left Google to found the target companies that ultimately became Ottomotto and Otto Trucking.

3.      Shortly after the initial contact, Uber retained MoFo for the purposes described in paragraph 2. Uber also retained separate counsel, Cooley LLP, to advise it on the legal, business, and financial terms of the transaction generally. I was one of the principal in-house attorneys at Uber with responsibilities connected with the legal advice described in paragraph 2.

4.      Otto was represented by the law firm O'Melveny & Myers LLP. Mr. Levandowski was represented personally by John Gardner of Donahue & Gardner LLP ("Donahue"). Mr. Ron was represented personally by Alisa Baker of Levine & Baker LLP ("Levine").

5.      Uber authorized MoFo, on Uber's behalf, to enter into a joint defense and common interest agreement with Otto, and subsequently with Mr. Levandowski and Mr. Ron. Uber

---

[1] While Uber acquired Ottomotto in August 2016, it has not acquired Otto Trucking.

1   entered into the joint defense and common interest agreement in light of the nature of the

2   proposed transaction. The target companies were recently founded and run by former employees

3   of Google. The target companies were also focused on self-driving technology, an emerging high

4   profile technology space. Based on these factors the parties entered into a joint defense and

5   common interest agreement in order to freely discuss legal risks and share legal analysis among

6   the parties to the proposed transaction without waiving the privileges and risking disclosure of

7   those discussions at some point in the future.

8       6.      The parties also contemplated the specific possibility that Google could bring

9   claims arising out of Uber's acquisition of Otto against some or all of the parties to the joint

10  defense and common interest agreement. The parties agreed it was in their collective best

11  interests to share certain confidential legal advice and analysis prepared by attorneys in

12  anticipation of litigation, as well as confidential business, technical and other information in order

13  to facilitate each party's attorneys in providing legal advice and analysis, all so as to further the

14  parties' common interest in opposing and engaging in a joint defense, against any potential

15  litigation. I understand that the joint defense and common interest agreement was entered into as

16  of at least February 24, 2016, with the express understanding that the parties would work to

17  memorialize in writing the joint defense and common interest agreement. I understand that

18  Messrs. Levandowski and Ron, and Donahue and Levine, became parties to the joint defense and

19  common interest agreement shortly thereafter.

20      7.      Recognizing that the parties were now party to a joint defense and common

21  interest agreement, I kept any communications and information pertaining to the parties' shared

22  legal interests received from OMM, Otto, Messrs. Levandowski and Ron and their respective

23  counsel at Donahue and Levine confidential and treated all such information as protected by the

24  attorney-client privilege, attorney work product doctrine, and/or common interest doctrine. I have

25  also spoken with all Uber in-house counsel listed in paragraph 13 below, and confirmed that each

26  of them did, as well.

27      8.      I understand that on or about April 11, 2016, the parties executed the Joint

28  Defense, Common Interest and Confidentiality Agreement ("JDA"). The JDA states that it

memorializes the parties' pre-existing understanding and oral agreement and confirms the terms

and conditions thereof.  I worked with MoFo on drafting, revising, and negotiating the written

JDA.

9.      In order to facilitate MoFo's legal advice and analysis for which it was retained as

described above, Uber authorized MoFo to engage a third-party consultant, Stroz Friedberg, LLC

("Stroz"), to aid MoFo by investigating information from the founders of Otto and some of its

employees, all of whom previously worked for Google.  Uber also authorized MoFo to retain

Stroz jointly with OMM, in connection with OMM's representation of Otto.  MoFo entered into

an engagement agreement with Stroz as of March 4, 2016.

10.      While in-house counsel at Uber regularly advise on legal risks that stem from a

proposed merger, acquisition, technology purchase, or the like, the retention of a consultant like

Stroz to perform the investigation described above is atypical when aiding in the provision of

legal advice for most acquisition diligence.  However, in light of the litigation risks that the

proposed acquisition presented (prior to any understanding of the facts informing those risks), as

discussed in paragraph 5 above, Uber took the additional, unique step of authorizing the Stroz

investigation, and would not have done so absent the litigation risk.

11.      Recognizing that Uber, Otto, Mr. Levandowski, and Mr. Ron were parties to a

joint defense and common interest agreement, Stroz agreed to keep confidential all

communications with MoFo, OMM, Uber, Otto, Messrs. Levandowski and Ron and their

respective counsel at Donahue and Levine confidential and to treat all information which Stroz

received as protected by the attorney-client privilege, attorney work product doctrine, and/or

common interest doctrine.

12.      Stroz's investigative work was guided by directives from MoFo, OMM, Donahue,

and Levine regarding what topics to investigate and how Stroz should investigate these topics.

MoFo provided these directives to Stroz after consulting with me and other in-house counsel at

Uber.

13.      On August 5, 2016, Stroz provided its report (the "Report") to MoFo, OMM,

Donahue, and Baker.  MoFo sent the Report to me, as well as other in-house counsel at Uber.

Angela Padilla, Esq., Andrew Glickman, Esq., Todd Hamblet, Esq., Christian Lymn, Esq., and Robert Wu, Esq., all of whom are in-house counsel at Uber, received copies of the Report. The Report is marked "Privileged & Confidential / Attorney Work Product." The Report was password protected.

14. I understand that, after issuing the Report, Stroz sent MoFo an Appendix of Exhibits to the Report. I do not recall receiving the Appendix of Exhibits until after the current litigation was filed. No Uber employee received the Appendix of Exhibits around the time that Stroz provided it to MoFo, and no Uber employee received it until after this above-captioned litigation was filed. I understand that no employee and specifically, no in-house counsel at Uber, received the Appendix of Exhibits until after this litigation was filed.

15. I have kept confidential at all times the Report, the Appendix of Exhibits, and the information contained in the Report and Appendix of Exhibits, and have always treated these materials as covered by attorney-client privilege, attorney work product doctrine, and the common interest doctrine. Other than the Uber in-house counsel named in this declaration and Uber's outside counsel of record in the above-captioned litigation, I have never shared the Report or the Appendix of Exhibits with any person, including any non-attorney at Uber.

16. I have also spoken with all Uber attorneys who received a copy of the Report as reflected in paragraph 13 herein. Each of them has kept confidential at all times the Report and the information contained therein, and has always treated these materials as covered by attorney-client privilege, attorney work product doctrine, and the common interest doctrine. None of them has ever shared the Report with any person, including any non-attorney at Uber, other than with Uber in-house counsel and Uber's outside counsel of record in this litigation. Additionally, none of the Uber employees listed in paragraph 13 received the Appendix of Exhibits prior to initiation of this litigation.

17. I did not receive, nor was I made aware of, any communications from Google, Waymo, or their counsel prior to the filings of the confidential arbitration matters filed against the founders of Otto that indicated they intended to bring legal action against Uber or Otto, or

1    Messrs. Levandowski or Ron. I was made aware of the confidential arbitration matters on or

2    about October 28, 2016, and Uber issued a litigation hold soon thereafter on November 10, 2016.

3         18.     I declare until penalty of perjury under the laws of the United States that the

4    foregoing is true and correct. Executed this 8th day of May, 2017, in San Francisco, California.

6          /s/

7                 Justin Suhr

# EXHIBIT 8

MILES EHRLICH (Bar No. 237954)
miles@ramsey-ehrlich.com
ISMAIL RAMSEY (Bar No. 189820)
izzy@ramsey-ehrlich.com
AMY CRAIG (Bar No. 269339)
amy@ramsey-ehrlich.com
**RAMSEY & EHRLICH LLP**
803 Hearst Avenue
Berkeley, CA 94710
(510) 548-3600 (Tel)
(510) 291-3060 (Fax)

Attorneys for Non-Party
ANTHONY LEVANDOWSKI

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>          Plaintiff,<br><br>     v.<br><br>UBER TECHNOLOGIES, INC., *et al.*,<br><br>          Defendants. | Case No.:  3:17-cv-00939-WHA<br><br>**NON-PARTY ANTHONY LEVANDOWSKI'S OPPOSITION TO MOTION TO COMPEL**<br><br>Date:  June 8, 2017<br>Time:  10:00 a.m.<br>Ctrm:  F, 15th Floor<br>Judge:  The Honorable Jacqueline Scott Corley<br><br>Trial Date:  October 2, 2017 |

# <u>TABLE OF CONTENTS</u>

**Page(s)**

I.   INTRODUCTION ................................................................................................................ 1

II.  BACKGROUND ................................................................................................................. 1

III. ARGUMENT ...................................................................................................................... 3

    A. Attorney-Client Privilege, Work Product Doctrine, and Common Interest Privilege All Protect the Stroz Friedberg Report ................................................................... 3

       1. The Stroz Friedberg Report is attorney-client privileged. ........................... 3

       2. Stroz Friedberg's work is protected attorney work product ......................... 5

       3. A valid common interest existed. ................................................................. 7

       4. Mr. Levandowski's reasonable reliance on the existence of a privilege warrants recognizing privilege. .................................................................... 9

    B. The Crime-Fraud Exception Does Not Apply. ...................................................... 11

IV. CONCLUSION ................................................................................................................. 12

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Admiral Ins. Co. v. U.S. District Court,*
5
   881 F.2d 1486 (9th Cir. 1989).................................................................................................5

6

*B.C.F. Oil Ref., Inc. v. Consol. Edison Co. of N.Y.,*
   168 F.R.D. 161 (S.D.N.Y. 1996) .............................................................................................7
7

*BriteSmile, Inc. v. Discus Dental Inc.,*
8
   No. C 02-3220 JSW (JL), 2004 WL 2271589, (N.D. Cal. Aug. 10, 2004), *aff'd,*
   No. C 02-03220 JSW, 2004 WL 3331770 (N.D. Cal. Oct. 26, 2004) ...........................................8
9

*Callwave Commc'ns, LLC v. Wavemarket, Inc.,*
10
   No. C 14-80112 JSW (LB), 2015 WL 831539 (N.D. Cal. Feb. 23, 2015) .......................................8

11
*Clark v. United States,*
12
   289 U.S. 1 (1933)....................................................................................................................11

13
*Fisher v. United States,*
   425 U.S. 391 (1976)................................................................................................................12
14

*F.T.C. v. Grolier Inc.,*
15
   462 U.S. 19 (1983)....................................................................................................................5

16
*Griffin v. California,*
17
   380 U.S. 609 (1965)................................................................................................................12

18
*Hewlett-Packard Co. v. Bausch & Lomb, Inc.,*
   115 F.R.D. 308 (N.D. Cal. 1987) .............................................................................................8
19

*Holmes v. Collection Bureau of Am., Ltd.,*
20
   No. C 09-02540 WHA, 2010 WL 143484 (N.D. Cal. Jan. 8, 2010)........................................7, 8

21
*Hunydee v. United States,*
22
   355 F.2d 183 (9th Cir. 1965)....................................................................................................8

23
*In re Asia Glob. Crossing, Ltd.,*
   322 B.R. 247 (Bankr. S.D.N.Y. 2005) ......................................................................................9
24

*In re Copper Mkt. Antitrust Litig.,*
25
   200 F.R.D. 213 (S.D.N.Y. 2001) ..............................................................................................9

26
*In re Grand Jury Investigation,*
27
   810 F.3d 1110 (9th Cir. 2016)..................................................................................................11

28

*In re Grand Jury Proceedings*,
   87 F.3d 377 (9th Cir. 1996) ................................................................................................11

*In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)*,
   357 F.3d 900 (9th Cir. 2004) ................................................................................................5

*MediaTek Inc. v. Freescale Semiconductor, Inc.*,
   No. 411CV05341YGRJSC, 2013 WL 5594474 (N.D. Cal. Oct. 10, 2013) .........................5

*Miller v. Int'l Bus. Machines*,
   No. C02-2118 MJJ(MEJ), 2006 WL 6619990 (N.D. Cal. Apr. 14, 2006) .........................9

*Rembrandt Patent Innovations, LLC v. Apple Inc.*,
   No. C 14-05093 WHA, 2016 WL 427363 (N.D. Cal. Feb. 4, 2016) ...................3, 4, 7, 8

*Republic Gear Co. v. Borg-Warner Corp.*,
   381 F.2d 551 (2d Cir. 1967) ................................................................................................4

*Samuels v. Mitchell*,
   155 F.R.D. 195 (N.D. Cal. 1994) ........................................................................................6

*S.E.C. v. Berry*,
   No. C07-04431 RMW HRL, 2011 WL 825742 (N.D. Cal. Mar. 7 2011) .........................7

*Segerstrom v. United States*,
   No. C 00-0833 SI, 2001 WL 283805 (N.D. Cal. Feb. 6, 2001) .....................................4, 5

*Speaker ex rel. Speaker v. Cty. of San Bernardino*,
   82 F. Supp. 2d 1105 (C.D. Cal. 2000) ..............................................................................10

*Sullivan v. Warminster Twp.*,
   274 F.R.D. 147 (E.D. Pa. 2011) ..........................................................................................6

*Upjohn Co. v. United States*,
   449 U.S. 383 (1981) ..................................................................................................3, 4, 9

*United States v. Bauer*,
   132 F.3d 504 (9th Cir. 1997) ............................................................................................10

*United States v. Gonzalez*,
   669 F.3d 974 (9th Cir. 2012) ..............................................................................................7

*United States v. Ostrer*,
   422 F. Supp. 93 (S.D.N.Y. 1976) .....................................................................................10

*United States v. Rivera*,
   837 F. Supp. 565 (S.D.N.Y. 1993) ...................................................................................10

*United States v. Ruehle*,
   583 F.3d 600 (9th Cir. 2009) ..............................................................................................3

iii

*United States v. Spector*,
    793 F.2d 932 (8th Cir. 1986) ........................................................................................9

*United States v. Zolin*,
    491 U.S. 554 (1989) ..............................................................................................11, 12

**Other Authorities**

Fed. R. Civ. P. 26(b)(3) ................................................................................................5

8 J. Wigmore, Wigmore on Evidence § 2298 (J. McNaughton rev. ed. 1961) ....................12

56 F.R.D. 183 ..........................................................................................................9, 10

iv

Defendant Anthony Levandowski ("Mr. Levandowski") submits the following papers in opposition to Plaintiff Waymo LLC's ("Waymo") Motion to Compel (Dkt. No. 147).

**I.    INTRODUCTION**

A few facts here are undisputed:

- Bracing themselves for potential litigation with Google and/or Waymo, the parties hired litigation counsel to help them prepare a future defense.
- The parties recognized that the threat was common to all of them.
- The parties expressed their common interest in oral communications, through emails, and in a Joint Defense, Common Interest, and Confidentiality Agreement (the "Joint Defense Agreement").
- Litigation counsel then hired a consultant to assist with a factual investigation.
- The information obtained by the consultant was used by litigation counsel to develop a defensive strategy in case Google and/or Waymo sued.

Despite these uncontradicted facts, Waymo now argues that the parties were acting for a business, not legal, purpose, and seeks to eviscerate the well-settled protections of attorney-client privilege, work product protection, and common interest privilege. The sworn record establishes that Waymo is wrong, and that the Stroz Friedberg work was done for a legal purpose. This Court should deny Plaintiff Waymo's Motion to Compel privileged documents.

**II.    BACKGROUND**

This is a motion about documents that lawyers and their consultant created to prepare for litigation that was likely to occur following a proposed corporate transaction. In 2016, Uber Technologies, Inc. ("Uber") considered partnering with Ottomotto LLC ("Ottomotto") and Otto Trucking LLC ("Otto Trucking," and collectively with Ottomotto, "Otto"). Declaration of Eric A. Tate ("Tate Decl.") ¶ 2. Mr. Levandowski and Lior Ron ("Mr. Ron") were former Google employees who had left to form Otto.[1] *Id.* ¶ 3. The Common Interest Group was concerned that Uber's

---

[1] For the purposes of this Motion, Uber, Ottomotto, Otto Trucking, Mr. Levandowski, and Mr. Ron are collectively referred to as the "Common Interest Group."

acquisition of Ottomotto ("Uber-Ottomotto acquisition") could spark intense litigation from Google/Waymo because of "the potentially billion dollar commercial market involved." Declaration of John F. Gardner ("Gardner Decl.") ¶ 3.

Members of the Common Interest Group retained counsel to provide legal advice surrounding the transaction and to prepare for litigation that might occur as a result of the transaction. Mr. Levandowski retained John F. Gardner ("Mr. Gardner") of Donahue Fitzgerald LLC to "evaluate those risks, anticipate defenses, and assess legal strategies." *Id.* ¶ 4. Mr. Ron retained Alisa Baker of Levine & Baker LLP. Tate Decl. ¶ 4. Uber retained Morrison & Foerster LLP ("Morrison") to advise on "potential claims that could be brought by Google against two of [Ottomotto's] founders, Anthony Levandowski and Lior Ron, who had left Google to create the target companies that ultimately became Ottomotto and Otto Trucking." *Id.* ¶ 3. Otto retained O'Melveny & Myers LLP ("O'Melveny"). *Id.* ¶ 4. Separate corporate lawyers were also employed to advise the parties with respect to the corporate acquisition. *Id.* The corporate transaction counsel for Uber was Cooley LLP, and the corporate transaction counsel for Otto were corporate transactional lawyers at O'Melveny. *Id.* ¶¶ 3–4.

From the very beginning, the Common Interest Group recognized their shared common interest in defending against legal claims. Gardner Decl. ¶¶ 3–4. They also recognized that to prepare a defense, they needed to ensure that communications between them remained confidential and privileged. *Id.* ¶ 4. Accordingly, the Common Interest Group orally entered into a common interest agreement, sent emails demonstrating their understanding, and later memorialized their oral agreement by executing a written joint defense agreement. Tate Decl. ¶¶ 6–8, 10; Gardner Decl. ¶¶ 8–10. At all times, the Common Interest Group and their counsel operated within the boundaries of their common interest privilege – namely, they operated with the understanding that information gathered and documents shared would remain privileged and confidential among the Common Interest Group. *See, e.g.*, Gardner Decl. ¶ 9 ("I would not have communicated freely with these parties, in particular with respect to the Stroz investigation, but for my understanding that those communications were privileged.").

Morrison and O'Melveny retained an investigative firm, Stroz Friedberg, to conduct a

1  detailed investigation. These were litigation consultants hired by litigation counsel to help prepare a

2  litigation defense. During the course of the resulting investigation, Morrison and O'Melveny

3  litigators regularly consulted with Stroz Friedberg personnel to learn relevant facts and information

4  so they could better craft legal advice for Otto and Uber regarding potential litigation. Mr.

5  Levandowski and Mr. Ron's counsel also interacted with Stroz Friedberg to provide guidance as to

6  the investigation. During the investigation, each of the lawyers discussed issues with Stroz Friedberg

7  and gave litigation advice as a result of what they learned. Once Stroz Friedberg concluded its

8  investigation, it summarized its legal findings in a report published in August 2016 (the "Stroz

9  Friedberg report").[2] The Common Interest Group used the Stroz Friedberg investigation and

10 resulting report to craft and define much of their litigation defense strategy. The Stroz Friedberg

11 report is the centerpiece of the present dispute.

12 **III.  ARGUMENT**

13      **A.  Attorney-Client Privilege, Work Product Doctrine, and Common Interest Privilege All Protect the Stroz Friedberg Report.**

14

15           1.  The Stroz Friedberg Report is attorney-client privileged.

16      Waymo wants a copy of the Stroz Friedberg report. Waymo should not get it. It is attorney-

17 client privileged.

18      The attorney-client privilege protects confidential communications between attorneys and

19 clients for the purpose of giving legal advice. *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

20 The privilege exists where: "(1) . . . legal advice of any kind is sought (2) from a professional legal

21 adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in

22 confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by

23 himself or by the legal adviser, (8) unless the protection be waived." *Rembrandt Patent Innovations,*

24 *LLC v. Apple Inc.*, No. C 14-05093 WHA, 2016 WL 427363, at *3 (N.D. Cal. Feb. 4, 2016) (quoting

25 *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009)). The attorney-client privilege may extend

26

27 [2] For purposes of this memorandum, "Stroz Friedberg report" refers to both the report and its exhibits.

28

to communications with third parties who have been engaged to help the attorney provide legal advice. *See, e.g.*, *Segerstrom v. United States*, No. C 00-0833 SI, 2001 WL 283805, at *2 (N.D. Cal. Feb. 6, 2001) ("The [attorney-client] privilege also covers papers prepared by the attorney or by a third party at the attorney's request for the purpose of advising the client, insofar as the papers are based on and would tend to reveal the client's confidential communications.") (citation omitted).

The attorney-client privilege "exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn Co.*, 449 U.S. at 390 (citations omitted). However, the privilege belongs to the client, regardless of whether the client is a party to the case in which the communication is sought. *See, e.g.*, *Republic Gear Co. v. Borg-Warner Corp.*, 381 F.2d 551, 556 (2d Cir. 1967) ("Not only may an attorney invoke the privilege in his client's behalf when the client is not a party to the proceeding in which disclosure is sought but he should do so, for he is duty-bound to raise the claim in any proceeding in order to protect communications made in confidence.") (internal quotations and citations omitted). It is an attorney's duty to invoke the privilege on the client's behalf and refuse to reveal confidential communications; the attorney cannot waive privilege on the client's behalf. *Id.*

It is undisputed that Mr. Levandowski's communications with his own lawyer, Mr. Gardner, are attorney-client privileged. In January 2016, prior to the creation of the Stroz Friedberg report and the execution of the Joint Defense Agreement, Mr. Levandowski consulted with Mr. Gardner to receive personal counsel regarding his departure from Google and his joining Uber as part of the Uber-Ottomotto acquisition. From the outset, Mr. Levandowski recognized —as did the Defendants—that Google might initiate litigation following Uber's acquisition of Ottomotto.

Contrary to Waymo's unsupported allegations, Mr. Levandowski's communications *were* offered so that Mr. Gardner could plan a legal defense. His communications with the Common Interest Group were made in a manner to ensure that his privilege was not waived and that it remained confidential. Mr. Levandowski's confidential communications to Mr. Gardner in order to receive candid legal advice is textbook attorney-client privileged information. *See, e.g.*, *Rembrandt Patent Innovations, LLC*, 2016 WL 427363, at *5–6 (finding attorney-client privilege and rejecting

1  plaintiff's argument that attorney-client communications and disclosures were made for commercial

2  interests, rather than legal interests, when they occurred for "conducting due diligence, perfecting

3  title in [a] patent, identifying targets for litigation, and developing legal strategies").

4      Waymo mistakenly argues that  Mr. Levandowski waived any attorney-client privilege by

5  interacting with Stroz Friedberg.  Mr. Levandowski was Ottomotto's Chief Executive Officer.  Stroz

6  Friedberg's investigation—as well as its final report—are protected by the attorney-client privilege

7  because Stroz Friedberg's work was to assist the lawyers advising Mr. Levandowski, Ottomotto, and

8  the other parties.   Litigation counsel retained Stroz Friedberg to assist all parties.  The Stroz

9  Friedberg report was created at the direction of litigation counsel, supervised by litigation counsel,

10  and delivered to litigation counsel and no one else.  When a consultant is hired to assist litigation

11  counsel, privilege extends to those consultants.  No waiver occurs when the consultation was

12  "primarily or predominantly to facilitate legal advice."  *See MediaTek Inc. v. Freescale*

13  *Semiconductor, Inc.*, No. 411-CV-05341 YGR JSC, 2013 WL 5594474, at *3 (N.D. Cal. Oct. 10,

14  2013) ("[I]f [a] third-party consultant is involved in the giving of legal advice, the privilege obtains."

15  ) (citations omitted); *see also Segerstrom*, 2001 WL 283805, at *4 (N.D. Cal. Feb. 6, 2001) (finding

16  no waiver of attorney-client privilege where "communications between third parties and the attorneys

17  were rendered at the attorneys' request to assist in providing legal services to the clients").

18                  2.    <u>Stroz Friedberg's work is also protected attorney work product.</u>

19      The Stroz Friedberg report is attorney work product.  The work-product doctrine protects

20  "from discovery documents and tangible things prepared by a party or his representative in

21  anticipation of litigation."  *Admiral Ins. Co. v. U.S. District Court*, 881 F.2d 1486, 1494 (9th Cir.

22  1989); *see also* Fed. R. Civ. P. 26(b)(3).  Rule 26(b)(3) protects materials prepared for any litigation

23  or trial as long as they were prepared by or for a party to the subsequent litigation.  *See F.T.C. v.*

24  *Grolier Inc.*, 462 U.S. 19, 25 (1983).  The standard for attorney work product does not consider

25  whether litigation was a primary or secondary motive behind the creation of a document.  *In re*

26  *Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)*, 357 F.3d 900, 908 (9th Cir. 2004).  Rather, it

27  considers the totality of the circumstances and affords protection when it can fairly be said that the

28  "document was created because of anticipated litigation, and would not have been created in

1  substantially similar form but for the prospect of that litigation." *Id.*

2       The Stroz Friedberg report was produced in anticipation of litigation.  Gardner Decl. ¶ 6.

3  Here, the Common Interest Group recognized the need to prepare for a potential future suit with

4  Google/Waymo, and commissioned an investigation and report by Stroz Friedberg to inform their

5  legal strategy.  In fact, the Common Interest Group entered their Joint Defense Agreement in order to

6  expedite the process of sharing confidential information in preparation of anticipated litigation after

7  acquisition.  Baker Decl. ¶¶ 5,6.  Notably, in entering a joint defense agreement, Mr. Levandowski

8  and Otto expressly preserved their right to attorney client-privilege and work-product immunity:

9  "[Otto and Mr. Levandowski], as the holder of those privileges, do[] not intend any communications

10  between [the parties] to be deemed a waiver of [attorney-client and attorney work product] privileges

11  whether not specifically referenced in a particular document or communication, and whether or not

12  we enter into a formal Joint Defense Agreement with respect those matters."

13       The fact that the acquisition of Ottomotto was being finalized while the Common Interest

14  Group was obtaining this report is beside the point.  A term sheet had already been signed.  Uber had

15  already agreed to the acquisition.  The Common Interest Group had a separate need to share

16  information through a joint defense agreement to prepare for possible litigation.  The Common

17  Interest Group shared an interest in ensuring that the individual group members complied with all

18  legal obligations to protect individual attorney-client privileges and work product protections.

19       Waymo incorrectly argues that the Common Interest Group waived their work product

20  protection by sharing information with Stroz Friedberg.  Stroz Friedberg was part of the team that

21  helped inform the litigation strategy, and was part of the investigative team creating the work

22  product.  In addition, work product protection is not waived by merely sharing information with third

23  parties when parties share an interest.  Rather, work product is only waived when disclosed to an

24  adversary or to someone who "substantially increase[s] the opportunities for potential adversaries to

25  obtain the information."  *Samuels v. Mitchell*, 155 F.R.D. 195, 200 (N.D. Cal. 1994) (citation

26  omitted); *see also Sullivan v. Warminster Twp.*, 274 F.R.D. 147, 150 (E.D. Pa. 2011) ("disclosure to a

27  third party only waives the work-product privilege if it permits an adversary to gain access to the

28  information").

This rule makes sense, as retention of consultants is often necessary to develop litigation strategy. For that reason, Courts have held that disclosing work product to a witness or third party does not waive protection because such disclosures are often necessary to enable the attorney to prepare for litigation. This understanding is consistent with the purposes of the work product doctrine. *See S.E.C. v. Berry*, No. C07-04431 RMW HRL, 2011 WL 825742, at *6–8 (N.D. Cal. Mar. 7 2011) (disclosure of work product to independent auditors does not waive protection); *see also B.C.F. Oil Ref., Inc. v. Consol. Edison Co. of N.Y.*, 168 F.R.D. 161, 165–66 (S.D.N.Y. 1996) (waiver does not occur when subject of investigative interview is given copy of interview transcript).

### 3. A valid common interest existed.

The common interest privilege also applies here, and precludes waiver of the attorney-client privilege or work product protection. The Common Interest Group recognized at the outset that they shared a common legal interest in connection with the Uber-Otto acquisition. As Judge Alsup explained:

> [An exception to the waiver of privilege] applies where parties are represented by separate counsel but engage in a common legal enterprise. The interests of the parties involved in a common defense need not be identical, *and, indeed may even be adverse in some respects*. The joint-defense exception, however, protects only those communications that are part of an on-going and joint effort to set up a common defense strategy.

*Rembrandt Patent Innovations, LLC*, 2016 WL 427363, at *7 (citing *Holmes v. Collection Bureau of Am., Ltd.*, No. C 09-02540 WHA, 2010 WL 143484, at *3 (N.D. Cal. Jan. 8, 2010)) (emphasis added). This privilege is so strong that no one member of a joint interest group can waive it. *United States v. Gonzalez*, 669 F.3d 974, 982–83 (9th Cir. 2012).

What was true in *Rembrandt* remains true here. The Common Interest Group—Uber, Ottomotto, Otto Trucking, Mr. Levandowski, and Mr. Ron—were, from the outset, concerned about litigation in connection with the Uber-Otto acquisition. They were concerned that Google might litigate as a result of the transaction and, on that basis, sought legal counsel to help prepare a defense. Or as Judge Alsup put it in *Rembrandt Patent Innovations, LLC*, they were "part of an on-going and

7

1    joint effort to set up a common defense strategy."  2016 WL 427363, at *7.

2         Waymo claims that the form of the transaction here precludes a finding of common legal

3    interest.  Waymo is wrong.  *Rembrandt Patent Innovations, LLC* expressly recognizes that

4    circumstances surrounding the assertions of privilege may be nuanced and not subject to such

5    sweeping and generalized premises.  *Id.* at *7 ("The interests of the parties involved in a common

6    defense need not be identical, *and, indeed may even be adverse in some respects.*") (emphasis added);

7    *accord Hunydee v. United States*, 355 F.2d 183, 185 (9th Cir. 1965); *Holmes v. Collection Bureau of*

8    *Am., Ltd.*, No. C 09-02540 WHA, 2010 WL 143484, at *2 (N.D. Cal. Jan. 8, 2010).  The fact that

9    Uber was acquiring Ottomotto does not preclude the inquiry surrounding common-interest privilege,

10   but invites it.

11        Indeed, this District has recognized that such common legal interests exist in the buyer-seller

12   context, *see, e.g.*, *BriteSmile, Inc. v. Discus Dental Inc.*, No. C 02-3220 JSW (JL), 2004 WL

13   2271589, at *2 (N.D. Cal. Aug. 10, 2004), *aff'd*, No. C 02-03220 JSW, 2004 WL 3331770 (N.D. Cal.

14   Oct. 26, 2004) (affirming Judge Larson's finding of common legal interest in connection with

15   technology acquisition); *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 115 F.R.D. 308, 310 (N.D.

16   Cal. 1987) (finding the parties had a common legal interest in connection with the sale of a business),

17   and in cases where the parties enter into indemnification agreements among each other, *see, e.g.*,

18   *Callwave Commc'ns, LLC v. Wavemarket, Inc.*, No. C 14-80112 JSW (LB), 2015 WL 831539, at *4

19   (N.D. Cal. Feb. 23, 2015) (Judge Beeler explaining that the parties "have an interest in defeating . . .

20   claims of patent infringement in the Underlying Litigation.  That they also have negotiated possible

21   indemnification with respect to those claims does not necessarily cancel that out.").

22        Waymo strains to characterize the Joint Defense Agreement as a document purporting to

23   show a common *business* interest among the Common Interest Group.  This is not a case where a

24   consultant is hired, does not interact with counsel, and only later does a party try to claim attorney-

25   client and attorney work product immunity.  Even a cursory reading of the Joint Defense Agreement,

26   the retention of Stroz Friedberg, or the report itself demonstrates that the interest here was legal, not

27   business.  The parties entered into the Joint Defense Agreement to memorialize their understanding

28   that they shared common legal interests with respect to the Uber-Otto acquisition.  Tate

8

Decl. ¶ 6. Uber and Otto also executed an indemnification agreement that, *inter alia*, engaged Stroz Friedberg to conduct an investigation related to the transaction. Gardner Decl. ¶¶ 5–6. The goal of Stroz Friedberg's investigation and report was to assist litigation counsel in preparing a litigation defense. All communications were with litigation counsel to advance a defense objective. Here, the consultant was hired for a litigation purpose at the very beginning, and the Common Interest Group vigorously maintained confidentiality in their communications and work product.

### 4. Mr. Levandowski's reasonable reliance on the existence of a privilege warrants recognizing privilege.

Mr. Levandowski's reliance on the privilege and work product protections provide an independent basis to find that each of these protections apply. The cornerstone of the attorney-client privilege is to protect the client against the invasion of its most sensitive and confidential communications with its lawyers, and to encourage the complete disclosure of information between attorney and client, all furthering the interests of justice. *Upjohn Co.*, 449 U.S. at 389. The privilege "exists to protect not only the giving of professional advice to those who can act on it, but also the giving of information to the lawyer to enable him to give sound and informed advice." *Id.* at 390.

When a client reasonably believes that the individual with whom he or she was communicating was an attorney competent to render legal advice, those communications are privileged. The Supreme Court articulated this "reasonable belief" test in Supreme Court Standard 503, which provides that for purposes of applying attorney-client privilege, an attorney is defined as a "person authorized, or reasonably believed by the client to be authorized, to practice law in any state or nation." Supreme Court Standard 503(a)(2), 56 F.R.D. 183, 236 (1973).[3] Further, the "reasonable belief" standard has long been followed by federal courts, including courts in this District. *See, e.g.*, *Miller v. Int'l Bus. Machines*, No. C02-2118 MJJ(MEJ), 2006 WL 6619990, at *6 (N.D. Cal. Apr. 14, 2006) (finding the attorney-client privilege protected the production of communications and documents when the plaintiff "could have reasonably believed that [a third party] was acting as a

---

[3] Standard 503 is generally considered an authoritative restatement of federal common law. *United States v. Spector*, 793 F.2d 932, 938 (8th Cir. 1986), *cert. denied*, 479 U.S. 1031 (1987); *see also In re Copper Mkt. Antitrust Litig.*, 200 F.R.D. 213, 217–18 n.2 (S.D.N.Y. 2001).

lawyer"); *Speaker ex rel. Speaker v. Cty. of San Bernardino*, 82 F. Supp. 2d 1105, 1112 (C.D. Cal. 2000) ("[S]everal courts and treatises have stated that where a client reasonably believed that her/his confidential communication was with an attorney, the attorney/client privilege still applies."); *United States v. Rivera*, 837 F. Supp. 565, 568 n.1 (S.D.N.Y. 1993) (same).

Mr. Levandowski, Mr. Ron, Uber, and Otto took pains to ensure from the start that communications and documents necessary for counsel to render competent legal advice remained protected among all parties. Mr. Levandowski is entitled to reasonably rely upon the assured confidentiality. Mr. Levandowski retained Mr. Gardner as his counsel. It was on this basis that he revealed to Mr. Gardner information regarding his tenure at Waymo, his role in launching Ottomotto and Otto Trucking, and, importantly, the documents that now form the subject of this motion. Waymo's request seeks to undermine a fundamental protection afforded by our legal system. *See United States v. Bauer*, 132 F.3d 504, 510 (9th Cir. 1997) ("It is important to note that the attorney-client privilege is, perhaps, the most sacred of all legally recognized privileges, and its preservation is essential to the just and orderly operation of our legal system."). Moreover, when it became clear that Uber would acquire Ottomotto and Otto Trucking, Mr. Levandowski took reasonable steps to preserve that privilege throughout the entirety of the acquisition process. Gardner Decl. ¶¶ 8–10, 12. Mr. Levandowski, Ottomotto, Otto Trucking, and Uber recognized that all parties shared common legal interests in the course of the acquisition. *Id.* ¶ 4. The Common Interest Group entered into an oral agreement memorializing their understanding of protected information, and weeks later entered into the written Joint Defense Agreement.

### B. The Crime-Fraud Exception Does Not Apply

Waymo argues that it is entitled to discovery of the privileged documents on the basis of the crime-fraud exception. However, Waymo fails to make any of the requisite showings necessary to establish that the exception applies here.

To invoke the crime-fraud exception, Waymo must satisfy the Ninth Circuit's two-part test:

> First, the party must show that "the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme." Second, it must demonstrate that the attorney-client communications for which production is sought are "sufficiently

related to" and were made "*in furtherance of* [the] intended, or present, continuing illegality."

*In re Grand Jury Investigation*, 810 F.3d 1110, 1113 (9th Cir. 2016) (citations omitted) (emphasis added). Here, Waymo fails to show either; Waymo does not identify any ongoing crime or fraud, nor does it point to any attorney-client communications that were used in furtherance of that alleged crime or fraud.

To prevail, Waymo must set forth a reasonable basis that Mr. Levandowski was committing or intending to commit a crime or fraud *at the time* that he sought the advice from his attorney. Waymo has not met this burden.

The timing of the crime that Waymo alleges occurred here is important. The exception applies to ongoing or future crimes only, and does not overcome the attorney-client privilege with respect to communications of past wrongdoings, the commission of which have ceased by the time the client sought the advice of counsel. *See United States v. Zolin*, 491 U.S. 554, 562–63 (1989) ("The attorney-client privilege 'ceas[es] to operate at a certain point, namely, where the desired advice refers *not to prior wrongdoing*, but to *future wrongdoing*.'" (citing 8 J. Wigmore, § 2298 (McNaughton Rev. 1961) (emphasis in original); *Clark v. United States*, 289 U.S. 1, 15 (1933)); *see also In re Grand Jury Proceedings*, 87 F.3d 377, 381 (9th Cir. 1996) (affirming district court's finding of no crime-fraud exception, and explaining that "the [crime-fraud] exception does not sweep so broadly that it discourages clients from 'mak[ing] full disclosure to their attorneys of *past* wrongdoings, in order that the client may obtain the aid of persons having knowledge of the law and skilled in its practice'") (citing *Zolin*, 491 U.S. at 562).

Waymo's factual argument reflects that no ongoing crime or fraud existed when Mr. Levandowski sought the advice of counsel. Waymo alleges that Mr. Levandowski's crime was in the commission of trade secret theft. Mot. at 13. That occurred, Waymo alleges, prior to Mr. Levandowski's departure from Google. The documents at issue here were created at least two months *after* Mr. Levandowski left Google.

Waymo next contends that the ongoing criminal activity is in the ongoing *concealment* of trade secret misappropriation by way of Defendants' refusal to produce the documents. Mot. at 14

11

1  ("There is also substantial evidence that the withheld Stroz Friedberg report is related to and in

2  furtherance of at least concealing that trade secret theft."). The mere act of *withholding* information

3  from the subpoenaing party cannot form the basis of waiving attorney-client privilege via the crime-

4  fraud exception because the very purpose of the attorney-client privilege is to maintain the

5  confidences of communications between clients and their attorneys. *Zolin*, 491 U.S. at 562

6  (expressly recognizing that "the [attorney-client] privilege has the effect of *withholding* relevant

7  information from the factfinder") (emphasis added) (quoting *Fisher v. United States*, 425 U.S. 391,

8  403 (1976)).

9     Finally, Waymo requests the Court to nevertheless pierce the privilege on the basis that the

10  Court "may draw [] an inference" of wrongdoing. Mot. at 13–14 ("The Court may infer from these

11  invocations of the Fifth Amendment that Mr. Levandowski and Defendants had a common interest in

12  planning, engaging in, or concealing the misappropriation of Waymo's trade secrets."). But again,

13  such an interpretation misapplies the crime-fraud exception. The inference is the first step, not the

14  last, in determining whether the exception applies. To otherwise follow Waymo's argument to its

15  logical conclusion: invoking a privilege in one manner, *i.e.*, through the Fifth Amendment, would by

16  itself revoke privilege in another, *i.e.*, the attorney-client privilege. Of course, this makes no sense,

17  nor is it supported in law. *See Griffin v. California*, 380 U.S. 609, 614 (1965) (recognizing that

18  allowing an opponent to comment on a claim of privilege would seriously undermine the value of the

19  privilege, and therefore forbidding prosecutors to comment on an accused's assertion of the Fifth

20  Amendment privilege against self-incrimination).

21  **IV.    CONCLUSION**

22     For the foregoing reasons, Mr. Levandowski respectfully requests that the Court DENY

23  Plaintiff Waymo's Motion to Compel.

24

25

26

27

28

Dated: May 8, 2017

Respectfully submitted,

By: /s/ _____
       Miles Ehrlich
       Ismail Ramsey
       Amy Craig
       Ramsey & Ehrlich LLP
       803 Hearst Avenue
       Berkeley, CA 94710
       Tel:  (510) 548-3600
       Fax:  (510) 291-3060

       miles@ramsey-ehrlich.com
       izzy@ramsey-ehrlich.com
       amy@ramsey-ehrlich.com

Attorneys for Non-Party
ANTHONY LEVANDOWSKI

# EXHIBIT 9

MICHAEL A. JACOBS (CA SBN 111664)
MJacobs@mofo.com
ARTURO J. GONZÁLEZ (CA SBN 121490)
AGonzalez@mofo.com
ERIC A. TATE (CA SBN 178719)
ETate@mofo.com
RUDY Y. KIM (CA SBN 199426)
RKim@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

KAREN L. DUNN (*Pro Hac Vice*)
kdunn@bsfllp.com
HAMISH P.M. HUME (*Pro Hac Vice*)
hhume@bsfllp.com
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, N.W.
Washington DC 20005
Telephone: 202.237.2727
Facsimile: 202.237.6131

Attorneys for Defendants
UBER TECHNOLOGIES, INC.
and OTTOMOTTO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>Plaintiff,<br><br>v.<br><br>UBER TECHNOLOGIES, INC.,<br>OTTOMOTTO LLC; OTTO TRUCKING LLC,<br><br>Defendants. | Case No. 3:17-cv-00939-WHA<br><br>**DECLARATION OF ERIC M. FRIEDBERG IN SUPPORT OF DEFENDANTS' OPPOSITION TO WAYMO'S MOTION TO COMPEL**<br><br>Date: June 8, 2017<br>Time: 10:00 a.m.<br>Ctrm: F, 15th Floor<br>Judge: Hon. Jacqueline Scott Corley<br><br>Trial Date: October 2, 2017 |

I, Eric M. Friedberg, declare as follows:

1.      I am the co-Founder of Stroz Friedberg, LLC ("Stroz"), and I currently serve as the Company's co-President.  I submit this declaration in support of Defendants' Opposition to Plaintiff Waymo's Motion to Compel Production of Withheld Documents.  I have personal knowledge of the facts stated herein and, if called as a witness, I could and would testify competently as to these facts.

2.      Stroz is a specialty consulting company that provides, among other services, digital forensics, electronic discovery, and factual investigations to its clients.

3.      On or about March 4, 2016, Stroz was jointly engaged by Morrison & Foerster ("MoFo"), on behalf of its client Uber Technologies LLC ("Uber"), and O'Melveny & Meyers LLP ("OMM"), on behalf of its client Ottomotto LLC ("Ottomotto") to conduct a factual investigation and develop the facts necessary to assist MoFo and OMM in providing legal advice about potential litigation by Google related to Uber's potential acquisition of Ottomotto and Otto Trucking, LLC.  Stroz's engagement is reflected in an engagement letter.  Stroz marked the engagement letter "privileged and confidential," and has at all times treated the engagement letter as such.

4.      Stroz's investigative work was guided by directives from MoFo and OMM regarding what topics to investigate and how Stroz should investigate these topics.  MoFo provided these directives to Stroz.

5.      I understand that Uber, Ottomotto, and two of Ottomotto's founders, Anthony Levandowski and Lior Ron, entered into a joint defense, common interest, and confidentiality agreement amongst themselves as of at least March 4, 2016.  Mr. Levandowski was separately represented by John Gardner of Donahue Fitzgerald LLP ("Donahue") and that Mr. Ron was separately represented by Alisa Baker of Levine & Baker LLP ("Levine").  I understand that the parties memorialized their joint defense and common interest agreement in writing subsequent to the commencement of Stroz's investigation.

6.      Recognizing that Uber, Ottomotto, Mr. Levandowski, and Mr. Ron were parties to a joint defense and common interest agreement in its engagement letter with MoFo and OMM,

1    Stroz agreed to keep confidential all communications with counsel for Uber, counsel for

2    Ottomotto, Messrs. Levandowski and Ron and their respective counsel at Donahue and Levine

3    and to treat all information which Stroz received as protected by the attorney-client privilege,

4    attorney work product doctrine, and/or common interest doctrine.

5           7.      Stroz entered into an agreement with Donahue, whereby Stroz agreed to keep

6    confidential all information learned from Mr. Levandowski during the course of its investigation

7    unless Mr. Levandowski consented to sharing that information with any person, including with

8    the parties to the joint defense and common interest agreement.  At times during Stroz's

9    investigation, Mr. Levandwoski's counsel consented to Stroz sharing certain information with

10   counsel for Uber, Otto, and Mr. Ron under the umbrella of the parties' joint defense and common

11   interest agreement.  Some information was shared on an outside counsel-eyes-only basis, while

12   other information was shared on an attorneys-eyes-only basis.

13          8.      On August 5, 2016, Stroz provided its report (the "Due Diligence Report") to

14   MoFo, OMM, Donahue, and Baker.  The Due Diligence Report was marked "Outside Counsel &

15   Attorneys-Eyes-Only" and "Privileged & Confidential / Attorney Work Product."  The Due

16   Diligence Report was password protected.

17          9.      After Stroz provided the Due Diligence Report to MoFo, OMM, Donahue, and

18   Baker, Stroz sent MoFo an Appendix of Exhibits to the Due Diligence Report.  The Appendix of

19   Exhibits is marked "Privileged & Confidential / Attorney Work Product" and "Outside Counsel-

20   Eyes-Only."

21          10.     Stroz selected the exhibits for inclusion in the Appendix based upon the topics that

22   MoFo and OMM identified as relevant to the investigation.  Stroz culled the exhibits from the

23   larger universe of documents that Stroz reviewed in the course of its investigation.

24          11.     I have kept confidential at all times the Due Diligence Report and the Appendix of

25   Exhibits, and all communications pertaining to the investigation, and have always treated these

26   materials as covered by attorney-client privilege, attorney work product doctrine, and the

27   common interest doctrine.  I have never shared or discussed the Due Diligence Report or the

28

1  Appendix of Exhibits with any person outside of Stroz, other than with counsel for Uber, Otto,

2  and Messrs. Levandowski and Ron.

3        12.    I have also communicated with the current Stroz employees who had access to the

4  content or findings of the Due Diligence Report or the Appendix of Exhibits. I have confirmed

5  that each of them has kept confidential at all times the Due Diligence Report, the Appendix of

6  Exhibits, and all communications pertaining to the investigation, and has always treated these

7  materials covered by attorney-client privilege, attorney work product doctrine, and the common

8  interest doctrine. To the best of my knowledge, none of them has ever shared or discussed the

9  content or findings of the Due Diligence Report or the Appendix of Exhibits with any person

10  outside of Stroz, other than with counsel for Uber, Otto, and Messrs. Levandowski and Ron.

11       I declare under penalty of perjury under the laws of the United States of America that the

12  foregoing is true and correct. Executed this 8th day of May, 2017, in New York, New York.

13

14

15               /s/ _Eric Friedberg_

16                  Eric M. Friedberg

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 10

1   MICHAEL A. JACOBS (CA SBN 111664)
    MJacobs@mofo.com
2   ARTURO J. GONZÁLEZ (CA SBN 121490)
    AGonzalez@mofo.com
3   ERIC A. TATE (CA SBN 178719)
    ETate@mofo.com
4   RUDY Y. KIM (CA SBN 199426)
    RKim@mofo.com
5   MORRISON & FOERSTER LLP
    425 Market Street
6   San Francisco, California 94105-2482
    Telephone:    415.268.7000
7   Facsimile:    415.268.7522

8   KAREN L. DUNN (*Pro Hac Vice*)
    kdunn@bsfllp.com
9   HAMISH P.M. HUME (*Pro Hac Vice*)
    hhume@bsfllp.com
10  BOIES SCHILLER FLEXNER LLP
    1401 New York Avenue, N.W.
11  Washington DC 20005
    Telephone:    202.237.2727
12  Facsimile:    202.237.6131

13  Attorneys for Defendants
    UBER TECHNOLOGIES, INC.
14  and OTTOMOTTO LLC

15                  UNITED STATES DISTRICT COURT

16                 NORTHERN DISTRICT OF CALIFORNIA

17                    SAN FRANCISCO DIVISION

18  WAYMO LLC,                          Case No.    3:17-cv-00939-WHA

19              Plaintiff,              **DECLARATION OF JOHN F.**
                                        **GARDNER IN SUPPORT OF**
20       v.                             **DEFENDANTS' OPPOSITION TO**
                                        **WAYMO'S MOTION TO COMPEL**
21  UBER TECHNOLOGIES, INC.,            **PRODUCTION OF WITHHELD**
    OTTOMOTTO LLC; OTTO TRUCKING LLC,   **DOCUMENTS**
22
                Defendants.             Date:     June 8, 2017
23                                      Time:     10:00 a.m.
                                        Ctrm:     F, 15th Floor
24                                      Judge:    Hon. Jacqueline Scott Corley
25                                      Trial Date: October 2, 2017
26

27

28

I, John F. Gardner, declare as follows:

1.     I am a member of the bar of the State of California and a partner with Donahue Fitzgerald LLP.   I submit this declaration in support of Defendants' Opposition to Motion to Compel Production of the Stroz Due Diligence Report.  I have personal knowledge of the facts stated herein and, if called as a witness, I could and would testify competently as to these facts.

2.     I was contacted in late January 2016 by Anthony Levandowski ("Mr. Levandowski") to provide personal counsel regarding a potential corporate transaction with Uber Technologies, Inc. ("Uber") (the "Transaction").  Mr. Levandowski had retained O'Melveny & Myers LLP ("OMM") as primary corporate counsel with respect to the Transaction representing Ottomotto LLC and Otto Trucking LLC (collectively "Otto").

3.     The parties recognized from the outset that there was a tangible risk that Google would file litigation against Uber, Otto, Mr. Levandowski, and Lior Ron ("Mr. Ron") if the Transaction was consummated.  The proposed Transaction involved the movement of former high-level executives from Google's self-driving car program, Project Chauffer, to another autonomous vehicle program.  The litigation risk was particularly high due to the intensely competitive nature of the self-driving vehicle industry and the potentially billion dollar commercial market involved.  A significant part of my practice is supervising litigation on behalf of corporate clients, which has included corporate disputes regarding executives moving from one company to another, so I was particularly aware of this issue and the potential risk.

4.     Based on the common interest the parties shared in protecting against this tangible risk of litigation, our open acknowledgement of that risk, and the need to share information freely among the firms in order to adequately evaluate those risks, anticipate defenses, and assess legal strategies, I viewed my conversations and communication with OMM, Morrison, Baker and their clients regarding a factual investigation and potential litigation by Google to be privileged from the outset of our engagement.  The parties assigned specialized legal teams to handle various aspects of the Transaction.  For purposes of the litigation risk and defensive strategy, Uber was primarily represented by Eric Tate at Morrison & Foerster LLP ("Morrison"), Otto was

1   represented by Eric Amdursky at OMM, Mr. Ron was represented by Alisa Baker at Levine &

2   Baker LLP ("Baker"), and I represented Mr. Levandowski.

3       5.      On February 22, 2016, the parties entered into a Term Sheet with respect to the

4   Transaction.  The signing documentation included a formal Indemnification Agreement (called an

5   "Indemnity Construct").  The Indemnification Agreement provided for OMM and Morrison to

6   engage a consultant to conduct an investigation, and they retained Stroz Friedberg LLC ("Stroz")

7   for this purpose (the "Stroz Investigation").

8       6.      I worked jointly with OMM, Morrison and Baker with respect to the process

9   involved in the Stroz Investigation, which included numerous conference calls and

10  correspondence.  Based on Stroz's work we discussed how to approach various possible litigation

11  scenarios, legal theories Google might assert against Uber, Otto, Mr. Levandowski and/or Mr.

12  Ron, and how best to refute and defend against any claims that might arise. I also worked

13  internally with Donahue litigators and employment partners to assess the parties' litigation

14  exposure, how claims might arise, and how best to prepare for defending against them in possible

15  future litigation.

16      7.      OMM, Morrison, Baker and I crafted a set of guidelines for Stroz, and worked

17  together regarding a strategy to be employed in the Stroz Investigation.

18      8.      On March 11, 2016, I received a draft Joint Defense, Common Interest, and

19  Confidentiality Agreement ("Joint Defense Agreement") which OMM was negotiating with

20  Morrison for the purpose of confirming our prior discussions and agreement that the parties were

21  working jointly in furtherance of a common interest in the anticipation of potential litigation by

22  Google in connection with the Transaction.

23      9.      On March 22, 2016, I sent separate e-mails to OMM, Morrison and Baker in order

24  to confirm our understanding that we were working collaboratively under the common interest

25  doctrine.  I would not have communicated freely with these parties, in particular with respect to

26  the Stroz Investigation, but for my understanding that those communications were privileged.

27      10.     A formal Joint Defense Agreement was signed on or about April 11, 2016.

28  GARDNER DECL. ISO DEFTS' OPPOSITION TO MOTION TO COMPEL
    Case No. 3:17-cv-00939-WHA

                                                                                        2

11.     At the end of the Stroz Investigation, Stroz produced a final Report.  The Report was delivered to OMM, Morrison, Donahue and Baker on or about August 5, 2016 by secure, passcode protected electronic delivery.  The Report also included a series of Exhibits, based on the results of the search criteria supplied by the law firms and applied by Stroz to information provided by Mr. Levandowski, as well as Mr. Ron and three other employees who participated in the Stroz Investigation review process.  The Exhibits reflected the attorneys' directions regarding what to search for, and what types of litigation risks were anticipated in connection with the Transaction.  I reviewed the Report and continued our risk assessment and legal strategy based in its findings.

12.     Under the Joint Defense Agreement, the parties were required to keep the Report in strict confidence.  To my knowledge, since its release to the parties to the Joint Defense Agreement by Stroz, the Report was not and has not been shared with anyone other than the parties to the Joint Defense Agreement.  In addition, Donahue has at all times treated the Report and information learned from the Report, including the Exhibits to the Report, and all communications pertaining to the Report, as privileged and confidential.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 7th day of May, 2017, in Walnut Creek, California.

John F. Gardner

GARDNER DECL. ISO DEFTS' OPPOSITION TO MOTION TO COMPEL
Case No. 3:17-cv-00939-WHA

3

# EXHIBIT 11

MICHAEL A. JACOBS (CA SBN 111664)
MJacobs@mofo.com
ARTURO J. GONZÁLEZ (CA SBN 121490)
AGonzalez@mofo.com
ERIC A. TATE (CA SBN 178719)
ETate@mofo.com
RUDY Y. KIM (CA SBN 199426)
RKim@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone:    415.268.7000
Facsimile:    415.268.7522

KAREN L. DUNN (*Pro Hac Vice*)
kdunn@bsfllp.com
HAMISH P.M. HUME (*Pro Hac Vice*)
hhume@bsfllp.com
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, N.W.
Washington DC  20005
Telephone:    202.237.2727
Facsimile:    202.237.6131

Attorneys for Defendants
UBER TECHNOLOGIES, INC.
and OTTOMOTTO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>Plaintiff,<br><br>v.<br><br>UBER TECHNOLOGIES, INC.,<br>OTTOMOTTO LLC; OTTO TRUCKING LLC,<br><br>Defendants. | Case No.      3:17-cv-00939-WHA<br><br>**DECLARATION OF JAMIE LEIGH**<br><br>Date:     June 8, 2017<br>Time:    10:00 a.m.<br>Ctrm:    F, 15th Floor<br>Judge:   Hon. Jacqueline Scott Corley<br><br>Trial Date: October 2, 2017 |

I, Jamie Leigh, declare as follows:

1.      I am a member of the bar of the State of California and a partner in the law firm Cooley LLP ("Cooley"). I have personal knowledge of the facts stated herein and, if called as a witness, I could and would testify competently as to these facts.

2.      Cooley represented Uber Technologies, Inc. ("Uber") in a proposed transaction through which Uber would acquire Ottomotto LLC and Otto Trucking LLC (the "Target Companies"). I understand that Uber has acquired Ottomotto LLC and has not acquired Otto Trucking LLC. Cooley's engagement on this matter specifically excluded advice on issues concerning the former employers of the Target Companies' founders and employees. As such, Cooley was not asked to (and did not) advise Uber with respect to any such issues. I understood that Uber had hired a separate law firm, Morrison & Foerster LLP ("MoFo"), to advise Uber with respect to such issues.

3.      In the course of Cooley's work for Uber on this matter, I learned that a third-party consultant, Stroz Friedberg, LLC ("Stroz"), had been retained to investigate certain matters in order to assist MoFo in advising Uber. I also understood that Stroz provided a final report to MoFo (the "Due Diligence Report"). I did not receive a copy of the Due Diligence Report, and I am not aware of anyone at Cooley obtaining a copy of it.

4.      I declare until penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 8th day of May, 2017, in San Francisco, California.

/s/ Jamie Leigh

Jamie Leigh

# EXHIBIT 12

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Charles K. Verhoeven (Bar No. 170151)
  charlesverhoeven@quinnemanuel.com
  David A. Perlson (Bar No. 209502)
  davidperlson@quinnemanuel.com
  Melissa J. Baily (Bar No. 237649)
  melissabaily@quinnemanuel.com
  John Neukom (Bar No. 275887)
  johnneukom@quinnemanuel.com
  Jordan Jaffe (Bar No. 254886)
  jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:     (415) 875-6600
Facsimile:     (415) 875-6700

Attorneys for WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

|  |  |
|---|---|
| WAYMO LLC,<br><br>            Plaintiff,<br><br>      v.<br><br>UBER TECHNOLOGIES, INC.;<br>OTTOMOTTO LLC; OTTO TRUCKING<br>LLC,<br><br>            Defendants. | CASE NO. 3:17-cv-00939-WHA<br><br>**PLAINTIFF WAYMO'S REPLY IN<br>SUPPORT OF ITS MOTION TO<br>COMPEL PRODUCTION OF<br>WITHHELD DOCUMENTS**<br><br>**PUBLIC REDACTED VERSION OF<br>DOCUMENT SOUGHT TO BE SEALED**<br><br>Date:  May 24, 2017<br>Time:  2:00 p.m.<br>Place: Courtroom F, 15th Floor<br>Judge:  The Honorable Jacqueline Scott Corley |

# TABLE OF CONTENTS

Page

I.  DEFENDANTS DO NOT REBUT THE INFIRMITIES IN THEIR LOG AND
    HAVE SUBMITTED A DEFICIENT SWORN RECORD THAT FALLS FAR
    SHORT OF SHOWING THAT ANY PRIVILEGES APPLY AND HAVE NOT
    BEEN WAIVED ....................................................................................................2

II. DEFENDANTS HAVE NOT ESTABLISHED AND CANNOT ESTABLISH
    THAT ANY PRIVILEGE APPLIES TO THE PURPORTED "DUE DILIGENCE"
    MATERIALS ........................................................................................................3

    A.  Defendants' Incomplete Record Does Not Justify The Claimed Privileges ..............4

    B.  The Acquisition Documents Confirm That Uber's Conduct Is Not
        Privileged As A Matter Of Law ....................................................................5

    C.  Defendants Do Not Even Submit The Declarations They Concede Are
        Necessary To Make A Prima Facie Showing That The Asserted Privileges
        Apply And Were Not Waived ........................................................................7

III. EVEN IF THE LOGGED DOCUMENTS WOULD OTHERWISE BE
     PROTECTED, THE CRIME-FRAUD EXCEPTION APPLIES .........................................10

IV. DEFENDANTS DO NOT DISPUTE THAT THEY SHOULD BE COMPELLED
    TO PRODUCE ALL DOCUMENTS AND FORENSIC DATA PROVIDED TO
    STROZ FOR USE IN ITS INVESTIGATION ...........................................................13

V.  WAYMO HAS SHOWN THE REQUISITE NEED FOR THE LOGGED
    DOCUMENTS ........................................................................................................14

VI. DISCOVERY ........................................................................................................15

-i-                                                    No. 3:17-cv-00939-WHA

WAYMO'S REPLY IN SUPPORT OF ITS MOTION TO COMPEL PRODUCTION OF WITHHELD DOCUMENTS

1   The Court has already found that "troves of likely probative evidence have been concealed

2   from Waymo under relentless assertions of privilege that shroud dealings between Levandowski

3   and defendants in secrecy." (Dkt. 433 at 18-19.)  In its motion to compel, Waymo demonstrated

4   that Defendants have not met their burden to justify this shroud over what Defendants call the

5   "due diligence materials" related to Uber's investigation of Mr. Levandowski and other former

6   Waymo employees prior to Uber's acquisition of Otto.  Defendants do not substantively rebut that

7   their (tardy) privilege log fails to comply with the Court's standing order.  Instead, in opposition to

8   Waymo's motion, Defendants raise ***new*** supposed grounds, not found in their log, to justify their

9   privilege assertions.  These new grounds should be ignored altogether, though even they do not

10  support Defendants' positions, as detailed below.

11  Defendants' recent production of documents regarding Uber's acquisition of Otto –

12  initially withheld even after the Court explicitly asked for those documents[1] – only further shows

13  that there is no basis to assert privilege over the "due diligence materials."  These acquisition

14  agreements reveal that ██████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████ (*E.g.*,

16  Ex.[2] 9 at 3-4 & Exh. C; Ex. 10.)  Incredibly, these ██████████████████████

17  █████████████████████████████ (*E.g.*, Ex. 9, Exh. C at 4; Ex. 10 at 2.)

18  ██████████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████ (*E.g.*, Ex. 9,

20  Exh. A; *see also* Dkt. 433 at 3-4.)  What is still unclear from Defendants' statements and

21  incomplete discovery is whether Uber learned about the ████████ through due diligence (and then

22

23  [1]   In connection with expedited discovery ordered for the purpose of informing Waymo's motion
    for a preliminary injunction, Waymo had asked for all agreements related to Uber's acquisition of

24  Otto, including those executed by Mr. Levandowski.  With no legitimate justification whatsoever,
    Defendants intentionally waited until ***after*** the Court issued its preliminary injunction ruling to

25  produce ***any*** such agreements.  If the Court had not made known that Defendants should "hurry
    up" and produce them, Defendants would have concealed the acquisition agreements for even

26  longer – at least until after this motion to compel was decided.  But, with the Court forcing their
    hand, on Thursday night and on Saturday, Defendants provided an incomplete set of heavily

27  redacted acquisition agreements executed by Mr. Levandowski.
    [2]   All Exhibits are attached to the Declaration of Patrick Schmidt.

28

sought to cover them up) or whether Uber was complicit in the theft of Waymo's confidential

documents from the start.  Uber's shroud of secrecy cannot be justified in either scenario.

## I.     DEFENDANTS DO NOT REBUT THE INFIRMITIES IN THEIR LOG AND HAVE SUBMITTED A DEFICIENT SWORN RECORD THAT FALLS FAR SHORT OF SHOWING THAT ANY PRIVILEGES APPLY AND HAVE NOT BEEN WAIVED

The Court made clear to Defendants that they needed to provide "bone-crushing detail" in

their privilege logs.  (4/5/17 Hr'g Tr. 27:10-28:4.)  Defendants do not substantively dispute that

they did not provide such detail.  Indeed, the new arguments Defendants make in their opposition

only confirm that the log describing the due diligence materials was grossly deficient.  As just one

example, while Defendants' log based their privilege assertions solely on an April 11, 2016 Joint

Defense Agreement (Dkt. 370-4 at 1 n.2), Defendants now point to all manner of oral and written

agreements (*e.g.*, Opp. 3 (Stroz engagement letter, side agreement between Stroz and

Levandowski), 7 (referring to an "indemnification construct"), 8 (February 2016 term sheet,

various emails purportedly related to oral agreements)).  As expressly called out in Waymo's

motion (at 5-6), Defendants' failure to reference these agreements "at the time of the assertion" of

the privileges should be "deemed a waiver" pursuant to Judge Alsup's standing order.

More problematic, however, is Defendants' failure to make the vast majority of the

agreements that they are now relying on part of the sworn record in opposition to Waymo's

motion to compel.  Referring to these various agreements in declarations is not sufficient.[3]

Indeed, Defendants ***intentionally*** limited their record to such references – as opposed to providing

the documents themselves – seemingly for a specific improper purpose:  to use self-serving

characterizations of the documents as a sword in opposition to Waymo's motion to compel, while

simultaneously shielding the problematic content of the documents from Waymo and the Court for

as long as possible, prejudicing Waymo with respect to not only this motion to compel but also its

motion for a preliminary injunction.  Defendants voluntarily submitted an incomplete record, and

that record cannot satisfy Defendants' burden to establish the applicability of the asserted

---

[3]   Such references do not pass muster on the best evidence rule.  *Groppi v. Barham*, 157 F. App'x 10, 11–12 (9th Cir. 2005); *United States v. Bennett*, 363 F.3d 947, 953 (9th Cir. 2004).

WAYMO'S REPLY IN SUPPORT OF ITS MOTION TO COMPEL PRODUCTION OF WITHHELD DOCUMENTS

privileges and the lack of any waiver thereof.

## II. DEFENDANTS HAVE NOT ESTABLISHED AND CANNOT ESTABLISH THAT ANY PRIVILEGE APPLIES TO THE PURPORTED "DUE DILIGENCE" MATERIALS

Regardless of Defendants' waiver in the context of its relentless efforts to obfuscate in this case, there is no viable privilege here. Defendants have taken the position that all parties related to a potential acquisition – including a potential acquirer, potential acquirees (whether ultimately acquired or not), individuals being investigated during "due diligence," and third-party investigators – can collectively use privilege to cloak unfavorable facts in secrecy. That is not the law, and "all manner of mischief could be concealed" (Dkt. 202 at 12) if it were.

The following colloquy regarding a hypothetical posed by Judge Alsup is instructive.

> **THE COURT:** All right. So let's say that the scenario is somebody is jumping ship, coming over. The acquiring company learns in the course of the negotiations that, by the way, the guy jumping ship has downloaded a bunch of secret documents. And then the acquirer says: Well, that's a problem. We've got to come up with some kind of a solution to this. So there's a lot of negotiation. Let's just say that, hypothetically, they all get put into a vault somewhere. They are not—you know, they're put into a vault and he promises in writing somewhere he will never look at them. He won't use them. The company tries to protect itself in every possible way. But isn't that—isn't that agreement part of the acquisition itself and something that everybody ought to see?

> **MR. GONZALEZ:** So, your Honor, what you just described, in my opinion, is classic joint interest material because—

> **THE COURT:** The magistrate judge ought to take a very, very close look at your position.

> **MR. GONZALEZ:** Understood, Your Honor. Understood. But if what we're describing is something like that, where the acquiring company is trying to do the right thing, such as in the hypothetical you just mentioned, putting things in a vault so that we never get it, that's why you have the joint interest privilege.

> **THE COURT:** I don't think that's correct, in my view. That's not what it's for. But that's for the magistrate judge to decide.

(5/3/2017 Public Hr'g Tr. 52:6-53:8.) Defendants' expansive understanding of privilege – as revealed in response to Judge Alsup's hypothetical – is not supportable. There is "no binding authority" to support the notion that litigants can "abuse" privilege to conceal whatever they like

1   "so long as they cleverly passed it on as part of 'due diligence.'"  (Dkt. 202 at 10.)

2   **A.    Defendants' Incomplete Record Does Not Justify The Claimed Privileges**

3   Even the limited information that Defendants provided in opposition to Waymo's motion –

4   which was cherry-picked to reflect what Defendants thought was most helpful while omitting what

5   they deemed to be unhelpful – makes clear that Defendants have not come anywhere near meeting

6   their burden to establish the asserted privileges.

7   For example, contrary to Defendants' statement that "Otto, its founders, and Uber . . .

8   jointly retain[ed] Stroz to investigate potential claims that Google may have" (Opp. 15), the

9   evidentiary record submitted by Defendants reveals that Mr. Levandowski and Mr. Ron did ***not***

10  participate in retaining Stroz and did ***not*** have a common interest with those who did.  Only

11  Uber/MoFo and Otto/OMM (not Mr. Levandowski, Mr. Ron, or their counsel) engaged Stroz

12  (Dkt. 370-3 at 1); the Stroz engagement was for the purpose of ***investigating*** Mr. Levandowski,

13  Mr. Ron, and other former Waymo employees (Dkt. 370 ¶ 9); Stroz communicated substantively

14  about its ongoing investigation only with MoFo and OMM (not with Mr. Levandowski, Mr. Ron,

15  or their attorneys) (*id.* ¶ 16); Ottomotto, Otto Trucking, and Mr. Levandowski did ***not*** permit Stroz

16  to share their attorney/client communications with Uber/MoFo (Dkt. 370-3 at 3); and Stroz had to

17  seek permission from Mr. Levandowski – which Mr. Levandowski only sometimes granted – to

18  share information uncovered in the investigation with Uber/MoFo (Dkt. 380 ¶ 7).  None of these

19  facts supports Defendants' conclusory assertion that all of these actors had a common legal

20  interest.  To the contrary, these facts show that those doing the investigating and those being

21  investigated were protecting their own, personal interests vis-à-vis the group and third parties.

22  As another example, Uber makes a point of stating that it authorized the Stroz

23  investigation[4] "prior to any understanding of the facts informing" the "litigation risks that the

24  proposed acquisition presented."  (Dkt. 378 ¶ 10.)  Uber should not be heard to both disclaim

25  knowledge of the facts informing purported litigation risks and seek to conceal those same facts

26

---

27  [4]   Defendants provide no date for this "authorization," though it now seems clear that Defendants ███████████████████████████████████████████████.  (*Compare* Ex. 9

28  (dated February 22, 2016), *with* Dkt. 370-3 (dated March 4, 2016).)

WAYMO'S REPLY IN SUPPORT OF ITS MOTION TO COMPEL PRODUCTION OF WITHHELD DOCUMENTS

based on purported litigation risks.   Moreover, Uber's assertion begs the question of how the

interests of various purported members of the common interest group fluctuated over time.  What

exactly did Uber know about Mr. Levandowski's theft of Waymo's confidential and proprietary

documents and when did it know it?  Were Uber's and Mr. Levandowski's interests aligned with

respect to that theft from the start or did their interests diverge once Uber gained "any

understanding of the facts informing the litigation risks"?  Defendants' record provides no answer.

Similarly, Defendants contend that Otto Trucking was initially an acquisition target but

was not ultimately acquired by Uber.  Although Otto Trucking is a purported member of the

common interest group, Defendants provide no information regarding the purpose of Otto

Trucking's receipt of any due diligence materials or its alleged change in status with respect to the

acquisition.  Did Otto Trucking's interests change vis-à-vis Waymo when the decision was made

that Otto Trucking would not be acquired?  Again, the record is silent.

The Court in this case made clear that Defendants' burden was to establish that each and

every recipient of the due diligence materials had a common legal interest related to those

materials.  But the limited evidence submitted by Defendants only raises doubts as to how that

could have possibly been the case.  Such a record is insufficient to justify the asserted privileges.

**B.      The Acquisition Documents Confirm That Uber's Conduct Is Not Privileged As A Matter Of Law**

This Court previously anticipated the possibility that Uber asked Mr. Levandowski to

disclose information to Stroz, so that Uber could "evaluate the extent to which Levandowski

would arrive with attendant liabilities."  (Dkt. 202 at 10.)  And that Mr. Levandowski, in turn,

"transferred any incriminating documents to [Stroz] . . . for the purpose of selling his ventures to

Uber for $680 million."  (*Id.* at 11.)  The Court intimated that such a scenario would not be

privileged, as it would constitute due diligence related to a commercial transaction between parties

on opposing sides.  (*See id.* at 10.)  Of course the actual facts here are much more troubling, as

███████████████████████████████████████████████████

███████████████████████████████ (Ex. 9 at Exh. C), and Defendants appear to have set

up the purported "due diligence" protocol to conceal ███████████████ But this more

1  nefarious scenario does not change the conclusion that, as a matter of law, no privilege applies.

2        To try to argue otherwise, Defendants heavily rely on Judge Alsup's opinion in *Rembrandt*

3  *Patent Innovations, LLC v. Apple Inc.*, No. C 14-05093 WHA, 2016 WL 427363 (N.D. Cal. Feb.

4  4, 2016). But that case actually supports Waymo's position. *Rembrandt* held that, before a

5  purchaser had acquired a binding option from inventors to purchase their patent, communications

6  between these parties could not be protected by the common interest doctrine. *Id.* at *8. "At that

7  point, Rembrandt's interest was in pitching the value of a business partnership to the named

8  inventors and possibly in highlighting concerns about invalidity and title in order to drive down

9  the price" – which was an interest assuredly not shared by the inventors. *Id.* The same logic

10  applies here. Unless there was a concerted plan for all purported members of the common interest

11  group – including Uber, Otto, Mr. Levandowski, and Mr. Ron – to steal Waymo's trade secrets

12  (which the circumstantial evidence suggests and in which case the crime-fraud exception applies),

13  those entities and individuals would have had starkly divergent interests vis-à-vis Waymo in the

14  period before the acquisition closed.[5] And Mr. Levandowski and Mr. Ron – the subjects of the

15  Stroz investigation – clearly had unique personal interests vis-à-vis those who were investigating

16  them and vis-à-vis third parties who might be interested in the results of the investigation.

17        Even if Defendants were to argue that the acquisition was effectively a done deal by the

18  time the due diligence materials were circulated among the group (an argument unsupported by

19  the record), there still would not be a common legal interest here. This can be seen by the way in

20  which the litigation against Waymo has actually unfolded: the legal interests of at least Mr.

21  Levandowski and Uber are certainly not common. Mr. Levandowski has broadly taken the Fifth

22  Amendment to protect himself against self-incrimination while exposing Uber to possible adverse

23  inferences. Uber purportedly took steps to **remove** Mr. Levandowski from responsibilities for

24  which he was originally hired even before the Court issued its Order enjoining Mr. Levandowski

25

---

26  [5]   The Court has recognized this, stating: "I have been in this job a long time. I have seen many
cases involving acquisitions, but I have never heard of an acquisition itself being cloaked in

27  secrecy every -- ***because you're really on adverse sides. It's a business deal.***" (5/3/17 Public
Hr'g Tr. at 47:24-48:3 (emphasis added).)

28

from working Uber's LiDAR technology (Dkt. 433 at 7-8). And the Court's preliminary injunction Order makes clear that Uber can threaten Mr. Levandowski with termination of his employment should he fail to return the "14,000-plus pilfered files" to Waymo. (*Id.* at 23 n.9.)

Needless to say, these divergent interests existed and were readily apparent at the time the purportedly privileged materials were circulated to Uber, Mr. Levandowski, and others in August 2016. Indeed, this Court recognized at the very outset of this litigation that Mr. Levandowski had vastly different legal interests from Uber, suggesting that Mr. Levandowski may need his own counsel. (3/16/17 Hr'g Tr. at 16:16-17:3.) And Defendants' counsel acknowledged that there was a "conflict" with respect to their representation of both Defendants and Mr. Levandowski. (3/29/17 Hr'g Tr. at 17:15-20.) In sum, all of the dynamics that make clear that Uber and Mr. Levandowski have divergent legal interests in this case would have been equally apparent in August 2016, when the parties were discussing the theft of Waymo's confidential design server and other proprietary documents in the context of purported "due diligence."[6]

### C. Defendants Do Not Even Submit The Declarations They Concede Are Necessary To Make A Prima Facie Showing That The Asserted Privileges Apply And Were Not Waived

In connection with any opposition to Waymo's motion to compel, the Court ordered

---

[6] In their Opposition, Defendants only cite cases in which the parties to a common interest agreement would actually pursue a joint defense as opposed to the divergent legal defenses that Uber and Mr. Levandowski are pursuing here. For example, in *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 115 F.R.D. 308, 310 (N.D. Cal. 1987), there was a common interest between a corporate buyer and seller with respect to possible future patent litigation because "they could be expected to conduct a joint defense on all the liability issues." *Id.* at 310; *see also FastVDO LLC v. AT&T Mobility LLC*, No. 16-CV-385-H (WVG), 2016 WL 6138036, at *4 (S.D. Cal. Oct. 21, 2016) ("[T]he Subject Documents, the final agreement signed by Boeing and Plaintiff, and other documents lodged with the Court clearly demonstrate that the parties had, at the time of the communication of the Subject Documents, a common legal interest. This legal interest was ultimately aligned with a final agreement regarding the asserted patent."); *Morvil Tech., LLC v. Ablation Frontiers, Inc.*, No. 10-CV-2088-BEN BGS, 2012 WL 760603, at *3 (S.D. Cal. Mar. 8, 2012) ("AFI and Medtronic shared common legal interests in whether the products that AFI and Medtronic would market infringed third party IP, and the communications addressing the scope of the IP certainly were designed to further that interest."); *FTC v. Abbvie, Inc.*, No. CV 14-5151, 2015 WL 8623076, at *12 (E.D. Pa. Dec. 14, 2015) ("Having signed an agreement to acquire Solvay on September 26, 2009, Abbott and Solvay shared a common interest in litigation concerning Solvay products when these emails were exchanged in October 2009.").

Defendants to "submit a proper sworn record as to all necessary predicates" for their privilege assertions. But whether one looks to the story told by Defendants in their opposition or the story told by the acquisition agreements, the fact is that Defendants submitted no sworn declaration from Mr. Ron, Mr. Levandowski, or OMM, even though each received all 42 of the logged "due diligence" documents. For this reason as well, Defendants have not carried their burden of establishing that the asserted privileges "appl[y] and ha[ve] not been waived." (Dkt. 202 at 5; 4/6/17 Hr'g Tr. at 36:1-4 ("Ordinarily if there's a claim of privilege, we look to see every single person who got the information because there could easily be a waiver. It happens all the time.").)

Defendants offer no explanation or justification for why they did not submit a sworn declaration from Mr. Ron. The absence of such a declaration is particularly problematic, given that Mr. Ron was a *target* of the Stroz investigation that Defendants contend they authorized. The declaration from Mr. Ron's counsel, Ms. Baker, does not solve the problem. For example, with respect to whether Mr. Ron disseminated the due diligence report – a critical point that must be supported by the sworn record in order for Defendants to prevail here (4/6/17 Hr'g Tr. at 36:1-16) – Ms. Baker states only: "I have no reason to believe, and do not believe, that Mr. Ron has, at any time, failed to keep the Due Diligence Report and exhibits thereto confidential." (Dkt. 375 ¶ 17.) Ms. Baker apparently has no personal knowledge of Mr. Ron's activities since receiving the purportedly privileged documents – her declaration does not even state that she *spoke* to Mr. Ron regarding his efforts, if any, to keep those documents confidential. Her statement that she has "no reason to believe" Mr. Ron waived confidentiality is essentially meaningless. *See United States v. Wallace*, 961 F. Supp. 969, 976 (N.D. Tex. 1996).

Similarly, Defendants offer no declaration from Mr. Levandowski, another *target* of the Stroz investigation that Defendants contend they initiated and one whose interests were *not* aligned with Defendants' interests with respect to the Stroz investigation. (*See supra* II.A & Dkt. 380 ¶ 7 (noting that Mr. Levandowski did *not* permit Stroz to share information uncovered in the investigation with Defendants or with Mr. Ron).) The declaration from Mr. Levandowski's corporate counsel does not state *any* belief as to whether Mr. Levandowski maintained the

WAYMO'S REPLY IN SUPPORT OF ITS MOTION TO COMPEL PRODUCTION OF WITHHELD DOCUMENTS

1    confidentiality of the purportedly privileged materials, and Mr. Levandowski did disclose those

2    materials at least to his criminal counsel, non-parties to any alleged joint defense agreement.

3        Although Mr. Levandowski moves for leave to submit a declaration *in camera*, Mr.

4    Levandowski cites ***no*** authority that supports his request. This is not a criminal proceeding in

5    which Mr. Levandowski faces a Hobson's choice between two fundamental constitutional rights

6    or even between a constitutional right and the attorney-client privilege. Here, Mr. Levandowski

7    chose – voluntarily – to disclose information to Stroz, Uber, and others "for the purpose of selling

8    his ventures to Uber for $680 million" (Dkt. 202 at 11). Defendants should not now be excused

9    from having to establish the predicates for a privilege "merely because [those predicates] might

10    connect the dots back to a non-party in a possible criminal investigation." (*Id.* at 12.)

11        Finally, Defendants concede that they were required to submit a declaration from OMM in

12    order to comply with the Court's order that they "submit a proper sworn record as to all necessary

13    predicates" for their privilege assertions. (Opp. at 3 n.2.) OMM is identified as a recipient of all

14    the purportedly privileged documents. (Dkt. 370-4.) Accordingly, a declaration from OMM

15    would need to address, OMM's purported representation of Ottomoto and Otto Trucking, the

16    nature of the asserted common interest privilege that OMM, Ottomoto, and Otto Trucking

17    purportedly shared with the other recipients of the due diligence report, and any efforts OMM

18    made and continue to make to limit the dissemination of the documents at issue. Defendants state

19    that "OMM would not provide that declaration . . ." (Opp. at 3 n.2.) Although Defendants try to

20    cast blame on "Waymo's counsel" for refusing to assist Defendants in obtaining such a declaration

21    (*id.*), Waymo's counsel certainly did not stand in the way of OMM contacting OMM's client,

22    Google, regarding any conflicts issues (indeed, Waymo's counsel suggested just that to

23    Defendants' counsel) or otherwise stand in the way of OMM submitting a declaration regarding

24    any issues it deemed appropriate. Waymo does not have an obligation to assist Defendants in

25    obtaining declarations necessary to support ***their*** claims of privilege.

26        Defendants' failure to submit declarations from Mr. Ron, Mr. Levandowski, and OMM is

27    an independent reason for finding that Defendants did not meet their burden to establish the

28

applicability of the asserted privileges and the lack of any waiver thereof.

## III. EVEN IF THE LOGGED DOCUMENTS WOULD OTHERWISE BE PROTECTED, THE CRIME-FRAUD EXCEPTION APPLIES

No one in this case has ever disputed that Mr. Levandowski – purported joint holder of the alleged "common interest" – stole Waymo's confidential and proprietary materials or that stealing confidential and proprietary materials is a crime. Indeed, Mr. Levandowski has broadly asserted his right against self-incrimination in this case, which has now been referred to the U.S. attorney's office for investigation (Dkt. 428). As summarized in the Restatement (Third) of the Law Governing Lawyers (§ 82 cmt. e), for crimes like theft that have continuing legal consequences, "[c]onfidential communications concerning ways in which Client can continue to possess the stolen goods, including information supplied by Client about their present location, are not protected by the privilege because of the crime-fraud exception." Communicating for the purpose of concealing evidence of a crime also constitutes obstruction of justice, making the crime-fraud exception to the attorney-client privilege applicable. *United States v. Laurins*, 857 F.2d 529, 540 (9th Cir. 1988) ("Obstruction of justice is an offense serious enough to defeat the privilege."); *see also United States v. Edison*, No. CR 07-0074, 2008 WL 170660, at *4 (N.D. Cal. Jan. 17, 2008) (Alsup, J.) (holding that under the crime-fraud exception, "conversations that furthered ongoing efforts to obstruct justice would not be protected").[7]

Here, Defendants cannot dispute that the logged materials are related to the theft of Waymo's proprietary and confidential materials. *See In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1095 (9th Cir. 2007), *abrogated on other grounds by Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009). Defendants themselves logged those materials in response to Judge Alsup's March 15 Order that Defendants produce the stolen materials – *i.e.*, "all files and documents downloaded by Anthony Levandowski, Sameer Kshirsagar, or Radu Raduta before leaving plaintiff's payroll and thereafter taken by them" – as well as all documents that reference the stolen materials. (Dkt. 61 ¶ 4.)

---

[7] Communications in furtherance of receiving stolen property in violation of California Penal Code 496 would also be a sufficient predicate for invoking the crime-fraud exception.

Moreover, a preponderance of the evidence indicates that the logged communications were "made 'in furtherance of [the] intended, or present, continuing illegality.'" *Napster*, 479 F.3d at 1095 (citation omitted). Indeed, Defendants' claim that "Waymo has **zero** evidence that Uber or Otto ever knew about," much less furthered a continuing illegality (Opp. at 18), does not pass the straight-face test. As an initial matter, even Defendants' otherwise deficient privilege log makes clear that the due diligence documents relate to at least the possession and location of stolen materials, as Stroz itself apparently received those stolen materials for review in its investigation (*e.g.*, Dkt. 370-4 at No. 10 (referring to "electronic media collected from A. Levandowski")). More tellingly, Judge Alsup has already found that:

> Waymo has made a strong showing that Levandowski absconded with over 14,000 files from Waymo, evidently to have them available to consult on behalf of Otto and Uber. As of the date of this order, those files have not been returned and likely remain in Levandowski's possession. The record further indicates that Uber knew or at least should have known of the downloading but nevertheless proceeded to bring Levandowski and Otto on board. Even after this litigation commenced, Uber kept Levandowski as the head of its self-driving efforts until his "recusal" from LiDAR development on the day before defendants' sur-reply in opposition to provisional relief.

> Defendants maintain that Waymo's files never crossed over to Uber's servers or devices and that "Uber took strict precautions to ensure that no trade secrets belonging to a former employer would be brought to or used at Uber." These denials, however, leave open the danger of all manner of mischief. For example, it remains entirely possible that Uber knowingly left Levandowski free to keep that treasure trove of files as handy as he wished (so long as he kept it on his own personal devices), and that Uber willfully refused to tell Levandowski to return the treasure trove to its rightful owner. At best (and this has *not* been shown), Uber may have required Levandowski, as a matter of form, to commit not to use the Waymo files. But even if Levandowski so agreed, his word under these circumstances would be cold comfort against the danger of trade secret misappropriation for Uber's benefit.

(Dkt. 433 at 7-8 (citations omitted).) And the documents that Defendants were withholding until after the issuance of the preliminary injunction order confirm that Uber and Otto not only knew about Mr. Levandowski's theft but – at best – did absolutely nothing about it.

The Stroz investigation was specifically directed to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*See, e.g.*, Ex. 10

§ 2.1(a).)  But, despite its knowledge of ████████ Uber did not require the files to be returned to Waymo; Uber did not require that any existing technology at Ottomoto be scrubbed for Waymo trade secrets; Uber did not require that Mr. Levandowski's consulting work for Uber to be scrubbed for Waymo trade secrets; Uber did not ensure that Mr. Levandowski did not keep Waymo's files handy on his personal devices; and Uber did not make Levandowski commit not to use the Waymo files even as a matter of form.  By failing to take *any* remedial or prophylactic measures whatsoever with respect to Mr. Levandowski's ████████ Uber ratified and furthered those ████████████████████████ for its own benefit.  Indeed, Uber *incentivized* Mr. Levandowski to use Waymo's stolen files by tying his compensation to aggressive technology milestones.  (*E.g.*, Dkt. 248-19.)  Defendants should not be permitted to rely on any privilege regarding Mr. Levandowski's ██████ under such circumstances.

Of course, further supporting the existence of the crime-fraud exception is Mr. Levandowski's across-the-board assertion of the Fifth Amendment (*see generally* Dkt. 273). *Amusement Indus., Inc. v. Stern*, 293 F.R.D. 420, 428 (S.D.N.Y. 2013) ("Courts have drawn [adverse inferences from invocation of the Fifth Amendment] when determining if the crime-fraud exception applies to evidence protected by the attorney-client privilege or work-product doctrine.").[8]  Mr. Levandowski now says that he cannot even submit a declaration that some sort of common interest with Uber ever existed because, apparently, admitting the fact of the common interest would incriminate him.  (Dkt. 382 at 4 ("Mr. Levandowski cannot fully explain to the Court the basis for the application of the common interest, attorney-client, or work product privileges to the communications at issue without risking a waiver of his Fifth Amendment privilege against self-incrimination.").)  Under these circumstances, an adverse inference that

---

[8]  Defendants ignore most of Waymo's authority that an assertion of the Fifth Amendment properly results in an adverse inference for purposes of the crime-fraud analysis.  Defendants also fail to distinguish *United States v. Saccoccia*, 898 F. Supp. 53, 62 (D.R.I. 1995), which held that a claim of attorney-client privilege is logically inconsistent with a Fifth Amendment claim over the same information.  Although Defendants argue that *Saccoccia* involved an *attorney*, as opposed to a client, asserting the Fifth Amendment, the Ninth Circuit has made clear that an attorney's knowledge or involvement in the criminal activity is not necessary to establish the crime-fraud exception.  *Laurins*, 857 F.2d at 540.

1    further supports the application of the crime-fraud exception is appropriate.[9]

2    **IV.    DEFENDANTS DO NOT DISPUTE THAT THEY SHOULD BE COMPELLED TO
         PRODUCE ALL DOCUMENTS AND FORENSIC DATA PROVIDED TO STROZ
3        FOR USE IN ITS INVESTIGATION**

4           As explained in Waymo's Motion, Defendants should also be compelled to produce all

5    documents and forensic data that Mr. Levandowski or others provided to Stroz for use in its

6    investigation. (Dkt. 321 at 15:24-16:5.) Indeed, this issue was even called out in the Notice of

7    Waymo's motion. (*Id.* at (i) (requesting "that the Court compel production of the withheld report

8    and attachments ***in addition to all other relevant information, files, and electronic media***

9    ***currently in the possession of Stroz Friedberg.***" (emphasis added)).) Notably, the Court's March

10   16 discovery order already required Defendants to produce any of Mr. Levandowski's

11   information, files, and media that remain in the possession of Uber or its agents, or to alternatively

12   provide a statement regarding the extent to which such materials have been deleted, destroyed, or

13   modified. (Dkt. 61 at 2.) Defendants' refusal to produce these materials, despite the Court's

14   discovery order and Waymo's explicit request for these materials, is unjustifiable.

15          Defendants' Opposition does not address these materials at all. Defendants' Opposition

16   never argues that the full set of documents and data provided to Stroz are privileged or

17   protected. Nor do Defendants dispute that Stroz is their agent such that they can compel

18   production of those materials in this case. Thus, there appears to be no dispute that these materials

19   should be produced in full. *I-Enterprise Co. v. Draper Fisher Jurvetson Mgmt. Co. V*, No. C-03-

20   1561, 2005 WL 1661959, at *14 (N.D. Cal. July 15, 2005) (non-movant's failure to address an

21   issue in its opposition brief "effective concedes" the issue).

22          Nor ***could*** there be any dispute that these materials are not privileged and should be

23   produced. Defendants' Opposition states again and again that Stroz was retained to investigate

24   facts. (*E.g.*, Opp. at 1:13-16; 3:8-11; 5:9-11; 6:1-2; 7:16-19; 13:21-14:1; 22:19.) Facts are not

25   privileged. (Dkt. 202 at 9:22-10:1 (*citing Upjohn Co. v. United States*, 449 U.S. 383, 395-96

---

26   [9]  There is sufficient evidence of both Mr. Levandowski's theft (Dkt. 433 at 1-2; 5/3/17 Hr'g Tr.
27   Public AM 75:22-76:1)  and Uber's complicity therein (Dkt. 433 at 2; Exs. 9-11) to justify the
     Court drawing adverse inferences here. (Dkt. 245-4 at 10-12.)

28

1    (1981) ("The [attorney-client] privilege only protects disclosure of communications; it does not

2    protect disclosure of the underlying facts by those who communicated with the attorney.").)  The

3    underlying documents and forensic data provided to Stroz for use in its investigation are classic

4    factual material that must be produced.

## V.      WAYMO HAS SHOWN THE REQUISITE NEED FOR THE LOGGED DOCUMENTS

6            Defendants have not rebutted Waymo's showing that Defendants should be compelled to

7    produce the documents due to Waymo's substantial and compelling need, even if they were

8    privileged and even if the privilege had not been made.

9            As an initial matter, Defendants have not established that every document on their 42-entry

10   log is "opinion work product," thereby raising the standard for compelling their production.  (Opp.

11   at 22-23.)  Defendants' own declarant states that the logged exhibits to the due diligence report are

12   "documents collected by Stroz" and "interview memoranda."  (Dkt. 370 ¶ 23.)  But the mere fact

13   that a document was "collected by Stroz" cannot transform that document into *any* type of work

14   product.  And "interview notes" are commonly classified as "fact" work product.  *In re*

15   *Healthsouth Corp. Secs. Litig.,* 250 F.R.D. 8, 12 (D.D.C. 2008).  Neither Defendants' log nor their

16   Opposition demonstrate that the contents of purported "interview memoranda" include any

17   attorney opinion.  To the contrary, the interviews were performed by Stroz Friedberg, not

18   Defendants' counsel, and they were not part of a business transaction, all of which weighs in favor

19   of a finding that the documents at issue reflect "fact" not "opinion" work product.[10]

20           Defendants next fail to persuasively distinguish authority holding that a witness'

21   invocation of the Fifth Amendment privilege creates a need for production of work product related

22   to that witness.[11]  (Opp. at 23.)  Mr. Levandowski should not be permitted to make statements

23

24   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [10]    *See In re Vitamins Antitrust Litig.*, 211 F.R.D. 1, 5 (D.D.C. 2002).

25   [11]    Defendants argue that the reasoning in *In re John Doe Corp.*, 675 F.2d 482, 492 & n.10 (2d
     Cir. 1982), applies only to "fact" not "opinion" work product.  Defendants similarly attempt to
26   limit *In re Crazy Eddie Secs. Litig.*, No. 87 CV 0033 (EHN), 1991 WL 17287, at *1 (E.D.N.Y.
     Jan. 28, 1991) and *In re Vitamins Antitrust Litig.*, 211 F.R.D. 1, 5 (D.D.C. 2002), to "fact work
27   product."  But Defendants' own record establishes that at least some of the logged documents are
     "interview memoranda" and "documents collected," (Dkt. 370 ¶23), *i.e.*, "fact work product."

28

about his ███████ when it suits him – *i.e.*, for the purpose of selling his company for $680 million – while shielding those same statements from discovery here.

Finally, Defendants cite *Holmgren v. State Farm Mutual Auto Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992), to argue that opinion work product can only be compelled where "mental impressions" are at issue. (Opp. at 24.) Here, Defendants' mental impressions ***are*** at issue. Waymo has alleged that Defendants' misappropriation is intentional, knowing, willful, malicious and fraudulent. (Dkt. 23 ¶¶ 75, 86.) And since Mr. Levandowski is an employee and officer at Uber and a central perpetrator of the theft, his mental impressions in particular are at issue.

In light of Mr. Levandowski's broad assertion of the Fifth, the withheld documents may be the only source for highly relevant information here; Defendants have identified no alternative.

## VI.    <u>DISCOVERY</u>

Defendants should be compelled to provide discovery related to the privileges they have asserted over the due diligence materials – they should be required to provide un-redacted versions of the agreements they cite in their opposition; they should be required to provide still-withheld documents cited in their opposition; witnesses should be subject to depositions about the declarations they have submitted; and so on. As indicated in its motion, Waymo requests leave to conduct discovery on these fronts outside the to-be-determined limits on discovery in this case.

But that discovery is not needed to grant Waymo's motion. Defendants have been preparing their positions on this 42-entry privilege log since before the March 29 hearing they initiated to discuss it.[12] Defendants chose to provide an insufficient log, even after receiving guidance from Judge Alsup and requests for additional information from Waymo. And they chose to provide a sworn record that falls short of their burden to establish that any privileges apply and that there has been no waiver. Discovery is closing in a little over two months. Defendants should be compelled to produce the due diligence materials now, without further delay.

---

[12] As the Court has described: "On March 29, at Uber's cryptic request, the Court convened a non-public conference at which separate counsel appeared for Levandowski. At that conference, defense counsel explained, 'Before the acquisition [of Otto] some due diligence was done. A third party prepared a report based on that due diligence. We intend to put that report on a privilege log.'" (Dkt. 433 at 6.)

DATED:  May 16, 2017

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By _Charles K. Verhoeven_
        Charles K. Verhoeven
        Attorneys for WAYMO LLC

# EXHIBIT 13

# DKT. NO. 510-3

## REDACTED VERSION OF DOCUMENT FILED UNDER SEAL

EXECUTION COPY

**PROJECT ZING**
**Draft Term Sheet**

*Date: 5:00 PM PST, February 22, 2016*

This term sheet (the "**Term Sheet**") is a summary of certain indicative terms of a proposed acquisition of Ottomotto Inc., a Delaware corporation (the "**Company**"), by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ (together with its affiliates, "**Unicorn**"), as further described herein.

| | |
|---|---|
| **Transaction Parties:** | • Company<br>• Unicorn<br>• Uber<br><br>It is understood and agreed that Uber, in addition to Unicorn, will be a party to the Put Call Agreement for purposes of guaranteeing the obligations of Uber and Unicorn under the Put Call Agreement (e.g., indemnification, representations and warranties, agreements regarding closing conditions, obligations to fund operating plans and budgets, etc.). In accordance with the preceding sentence, references to Unicorn in this Term Sheet shall also be deemed to include references to Uber in all such contexts. |
| **Structure:** | Unicorn will directly or indirectly acquire 100% ownership of the equity securities of the Company based on the transaction structure and other terms and conditions set forth in this Term Sheet (the "**Transaction**").<br><br>As of or promptly following the date hereof, the Company holds both (i) the business of the development or commercialization of consumer autonomous vehicles and related services (the "**Consumer Business**"), and (ii) the Trucking Business (as defined in Exhibit D). Following the consummation of the Transaction, the Company will be a direct or indirect wholly-owned subsidiary of Unicorn.<br><br>Prior to signing the Put Call Agreement (as defined below), the Company will (i) designate two series of units in order to achieve the parties desired economics regarding the allocation of (x) the Milestone RSUs (as defined below) with respect to the Consumer Business and (y) the Trucking Company Pool (as defined below) with respect to the Trucking Business, (ii) form a new Delaware limited liability company that operates the Trucking Business (the "**Trucking Company**"), or (iii) mutually agree with Unicorn on another transaction structure that achieves the same desired economics and has substantially similar tax consequences (including a structure whereby a separate put call arrangement exists for each of the Company and the Trucking Company) (an "**Alternative Structure**"). If the Trucking Company is formed, all intellectual property related to the Consumer Business will be transferred from the Company to, and be held by, the Trucking Company, and the parties will mutually agree to adjust the transaction structure as necessary to ensure that the Transaction includes the |

1

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

Case 17-20959-WDA Document 3 Page: 163 Filed 06/27/2017 Page 3 of 62

**EXECUTION COPY**

| | |
|---|---|
| | acquisition of the Trucking Company (in addition to the Company). |
| | Prior to signing the Put Call Agreement, Unicorn will complete all of the due diligence in accordance with <u>Exhibit C</u>. Subject to any Alternative Structure, the Transaction shall be structured as follows: |
| | • As promptly as practicable after the date hereof, Unicorn and the Company will enter into a definitive Put / Call Agreement (the "**Put Call Agreement**"). |
| | • Either attached to the Put Call Agreement will be an acquisition agreement (which will provide for a stock purchase, merger or other transaction structure mutually agreed by the parties, whereby Unicorn acquires 100% ownership of the equity securities of the Company) in a form mutually agreed upon between the parties or the Put Call Agreement will itself be an acquisition agreement (in either case, the "**Acquisition Agreement**"). ███████ (i) ███████ to all employees other than Anthony Levandowski, Lior Ron and other key employees to be identified and mutually agreed upon (collectively, the "**Key Employees**") or (ii) ███████████. The parties shall have the ability to update the Acquisition Agreement in good faith as mutually agreed upon based on changes to the structure of the Transaction. |
| | • Subject to any Alternative Structure, at any time from (i) February 28, 2017 until (ii) March 31, 2017 (such date, the "**Put Call End Date**"),  (x) the Company shall have the right, subject to the below, to cause Unicorn to execute the Acquisition Agreement and consummate the Transaction (the "**Put**"), subject to the "Closing Conditions" set forth below, and (y) Unicorn shall have the right, subject to the below, to cause the Company to execute the Acquisition Agreement and consummate the Transaction (the "**Call**"), subject to the "Closing Conditions" set forth below. |
| | • Unicorn and the Company shall consummate the Transaction (the "**Closing**") as promptly as practicable after the exercise of the Put or the Call (as applicable); ███████████████ |
| | • ████████████████████████████ |
| **Consideration /** | At the Closing, Unicorn will pay the Company a mutually agreed upon |



**EXECUTION COPY**

| | |
|---|---|
| **Employment Arrangements:** | amount that is no greater than ▮▮▮▮▮▮ (such amount, the "**Cash Consideration**") for 100% of the equity securities of the Company ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Additionally, at the Closing, employees of the Company who accept employment offers with Uber will receive: <ul><li>Base salary in accordance with Uber's customary practices; and</li><li>In the aggregate, a pool of restricted stock units of Uber Technologies, Inc., a Delaware corporation ("**Uber**") with respect to shares of Uber's Common Stock ("**RSUs**"), which shall be allocated by the Company in accordance with, and which shall be determined in accordance with, the terms set forth in <u>Exhibit A</u>.</li></ul> After the date hereof, the parties and their respective counsel will explore in good faith alternative mutually beneficial transaction and compensation structures (i.e. earn-outs for the Trucking Company Pool, restricted stock, formation of trusts, etc.) with the objective of being tax-efficient for the employees and stockholders of the Company. Anthony Levandowski's employment agreement with Uber shall provide that he shall report to Jeff Holden. |
| **Put / Call Closing Conditions:** | The exercise of the Put by the Company will be subject to the Company providing to Unicorn an officer's certificate certifying the satisfaction of the following conditions (the "**Put Conditions**"), which such Put Conditions shall also be satisfied immediately prior to the consummation of the Transaction; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ <ul><li>A customary bring down of representations and warranties with respect to the Company and stockholders (if applicable depending on the structure) set forth in the Put Call Agreement and/or Acquisition Agreement, except as would not have a material adverse effect (other than certain fundamental representations and warranties, which will be brought down to a more stringent standard as mutually agreed by the parties in definitive documentation); provided, that, other than (i) with respect to fundamental representations and warranties or (ii) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮</li><li>Except as explicitly set forth in <u>Exhibit C</u>, all of the covenants of the</li></ul> |

3

EXECUTION COPY

Company and stockholders (if applicable depending on the structure) in the Put Call Agreement and/or Acquisition Agreement shall have been performed and/or complied with in all material respects;

- No material adverse change with respect to the Company;

- No material claims or litigation with respect to the Company, including without limitation the Company's intellectual property (including claims of infringement or misappropriation of any intellectual property of any third party) or with respect to any of the Key Employees;

- All governmental approvals or authorizations with respect to the Transaction (including HSR, if required) have been obtained;

- No (i) injunctions prohibiting the Transaction or (ii) legal proceedings brought by governmental entities prohibiting the Transaction;

- The Company has not received capital, financing or other funding from any third party other than (i) Unicorn or (ii) employees of the Company, including the Key Employees;

- Unless mutually agreed by the parties, execution and delivery to Uber (and non-revocation) by ▮ employees of the Company (which such ▮ employees shall include all of the Key Employees) (i) an employment offer letter on terms and conditions acceptable to Uber, which such offer letter will include, among other things, base salary, benefits and equity incentive grants (with customary vesting terms over four years beginning on employee's start date at the Company) in accordance with Uber's customary practices), and (ii) Uber's standard form of employee proprietary information and inventions assignment agreement;

- Receipt by Unicorn of any material third-party consents (if any)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**

|  | mutually agreed between the parties; and
|  |
|  | • Other customary conditions as mutually agreed upon by Unicorn and the Company.
|  |
|  | In the event Unicorn exercises the Call, the Company shall promptly, but in any event within five (5) business days, provide an officer's certificate certifying the satisfaction of the Put Conditions, which, if not provided by the Company, Unicorn shall have the option, in its sole discretion, to either (i) consummate the Transaction or (ii) cancel and nullify the Call in all respects. The Put Conditions shall also be satisfied as of immediately prior to the consummation of the Transaction.
|  |
|  | The exercise of the Call by Unicorn will be subject to Unicorn providing to the Company an officer's certificate certifying the satisfaction of the following conditions (the "**Call Conditions**"), which such Call Conditions shall also be satisfied immediately prior to the consummation of the Transaction:
|  |
|  | • A customary bring down of representations and warranties with respect to Unicorn set forth in the Put Call Agreement and/or Acquisition Agreement;
|  |
|  | • All of the covenants of Unicorn in the Put Call Agreement and/or Acquisition Agreement shall have been performed in all material respects;
|  |
|  | • All governmental approvals or authorizations with respect to the Transaction (including HSR, if required) have been obtained;
|  |
|  | • No (i) injunctions prohibiting the Transaction or (ii) legal proceedings brought by governmental entities prohibiting the Transaction; and
|  |
|  | • A certificate as to capitalization of Uber certifying that the RSUs in the aggregate represent ▮▮▮ of Uber's issued and outstanding shares of capital stock on a fully diluted basis as of ▮▮▮▮▮▮
|  |
|  | In the event the Company exercises the Put, Unicorn shall promptly, but in any event within five (5) business days, provide an officer's certificate certifying the satisfaction of the Call Conditions, which, if not provided by Unicorn, the Company shall have the option, in its sole discretion, to either (i) consummate the Transaction or (ii) cancel and nullify the Put in all respects. The Call Conditions shall also be satisfied as of immediately prior to the consummation of the Transaction.
| **Covenants / Interim** | <u>Interim Financing</u>

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY

| Financing: | The parties agree that from the execution of the Put Call Agreement until the earlier of the Put Call End Date and the termination of the Put Call Agreement, the Company shall not seek or receive any financing (debt or equity) from any third party other than (i) Unicorn, Uberand/or (ii) employees of the Company, including the Key Employees. |
|---|---|
| | Prior to signing the Put Call Agreement, Unicorn and the Company will agree on an operating plan and budget for the Company's Consumer Business and the Trucking Business prepared for each quarter from the signing of the Put Call Agreement until the later of the (i) Closing and (ii) Put Call End Date (the "**Operating Plan**"); ███████████████████████████████████████████████████████████████ ████████████████████████████████ Beginning upon the signing of the Put Call Agreement, Unicorn and Uber shall be obligated to fund the Company for each quarter in advance in accordance with the Operating Plan, so long as the Operating Plan for all prior quarters (if any) has been materially complied with by the Company, or as mutually agreed upon by the parties. Unicorn and the Company shall have the ability to amend the Operating Plan at any time by mutual written consent. |
| | • ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ |
| | • ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ |
| | ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ |
| | <u>Other Covenants</u> |
| | In addition to any covenants set forth in <u>Exhibit C</u>, the Put Call Agreement and/or the Acquisition Agreement shall contain other customary interim |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**

| | |
|---|---|
| | covenants (including with respect to exclusivity negative covenants regarding Competitive Transactions) of the Company covering the period between the dates of the Put Call Agreement and/or the Acquisition Agreement and the Closing. |
| **Representations and Warranties:** | The Put Call Agreement and/or the Acquisition Agreement will contain customary representations and warranties for a transaction of this nature. |
| ███████ | █████████████████████████████████████████████ |
| **Trucking Company:** | The parties shall agree on an earn-out whereby, after the Closing, a combination of (x) certain employees of the Company prior to the Closing and (y) employees of the Trucking Company (if formed) prior to the Closing (collectively, the "**Trucking Company Pool**") shall receive ████████ ███████████████████████████████████████████████████████ ████████████████ shall be measured each fiscal year and paid to the Trucking Company Pool employees (in their respective shares) in accordance with the principals set forth herein promptly following the end of each fiscal year.<br><br>In order for the profits to vest for any member of the Trucking Company Pool, ████████████████████████████████████████████ |

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

**EXECUTION COPY**

Time Vesting Condition

12/48 of the profits will vest on the one-year anniversary of each such Trucking Company Pool employee's start date with the Company, Trucking Company or Uber (whichever is earlier) and 1/48 of the profits will vest on each monthly anniversary thereafter.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**

| | |
|---|---|
| | ███████████████████████ |
| **Confidentiality:** | Each party to this Term Sheet agrees to keep confidential the existence, status and terms of this Term Sheet in accordance with the terms of the Mutual Non-Disclosure Agreement, dated as of February 1, 2016, by and between Uber, the Company and the Founders. |
| **Exclusivity:** | Each of the Founders and the Company (each a "**Restricted Party**") shall negotiate exclusively with Unicorn with respect to the subject matter of this Term Sheet for an initial period of 45 days from the date hereof (the "**Exclusivity Period**"); provided, that the Exclusivity Period shall be automatically extended for two successive 15 day periods so long as each of Unicorn, the Company and the Founders and their respective advisors are |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**



continuing to negotiate the Transaction in good faith as of the end of each preceding period. During the Exclusivity Period no such Restricted Party shall (i) solicit, or encourage the initiation or submission of, any indication of interest, proposal or offer from any party other than Unicorn (including, without limitation, any Competitor (as defined below)) regarding (x) a transaction or other arrangement that is similar and/or competitive to the Transaction or (y) any other commercial arrangement with any Competitor (in either the case of clause (x) or clause (y), a "**Competitive Transaction**"), or (ii) participate, or engage in any discussions, negotiations or otherwise with, or provide any information to, any party other than Unicorn (including, without limitation, with any competitors of Unicorn) regarding a Competitive Transaction. "**Competitor**" shall mean party

Each of the Restricted Parties shall immediately terminate and cease any ongoing discussions, communications or negotiations with any party (other than Unicorn) regarding a Competitive Transaction, and shall promptly provide Unicorn with an oral and a written notice of any expression of interest, inquiry, proposal or offer that (i) is in the form of a written term sheet, letter of intent, indication of interest letter or similar written document and/or (ii) relates to a possible acquisition of more than 20% of the equity interests (including via convertible debt) of the Company (which notice shall, to the extent permitted by any applicable non-disclosure agreements that were in place as of the date of this Term Sheet and remain in force as of the time of such notice, identify the other party(ies) involved, and set forth the material terms and conditions, including the amount and form of consideration and material conditions of any such offer, expression of interest, inquiry or proposal) that is received by any of such Restricted Parties from any party (other than Unicorn) after the date of this Term Sheet and on or prior to the expiration of the Exclusivity Period.

| | |
|---|---|
| **Governing Law:** | This Term Sheet and all definitive documentation will be governed by and construed in accordance with the laws of the State of California, without giving effect to any provisions or principles thereof with respect to conflict of laws. |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**

| | |
|---|---|
| **Costs & Expenses:** | Each party to this Term Sheet shall bear its own costs and expenses incidental to the preparation of this Term Sheet and any definitive documentation and the consummation of the Transaction. |
| **Counterparts:** | This Term Sheet may be executed in one or more counterparts and when so executed such counterparts shall constitute a single agreement. Execution by facsimile or scanned to e-mail format signatures shall be legal, valid and binding. |
| **Termination:** | If this Term Sheet has not been fully-executed by each of the parties to this Term Sheet as of 9 p.m. Pacific Time on February 22, 2016, this Term Sheet shall terminate and be of no further force or effect. |
| **Binding Effect; Liability:** | The parties to this Term Sheet hereto agree and acknowledge that, except for the obligations of the parties set forth in the sections "**Confidentiality**", "**Exclusivity**," ███████████████ "**Governing Law,**" "**Costs & Expenses,**" "**Counterparts,**" "**Termination**" and "**Binding Effect; Liability,**" which are intended to be and shall be legally binding, this Term Sheet is not intended to be and shall not be a legally binding agreement. For the avoidance of doubt, no party hereto shall be under any obligation to enter into and deliver any legally binding definitive agreements with respect to the Transaction, and failure to do so shall not impose any liability on any party hereto.<br><br>The parties also acknowledge and agree that this Term Sheet does not constitute an offer for the sale of, or an invitation or a solicitation of any offer for the purchase or acquisition of, securities or any interests in or assets or business of the Company or any of its affiliates. |

***

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**

IN WITNESS WHEREOF, the undersigned have executed and delivered this Term Sheet as of the date first written above.

By: ████████████████

Ottomotto Inc.

By: _____
      Name:
      Title:

_____
Anthony Levandowski

_____
Lior Ron

13

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**

IN WITNESS WHEREOF, the undersigned have executed and delivered this Term Sheet as of the date first written above.

By: _____
    Name: ███████████
    Title: General Partner

On behalf of ████████████
    Name: ███████████
    Title: Manager

Ottomotto Inc.

By: _____
    Name: LIOR RON
    Title: PRESIDENT

_____
Anthony Levandowski

_____
Lior Ron

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**

### Exhibit A

### Incentive Compensation

The Company will have the ability to allocate (in accordance with the terms of the next paragraph) a number of Uber restricted stock units with respect to shares of Uber's Common Stock on a fully diluted basis as of immediately prior to the date of this Term Sheet less the Cash Consideration. (the "**Milestone RSUs**"), unless mutually agreed by the parties, if at least ▮ employees of the Company accept employment with Uber prior to or as of the Closing.

Allocation of the Milestone RSUs shall be determined by the Company prior to the Closing and shall be subject to Unicorn's good faith approval ("**Allocation Percentages**"). At the Closing, the Company shall be entitled, subject to Unicorn's good faith approval, to reserve a portion of the Allocation Percentages for future employees of the Company and Trucking Company. Once the Company sets the Allocation Percentages in accordance with the preceding sentence, any changes to the Allocation Percentages shall require the mutual written consent of Unicorn and the Company or the Founders (each of which shall be provided in such party's sole discretion). The sum of the Allocation Percentages for the RSUs shall not exceed 100%.

The Milestone RSUs will have a milestone-based condition, a time-based condition, and a performance-based condition, all of which must be met in order for the Milestone RSUs to vest.



14

**EXECUTION COPY**

- The time-based condition will be met as follows: 12/48 of the RSUs on the one-year anniversary of each employee's start date with the Company or Uber (whichever is earlier) and 1/48 of the RSUs on each monthly anniversary thereafter.

- The performance-based condition will be met on the earlier to occur of: (i) an initial public offering ("**IPO**") of Uber stock or (ii) a liquidation transaction, which includes customary liquidation, dissolution or winding up of Uber transactions (each of clause (i) and (ii), a "**Liquidity Event**").

- The RSUs and any shares acquired pursuant to the RSUs will be subject to customary limitations on transfer, including, but not limited to, a six-month lock-up period following an IPO and a one-year holding period from the date the RSUs meet the time-based condition.

- If employment is terminated prior to the occurrence of a Liquidity Event and if, and to the extent, the RSUs have not met the time-based condition as of the date of such termination, the RSUs that have not met the time-based condition will terminate and be forfeited.

By way of example, if, for any particular employee who was employed by Uber or the Company beginning on January 1, 2017, (i) the total number of Milestone RSU's granted to such employee was 100, (ii) Milestone A was allocated 10% of the total Milestone RSU's (i.e., such employee was granted 10 RSU's that were associated with Milestone A), and (iii) Milestone A was achieved on ███████████ if the employee was (x) still employed by Uber on January 1, 2019 or (y) was terminated (other than for cause) after ████████████ provided, that, for the avoidance of doubt, such ████████ would not be required in the case of Milestone 7), then on such date:

(1) the milestone-based condition would be satisfied with respect to such 10 Milestone RSU's;

(2) the time-based condition would be satisfied with respect to 5 out of such 10 Milestone RSU's;

(3) if a Liquidity Event occurred prior to January 1, 2019, then with respect to the 5 Milestone RSU's for which the milestone-based condition and time-based condition have been satisfied in accordance with clauses (1) and (2) above, such 5 Milestone RSU's would be fully vested;

(4) the remaining 5 Milestone RSU's for which the time-based condition has not yet been satisfied as of ████████████████ of such 5 remaining milestone RSU's Milestone RSU's would be become fully vested over each of the next ███ months so long as such employee remains employed by Uber; and

(5) the other 90 Milestone RSUs shall vest similarly based on achievement of the Milestones with which they are associated.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY



16

**EXECUTION COPY**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY



19

EXECUTION COPY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY



24

**EXECUTION COPY**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY



29

**EXECUTION COPY**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY

(see attached)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



2
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



7

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



14

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Exhibit C

**Indemnity Construct**

**(see attached)**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Exhibit C**

**Indemnity Construct**

*Pre-Signing Due Diligence Process*

Promptly after the date hereof, Unicorn and its advisors and the Outside Expert (as defined below) shall begin due diligence on Newco and the Diligenced Employees (as defined below), in accordance with the due diligence plan attached hereto as Attachment A, which shall include the completion of the Third Party Report (as defined below). The initial due diligence of Diligenced Employees employed by Newco prior to the signing of the Put Call Agreement will be completed prior to the execution of the Put Call Agreement. The Diligenced Employees shall certify as to the completion of the due diligence in good faith and that they have responded truthfully to the Outside Expert. Prior to execution of the Put Call Agreement, all Employees (as defined below) (other than Diligenced Employees) shall sign the attestation in accordance with the due diligence plan attached as Attachment A.

*Indemnification Construct*

Unless (i) the Closing does not occur and Unicorn terminates the Put Call Agreement by reason of a Post-Signing Specified Bad Act (as defined below) being committed by or on behalf of Newco by a Diligenced Employee and/or being committed by any Diligenced Employee that was either (A) mutually agreed to have occurred by both Unicorn and Newco or (B) conclusively determined by a non-appealable judgment of a court of competent jurisdiction (or in binding arbitration, if Unicorn elects to pursue arbitration to adjudicate such matter) to have occurred, or (ii) if the Closing occurs, but after the Closing, it is conclusively determined by a non-appealable judgment of a court of competent jurisdiction (or in binding arbitration, if Unicorn elects to pursue arbitration to adjudicate such matter) that a Post-Signing Specified Bad Act was committed by or on behalf of Newco by a Diligenced Employee and/or was committed by any Diligenced Employee prior to Closing (in each case Unicorn's indemnification obligation pursuant to this paragraph shall become immediately null and void), following the execution of the Put Call Agreement by Unicorn and Newco, Unicorn will indemnify and hold harmless Newco and/or the Diligenced Employees to the maximum extent permitted by applicable law (subject to the limitations and exclusions set forth herein) from and against any and all Expenses (as defined below) arising out of any claim brought or alleged in writing by any Former Employer (as defined below) of any Diligenced Employee against Newco and/or any Diligenced Employee arising out of or alleged to arise out of (i) the infringement (direct or indirect) or misappropriation by a Diligenced Employee, Newco, or any other entity, of any intellectual property, including any patents, copyrights, trademarks or trade secrets of such Diligenced Employee's Former Employer, and/or (ii) breach of fiduciary duty or duty of loyalty to such Former Employer, and/or (iii) breach of any lawful and enforceable non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between any Diligenced Employee and such Diligenced Employee's Former Employer (collectively, the "Indemnified Claims"); provided, that the Indemnified Claims shall not, regardless of whether the Closing occurs, include any:

(i) claims that have been conclusively determined by a non-appealable judgment of a court of competent jurisdiction (or in binding arbitration, if Unicorn elects to pursue arbitration to adjudicate such Indemnified Claim) to arise or result from Bad Acts committed by any Employee (other than a Diligenced Employee), regardless of whether such Bad Acts were committed prior to or after the execution of the Put Call Agreement; provided, that, for the avoidance of doubt, this clause (i) shall not

have any impact on Unicorn's obligation to otherwise indemnify the Diligenced Employees and Newco for any Indemnified Claims in accordance with the provisions herein;

(ii) claims that have been conclusively determined by a non-appealable judgment of a court of competent jurisdiction (or in binding arbitration, if Unicorn elects to pursue arbitration to adjudicate such matter) to arise or result from any Pre-Signing Bad Acts committed by or on behalf of Newco by a Diligenced Employee and/or committed by any Diligenced Employee that reasonably arise or result from any facts, circumstances, activities or events that either (x) were not truthfully disclosed by Newco and/or the Diligenced Employees to the Outside Expert in response to relevant inquiries in connection with the due diligence performed by the Outside Expert, or (y) were not contained or reflected in the due diligence materials provided by the Diligenced Employees to the Outside Expert; and

(iii) claims that have been conclusively determined by a non-appealable judgment of a court of competent jurisdiction (or in binding arbitration, if Unicorn elects to pursue arbitration to adjudicate such matter) to arise or result from any Post-Signing Specified Bad Acts committed by or on behalf of Newco by a Diligenced Employee and/or committed by any Diligenced Employee (the matters excluded from Indemnified Claims in the preceding clauses (i), (ii) and (iii) collectively, the "Excluded Claims").

The indemnification obligation of Unicorn to a Diligenced Employee with respect to an Indemnified Claim against such Diligenced Employee shall be subject to the following deductible:



Notwithstanding the foregoing, in the event of an Indemnified Claim that Unicorn believes is an Excluded Claim, Unicorn shall have the right within 60 days after the settlement or final adjudication of the Indemnified Claim, in its sole discretion, to invoke binding expedited arbitration between Unicorn and Newco and/or the applicable Diligenced Employee(s) in order to determine whether such claim is an Indemnified Claim or an Excluded Claim, and if such claim is an Excluded Claim then Unicorn shall be entitled to reimbursement from Newco or such Diligenced Employee(s) for all Expenses paid by Unicorn on behalf of Newco or such Diligenced Employee(s) with respect to such Excluded Claim (but not any Indemnified Claim).

Upon written request for Expenses incurred by Newco and/or any Diligenced Employee (Newco or any such Diligenced Employee, the "Indemnified Person") arising out of any Indemnified Claim, Unicorn shall pay to such Indemnified Person the amount of any such Expenses ███████████████████████ of such request. If Unicorn denies any such request or otherwise fails to advance such Expenses or provide any such indemnification to the applicable Indemnified Person ████████████████████ after making such request, such Indemnified Person shall have the right to enforce its indemnification rights

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

by commencing binding expedited arbitration seeking a determination that the Indemnified Person is entitled to such indemnification or advancement of Expenses. In the event of any such arbitration described in this paragraph, Unicorn shall not be permitted to arbitrate in such arbitration whether such a claim is an Excluded Claim unless, in accordance with the paragraph above, the Indemnified Claim has been settled or finally adjudicated.

Unicorn, on the one hand, and Newco and/or any Diligenced Employee, on the other hand, each hereby agree to appear in any such expedited binding arbitration proceeding set forth above.

In any arbitration or other proceeding between Unicorn, on the one hand, and Newco and/or any Diligenced Employee, on the other hand, to determine whether an Indemnified Claim is an Excluded Claim or whether an Indemnified Person is entitled to indemnification, the burden of proving that an Indemnified Claim is an Excluded Claim and/or that an Indemnified Person is not entitled to indemnification shall, in each case, be on Unicorn. The Put Call Agreement will contain customary provisions regarding indemnification procedures for any Indemnified Claim.

In any arbitration or other proceeding between Unicorn, on the one hand, and Newco and/or any Diligenced Employee, on the other hand (including any arbitration in order to determine whether an Indemnified Claim is an Excluded Claim), the non-prevailing party shall promptly reimburse the prevailing party for all out-of-pocket expenses (including reasonable attorneys' fees) incurred in connection with such arbitration or other proceeding.

For the avoidance of doubt, no Employee other than any Diligenced Employee shall receive any indemnification from Unicorn hereunder.

If Unicorn advances any Expenses of Newco and/or any Diligenced Employees in connection with any Indemnified Claim, and thereafter (i) the Closing does not occur and Unicorn terminates the Put Call Agreement by reason of a Post-Signing Specified Bad Act being committed by or on behalf of Newco by a Diligenced Employee and/or being committed by any Diligenced Employee that was either (A) mutually agreed to have occurred by both Unicorn and Newco or (B) conclusively determined by a non-appealable judgment of a court of competent jurisdiction (or in binding arbitration, if Unicorn elects to pursue arbitration to adjudicate such matter) to have occurred, or (ii) if the Closing occurs, but after the Closing, it is conclusively determined by a non-appealable judgment of a court of competent jurisdiction (or in binding arbitration, if Unicorn elects to pursue arbitration to adjudicate such Indemnified Claim) that a Post-Signing Specified Bad Act was committed by or on behalf of Newco by a Diligenced Employee and/or was committed by any Diligenced Employee prior to Closing, then Unicorn shall be entitled to reimbursement from Newco or such Diligenced Employee(s) for all Expenses paid by Unicorn on behalf of Newco or such Diligenced Employee(s) with respect to such Indemnified Claim.

All reimbursement of Expenses obligations of Newco and/or the Diligenced Employees hereunder are several and not joint, and any Diligenced Employee is only responsible for the reimbursement of any Expenses to the extent such Expenses related to an Indemnified Claim against such Diligenced Employee. Except as otherwise provided by law and conclusively determined by a non-appealable judgment of a court of competent jurisdiction (or in binding arbitration, if Unicorn elects to pursue arbitration to adjudicate such matter), no Diligenced Employees are personally liable for the reimbursement obligations of Newco.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

*Certain Defined Terms*

"Bad Acts" shall mean (i) fraud committed by or on behalf of Newco and/or committed by any Employee, and/or (ii) willful, intentional or deliberate conduct by an Employee or Newco that constitutes or directly leads or contributes to the infringement (direct or indirect) or misappropriation by an Employee, Newco, or any other entity, of any patents, copyrights, trademarks or trade secrets of such Employee's Former Employer, including, without limitation, taking, removing and/or copying software, product plans, or invention disclosures, in electronic or tangible form that are owned by such Diligenced Employee's Former Employer, and/or (iii) willful and/or intentional breach by Newco or any Employee of fiduciary duty or duty of loyalty to such Former Employer, and/or (iv) willful and/or intentional breach by Newco or any Employee of any lawful and enforceable non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between any Employee and such Employee's Former Employer.

"Diligenced Employees" means the Key Employees and any other employees mutually agreed upon by the Company and Newco to be deemed "Diligenced Employees" either (i) prior to signing the Put Call Agreement or (ii) after the signing of the Put Call Agreement but prior to Closing.

"Employee" means any employee of Newco.

"Expenses" means (i) any expense, liability, or loss, including reasonable attorneys' fees, mediation fees, arbitration fees, expert witness fees, vendor fees, costs (such as witness fees, duplication charges, data storage fees, filing fees, travel and meals), (ii) any judgments, fines, penalties, damages, awards, and amounts paid or to be paid in settlement; and (iii) any interest, assessments or other charges imposed on any of the items in parts (i) and (ii) of this definition, in each case, that is out-of-pocket and documented.

"Former Employer" means, with respect to any employee or non-employee service provider, any former employer of such employee or non-employee service provider, together with any of such former employer's affiliates.

"Newco" means the Company and the Trucking Company.

"Outside Expert" means Stroz Freidberg LLC.

"Post-Signing Specified Bad Acts" has the meaning set forth in Attachment B.

"Pre-Signing Bad Acts" means any Bad Act occurring prior to the date of the Put Call Agreement.

"Third Party Report" means the written report(s) produced by the Outside Expert summarizing in detail all of the facts, circumstances, activities or events obtained by the Outside Expert from any Diligenced Employee that the Outside Expert deems are reasonably related to any Bad Act of such Diligenced Employee, in each case, based on the interviews, forensic due diligence and other due diligence investigation with respect to all Diligenced Employees conducted by the Outside Expert, as jointly directed by and engaged by Newco and Unicorn.

*Conditionality*

lf Unicorn enters into the Put Call Agreement, then Unicorn's obligation to effect the Closing shall not be conditioned on there having been no Pre-Signing Bad Acts.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Newco and the Diligenced Employees shall (i) disclose with reasonable specificity any Post-Signing Specified Bad Acts that have been committed by or on behalf of Newco by a Diligenced Employee and/or have been committed by any Diligenced Employee, or (ii) certify that no Post-Signing Specified Bad Acts have been committed by or on behalf of Newco by a Diligenced Employee and/or have been committed by any Diligenced Employee. The Put Call Agreement will include as a condition to the exercise of the Put or Call (as applicable), and to the Closing, that no Post-Signing Specified Bad Acts have been committed by or on behalf of Newco by a Diligenced Employee and/or have been committed by any Diligenced Employee; the determination of whether a Post-Signing Specified Bad Act have been committed by or on behalf of Newco by a Diligenced Employee and/or have been committed by any Diligenced Employe will be determined by either (A) the mutual agreement of Unicorn and Newco or (B) a non-appealable judgment of a court of competent jurisdiction (or in binding arbitration, if Unicorn elects to pursue arbitration to adjudicate such matter).

The Put Call Agreement will contain affirmative and negative covenants from the date of the Put Call Agreement until Closing, which will contain, among other things, (x) restrictions on Newco and all Employees (including, without limitation, Diligenced Employees) committing any Post-Signing Specified Bad Acts, (y) the right for Unicorn to conduct reasonable audits, inspections and due diligence to uncover any potential Post-Signing Specified Bad Acts, and (z) (i) Newco and Unicorn mutually agreeing on determining whether any newly-hired Employee shall be deemed a Diligenced Employee, (ii) Newco not being permitted to hire any new Diligenced Employee without the prior written consent of Unicorn, and (iii) Newco not being permitted to hire any non-Diligenced Employee who does not complete the attestation described in the due diligence process described above unless consented to by Unicorn. All such covenants must be performed and/or complied with in all material respects prior to the exercise of the Put or Call (as applicable) and the Closing; provided, that the covenant in clause (x) above, solely with respect to Post-Signing Bad Acts being committed by or on behalf of Newco by a Diligenced Employee and/or being committed by any Diligenced Employee, must be performed and/or complied with in all respects.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Attachment A

### Document Due Diligence Request List

1) Provide a list of all current and/or former employees, contractors, or other service providers (e.g. interns) hired by the Company ("Workers"), including, as applicable, each individual's name, job title, salary, incentive compensation, date of hire or retention and termination, if applicable, full-time or part-time status, exempt or non-exempt classification, and details of the social benefits for each employee.

2) Provide current organizational chart of the Company (if one exists).

3) As part of the Company's onboarding process for all Workers, each Worker shall provide an attestation that they have not committed any Bad Acts (as defined in the Term Sheet), and the Company shall provide copies of all such attestations.

4) Confirm all Workers executed an undertaking of confidentiality, non-disclosure, non-competition, and assignment of intellectual property rights to the Company, and provide copies of such agreements.

5) Provide any agreement restricting the ability of the Company or any Worker to compete in any line of business, with any person or in any geographic area, committing the Company to continue in any line of business or granting rights of first refusal to any party

6) Provide a list of Workers who contributed to the intellectual property of the Company (if any), and indicate whether they did so while being engaged by a university. Provide copies of any agreements or university policies relevant for such engagement.

7) Provide all documents (or a written description if any employee plan is unwritten) representing any "employee plans" covering, maintained for the benefit of or relating to, any Workers, officers or directors of the Company. This request shall include all employment agreements, consulting agreements, equity agreements (including equity incentive plans) and other agreements between the Company and any Workers.

8) To the extent there are any former Workers, did they sign a release upon their termination of employment? If so, please provide us with a copy thereof.

9) Confirm that there is no pending or threatened litigation challenging the Company's or any Workers' ownership or right to use intellectual property.

10) Confirm that there is no employment-related (or other) actual or threatened litigation, formal or informal, whether in court, arbitration, before administrative agencies, or otherwise, against the Company or any Worker.

11) Provide all incorporation and formation docs for the Company, including all actions taken by the board of directors of the Company.

12) Provide all agreements pertaining to all stock issuances or debt issuances (including convertible debt) of the Company (including, without limitation, to any Workers of the Company).

13) Provide a detailed capitalization table for the Company.

14) Provide a list of all material assets of the Company.

15) Provide a list of all other material contracts of the Company (if any).

### Diligenced Employee Due Diligence Process

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1) Stroz Freidberg (an independent third party digital forensic expert) (the "**Expert**") shall conduct the relevant due diligence review. The Expert shall simultaneously report back all findings of such due diligence review to outside counsel advisors of both Unicorn and the Company.

2) Due diligence shall be focused on Diligenced Employees (as defined in the Term Sheet) who are no longer employed by ACME.

3) Unicorn's intent is to move through the due diligence process quickly and reasonably, without impairing any privacy rights of the Company or any Diligenced Employee. As such, as promptly as practicable after signing the Term Sheet, Unicorn and the Company shall jointly determine in good faith the scope of the due diligence review. For example, the parties to agree on certain parameters for the due diligence review: (i.e., (i) searching for any emails sent to any @unicorn accounts, searching (ii) any emails or texts sent to any personal accounts of key Unicorn employees within a defined period of time; and (iii) searching based on agreed upon terms, e.g., the Company, ACME, Trucking, etc.).

4) Each Diligenced Employee shall cooperate and exercise best efforts (i) to preserve any information on Devices or Accounts provided by the Company and all Workers, including but not limited to, making forensically-sound images or copies to the extent possible; and (ii) to employ measures to be respectful of personal information of all Workers and third parties.

5) As part of the due diligence process, each Diligenced Employee:

   a. Shall make available (including by providing passwords or any other information needed for access) to the Expert for review, all relevant devices, including, non-ACME laptop, desktop, tablet or other computers, mobile phones, personal digital assistants, or any other devices or sources where information can be stored, (e.g., USB, flash drive, thumb drives, discs, external hard drive, cloud storage) in any medium ("Devices") that may have been used by such Diligenced Employee during and after any such Diligenced Employee's employment with ACME and any predecessor entity that ACME acquired.

   b. Shall make available (including by providing passwords or any other information needed for access) to the Expert for review, all non-ACME accounts for emails, text messages, chats, or other information on social media or networks (including but not limited to Facebook, Twitter, LinkedIn) (collectively, "Information") that may have been used by such Diligenced Employee during and after any such Diligenced Employee's employment with ACME and any predecessor entity that ACME acquired.

   c. Shall provide to the Expert all employment, consulting, confidentiality agreements, non-solicitation agreements, invention assignment agreements and any other material agreements between any Worker and ACME.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Attachment B

Post-Signing Specified Bad Acts

"Post-Signing Specified Bad Acts" means any of the following Actions by any Employee and/or by Newco after the date of the Put Call Agreement and prior to the Closing; <u>provided</u> that if any such Employee and/or Newco obtains the explicit written consent of Unicorn to engage in any such Action, then such Action shall not be deemed by either Party to be a "Post-Signing Specified Bad Act":

*Parameters/Definitions*:

- **Action** shall mean:  (i) an act; (ii) an action that such Employee has directed, caused, induced, knowingly contributed to, or knowingly permitted someone else to take; and (iii) failure to disclose to Unicorn actual knowledge that such Employee has that a NEWCO employee or Non-Employee Service Provider or other Employee engaged or is engaging in any Post-Signing Specified Bad Act.

- **Non-Employee Service Provider** shall mean a natural person in her or his capacity as a consultant or contractor.

- **Software** shall mean software, including, but not limited to, system software, applications, application program interfaces, firmware, source code, machine or object code, computer programs, program instructions, and any associated comments and revision histories, formulas, engineering specifications, or schematics that define or otherwise describe the algorithms or structure of software or hardware designs.

IP/Trade Secrets Misappropriation.

1. Take, retain, not return, transfer, access, or possess any hardware, computers, electronic devices, memory chip, machine readable storage media, transmission media, equipment, tools, jigs, templates, molds, models, samples, mock ups, prototypes, or any other tangible articles of manufacture, machines, or physical materials similar to the foregoing of Former Employer without the express written consent of Former Employer.
2. Disclose, download, upload, copy, re-write from memory, take, retain, store, not return, transfer, access, or possess any confidential or proprietary software of Former Employer without the express written consent of, or an appropriate license from, Former Employer.
3. Disclose, download, upload, copy, re-write from memory, take, retain, store, not return, transfer, access, or possess any hard copy, electronic copy, or any other form of confidential Former Employer document, file, data or information in any medium or form without the express written consent of Former Employer, with the exception of retaining data or information solely in the memory of an Employee, provided the information was not memorized for the purpose of retaining and subsequently using or disclosing such information for any purpose outside the scope of their employment with

1

their Former Employer, provided such data or information is not used or disclosed in a manner that is otherwise a Post-Signing Specified Bad Act.

4. Load, install, and/or run wiping or specialized or permanent file deletion software (other than that which runs by default on any operating system, provided that such operating system software is not used to intentionally render any files or data permanently unrecoverable) on any: (1) Former Employer computer or other electronic device without the express written consent of Former Employer; (2) NEWCO computer or other electronic device without the express written consent of NEWCO; or (3) personal computer or other device, to the extent such computer or device is or was used for work related to NEWCO or Former Employer, without the express written consent of NEWCO, but only with respect to use of such file deletion software on any documents, files, data, or information of Former Employer or NEWCO.

5. Without the express written consent of Former Employer, access remotely or otherwise, (a) other than by express invitation of a principal or senior executive of Former Employer, any secured, restricted or non-public facilities or physical premises, or (b) electronic, computer, or cloud systems of Former Employer (other than cloud systems designed for non-employee access, provided such cloud systems are accessed pursuant to a valid user license), including but not limited to by using codes or other access information that were issued during a period of employment or service as a Non-Employee Service Provider with Former Employer or by using access information of another current or former employee or Non-Employee Service Provider of Former Employer.

6. Take, copy, retain, disclose, make, use, sell, offer for sale, or import into the U.S., any confidential information, technology or invention that is a material trade secret of Former Employer or is known by Employee or NEWCO to be protected by Former Employer's patent or material copyright, without the express written consent or an appropriate license of Former Employer, with the exception of retaining confidential information solely in the memory of an Employee, provided the information was not memorized for the purpose of retaining and subsequently using or disclosing such information for any purpose outside the scope of their employment with their Former Employer, provided such information is not used or disclosed in a manner that is otherwise a Post-Signing Specified Bad Act.

<u>Solicitation/Confidentiality/Hiring.</u>

1. Without the express written consent of Former Employer, in any way to benefit NEWCO or Unicorn (a) initiate communications (including by arranging a communication) with (x) any then current employee of Former Employer or (y) any then current Non-Employee Service Provider of Former Employer (in the case of clause (y), solely to the extent that the non-solicitation provisions of an Employee's or NEWCO Non-Employee Service Provider's contractual obligations with Former Employer apply to solicitation of Non-Employee Service Providers) regarding (i) whether such individual should leave Former Employer or join NEWCO or Unicorn, or (ii) the possibility of working for NEWCO or Unicorn, including but not limited to an offer to employ or retain his/her services; or

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

(b) disclose to NEWCO or Unicorn non-public information learned during employment or service with Former Employer regarding the specific skills, experience, or competencies obtained while working for Former Employer or compensation from Former Employer of any then current Former Employer employee or Non-Employee Service Provider (provided that general responses to communications initiated by persons other than Employees or Non-Employee Service Providers of NEWCO of whether any such individual is a good candidate that does not reveal such non-public information shall not violate this provision).

2. Hire any non-Diligenced Employee who, without the consent of Unicorn, does not sign an attestation.
3. Hire any Diligenced Employee without Unicorn's consent.

Notwithstanding anything herein to the contrary, Post-Signing Specified Bad Acts set forth above related to IP/Trade Secrets Misappropriation shall not include use of Residual Information by Newco and/or any Employee, provided such use does not involve knowingly or intentionally using or disclosing a material trade secret of Former Employer, or using any technology known by Employee or NEWCO to be protected by Former Employer's patent or material copyright, without the express written consent of, or an appropriate license of, Former Employer.

"Residual Information" means, with respect to any Employee, the information, skills, knowledge, or know-how of general application in the trade of such Employee that is retained in the unaided memory of such Employee and that is not recollected by Employee with reference to any copies of the Former Employee Materials in written, electronic, or other form. Residual Information shall not include any trade secret or other confidential information memorized by Employee for the purpose of retaining and subsequently using or disclosing such information for any purpose outside the scope of their employment with their Former Employer.

"Former Employer Materials" means copyrightable material or materials embodying trade secrets or other confidential information, including copies of software, product plans, or invention disclosures, in electronic or tangible form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY

### Exhibit D

**(see attached)**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Exhibit D**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# EXHIBIT 14

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WAYMO LLC,

               Plaintiff,

     v.

UBER TECHNOLOGIES, INC., et al.,

               Defendants.

Case No. 17-cv-00939-WHA   (JSC)

**ORDER RE: WAYMO'S MOTION TO COMPEL**

Re: Dkt. No. 321

Waymo has sued Uber for violating federal and state trade secret laws.  In particular, Waymo accuses its former employee Anthony Levandowski of downloading thousands of Waymo documents related to its driverless vehicle technology, forming competing driverless vehicle companies Ottomotto and Ottomotto Trucking, and then selling Ottomotto to Uber, all along taking the downloaded documents with him.  In March 2016, after Levandowski departed Waymo but before the Ottomotto/Uber transaction closed, Ottomotto and Uber jointly retained an outside forensic expert, Stroz Friedman, to investigate certain Ottomotto employees who were formerly employed by Waymo, including Levandowski and Lior Ron. Stroz interviewed the employees, reviewed their digital devices and cloud storage, and prepared a report, memos and exhibits recording the results of their investigation ("the Stroz Report").  Waymo seeks to compel Uber to produce the Stroz Report and its exhibits in full.  (Dkt. No. 321.)  After carefully reviewing the record, including an *in camera* review of the Report and its exhibits, and having held oral argument on May 25, 2017, the Court GRANTS the motion to compel.  Neither Uber nor Levandowski has met their burden to show that the Report and any of its exhibits are protected by the attorney-client privilege and Uber has waived any claim of attorney work-product.  Thus, there is no basis to withhold the Report from Waymo. Waymo's motion to compel must be granted.

# BACKGROUND

Levandowski formed Ottomotto ("Otto") on January 15, 2016.  Twelve days later he resigned from Waymo.  On February 1, 2016, he formed Otto Trucking.

## A.    The Uber/Otto Term Sheet

On February 22, 2016, Uber and Otto signed a Term Sheet.  Uber was represented, in part, by Morrison and Foerster ("MoFo") and Otto by O'Melveny and Myers ("OMM").  The Term Sheet created a process for Uber to potentially acquire 100% ownership of Otto through the execution of a Put Call Agreement.  (Dkt. No. 510-3 at 3.[1]).  Exhibit C to the Term Sheet required Uber to complete certain "Pre-signing Due Diligence" on Otto and certain of its employees in accordance with Attachment A to Exhibit C.  (*Id.* at 50, 55-56.)  Such due diligence was to be conducted by Stroz, identified in the Term Sheet as "an independent third party digital forensic expert," and included Stroz's completion of a Third Party Report.  (*Id.* at 50, 53.)  The Term Sheet defines the Third Party Report as:

> the written report(s) produced by the Outside Expert summarizing in detail all of the facts, circumstances, activities or events obtained by the Outside Expert from any Diligenced Employee that the Outside Expert deems reasonably related to any Bad Act of such Diligenced Employee, in each case, based on the interviews, forensic due diligence and other due diligence investigation with respect to all Diligenced Employees conducted by the Outside Expert, as jointly directed by and engaged by [Otto] and [Uber].

(*Id.* at 53.)  A "Bad Act" means fraud, misappropriation of Waymo's patents, copyrights, trademarks or trade secrets, breach of a fiduciary duty owed to Waymo, or breach of a non-solicitation agreement with Waymo.  (*Id.*).

Exhibit C required the initial due diligence of Otto employees, including Levandowski and Ron, to be completed prior to the signing of the Put Call Agreement.  (*Id.* at 50.)  Also prior to any signing of the Put Call Agreement, each diligenced  employee had to certify that he or she had completed the due diligence in good faith and had responded truthfully to Stroz. (*Id.*)

Following the execution of the Put Call Agreement, and regardless of whether the

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

Uber/Otto transaction actually closed, Uber is required to indemnify Otto and/or any diligenced employee, including Levandowski, for any claim brought by an employee's former employer (Waymo) for a "Bad Act," including misappropriation of trade secrets. (*Id.* at 50-51.) However, the indemnification obligation excludes claims for misappropriation of trade secrets, among other "Bad Acts," committed *before* the signing of the Put Call Agreement if they

> reasonably arise or result from any facts, circumstances, activities or events that either (x) were not truthfully disclosed by [Otto] and/or the Diligenced Employees to [Stroz] in response to relevant inquiries in connection with the due diligence performed by the [Stroz], or (y) were not contained or reflected in the due diligence materials provided by the Diligenced Employees to [Stroz].

(*Id.* at 51.) In other words, Uber agrees to indemnify Levandowski and others for Bad Acts committed before Uber entered into the Put Call Agreement, provided the employees disclosed the Bad Acts to Stroz during its pre-signing due diligence; that is, the due diligence conducted before the signing of the Put Call Agreement. Uber's indemnification obligation also excludes certain "Bad Acts" committed after the signing of the Put Call Agreement. (*Id.* at 51-52.)

Following the settlement or final adjudication of a diligenced employee's indemnified claim, Uber has the right to dispute through arbitration or a court whether it was obligated to indemnify the employee; for example, to determine whether the indemnification is excluded because it arose from pre-signing Bad Acts that the indemnified employee did not properly disclose to Stroz. (*Id.* at 51.) If the court or arbitrator so concludes, the indemnified employee is required to reimburse Uber for expenses paid in indemnification. (*Id.* at 52.)

The Term Sheet did not obligate Uber or Otto to enter into the Put Call Agreement or to eventually close the transaction; that is, Uber was not required to enter into the Put Call agreement regardless of the results of the initial Stroz due diligence. (*Id.* at 13 ("For the avoidance of doubt, no party hereto shall be under any obligation to enter into and deliver any legally binding definitive agreements with respect to the Transaction, and failure to do so shall not impose any liability on any party hereto").) To the contrary, the Term Sheet provides that *if* Uber enters into the Put Call Agreement, its obligation to close the transaction *shall not* be conditioned upon a determination that there were no Bad Acts, including misappropriation, prior to the signing of the

3

Put Call Agreement. (*Id.* at 53.)  Thus, if Uber did not want to do the deal because Levandowski or other Otto employees misappropriated Waymo's trade secrets, that decision had to be made before it entered into the Put Call Agreement.

### B.    The Stroz Pre-Signing Due Diligence

A few days after the execution of the Term Sheet, Otto and Uber formally engaged Stroz to investigate Levandowski, Ron and other Otto employees, and to create the Third Party Report required by the Term Sheet.  (Dkt. No. 370 ¶ 10; Dkt. No. 370-3; Stroz Report, Exh. 4.)  Stroz identified its clients as Otto and Uber.  (Dkt. No. 370-3.)

By letter dated March 14, 2016, Levandowski's personal attorney John Gardner wrote Stroz.  (Stroz Report, Exh. 2.)  Gardner stated that his firm represents Levandowski "individually, with respect to a proposed examination by Stroz . . . of Mr. Levandowski's electronic media, personal accounts and related materials, all as described in your joint engagement letter with Morrison & Foerster LLP and its client Uber USA, LLC, and O'Melveny & Myers LLP and its client Ottomotto Inc. (collectively, 'Clients'), dated March 4, 2016 ('Stroz Examination')." (*Id.*) The letter went on to recite how Stroz had requested certain information of Levandowski, and how Levandowski would only disclose such information to Stroz provided Stroz agreed to certain conditions, including not disclosing certain of the information to Otto or Uber.  Gardner sent a similar letter to Stroz one week later involving a Stroz request that Levandowski disclose additional information.  (Stroz Report, Exh. 3.)  In both letters Gardner represented that Levandowski and Otto "share a common legal interest in the subject matter of the Stroz Examination, and in Stroz's retention through O'Melveny & Meyers, as counsel for Ottomotto Inc., as a related party to Mr. Levandowski."  He made no mention of any purported common interest with Uber.  (Stroz Report Exhs. 2, 3.)

Stroz interviewed Levandowski, without counsel present, at Stroz's office on March 22 and 23, 2016 and conducted a follow up telephone interview on April 1, 2016.  (Stroz Report, Exh. 5.)  Prior to the interviews, on March 18, he provided certain information to Stroz via a written questionnaire.  Stroz interviewed Ron on March 22, 2016, also without any counsel present, and on April 11 Stroz conducted a follow-up telephone interview.  (Stroz Report, Exh. 6.)

United States District Court
Northern District of California

1  Stroz interviewed other Otto employees on March 23 and 24, 2016. (Stroz Report, Exhs. 7 & 8.)

2  Stroz also collected and analyzed the interviewees' devices and cloud-based storage. Prior to the

3  commencement of the interviews, Stroz adopted a protocol for its investigation which gave OMM

4  the right to require Stroz to withhold from disclosure to MoFo documents that OMM contends are

5  protected by a privilege from disclosure to MoFo. (Stroz Report, Exh. 1.)

6       In early April 2016, prior to the execution of the Put Call Agreement, and at MoFo's

7  request, Stroz provided MoFo with an interim report; in particular, it provided MoFo with its

8  memos of its interviews of Levandowski, Ron and the diligenced employees; data regarding

9  information found on the diligenced employees' devices; and an oral report regarding certain Stroz

10  fact finding. (Stroz Report at 3-4.) The interview memos were redacted as requested by OMM

11  and Gardner. In August 2016, counsel for the diligenced employees consented to Stroz producing

12  its Report to MoFo, OMM, Gardner and Ron's counsel, Levine & Baker LLP, as well as in-house

13  counsel at Uber and Otto. (Stroz Report at 5.)

14       C.       **The Execution of the Put Call and Joint Defense Agreements**

15       At some point Uber and Otto executed the Put Call Agreement, dated April 11, 2016,

16  obligating them to complete the transaction assuming certain conditions were satisfied. (Dkt. No.

17  515-3.) As was stated in the Term Sheet, the Put Call Agreement reiterated that the closing

18  conditions will be deemed satisfied regardless of whether Levandowski or any other diligenced

19  employee committed a Bad Act prior to the signing of the Put Call Agreement. (*Id.* at 39.)

20       Also dated April 11, 2016, is a "Joint Defense, Common Interest and Confidentiality

21  Agreement" among Otto, Otto Trucking, Uber, Levandowski and Ron. (Dkt. No. 370-2 at 2-11.)

22  The first paragraph states that it is entered into "in contemplation of potential investigations,

23  litigation, and/or other proceedings relating to the proposed transactions between Ottomotto, Otto

24  Trucking and Uber and/or any affiliates of Uber." (*Id.* at 2.)

25       Four months later, in August 2016, Stroz issued its final report. That same month, Uber

26  bought Otto for approximately $680 million and hired Levandowski to lead its self-driving car

27  program. (Dkt. No. 433 at 4:24-25.)

28       This litigation commenced in February 2017. Waymo now moves to compel production of

5

1    Stroz's August 5 Report and all of its exhibits.  (Dkt. No. 321.)

2                                     **DISCUSSION**

3           Uber contends that the Stroz Report and all of its exhibits are protected from disclosure as

4    attorney work-product.  It also contends that six of the documents comprising the Report and its

5    exhibits are protected by the attorney-client privilege: (1) the Stroz Report itself, (2) Stroz's

6    protocol for review of data and devices, (3) Levandowski's side letter agreement with Stroz dated

7    March 14, 2016, (4) Levandowski's side letter agreement with Stroz dated March 21, 2016, (5)

8    Stroz's memorandum of its interview of Levandowski, and (6) Stroz's memorandum of its

9    interview with Ron.  Mr. Levandowski, on the other hand, contends that the Stroz Report and all

10   of the exhibits, even those for which Uber only claims the work-product privilege, are protected

11   from disclosure by his personal attorney-client privilege. As requested by the district court, the

12   undersigned has reviewed the Stroz Report and its exhibits *in camera.* (Dkt. No. 271 at 2; Dkt. No.

13   350.)

14          **A.  The Report and its Exhibits are not Protected by the Attorney-Client Privilege**

15          "Issues concerning application of the attorney-client privilege in the adjudication of federal

16   law are governed by federal common law."  *United States v. Ruehle,* 583 F.3d 600, 608 (9th Cir.

17   2009).  "Because it impedes full and free discovery of the truth, the attorney-client privilege is

18   strictly construed." *Id.* (quoting *Weil v. Inv./Indicators, Research & Mgmt., Inc.,* 647 F.2d 18, 24

19   (9th Cir. 1981)). "[T]he privilege stands in derogation of the public's 'right to every man's

20   evidence' and as 'an obstacle to the investigation of the truth,' [and] thus, . . . '[i]t ought to be

21   strictly confined within the narrowest possible limits consistent with the logic of its principle.'"

22   *United States v. Ruehle,* 583 F.3d 600, 607 (9th Cir. 2009) (quoting *In re Horowitz,* 482 F.2d 72,

23   81 (2d Cir. 1973)). "[A] party asserting the attorney-client privilege has the burden of establishing

24   the relationship *and* the privileged nature of the communication."  *Ruehle,* 583 F.3d at 607

25   (internal quotation marks and citation omitted; emphasis in original).

26          An eight-part test determines whether information is covered by the attorney-client

27   privilege:

28                    (1) Where legal advice of any kind is sought (2) from a professional
                      legal adviser in his capacity as such, (3) the communications relating

United States District Court
Northern District of California

to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

*In re Grand Jury Investigation,* 974 F.2d 1068, 1071 n.2 (9th Cir. 1992) (quoting *United States v. Margolis (In re Fischel),* 557 F.2d 209, 211 (9th Cir. 1977)). The attorney-client privilege may extend to communications with third parties who have been engaged to assist the attorney in providing legal advice. *See United States v. Richey,* 632 F.3d 559, 566 (9th Cir. 2011) "'What is vital to the privilege is that the communication be made in confidence for the purpose of obtaining *legal* advice *from the lawyer.*'" *Id.* at 566, n.3 (quoting *United States v. Gurtner,* 474 F.2d 297, 299 (9th Cir. 1973) (emphasis in original)).

### 1. Levandowski's Attorney-Client Privilege

As a preliminary matter, the Court grants Levandowski's motion to intervene for the limited purpose of opposing Waymo's motion to compel the Stroz Report. (Dkt. No. 371.) As the district court already directed that Levandowski may file an opposition (Dkt. No. 270), he has done so (Dkt. No. 379), and he claims an attorney-client and attorney work-product privilege in the documents, the limited motion is granted. His additional request, however, to provide the Court with an ex parte declaration in support of his privilege assertion is denied in the exercise of the Court's discretion. (Dkt. No. 382.) The cases he cites in support of his request involve a court reviewing the withheld privileged materials *in camera*, which the Court has done here; none state that in a civil case a court may entertain an ex parte declaration from a witness who is refusing to provide any discovery or testimony in the case.

Levandowski contends that the Stroz Report and all of its exhibits are protected by *his* attorney-client privilege. Not so. The record is clear that Uber and Otto alone engaged Stroz to conduct the due diligence required by the Term Sheet. First, the Term Sheet provides that Otto and Uber will engage Stroz. (Dkt. No. at 510-3 at 50 (Exhibit C).) Second, Uber's own counsel attests that Uber and Otto engaged Stroz. (Dkt. No. 370, Tate Decl. ¶ 9.) Third, the Stroz engagement letter likewise identifies Stroz's clients as Uber and Otto. (Dkt. No. 370-3.) It also states that Uber and Otto will direct Stroz's efforts. Fourth, Levandowski's personal attorney acknowledged as much in his side letter agreements with Stroz. The letters recite that Stroz's

United States District Court
Northern District of California

clients are Otto and Uber with no mention of Levandowski or his attorney Gardner being a Stroz client. (Stroz Report, Exhs. 2, 3.)  Fifth, the Stroz Report itself, which the Court has reviewed *in camera*, recites that the Stroz protocol was revised on April 11, 2016 to clarify that Uber's outside lawyers MoFo and Otto's outside lawyers OMM were directing the Stroz investigation and "making all legal determinations." (Stroz Report at 4.)  Thus, the rule that the attorney-client privilege may extend to third parties who have been engaged to assist the lawyer in providing advice to his client, *see Richey,* 632 F.3d at 566, does not apply to Levandowski and Stroz. Levandowski's attorney did not engage Stroz.

While Levandowski was an Otto executive, this position did not give him a personal attorney-client relationship with Otto's counsel OMM, who did engage Stroz (along with Uber's counsel MoFo).

> [I]individual corporate officers or employees seeking to assert a personal claim of attorney-client privilege must affirmatively show five factors: First, they must show they approached counsel for the purpose of seeking legal advice. Second, they must demonstrate that when they approached counsel they made it clear that they were seeking legal advice in their individual rather than in their representative capacities. Third, they must demonstrate that the counsel saw fit to communicate with them in their individual capacities, knowing that a possible conflict could arise. Fourth, they must prove that their conversations with counsel were confidential. And fifth, they must show that the substance of their conversations with counsel did not concern matters within the company or the general affairs of the company.

*United States v. Graf*, 610 F.3d 1148, 1159–60 (9th Cir. 2010).  Applying the first two factors, there is nothing in the record that even remotely suggests that OMM was acting as Levandowski's personal counsel at the time Levandowski gave his personal devices and interview to Stroz in March 2016; to the contrary, Levandowski retained Gardner as his personal counsel from as early as January 2016. (Dkt. No. 381 ¶ 2.)  Further, the record demonstrates that Levandowski was complying with the Term Sheet, rather than seeking OMM's legal advice, when he participated in Stroz's investigation. Gardner's side letter agreements confirm that Levandowski's participation was pursuant to the Term Sheet's requirement that he cooperate with Stroz's due diligence and the Term Sheet establishes that his cooperation was a precondition to his receiving any personal indemnification from Uber should the parties enter into the Put Call Agreement. As for the third

factor, there is nothing in the record that suggests OMM communicated with Levandowski as attorneys giving him advice in his individual capacity, let alone that they did so knowing that a conflict could arise. The fifth requirement is also not satisfied: the Court's *in camera* review of the Stroz Report and its exhibits establishes that the matters on which he gave evidence to Stroz concerned him personally, although there could be some spillover effect on Otto. The fourth element is satisfied as Levandowski attempted to keep his conversations and disclosures to Stroz confidential generally, and partially confidential from Uber and Otto. However, as all five factors must be shown, Levandowski has not met his burden.

Since Gardner did not retain Stroz to assist with Gardner's provision of legal advice to Levandowski, and Levandowski did not have an attorney-client relationship with OMM in his individual capacity, it follows that the documents Levandowski gave Stroz by providing Stroz with his personal digital devices and cloud storage are not protected by Levandowski's attorney-client privilege. While they might be so protected if provided to a third party retained by Gardner and privileged in and of themselves, for example, if they are incriminating and therefore protected by the Fifth Amendment privilege, *see Fisher v. United States*, 425 U.S. 391, 410 (1976), Stroz was not so retained. The case cited by Levandowski is not to the contrary. *See Segerstrom v. United States*, No. C 00-0833 SI, 2001 WL 283805, at *2 (N.D. Cal. Feb. 6, 2001) ("confidential communications passing through persons acting as the attorney or client's agent are also covered by the privilege. The privilege also covers papers prepared by the attorney or by a third party at the attorney's request for the purpose of advising the client, insofar as the papers are based on and would tend to reveal the client's confidential communications.").

Levandowski also argues that his confidential communications with his attorney Gardner are protected by the attorney-client privilege unless waived. Agreed. The Stroz Report, however, is based on Levandowski's communications with Stroz during two days of in-person interviews and one follow up call at which Gardner was not present; indeed, no attorney was present. (Stroz Report, Exh. 5.) Similarly, there is no evidence that Gardner provided Levandowski's devices and passwords and the like to Stroz; rather, the Term Sheet directs that such information is to come directly from the diligenced employee. (Dkt. No. 510-3 at 56, Term Sheet, Exh. C, Attach. A.;

Stroz Report at 6.)  If Gardner had provided Levandowski's statement and documents to Stroz, the Court would have to determine whether counsel giving that information to Stroz waived any attorney-client privilege; but since there is nothing in the record to support such a finding, and abundant evidence to support the opposite, the Court does not have to reach that question.

### 2.       Uber's Attorney-Client Privilege

Uber contends that the six documents it has identified as attorney-client privileged are protected because "[c]ommunications between a client and attorney's agent or representative are also covered by the privilege." (Dkt. No. 369 at 10:21-23 (citing *U.S. v. Christensen*, 828 F.3d 763, 802 (9th Cir. 2016)).)  *Christensen*, however, merely held that conversations between a lawyer and an investigator retained by the lawyer about the lawyer's client were privileged.  Just as MoFo and OMM were not Levandowski's attorneys, neither was Levandowski the client of MoFo or OMM.  Thus, the memo regarding Stroz's interview of Levandowski is not protected by an attorney-client privilege held by Uber or Otto.  Again, the Term Sheet and Gardner's side agreements with Stroz establish that Stroz's interview of Levandowski was performed in Levandowski's individual capacity, and not as an Otto executive.  The same is true of the Ron interview memo; there is no evidence that he had an attorney-client relationship with OMM in his individual capacity.  Uber has therefore not met its burden of showing that those interviews are protected by Uber's attorney-client privilege, even assuming that Uber may now assert an attorney-client privilege previously held by Otto.

In any event, Uber has not proven that it has a protectable attorney-client privilege in any of the six identified documents given that it retained Stroz jointly with Otto.  At the time Uber and Otto engaged Stroz, and directed its investigation, Uber and Otto were on the opposite sides of a proposed transaction represented by separate counsel. MoFo did not represent Otto and OMM did not represent Uber.  Uber cites no case, and the Court is aware of none, that holds that communications between separate parties with separate counsel on opposite sides of a proposed transaction are protected by the attorney-client privilege. Thus, those separate counsel's joint communications with an independent expert are likewise not protected by an attorney-client privilege.  While Uber represented in its opposition brief that the Term Sheet was "an agreement

in principle" (Dkt. No. 369 at 21), once the Term Sheet was produced (by Waymo, not Uber), it became apparent that there was no such agreement; to the contrary, the Term Sheet explicitly disclaims that it creates an obligation on Uber or Otto to proceed with the transaction.  (Dkt. No. 510-3 at 13.)  It obligated Uber and Otto to certain terms, such as confidentiality and exclusivity with respect to negotiating, but it did not in any way obligate them to consummate the contemplated transaction.  Thus, at the time they jointly retained Stroz they were parties to a potential acquisition, and nothing more.  Two clients represented by separate counsel do not create an attorney-client relationship by jointly retaining an agent.  Such a result would run contrary to the rule that the attorney-client privilege is to be strictly construed.  *See United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009).

Uber insists that Waymo has waived any argument that these particular documents are not protected by the attorney-client privilege.  Not so.  It is Uber's burden, not Waymo's, to prove that they are privileged from discovery.  *Ruehle*, 583 F.3d at 607.  Moreover, Waymo argued that Uber had not met its burden because its privilege log is inadequate.  And Waymo does not have the benefit of *in camera* review of the documents as does the Court.  Further, at the time Waymo filed its motion to compel, Uber had withheld from Waymo many of the documents central to evaluation of Uber's argument, including the Term Sheet, the Stroz engagement letter, and the Put Call Agreement.  Waymo has not waived a challenge to Uber's assertion of the attorney-client privilege and neither Uber nor Levandowski has met their burden to show that the privilege applies.

### 3. A Purported Common Interest Does not Create an Attorney-Client Privilege

Uber and Levandowski appear to be contending that because they assert that they along with Otto and Ron had a common interest in preparing for potential litigation against Waymo, Levandowski's communications with OMM and MoFo, or more precisely, communications with their agent Stroz, are protected by the attorney-client privilege.  They thus highlight the Stroz engagement letter's statement that "Stroz Friedberg's communications with Clients, Uber, Ottomotto, (and Messrs. Levandowski and Ron (including their respective counsel), Stroz Friedberg's work product, and all information and data received from Clients, Uber, and

1 Ottomotto (including its employees and/or their respective counsel) are covered by common

2 interest, attorney-client privilege and/or attorney work-product doctrine." (Dkt. No. 370-3 at 3.)

3 The Court disagrees.

4      The common interest/joint defense doctrine does not make a document or communication

5 privileged; rather, it is a doctrine that prevents waiver of a pre-existing privilege if the privileged

6 information is shared only with those with a common legal interest. Thus, it "is not technically a

7 privilege in and of itself but instead constitutes an exception to the rule on waiver where

8 communications are disclosed to third parties." *Holmes v. Collection Bureau of Am., Ltd.*, No. C

9 09-02540 WHA, 2010 WL 143484, at *2 (N.D. Cal. Jan. 8, 2010). As one court has explained:

> Therefore, a party seeking to rely on the common interest doctrine
> does not satisfy its burden to justify a claim of privilege simply by
> demonstrating that a confidential communication took place
> between parties who purportedly share a common interest. Rather,
> the party seeking to invoke the doctrine must first establish that the
> communicated information would otherwise be protected from
> disclosure by a claim of privilege. For example, the content of the
> communication may comprise information shared in confidence by a
> client with his or her attorney, a legal opinion formed and advice
> given by the lawyer in the course of the attorney-client relationship,
> or a writing reflecting an attorney's impressions, conclusions, or
> theories. The next step in the analysis is to determine whether
> disclosing the information to a party outside the attorney-client
> relationship waived any applicable privileges.

*OXY Res. California LLC v. Superior Court*, 115 Cal. App. 4th 874, 890, 9 Cal. Rptr. 3d 621, 635

(2004), *as modified* (Mar. 4, 2004); *see also Lennar Mare Island, LLC v. Steadfast Ins. Co.*, No.

2:12-CV-2182 KJM KJN, 2014 WL 1366252, at *5 (E.D. Cal. Apr. 7, 2014) ("The common

interest doctrine does *not* mean there is an expanded attorney-client relationship encompassing all

parties and counsel who share a common interest.") (internal quotation marks and citation

omitted); *In re Commercial Money Ctr., Inc., Equip. Lease Litig.*, 248 F.R.D. 532, 536 (N.D. Ohio

2008) (explaining that the common interest/joint defense doctrine "is not an independent source of

privilege or confidentiality. If a communication or document is not otherwise protected by the

attorney-client privilege or work-product doctrine, the common interest doctrine has no

application."); *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 578 (N.D. Cal. 2007) ("The

joint defense and common interest doctrines are not privileges in and of themselves. Rather, they

United States District Court
Northern District of California

1     constitute exceptions to the rule on waiver where communications are disclosed to third parties.").

2           In all of the cases cited by Uber and Levandowski, the document or communication was

3     protected by the attorney-client privilege before counsel provided it to another party. The

4     circumstances here are different. Levandowski, without his attorney present, gave an interview in

5     his individual capacity to Stroz, an agent for Otto's separate counsel and Uber's separate counsel.

6     As is explained above, Stroz was not an agent for Levandowski's attorney and thus

7     Levandowski's communications with Stroz are not protected by the attorney-client privilege. That

8     Otto, Uber, Levandowski and Ron purportedly shared a common legal interest at the time of

9     Levandowski's communications does not make Levandowski's communications with Uber's

10     attorney's agent an attorney-client privileged communication. To hold that the common interest

11     creates a privilege in these circumstances would be unprecedented and violate the long-standing

12     rule that the attorney-client privilege shall be strictly construed. *Ruehle*, 583 F.3d at 607.

13           Finally, that the attorneys for Levandowski and Ron provided input as to the protocol Stroz

14     implemented, and the preconditions for their clients' cooperation with Stroz, does not make OMM

15     and MoFo (and their agent Stroz) the attorneys for Levandowski and Ron any more than an

16     attorney-client relationship is created when an attorney for the government negotiates a

17     cooperation agreement with a defendant's counsel. No one, including Levandowski, claims that

18     Levandowski's and Ron's personal attorneys retained Stroz. No attorney-client privilege attached

19     to the Stroz Report or any of its exhibits.

20        **B. Uber Waived any Attorney Work-Product Privilege**

21           The attorney work-product doctrine, codified in Federal Rule of Civil Procedure 26(b)(3),

22     protects "from discovery documents and tangible things prepared by a party or his representative

23     in anticipation of litigation." *Admiral Ins. Co. v. United States Dist. Court for the Dist. Ariz.*, 881

24     F.2d 1486, 1494 (9th Cir. 1989). "The doctrine provides an attorney working on a case 'with a

25     certain degree of privacy' so that he may 'prepare his legal theories and plan his strategy without

26     undue and needless interference.'" *Elan Microelectronics Corp. v. Apple, Inc.*, No. C 09-01531

27     RS PSG, 2011 WL 3443923, at *2 (N.D. Cal. Aug. 8, 2011) (quoting *Hickman v. Taylor*, 329 U.S.

28     495, 511 (1947).). "The doctrine aims to balance the promotion of an attorney's preparation in

United States District Court
Northern District of California

representing a client" and "society's general interest in revealing all true and material facts to the resolution of a dispute." *Phoenix Techs. Ltd. v. VMware, Inc.*, 195 F. Supp. 3d 1096, 1101 (N.D. Cal. 2016) (quoting *In re Seagate Tech., LLC*, 497 F.3d 1360, 1375 (Fed. Cir. 2007)).  The doctrine applies to documents created by investigators working for attorneys, provided the documents were created in anticipation of litigation.  *In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)*, 357 F.3d 900, 907 (9th Cir. 2004).  Uber, as the party resisting discovery, bears the burden of proving that the Stroz documents are attorney work-product.  *See, e.g.*, *United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1069 (N.D. Cal. 2002).  The work-product privilege, like the attorney-client privilege, can be waived by disclosure to a third party.  *Hernandez v. Tanninen*, 604 F.3d 1095, 1100 (9th Cir. 2010).

Assuming the Stroz investigation qualifies as Uber's attorney work-product, the question is whether Uber waived any privilege by disclosing the work product to Otto.  MoFo and OMM together engaged Stroz to conduct the Term Sheet's required due diligence, although Uber alone paid for it.  And they directed Stroz to jointly and simultaneously communicate the investigation's factual findings to MoFo and OMM.  Thus, the Stroz work product was simultaneously disclosed to Otto at the time it was created. Uber contends that its work-product privilege was nonetheless not waived because Otto and Uber shared a common legal interest in defending against claims by Waymo.

### 1. The Common Interest Doctrine does not Apply

As was explained in connection with the attorney-client privilege argument, the "joint defense" or "common interest" privilege is an exception to the rule that a claim of privilege is waived by disclosure to a third party.

> The concept applies where parties are represented by separate counsel but engage in a common legal enterprise. The interests of the parties involved in a common defense need not be identical, and, indeed may even be adverse in some respects. The joint-defense exception, however, protects *only* those communications that are part of an on-going and joint effort to set up a common defense strategy.

*Holmes v. Collection Bureau of Am., Ltd.*, No. 09-02540 WHA, 2010 WL 143484, at *2 (N.D. Cal. Jan. 8, 2010) (internal citation omitted) (emphasis in original).  Thus, for non-waiver of a

privilege to apply, the parties must have a common legal interest and the communications sought to be shielded from discovery must have been in furtherance of a joint strategy in support of that legal interest. *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 579 (N.D. Cal. 2007); *see also In re Pac. Pictures Corp.*, 679 F.3d 1121, 1129 (9th Cir. 2012) (for the common interest doctrine to apply, "a shared desire to see the same outcome in a legal matter is insufficient to bring a communication between two parties within this exception. Instead, the parties must make the communication in pursuit of a joint strategy in accordance with some form of agreement— whether written or unwritten."). Uber argues that as soon as it and Otto signed the Term Sheet they had a common legal interest in jointly developing a strategy to defend potential litigation by Waymo; therefore, their joint retention of Stroz did not waive the attorney work-product privilege. The Court disagrees.

The Term Sheet required the Stroz investigation and Uber and Otto did not have a common legal interest at the time they entered into it. At that time, Otto and Uber were on the opposite sides of a proposed acquisition with no obligation to consummate the transaction. Uber and Otto could only have a common legal interest in pursuing a defense of a possible lawsuit by Waymo once Uber was obligated (if certain conditions were met) to acquire Otto and thus inherit or create any liabilities to Waymo. If Uber did not acquire Otto and hire Otto's former Waymo employees, Uber and Otto did not have a common legal interest. But as the Term Sheet demonstrates, no acquisition obligation existed until the subsequent execution of the Put Call Agreement. Thus, Uber and Otto did not share a common legal interest and therefore Uber's sharing of its work product with Otto waived any work-product privilege.

Moreover, even if Otto and Uber shared a common legal interest notwithstanding the lack of any acquisition agreement, the common legal interest doctrine prevents waiver only if the communications at issue were "designed to further *that* [legal] effort." *Nidec*, 249 F.R.D. at 579 (internal quotation marks and citation omitted). The Term Sheet itself is the best evidence of the purpose of the Stroz investigation: it calls for the investigation, sets its parameters, and even in detail describes what information the diligenced employees must give to Stroz. The Term Sheet reveals two purposes of the Stroz investigation: (1) to allow Uber to conduct due diligence into

15

certain Otto employees prior to making a decision to sign the Put Call Agreement, and (2) to create a record that will control whether any diligenced employees have to reimburse Uber for indemnification expenses should Waymo sue the diligenced employees. Neither of these purposes is in furtherance of some common interest in defending against potential litigation by Waymo.

Stroz's interim disclosure to MoFo of its investigation findings just before Uber signed the Put Call Agreement is further evidence that the purpose of the Stroz investigation was to enable Uber to evaluate whether to purchase Otto rather than to develop a joint strategy regarding Waymo litigation. There is no reason for Uber to receive that interim report other than to evaluate whether to sign the Put Call Agreement. And, indeed, it appears that within days of receiving the interim Stroz report Uber did just that.

Uber's reliance on *Rembrant Patent Innovations, LLC v. Apple Inc.*, 2016 WL 427363 (N.D. Cal. Feb. 4, 2016), is misplaced. There, privileged communications regarding a patent were shared after Rembrant obtained an exclusive option to purchase the patent from the named inventors. Following the option purchase, Rembrandt hired the inventors as consultants and they jointly obtained an attorney to provide legal advice regarding patent ownership. Rembrandt subsequently exercised the option and filed suit against an alleged infringer. The district court held that once Rembrandt had acquired an exclusive option to purchase the patent, "it was already 'engage[d] in a common legal enterprise' with the named inventors and communications between them were 'part of an on-going and joint effort to set up a common ...strategy' for perfecting title in the patent and enforcing it through litigation." *Id.* at *7. The court added that his review of the withheld documents *in camera* confirmed that once Rembrant purchased the exclusive option the "the parties' interests aligned and they began to pursue joint legal interests." *Id.*

Here, in contrast, the Court's review of the Term Sheet, the Stroz Report, and its exhibits confirms the opposite: Uber and Otto's interests were not aligned. The interviewees were required to "attest" to the truth of what they reported to Stroz and to "certify" that they had complied with Uber's due diligence in good faith. The protocol set up an elaborate process to ensure that Stroz did not share Otto's attorney-client privileged communications with Uber. And, most significantly, whether Uber decided to go forward with the acquisition depended in part on what it

16

learned from the Stroz pre-signing due diligence. Thus, Otto's interest was in Uber not learning anything that would cause it not to sign the Put Call Agreement, whereas Uber's interest was in learning as many facts as possible before it committed to the Put Call Agreement. Accordingly, Uber and Otto's interests, legal or otherwise, were not aligned. This is why on March 14 and March 21, Levandowski's counsel told Stroz that Levandowski shared a common legal interest with Otto, but did not also claim to share a common interest with Uber. (Stroz Report, Exhs. 2, 3.) Uber and Otto were on opposite sides of a proposed transaction.

The Court's review of the Term Sheet, the Stroz Report and its exhibits also shows that Uber was not "engage[d] in a common legal enterprise" with Otto and their joint communications with Stroz were not "part of an on-going and joint effort to set up a common . . . strategy." *Rembrandt*, 2016 WL 427363, at *7. Instead, the Stroz investigation was a process designed to allow Uber to discover facts relevant to its acquisition decision and to create a record to control reimbursement of indemnification expenses to Uber.

Some district courts have held that so long as parties are contemplating a merger or similar transaction they share a common interest sufficient to avoid waiver through the sharing of privileged documents. *See, e.g.*, *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 115 F.R.D. 308 (N.D. Cal. 1987). These cases, however, involve the sharing of already privileged information, and not the joint production of purportedly privileged work product. Uber does not cite any case in which parties on opposing sides of a proposed transaction were allowed to claim attorney work-product for due diligence jointly conducted by the parties. But, to the extent the *Hewlett-Packard* analysis could be extended to the joint creation of work product, this Court simply disagrees. "Such an exception would remove the common interest doctrine far from its historical antecedent, the joint defense doctrine." *Nidec Corp.,* 249 F.R.D. at 580. Thus, the Court finds that Otto and Uber did not share a common legal interest at the time they jointly engaged Stroz to conduct a factual investigation into certain Otto employees and the Stroz investigation was not designed to further a joint defense strategy.[2] The common interest/joint defense doctrine therefore does not

---

[2] The outcome might be different after the signing of the Put Call Agreement. At that point Uber and Otto, and perhaps even Levandowski and Ron, arguably shared a common legal interest.

United States District Court
Northern District of California

1    prevent Uber's waiver of any work-product privilege in the Stroz Report.

2          Uber relies on the Stroz engagement letter and the written joint defense agreement as

3    evidence of the parties' common legal interest. Once again it emphasizes that the letter recites that

4    the "purpose of the Engagement is to enable Uber, Otto, Anthony Levandowski and Lior Ron

5    (who are parties to a Joint Defense and Common Interest Agreement), along with respective

6    counsel, to understand certain factual matters potentially related to potential litigation," and that

7    the "Joint Defense, Common Interest and Confidentiality Agreement" states that it is in

8    contemplation of potential litigation. (Dkt. No. 369 at 13.) None of this evidence is persuasive.

9          The engagement letter attached to Uber's opposition (and provided with its *in camera*

10   submission) is not evidence of the parties' intent when MoFo and OMM engaged Stroz. The

11   engagement letter does not appear to be the version that was operative when Stroz began its

12   investigation and, specifically, when it interviewed Levandowski and Ron and received their

13   devices in March 2016 and when it provided its interim report to MoFo in early April

14   2016. Instead, there appears to be an earlier version of the letter which Uber has not

15   produced. Although the version Uber produced is dated "as of March 4, 2016," Uber's

16   authenticating witness does not provide any evidence as to when that version of the letter was

17   created. (Dkt. 370 ¶ 12.) The objective evidence suggests it was not created on March 4, and was

18   instead drafted or modified around the time of the April 11 execution of the Put Call Agreement

19   and Joint Defense Common Interest and Confidentiality Agreement.

20         On March 14 and March 21, Levandowski's counsel Gardner writes Stroz regarding

21   Levandowski's upcoming examination by Stroz "pursuant to the engagement letter"; thus, there

22   seems to have been some engagement letter that was written prior to those dates. Counsel also

23   states, however, that his client Levandowski shares a common interest with Otto, but he does not

24   state that Levandowski shares a common interest with Uber. Nor does he disclose the existence of

25

26   _____

27   Once the Put Call Agreement was signed Uber had an indemnification obligation and the parties
     could bind one or the other to the sale, provided certain conditions were met. Uber's only
     argument to the Court, however, is that the common legal interest arose upon the signing of the

28   Term Sheet and, in any event, the Stroz investigation began well before the Put Call Agreement
     was signed.

a "Joint Defense and Common Interest Agreement." This omission directly contradicts the "as of March 4, 2016" engagement letter's statement that Uber, Otto, Levandowski and Ron are parties to a "Joint Defense and Common Interest Agreement." If as of March 14 Levandowski had entered into such an agreement, Gardner would have certainly referenced that in his communication with Stroz, rather than simply stating that Levandowski shares a common interest with Otto and not with Uber. Further, the written "Joint Defense and Common Interest Agreement" was not entered into until April 11, 2016, weeks after the purportedly "as of March 4" engagement letter.

Finally, the Court's *in camera* review of the Stroz Report reveals that the Stroz investigation protocol was revised on April 11, 2016, but then given the date of "as of March 4, 2016." (Stroz Report at 4.) The protocol is an exhibit to the engagement letter, and both are attached as Exhibit 4 to the Stroz Report and both dated "as of March 4, 2016." The Court thus finds that the engagement letter, like the protocol, was most likely revised on April 11, 2016 and then given the date "as of March 4, 2016." It is thus not evidence of the parties' intent when Stroz began its investigation in early March 2016. What might be probative is the engagement letter, if any, Stroz actually sent MoFo and OMM on March 4, but Uber has chosen not to place such document in the record.

The engagement letter's probative value as to Uber's intent in retaining Stroz is further undermined by what is missing from the "as of March 4" letter; namely, any reference whatsoever to the very Term Sheet which required the hiring of Stroz in the first instance and set forth in detail Stroz's duties and responsibilities. The Term Sheet also dictated that the Stroz investigation would create a record to determine whether an employee, such as Levandowski, must reimburse Uber for indemnification, should Uber incur an indemnification obligation. Yet, the engagement letter is silent as to the existence of the Term Sheet.

The written Joint Defense, Common Interest and Confidentiality Agreement also does not persuade the Court that Uber and Otto retained Stroz to further a common legal interest in litigation with Waymo. The Agreement was entered into at the same time as the signing of the Put Call Agreement and primarily references that Agreement and the need for the parties to cooperate

United States District Court
Northern District of California

in the "proceedings" that are likely to occur as a result of the acquisition. The February 24, 2016 email among counsel for Uber and Otto referencing discussions about a "JDA" is insufficient to support a finding that Stroz was engaged to further a common legal interest in defending against litigation brought by Waymo rather than the purposes set forth in the Term Sheet. The email may have been referencing the "JDA" that would be entered into upon the signing of the Put Call Agreement, exactly what happened here. And, in any event, parties cannot create a common legal interest where none exists merely by entering into a joint defense agreement.

Counsel's declarations are also not persuasive evidence that Otto and Uber retained Stroz to pursue a common legal strategy. MoFo, for example, declares that it and OMM engaged Stroz "to aid MoFo and OMM in providing legal advice to their respective clients about litigation risks and potential claims that could be brought by Google in connection with Uber's acquisition of Otto." (Dkt. No. 370 ¶ 9.) Nowhere in the declaration, however, or even in Uber's opposition, is it disclosed that MoFo retained Stroz as required by the Term Sheet to enable Uber to conduct due diligence before deciding whether to enter into the Put Call Agreement. Nowhere in the declaration is it disclosed that the Stroz investigation would control whether an employee, such as Levandowski, would be required to reimburse Uber for indemnification expenses as determined by an arbitrator or a court. And nowhere in the declaration does it disclose that the Term Sheet did not obligate either party, even conditionally, to close the transaction. The only objective contemporaneous evidence as to the purpose of the Stroz engagement—Exhibit C to the February 22, 2016 Term Sheet—is omitted from all of the counsel declarations. Accordingly, the Court accords them little weight.

In sum, the Court finds that Uber and Otto did not share a common legal interest when they jointly retained Stroz and that the Stroz investigation was not in furtherance of any common legal strategy. Thus, the common interest/joint defense doctrine does not prevent Uber's disclosure of its work product to Otto from waiving Uber's work-product privilege. It also appears that the Stroz Report, or at least portions of it, were disclosed to Levandowski and Ron before the execution of the Put Call Agreement. (Stroz Report at 4.) Levandowski/Ron also did

not share a common legal interest with Uber for the same reasons as Otto. This is an additional reason the common interest doctrine does not prevent waiver of Uber's work-product privilege.

### 2. Uber Disclosed the Stroz Investigation to an Adversary

"Unlike for the attorney-client privilege, waiver of attorney work-product protection requires more than the disclosure of confidential information, it requires an act inconsistent with the adversary system." *Great Am. Assur. Co. v. Liberty Surplus Ins. Corp.*, 669 F. Supp. 2d 1084, 1092 (N.D. Cal. 2009); *see also United States v. Bergonzi*, 216 F.R.D. 487, 497 (N.D. Cal. 2003). (work-product protection is waived when the privileged documents are disclosed to a third party and that disclosure enables an adversary to access the information).

This additional hurdle does not save Uber's waiver here. Uber disclosed the Stroz investigation to its then adversaries Otto, Levandowski and Ron. Before the signing of the Put Call Agreement, Otto was Uber's adversary because they were on opposite sides of a potential transaction. Further, Uber engaged Stroz to investigate Otto and its employees and the results of that investigation could have caused Uber to not proceed with the acquisition. In *Bergonzi*, for example, a company disclosed to the government its internal investigation into its officers' securities fraud. After the government sued the officers, the officer defendants sought discovery from the company of the internal investigation. The district court held that the company waived any work-product privilege in the investigation by disclosing it to the government; the government was its adversary since it was investigating the company. 216 F.R.D. at 498. Similarly, here, Uber was investigating Otto and the results of that investigation could have resulted in no acquisition. Otto was Uber's adversary.

Levandowski and Ron were also Uber's adversaries as Uber was investigating them too. The investigation results could have led to Levandowski and Ron losing millions of dollars if Uber decided not to sign the Put Call Agreement because of what it learned. Or, the investigation could lead to Levandowski or Ron having to reimburse Uber for indemnification expenses if an arbitrator or court finds that they were not truthful with Stroz. Levandowski and Ron were Uber's adversaries with respect to the Stroz investigation and thus Uber's disclosure of its work product to Levandowski and Ron waived any work-product privilege.

1        Once a party has disclosed work product to one adversary, it waives work-product

2  protection as to all other adversaries. *See Bergonzi*, 216 F.R.D. at 498 (holding that since the

3  company had disclosed its work product to the government, an adversary, the company had to

4  disclose it to the officer defendants). As Uber disclosed its Stroz work product to its adversaries

5  Otto, Levandowski and Ron, it must disclose the same work product to Waymo.

6        **C.**    **Waymo has a Substantial Need for Parts of the Stroz Report**

7        Even if the Stroz Report and exhibits are non-waived attorney work-product, some of the

8  documents must nonetheless be produced to Waymo. Ordinary fact work product is discoverable

9  when the moving party has a substantial need for the documents. *See* Fed. R. Civ. P.

10  26(b)(3)(A)(ii). Opinion work product, in contrast, "receives greater protection than ordinary work

11  product and is discoverable only upon a showing of rare and exceptional circumstances." *Tennison*

12  *v. City & Cnty. Of San Francisco,* 226 F.R.D. 615, 623 (N.D. Cal. 2005) (citation omitted); *see*

13  *also Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992) ("A party

14  seeking opinion work product must make a showing beyond the substantial need/undue hardship

15  test required under Rule 26(b)(3) for non-opinion work product."). Opinion work product reveals

16  an attorney's or the attorney's representative's mental impressions, conclusions, opinions or legal

17  theories. *Holmgren*, 976 F.2d at 577. To the extent that an investigator's interview reports reflect

18  essentially verbatim witness statements, they are only factual work product that are discoverable

19  based on a showing of substantial need. *See In re Convergent Technologies Second Half 1984*

20  *Secs. Litig.*, 122 F.R.D. 555, 559 (N.D. Cal. 1988).

21        Waymo has made a showing of a substantial need for Levandowski's interview memo and

22  the documents retrieved from his devices and cloud storage. The district court has already found

23  that Levandowski downloaded 14,000 Waymo files shortly before decamping for Otto; thus, he is

24  the key witness in this trade secret litigation. However, he has refused to testify or produce any

25  documents on Fifth Amendment grounds, including any documents he may have taken from

26  Waymo. Thus, the Stroz investigation is the only way for Waymo to obtain this relevant

27  information; Waymo has thus met its burden of showing a substantial need for these documents.

28  *See, e.g., In re Vitamins Antitrust Litig.*, No. 99-197, 2003 WL 1867908, at \*1 (D. D.C. Jan. 24,

United States District Court
Northern District of California

2003).

Having reviewed the documents and the memo *in camera*, the Court finds that they are ordinary fact work product. The memo is nearly a verbatim recitation of what Levandowski told Stroz and in the end he even attests to the truth of what he reported. Levandowski, or at least his counsel, also reviewed the memo before Stroz disclosed it to OMM and MoFo. (Stroz Report at 5.) It does not contain any Stroz impressions, conclusions, opinions or legal theories. Much of the Report itself, in contrast, reflects Stroz's "findings and methodology" and thus, may be opinion work product.

The exhibits, which are documents Stroz retrieved rather than created, are also, at best, fact work product. The Court rejects Uber's argument that ordering the documents produced will reveal Stroz's mental impressions and opinions in deciding which documents to attach to the Report. As neither the Court nor Waymo has access to all of the documents Stroz reviewed, producing these pre-existing documents will not reveal Stroz's strategies or opinions. *Compare with Sporck v. Peil*, 759 F.2d 312, 316 (3d Cir. 1985) (holding that an attorney's binder of a few documents used to prepare his client for deposition out of the thousands produced in the litigation was opinion work product).

Because the Court has concluded that the entire Stroz Report and its exhibits must be produced as they are not protected by attorney-client privilege and any work-product privilege has been waived, the Court will not in this Order identify with specificity which documents or portions of documents are ordinary fact work product for which Waymo has demonstrated a substantial need. The Court will do so when and if needed.

## CONCLUSION

Neither Uber nor Levandowski has met its/his burden of showing that the Stroz Report and any of its exhibits are protected from discovery in this civil action by an attorney-client privilege. As there is no separate "common interest privilege" that protects documents from discovery that are not otherwise privileged, that is the end of the Court's inquiry on the attorney-client privilege question. To the extent the Report and its exhibits are Uber's attorney work-product, Uber waived any privilege by disclosing, indeed jointly creating, that work product with Otto and later to

United States District Court
Northern District of California

1    Levandowski and Ron. Waymo's motion to compel is therefore GRANTED.

2         Any party wishing to file an objection to this Order with the district court in accordance

3    with N.D. Cal. Civil L.R. 72-2 must file its objection on or before Thursday, June 8, 2017.  In the

4    meantime, the Court STAYS this Order until further order of the district court or unless or until no

5    objection is filed.

6         This Order disposes of Docket Nos. 321, 371, 382.

7         **IT IS SO ORDERED.**

8    Dated:  June 5, 2017

9

10

11   JACQUELINE SCOTT CORLEY
     United States Magistrate Judge

United States District Court
Northern District of California

# EXHIBIT 15

MILES EHRLICH (Bar No. 237954)
miles@ramsey-ehrlich.com
ISMAIL RAMSEY (Bar No. 189820)
izzy@ramsey-ehrlich.com
AMY CRAIG (Bar No. 269339)
amy@ramsey-ehrlich.com
RAMSEY & EHRLICH LLP
803 Hearst Avenue
Berkeley, CA 94710
(510) 548-3600 (Tel)
(510) 291-3060 (Fax)

Attorneys for Non-Party Anthony Levandowski

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC, | Case No.: C 17-00939 WHA |
| Plaintiff, | **NON-PARTY ANTHONY LEVANDOWSKI'S NOTICE OF MOTION AND MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE; AND [PROPOSED] ORDER** |
| v. | |
| UBER TECHNOLOGIES, INC., *et al.*, | |
| Defendants. | |

## <u>NOTICE OF MOTION AND MOTION</u>

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that non-party Anthony Levandowski seeks relief pursuant to Fed. R. Civ. P. 72(a) and 28 U.S.C. § 636(b)(1)(A) from the order of Magistrate Judge Corley granting Waymo LLC's motion to compel production of a report generated by Stroz Friedberg, LLC. *See* Dkt. 566. We ask the Court to set aside Judge Corley's order and deny Waymo's motion to compel.

This motion is based on this notice of motion and motion, the below memorandum of points and authorities, the pleadings, files, and records in this case, as well as other written or

oral argument which may be presented at the hearing.

Date:   June 8, 2017                              Respectfully submitted,


                                                  /s/
                                                  Miles Ehrlich
                                                  Ismail Ramsey
                                                  Amy Craig
                                                  Ramsey & Ehrlich LLP
                                                  *Counsel for Non-Party Anthony*
                                                  *Levandowski*

LEVANDOWSKI'S MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE; AND [PROPOSED] ORDER  Case No. C 17-00939 WHA

2

## MEMORANDUM OF POINTS AND AUTHORITIES

On June 5, 2017, Magistrate Judge Corley granted Waymo LLC's motion to compel production of a report generated by Stroz Friedberg, LLC.  Dkt. 549 & 566.  Non-party Anthony Levandowski objected that the report and its attachments are protected by the common interest, attorney-client, and attorney work product privileges.  Because Judge Corley's order denying these privilege claims rested on three fundamental errors, pursuant to Federal Rule of Civil Procedure 72(a) and 28 U.S.C. § 636(b)(1)(A), the Court should set aside Judge Corley's order and deny Waymo's motion.[1]

### I.  *Objection 1*: In a Common Interest Group, the Privilege Protects More than Just the Sharing of Already-Privileged Information Between Attorneys

Judge Corley ruled that communications between Mr. Levandowski and Stroz were not protected by the attorney-client privilege as extended by the common interest privilege.  Dkt. 566 at 11-13.  Central to this conclusion was Judge Corley's holding that the common interest privilege solely protects information that is initially communicated by a party to *his or her own attorney* in an attorney-client privileged manner and only *later* communicated between attorneys engaged in a common interest arrangement.  *Id.* at 11-13.  As the information at issue here was not first communicated by Mr. Levandowski to his own attorney, but was instead communicated to Stroz in the first instance, *id.* at 6-10, Judge Corley opined that the communications with Stroz could not be protected by the common interest privilege:

> In all of the cases cited by Uber and Levandowski, the document or communication was protected by the attorney-client privilege before counsel provided it to another party.  The circumstances here are different.  Levandowski, without his attorney present, gave an interview in his individual capacity to Stroz, an agent for Otto's separate counsel and Uber's separate counsel.

*Id*. at 13.  That ruling was contrary to law: the common interest privilege protects more than just communications between the client and his own lawyer or his own lawyer's agents.

A joint-defense or common interest agreement "establishes an implied attorney-client relationship" between each of the attorneys and parties involved.  *United States v. Henke*, 222

---

[1] Mr. Levandowski hereby joins and adopts Parts II-IV of the objections to Judge Corley's order filed by Otto Trucking. Dkt. 572.

LEVANDOWSKI'S MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE; AND [PROPOSED] ORDER  Case No. C 17-00939 WHA

1

1    F.3d 633, 637 (9th Cir. 2000).  Once the joint defense relationship is established, "[t]he joint

2    defense privilege . . . protects not only the confidentiality of communications passing from a

3    party to his or her attorney but also '*from one party to the attorney for another party* where a

4    joint defense effort or strategy has been decided upon and undertaken by the parties and their

5    respective counsel.'"  *United States v. Austin*, 416 F.3d 1016, 1021 (9th Cir. 2005) (emphasis

6    added, quoting *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989)); *see also United*

7    *States v. Gonzalez*, 669 F.3d 974, 978 (9th Cir. 2012) (citing *Austin* and the principle set out

8    above); *Nidec Corp. v. Victor Co.*, 249 F.R.D. 575, 578 (N.D. Cal. 2007) ("Participants in a joint

9    or common defense or individuals with a community of interests '*may communicate among*

10   *themselves and with the separate attorneys on matters of common legal interest*, for the purpose

11   of preparing a joint strategy, and the attorney-client privilege will protect those communications

12   to the same extent as it would communications between each client and his own attorney.'"

13   (emphasis added)).  As the Ninth Circuit has held, "the rationale for the joint defense rule" is that

14   "persons who share a common interest in litigation *should be able to communicate with their*

15   *respective attorneys and with each other* to more effectively prosecute or defend their claims."

16   *Gonzalez*, 669 F.3d at 978 (emphasis added).

17        Moreover, for the common interest privilege to apply, it is *not* "necessary for the attorney

18   representing the communicating party to be present when the communication is made to the

19   other party's attorney."  *Schwimmer*, 892 F.2d at 244.  In *Schwimmer*, Schwimmer and Renda

20   were the subjects of a grand jury investigation.  The court found that statements made by

21   Schwimmer to an "accountant hired by Renda's attorney" were "protected by the attorney-client

22   privilege"—even though Schwimmer's attorney was not present during the statements.  *Id.* at

23   241, 244; *see also United States v. McPartlin*, 595 F.2d 1321, 1336-37 (7th Cir. 1979);

24   *Corporate Express Office Prods. v. Gamache (In re Wagar)*, No. 1:06-MC-127 (LEK/RFT),

25   2006 U.S. Dist. LEXIS 90345 at *39 (S.D.N.Y. Dec. 13, 2006).

26        Accordingly, the law contradicts Judge Corley's ruling that, because Mr. Levandowski

27   communicated directly with the agent for another party's attorney, his communications with

28   Stroz were not protected by the common interest privilege.  The privilege *does* protect such

LEVANDOWSKI'S MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE;
AND [PROPOSED] ORDER   Case No. C 17-00939 WHA

communications, so long as a common interest agreement has been established.[2]  As set out in the litigants' previous papers, Dkt. 369, 370, 372, 374, 375, 376, 378, 379, 380, 381, 383, 384, and in this brief, *infra*, the evidence establishes that such an agreement was in force at the time of Mr. Levandowski's communications to Stroz.

## II.  *Objection 2*: **Mr. Levandowski, Otto, and Uber Shared a Common Legal Interest**

Judge Corley next found that Uber, Otto, and Mr. Levandowski lacked a "common legal interest" at the time of Mr. Levandowski's communications to Stroz, and thus that the common interest privilege could not apply.  Dkt. 566 at 15, 20.  That finding was clearly erroneous.

As Judge Corley's order itself makes clear, prior to the engagement of Stroz, Uber, Otto, Mr. Levandowski, and others entered into an agreement (the "Term Sheet") that required Uber—*regardless whether it ended up purchasing Otto*—to indemnify Otto and Mr. Levandowski against third party actions alleging misappropriation of trade secrets or other violations.  *Id.* at 2-3.  Plainly, once this Term Sheet was signed, this indemnity obligation gave Uber, Otto, and Mr. Levandowski an immediate shared legal interest in the facts that might underlie an action that Uber would be required to defend.  *Cf., e.g., Lectrolarm Custom Sys. v. Pelco Sales, Inc.*, 212 F.R.D. 567, 572-73 (E.D. Cal. 2002) (finding that the common interest privilege protected communications between an insurer defending an insured party).

To the extent Judge Corley concluded that entities engaged as buyers and sellers in a potential transaction *cannot* have a common legal interest, *see* Dkt. 566 at 15, that conclusion is contrary to law.  *See, e.g., In re Regents of the Univ. of Cal.*, 101 F.3d 1386, 1390 (Fed. Cir. 1996) (holding that an inventor/patentee and a potential licensee have a common legal interest in successfully prosecuting patent applications); *Rembrandt Patent Innovations, LLC v. Apple Inc.*, No. C 14-05094 WHA, 2016 U.S. Dist. LEXIS 13749 at *23-24 (N.D. Cal. Feb 4, 2016); *Rayman v. Am. Charter Fed. Sav. & Loan Ass'n*, 148 F.R.D. 647, 655 (D. Neb. 1993); *Hewlett-Packard Co. v. Bauch & Lomb, Inc.*, 115 F.R.D. 308, 310 (N.D. Cal. 1987).

---

[2] As the common interest privilege is "an extension of the attorney-client privilege," *Henke*, 222 F.3d at 637, any records provided by Mr. Levandowski to Stroz must likewise be protected from disclosure under the reasoning of *Fisher v. United States*, 425 U.S. 391, 405 (1975).

LEVANDOWSKI'S MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE; AND [PROPOSED] ORDER  Case No. C 17-00939 WHA

3

1    **III.    *Objection 3*: Stroz Drafted its Report in Furtherance of a Common Legal Strategy**

2    Judge Corley also committed clear error by finding that, even if Uber, Otto, and Mr.

3    Levandowski shared a common legal interest, Stroz's investigation and report were not

4    undertaken to vindicate that legal interest.  Dkt. 566 at 15-21.

5    <u>First</u>: This ruling ignores sworn declarations of five attorneys and Stroz's president, each

6    of whom attests that Stroz *was* retained for a litigation purpose.  Dkt. 370 ¶¶ 9-10; Dkt. 375 ¶ 3;

7    Dkt. 376 ¶ 11; Dkt. 378 ¶¶ 2-3, 5-6, 9; Dkt. 380 ¶ 3; Dkt. 381 ¶¶ 3-6.

8    <u>Second</u>: Judge Corley's order disregards the fact that the attorneys involved in the Stroz

9    investigation efforts and communications were Uber's *litigation* counsel, *not* separate corporate

10   transactional counsel engaged to handle the Uber-Otto deal—and the Stroz materials were not

11   shared with transactional counsel.  *See, e.g.*, Dkt. 370 ¶¶ 3 & 9-10, 20; Dkt. 375 ¶ 3; Dkt. 378 ¶¶

12   2-5; Dkt. 381 ¶¶ 4-6; Dkt. 383 ¶¶ 2-3.  This is strong evidence that Stroz was engaged to gather

13   information relevant to potential litigation, not to guide the decision whether to "sign the Put Call

14   Agreement," *see* Dkt. 566 at 15-16, or any other business matter.  Indeed, even if the parties had

15   *both* business and legal purposes, the privilege would still apply.  *Rayman*, 148 F.R.D. at 654.

16   <u>Third</u>: Prominent in Judge Corley's reasoning were erroneous conclusions about an

17   engagement letter between Stroz and the joint-defense participants.  The letter expressly recites

18   that the engagement was designed to "understand certain factual matters potentially related to

19   potential litigation," but Judge Corley found the letter unpersuasive evidence of the parties'

20   intent at the relevant time because, according to Judge Corley, the letter—which on its face is

21   dated "as of March 4, 2016"—was not executed until April 11, 2016.  Dkt. 566 at 18-19.  Judge

22   Corley's conclusions were incorrect and miss important facts.

23   In the Ninth Circuit, a common interest agreement may be established orally or "implied

24   from conduct and situation." *Gonzalez*, 669 F.3d at 979.  The declarations of the involved

25   parties clearly demonstrate that the engagement letter's recitation of the litigation-related

26   purpose of the common interest agreement—like similar language in the formal Joint Defense

27   and Common Interest Agreement—merely confirmed an existing oral understanding that was

28   reached no later than March 11, 2016.  Dkt. 381 ¶¶ 3-4, 6, 8-9; *see also* Dkt. 370 ¶¶ 12-14; Dkt.

LEVANDOWSKI'S MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE;
AND [PROPOSED] ORDER   Case No. C 17-00939 WHA

4

375 ¶¶ 5-8; Dkt. 376 ¶¶ 8-9; Dkt. 378 ¶¶ 5-8; Dkt. 380 ¶ 5. Judge Corley's focus on the date this particular letter was signed misses the mark; the parties to the common interest agreement were not required to memorialize the agreement in writing at all, and the uncontradicted evidence demonstrates that the parties had at least an oral agreement at all times relevant here.

Fourth: Judge Corley seized on a sentence included by Mr. Levandowski's counsel in March 2016 letters to Stroz stating that Mr. Levandowski and Otto shared a "common legal interest in the subject matter of the Stroz Examination," without mentioning Uber in the same breath. Dkt. 566 at 4, 17. But this phrase emphasizes that Mr. Levandowski and Otto both had a "common legal interest"—rather than an adversarial, or purely business, interest—in the "subject matter" of Stroz's investigative work. This confirms, rather than refutes, the conclusion that the Stroz work was done in service of a common interest agreement including Levandowski. The omission of Uber here hardly negates uncontradicted sworn declarations demonstrating that he was already party to a common interest agreement including Uber and Otto.

Fifth: Relatedly, Judge Corley apparently concluded that Mr. Levandowski was not seeking legal advice when he participated in the Stroz investigation. Dkt. 566 at 8. This conclusion is belied by the uncontradicted declaration of Mr. Levandowski's counsel, who describes that he and Mr. Levandowski participated in the investigation in order to evaluate litigation risks and generate litigation strategy. Dkt. 381 ¶¶ 3-6, 11.[3]

## V.    Request for Additional Briefing

Civil Local Rule 72-2 confines to five pages a litigant's objections to a magistrate judge's non-dispositive order. In light of the important interests involved and the complicated underlying factual scenario—which yielded a 24-page order—Mr. Levandowski requests that the Court order more extensive briefing on this motion.[4]

---

[3] Judge Corley denied Mr. Levandowski's request to file an *in camera* submission to support his opposition to Waymo's motion to compel. Dkt. 566 at 7; Dkt. 382. We object that this ruling deprived Mr. Levandowski of a significant opportunity to support his opposition without waiving his privileges.
[4] Given the importance of the issues at stake, if this Court upholds Judge Corley's order, we respectfully request a brief stay while Mr. Levandowski files an appeal and/or mandamus petition at the Federal Circuit. *See Regents of University of California*, 101 F.3d at 1387.

LEVANDOWSKI'S MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE; AND [PROPOSED] ORDER   Case No. C 17-00939 WHA

5

1    Dated: June 8, 2017                          Respectfully submitted,

2                                                 /s/
3                                                 Miles Ehrlich
                                                  Ismail Ramsey
4                                                 Amy Craig
                                                  Ramsey & Ehrlich LLP
5
                                                  *Counsel for Non-Party Anthony*
6                                                 *Levandowski*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**[PROPOSED] ORDER**

On June 5, 2017, Magistrate Judge Corley issued an order granting Waymo LLC's motion to compel production of a report authored by Stroz Friedberg, LLC.  Dkt. 566.  This Court finds under Federal Rule of Civil Procedure 72(a) and 28 U.S.C. § 636(b)(1)(A) that Judge Corley's order was contrary to law and clearly erroneous.  The order is hereby SET ASIDE. Waymo's motion to compel, Dkt. 321, is DENIED.


DATE: _____           _____
                                  HONORABLE WILLIAM ALSUP
                                  UNITED STATES DISTRICT JUDGE

LEVANDOWSKI'S MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE; AND [PROPOSED] ORDER  Case No. C 17-00939 WHA

7

# EXHIBIT 16

QUINN EMANUEL URQUHART & SULLIVAN, LLP
 Charles K. Verhoeven (Bar No. 170151)
 charlesverhoeven@quinnemanuel.com
 David A. Perlson (Bar No. 209502)
 davidperlson@quinnemanuel.com
 Melissa J. Baily (Bar No. 237649)
 melissabaily@quinnemanuel.com
 John Neukom (Bar No. 275887)
 johnneukom@quinnemanuel.com
 Jordan Jaffe (Bar No. 254886)
 jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:  (415) 875-6600
Facsimile:  (415) 875-6700

Attorneys for WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>  Plaintiff,<br><br>  v.<br><br>UBER TECHNOLOGIES, INC.;<br>OTTOMOTTO LLC; OTTO TRUCKING<br>LLC,<br><br>  Defendants. | CASE NO. 3:17-cv-00939-WHA<br><br>**PLAINTIFF WAYMO LLC'S<br>CONSOLIDATED RESPONSE TO<br>MOTIONS FOR RELIEF FROM<br>NONDISPOSITIVE PRETRIAL ORDER<br>OF MAGISTRATE JUDGE (DKTS. 572,<br>574, 575)** |

# TABLE OF CONTENTS

Page

I.     LEGAL STANDARD ................................................................................................1

II.    MOVANTS HAVE NOT SHOWN THAT MAGISTRATE CORLEY'S RULINGS
       ON THE ATTORNEY-CLIENT PRIVILEGE WERE CLEARLY ERRONEOUS............2

       A.     The Due Diligence Materials Are Not Protected By Uber's Attorney-Client
              Privilege ...............................................................................................2

       B.     The Due Diligence Materials Are Not Protected By OT's Newly Asserted
              Claim of Attorney-Client Privilege .................................................................3

III.   MOVANTS HAVE NOT SHOWN THAT MAGISTRATE CORLEY'S JOINT
       DEFENSE INTEREST FINDINGS ARE CLEARLY ERRONEOUS ...............................4

       A.     Magistrate Corley's Finding That The Term Sheet Created No Joint
              Defense Interest Is Not Clearly Erroneous..................................................5

       B.     Magistrate Corley Did Not Clearly Err By Concluding That The
              Indemnification Clause Did Not Create A Joint Defense Interest ...........................6

       C.     Magistrate Corley Did Not Clearly Err By Finding That Correspondence
              From Levandowski's Counsel Indicated He Shared No Joint Defense
              Interest With Uber ...............................................................................7

       D.     The Purpose Of The "Due Diligence Report" Was, In Fact, Due Diligence ............8

IV.    MAGISTRATE CORLEY DID NOT CLEARLY ERR IN REJECTING
       LEVANDOWSKI'S ARGUMENT THAT A JOINT DEFENSE AGREEMENT
       CREATES A NEW PRIVILEGE WHERE NONE EXISTED .........................................10

V.     MOVANTS' ASSERTION THAT WORK PRODUCT WAIVER OCCURS
       ONLY THROUGH DISCLOSURE TO A LITIGATION ADVERSARY IS
       INCORRECT ...............................................................................................11

VI.    MAGISTRATE CORLEY DID NOT CLEARLY ERR BY ORDERING
       PRODUCTION OF THE STROZ REPORT BECAUSE IT POST-DATED THE
       PUT CALL AGREEMENT ...............................................................................12

VII.   MAGISTRATE CORLEY DID NOT CLEARLY ERR IN HOLDING THAT
       "WAYMO HAS A SUBSTANTIAL NEED FOR PARTS OF THE STROZ
       REPORT" ...............................................................................................14

VIII.  REVERSAL IS INAPPROPRIATE IN LIGHT OF THE ALTERNATIVE BASES
       FOR AFFIRMANCE ...............................................................................................14

IX.    NO STAY PENDING APPEAL OR MANDAMUS IS WARRANTED..........................14

X.     CONCLUSION ...............................................................................................15

## <u>TABLE OF AUTHORITIES</u>

<u>**Page**</u>

<u>**Cases**</u>

*Bank Brussels Lambert v. Credit Lyonnais*,
   160 F.R.D. 437 (S.D.N.Y. 1995)...............................................................................5

*Beavers-Gabriel v. Medtronic, Inc.*,
   No. 13-686, 2015 WL 3397859 (D. Hawaii May 26, 2015) ....................................3, 13

*In re Fujitsu Ltd.*,
   578 F. App'x 997 (Fed. Cir. 2014) ...........................................................................14

*In re Grand Jury Subpoena*,
   357 F.3d 900 (9th Cir. 2004).................................................................8, 9, 11, 13

*Griffith v. Davis*,
   161 F.R.D. 687 (C.D. Cal. 1995) .............................................................................11

*Hewlett-Packard Co. v. Bausch & Lomb, Inc.*,
   115 F.R.D. 308 (N.D. Cal. 1987) ..............................................................................5

*In re JP Morgan Chase & Co. Sec. Litig.*,
   MDL No. 1783, 2007 WL 2363311 (N.D. Ill. Aug. 13, 2007) ...................................5

*Libbey Glass, Inc. v. Oneida, Ltd.*,
   197 F.R.D. 342 (N.D. Ohio 1999)..............................................................................5

*Mohawk Indus., Inc. v. Carpenter*,
   558 U.S. 100 (2009) .................................................................................................15

*NL Indus., Inc. v. Commercial Union Ins. Co.*,
   144 F.R.D. 225 (D.N.J. 1992) ...................................................................................7

*Neilson v. Union Bank of Cal., N.A.*,
   No. 02-6942, 2003 WL 27374179 (C.D. Cal. Dec. 23, 2003) ..................................11

*Nidec Corp. v. Victor Co. of Japan*,
   249 F.R.D. 575 (N.D. Cal. 2007) ...............................................................................5

*Oak Industries v. Zenith Industries*,
   No. 86 C 4302, 1988 WL 79614, 1988 U.S. Dist. LEXIS 7985
   (N.D. Ill. July 27, 1988) .............................................................................................5

*In re Pac. Pictures Corp.*,
   679 F.3d 1121 (9th Cir. 2012)..................................................................................10

*Patrick Caldwell v. Facet Retiree Med. Plan*,
   No. C 13-00385 WHA ................................................................................................2

*In re Rearden LLC*,
   841 F.3d 1327 (Fed. Cir. 2016).................................................................................14

*SCM Corp. v. Xerox Corp.*,
   70 F.R.D. 508 (D. Conn. 1976) .................................................................................................5

*Sec. & Exch. Comm'n v. Mercury Interactive LLC, No. C*,
   07-02822 WHA 2012 WL 4466582 (N.D. Cal. Sept. 25, 2012)..................................................1

*In re Shelbyzme LLC*,
   547 F. App'x 1001 (Fed. Cir. 2013) ........................................................................................14

*In re Shukh*,
   485 F. App'x 437 (Fed. Cir. 2012) ..........................................................................................14

*In re Taiwan Union Tech. Corp.*,
   587 F. App'x 638 (Fed. Cir. 2014) ..........................................................................................14

*United States v. Bergonzi*,
   216 F.R.D. 487 (N.D. Cal. 2003) ............................................................................................12

*United States v. Boyce*,
   No. 13-601, 2014 WL 7507240 (C.D. Cal. May 2, 2014) ...........................................................3

*United States v. Christensen*,
   828 F.3d 763 (9th Cir. 2016)......................................................................................................2

*United States v. MIT*,
   129 F.3d 681 (1st Cir. 1997) ....................................................................................................11

*United States v. Schwimmer*,
   892 F.2d 237 (2d Cir. 1989) .....................................................................................................10

*Upjohn Co. v. United States*,
   449 U.S. 383 (1981) ....................................................................................................................3

*Verigy US, Inc. v. Mayder*,
   No. 07-4330, 2008 WL 4866290 (N.D. Cal. Nov. 7, 2008).......................................................11

*In re Verisign, Inc. Sec. Litig., No. C 02-02270 JW*,
   2004 WL 2445243 (N.D. Cal. Mar. 10, 2004) ..........................................................................1

**Statutes**

Cal. Civ. Code. § 1668 ....................................................................................................................7

Cal. Ins. Code § 533 .......................................................................................................................7

Fed. R. Civ. P. 72(a)......................................................................................................................14

Cal R. Prof'l Conduct 3-310(c) .......................................................................................................5

Magistrate Judge Corley found that Waymo's Motion To Compel should be granted on multiple grounds. Rather than attempt to identify any specific "clear error," as required to meet their burden to overturn the Magistrate's ruling, the Movants collectively throw the kitchen sink in their objections, citing to anything and everything they can to try to avoid the Magistrate's ruling and continue their "relentless concealment of likely probative evidence." (Dkt. 433, 8.) Otto Trucking ("OT") argues, for example, that the Magistrate "clearly erred" in finding that what Defendants themselves have repeatedly referred to as the Stroz "Due Diligence Report" related to "due diligence." (Dkt. 574, 4.) And Movants attempt to show error by relying on arguments and case law never presented to the Magistrate.

Movants do not come close to meeting the clear error standard for setting aside the Magistrate's 24-page opinion. All of Magistrate Corley's findings – that Stroz was not retained by Levandowski or his lawyer, that Levandowski communicated with Stroz in his individual capacity rather than in his capacity as an officer of any Otto entity, that the recipients of the report did not share a common litigation interest, that the preparation and sharing of the report was not designed to further any alleged shared litigation interest, and that the declarations submitted by Movants were not credible – are supported by the evidence and the law and necessitate the conclusion that the due diligence materials must be produced. They certainly do not rise to "clear error," and Movants do not show otherwise. Magistrate Corley's Opinion should be affirmed.

## I.      LEGAL STANDARD

As this Court has explained, "[a] non-dispositive order entered by a magistrate must be deferred to unless it is 'clearly erroneous or contrary to law.' . . . . A district court reviewing the magistrate judge's order 'may not simply substitute its judgment for that of the deciding court.'" *Sec. & Exch. Comm'n v. Mercury Interactive LLC*, No. C 07-02822 WHA, 2012 WL 4466582, at *3 (N.D. Cal. Sept. 25, 2012) (Alsup, J.) (citations omitted). More specifically, discretionary discovery rulings by a magistrate judge should be upheld unless they are clearly erroneous. *In re Verisign, Inc. Sec. Litig.*, No. C 02-02270 JW, 2004 WL 2445243, at *1 (N.D. Cal. Mar. 10, 2004) ("The 'clearly erroneous' standard applies to factual findings and discretionary decisions made [by

1   magistrate judges] in connection with non-dispositive pretrial discovery matters."); *see also*

2   *Patrick Caldwell v. Facet Retiree Med. Plan*, No. C 13-00385 WHA, Dkt. 86 at 3 (March 31,

3   2014) (Alsup, J.) ("Had this issue been before the assigned judge *ab initio*, he would have allowed

4   the depositions to go forward.  That, however, is not the standard of review.  Defendants have

5   simply not met their burden to prove that the discovery order was clearly erroneous or contrary to

6   law.").

## II.     MOVANTS HAVE NOT SHOWN THAT MAGISTRATE CORLEY'S RULINGS ON THE ATTORNEY-CLIENT PRIVILEGE WERE CLEARLY ERRONEOUS

In her ruling, Magistrate Corley held that the report and its attachments are not protected

by anyone's attorney-client privilege, because Stroz was retained jointly by Ottomotto and Uber

while those companies "were on the opposite sides of a proposed transaction represented by

separate counsel." (Dkt. 566, 10.)  The Magistrate noted that there is no case holding "that

communications between separate parties with separate counsel on opposite sides of a proposed

transaction are protected by the attorney-client privilege" (*id.*) and rightly pointed out that "[t]wo

clients represented by separate counsel do not create an attorney-client relationship by jointly

retaining an agent" (*id.* 11).  Magistrate Corley further found that memoranda summarizing

interviews with Ron and Levandowski are not privileged because neither held an attorney-client

relationship with any of the attorneys who retained Stroz.  (*Id.*)  Movants have not shown clear

error for any of these findings, nor could they as they are well supported in the opinion.

### A.     The Due Diligence Materials Are Not Protected By Uber's Attorney-Client Privilege

Uber contends that Magistrate Corley clearly erred by not concluding that the Stroz Report

is privileged under *United States v. Christensen*, 828 F.3d 763, 802 (9th Cir. 2016).  (Dkt. 575, 4-

5.)  Magistrate Corley, however, considered *Christensen* and found that it "merely held that

conversations between a lawyer and an investigator retained by the lawyer about the lawyer's

client are privileged." (Dkt. 566, 10.)  As discussed above, however, Magistrate Corley found that

neither Levandowski, Ron, nor their lawyers hired Stroz.  (*Id.*)  This case is therefore unlike

*Christensen.*  Nor does Uber address Magistrate Corley's finding (*id.*) that the report is not

privileged because it was prepared by an "independent expert" for two parties "on opposite sides

of a proposed transaction."  Magistrate Corley noted that Uber had not cited authority "that holds that communications between separate parties with separate counsel on opposite sides of a proposed transaction are protected by the attorney-client privilege" (Dkt. 566, 10), and Uber's motion still cites no such authority.  Nor does Uber cite any authority contrary to Magistrate Corley's holding that "[t]wo clients represented by separate counsel do not create an attorney-client privilege by jointly retaining an agent."  (Dkt. 566, 11.)[1]

### B.  The Due Diligence Materials Are Not Protected By OT's Newly Asserted Claim of Attorney-Client Privilege

OT argues that Magistrate Corley erred by not finding the report to be protected by *OT's* attorney-client privilege because Stroz and Levandowski were supposedly acting on OT's behalf when Stroz interviewed Levandowski .  (Dkt. 572, 2.)  But no one ever made that argument before, so it is waived.[2]  *See Beavers-Gabriel v. Medtronic, Inc*., No. 13-686, 2015 WL 3397859, at *4 (D. Hawaii May 26, 2015); *United States v. Boyce,* No. 13-601, 2014 WL 7507240, at *7 (C.D. Cal. May 2, 2014).  Having not made this argument, no movant can show that Magistrate Corley's decision not to adopt it is clear error.  It is without merit in any event.  While OT asserts it "jointly retained Stroz" (Dkt. 572, 1, 4), the Stroz retention agreement makes no mention of OT (who was not a party to the Term Sheet) at all.  Thus, Magistrate Corley correctly found "the Term Sheet and [Levandowski's counsel's] side agreements with Stroz establish that Stroz's interview of Levandowski was performed in Levandowski's individual capacity," and not as an OT or Ottomoto executive.[3]  (Dkt. 566, 10.)

---

[1]  Even crediting Uber's arguments, Magistrate Corley found that Uber waived any work product protection by sharing the withheld documents with Otto (Dkt. 566, 13-21), and that same conclusion would equally compel a finding that any attorney-client privilege was waived.

[2]  OT joined Uber and Ottomoto's opposition to Waymo's motion to compel rather than file its own.  (Dkt. 389.)

[3]  The fact that Levandowski communicated with Stroz in his individual capacity renders *Upjohn Co. v. United States*, 449 U.S. 383 (1981), inapposite.

### III. MOVANTS HAVE NOT SHOWN THAT MAGISTRATE CORLEY'S JOINT DEFENSE INTEREST FINDINGS ARE CLEARLY ERRONEOUS

Magistrate Corley held that any privileges over the report and its attachments had been waived by their distribution to parties who do not satisfy the joint defense doctrine. She found that, at the time the Term Sheet was signed by Uber and Ottomotto, the companies "were on the opposite sides of a proposed acquisition with no obligation to consummate the transaction." (Dkt. 566, 15.) Uber and Ottomotto "could only have a common legal interest in pursuing a defense of a possible lawsuit by Waymo once Uber was obligated (if certain conditions were met) to acquire Otto and thus inherit or create any liabilities to Waymo."[4] (*Id.*) Magistrate Corley also noted that the fact that Levandowski's lawyer, in a letter to Stroz, had claimed that Levandowski "shared a common legal interest with Otto, but did not also claim to share a common interest with Uber," evidenced that Levandowski did not share such an interest with Uber. (*Id.*, 17.)

Magistrate Corley went on to find that, even if Ottomotto and Uber had shared a common legal interest when they hired Stroz, the purpose of the Stroz investigation was "to enable Uber to evaluate whether to purchase Otto rather than to develop a joint strategy regarding Waymo litigation." (Dkt. 566, 16.) She noted that the Term Sheet identified the purpose of the Stroz investigation as allowing Uber to conduct due diligence before deciding whether to sign the Put Call Agreement and creating a record that "will control whether any diligenced employees have to reimburse Uber for indemnification expenses should Waymo sue the diligenced employees." (*Id.* 15-16.) Magistrate Corley then noted that Stroz provided Uber with an interim report "just before Uber signed the Put Call Agreement," confirming that the purpose of the investigation was so that Uber could evaluate whether to sign the agreement. (*Id.*, 16.) Indeed, the Term Sheet requires that Stroz's "initial due diligence" be completed prior to the time Uber was required to sign the Put Call Agreement, confirming that the purpose of the investigation was to complete the acquisition. (Dkt. 523-5, UBER00017566; Dkt. 566, 3.)

---

[4] Contrary to OT's contention (Dkt. 575, 1), Magistrate Corley did not hold that two parties can never "share litigation risk prior to the time that one of them becomes 'obligated' to acquire the other." Rather, Magistrate Corley held that Defendants had not met their burden of proving that Uber shared any risk of litigation with Waymo prior to acquiring Ottomotto.

### A. Magistrate Corley's Finding That The Term Sheet Created No Joint Defense Interest Is Not Clearly Erroneous

Movants contend that Magistrate Corley erred by finding that the Term Sheet did not create a joint defense interest because Ottomotto and Uber were on opposite sides of the proposed transaction. (Dkt. 572, 3-4; Dkt. 574, 3; Dkt. 575, 1.) For its part, Uber claims there is "no legal basis" for Magistrate Corley's finding. But the Court need look no further than the Rules of Professional Conduct, which describes the legal interests of parties to a proposed business deal as adverse such that the same attorneys cannot represent both sides, absent a waiver. Cal. R. Prof'l Conduct 3-310(c). Courts, therefore, often hold that no joint defense privilege arises merely because two parties contemplate a business transaction that may give rise to litigation.[5]

*Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 115 F.R.D. 308 (N.D. Cal. 1987), the primary authority relied on by Uber, is not to the contrary. Magistrate Corley considered this decision and distinguished it on the ground that it "involve[d] the sharing of already privileged information, and not the joint production of purportedly privileged work product." (Dkt. 566, 17.) *Hewlett-Packard* involved the disclosure of a single opinion letter concerning one patent during the sale of a business, not the joint commissioning of an investigation into "Bad Acts" as a precondition to whether a business transaction would go forward. That decision has, further, been widely criticized as taking too "expansive" of a view of the joint defense privilege by expanding that doctrine to predominantly commercial transactions. *See Nidec*, 249 F.R.D. at 579; *Libbey Glass, Inc. v. Oneida, Ltd.*, 197 F.R.D. 342, 348 (N.D. Ohio 1999); *Bank Brussels Lambert v. Credit Lyonnais,* 160 F.R.D. 437, 447 (S.D.N.Y. 1995); *Oak Industries v. Zenith Industries,* No. 86 C 4302, 1988 WL 79614, at *4, 1988 U.S. Dist. LEXIS 7985, at *12 (N.D. Ill. July 27, 1988).

---

[5] *In re JP Morgan Chase & Co. Sec. Litig.*, MDL No. 1783, 2007 WL 2363311, *5 (N.D. Ill. Aug. 13, 2007) ("Fundamentally, the Court does not understand how Bank One and JP Morgan can be said to share a common legal interest prior to their signing the merger. Prior to the merger, these organizations stood on opposite sides of a business transaction."); *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 579 (N.D. Cal. 2007) (joint defense doctrine did not apply to communications between a company and potential purchasers of that company); *SCM Corp. v. Xerox Corp.,* 70 F.R.D. 508, 513 (D. Conn. 1976)(antitrust analysis offered during joint venture negotiations not privileged as parties were not commonly interested, but adverse, negotiating an arm's length a business transaction).

1  The Magistrate therefore correctly followed the later authority from this and other Districts

2  declining to follow *Hewlett-Packard*.  (*See* 6/7/27 Hearing Tr., 8 ("There's no such thing as 'the

3  Northern District has decided.'").)

4       Uber also argues that it shared a common legal interest with Ottomotto when the Term

5  Sheet was signed because they "faced that risk [of litigation] irrespective of whether the deal

6  closed."  (Dkt. 575, 1-2.)  Although Uber cites paragraphs 6 and 10 of the declaration of its in-

7  house counsel, Justin Suhr, to support that contention (Dkt. 378), those paragraphs simply state

8  that Uber "contemplated the specific possibility that Google could bring claims arising out of

9  Uber's acquisition of Otto against some or all of the parties" and that there were "litigation risks

10  that the proposed acquisition presented."  (*Id.* ¶¶ 6, 10.)  Suhr does not suggest, much less explain,

11  how Uber faced a shared risk of litigation against Waymo with Ottomoto even if the acquisition

12  was not completed.

13       In its part, OT contends a shared joint defense interest existed because the parties were "in

14  the late stages of negotiation" when they (albeit not OT) signed the Term Sheet to retain Stroz.

15  (Dkt. 572, 4.)  OT cites no authority that the "stage of negotiations," whether early or late, impacts

16  whether a joint defense privilege exists.  Even if it had, Movants do not even meet the legal

17  standard OT contends Magistrate Corley should have applied.  The Magistrate Judge found that

18  the Term Sheet imposed significant due diligence requirements that had to occur before the

19  acquisition could be completed.  (Dkt. 566, 2-3.)  And while OT argues that the Term Sheet gave

20  it a joint defense interest with Uber, Ottomotto, Ron, and Levandowski (Dkt. 572, 2), again, OT is

21  not a signatory to the Term Sheet.  (Dkt. 510-3.)

22      **B.**     **Magistrate Corley Did Not Clearly Err By Concluding That The Indemnification Clause Did Not Create A Joint Defense Interest**

23       Levandowski argues that the indemnification obligation in the Term Sheet gave rise to a

24  shared litigation risk "regardless whether it ended up purchasing Otto."  (Dkt. 574, 3.)  But this

25  argument ignores, and does not rebut, Magistrate Corley's finding that the parties remained

26  adverse with respect to that shared litigation risk at least until after the Stroz investigation was

27  completed.  (Dkt. 566, 3.)  As Magistrate Corley found (Dkt. 566, 3), the Term Sheet explicitly

28

makes the indemnification obligation conditional (Dkt. 523-5, UBER00017566). Further, as the Magistrate found (Dkt. 566, 2-3), Uber did not even have an indemnification obligation until after "execution of the Put Call Agreement" (Dkt. 523-5, UBER00017566). Uber therefore owed no indemnification obligation at the time the Term Sheet was signed and the Stroz investigation undertaken. Regardless, indemnification agreements covering intentional torts like trade secret theft are illegal and unenforceable, Cal. Ins. Code § 533; Cal. Civ. Code. § 1668, and therefore cannot give rise to a shared legal interest. Further, an indemnification relationship does not, per se, create a joint defense privilege, and there is no insured-insurer privilege.[6]

But even crediting Levandowski's position that the indemnification provision in the Term Sheet created a common legal interest between Uber and Ron and between Uber and Levandowski, that is not sufficient to show clear error. Levandowski has not shown that all members of the "joint defense group" shared that *same* common interest. In particular, he has not shown that he and Ron shared the same common interest. Levandowski and Ron were not in an indemnitor-indemnitee relationship with each other and therefore shared no joint defense interest with respect to their individual "Bad Acts" being investigated by Stroz.

### C. Magistrate Corley Did Not Clearly Err By Finding That Correspondence From Levandowski's Counsel Indicated He Shared No Joint Defense Interest With Uber

Levandowski faults (Dkt. 574, 5) Magistrate Corley for relying on the letter from his counsel to Stroz that asserted that Levandowski shared a common legal interest with Ottomotto but made no mention of any shared interest with Uber. (Dkt. 566, 17.) Levandowski's argument simply disagrees with the reasonable inference Magistrate Corley drew from the evidence, which suggested Levandowski shared no interest with Uber. Because Levandowski's conversations with Stroz were shared with Uber, it is not sufficient for Levandowski to merely show a joint defense interest with Ottomotto.

---

[6] *See, e.g., NL Indus., Inc. v. Commercial Union Ins. Co.* 144 F.R.D. 225, 231 (D.N.J. 1992) ("The common interest doctrine is applicable only when it has been determined that the ... insurer is obligated to defend the underlying action brought against the insured ... and the parties 'have employed a lawyer to act for them in common.'").

**D.     The Purpose Of The "Due Diligence Report" Was, In Fact, Due Diligence**

OT contends that any finding that "the Stroz investigation was intended for due diligence purposes" was clear error in light of the attorney declarations the defendants submitted.  (Dkt. 572, 4.)  That the purpose of the Stroz investigation was not "due diligence" does not pass the straight face test.  Uber identified Stroz's work as a "due diligence review" the first time they disclosed its existence and stated the Stroz report is "based on that due diligence."  (3/29/17 Hearing Tr., 12, 24.)  The privilege log itself refers to Stroz's work as the "Due Diligence Investigation."  (Dkt. 321-2.)

Uber argues the Stroz investigation had a "dual purpose" that was both business and in anticipation of litigation.  (Dkt. 575, 2.)  Uber asks the Court to apply, in the joint defense context, the standard for determining if a "dual purpose" document is work product, which Uber states is met "if it can fairly be said that the document was created because of anticipated litigation and would not have been created in substantially similar form but for the prospect of litigation."  (Dkt. 575, 2 (*quoting In re Grand Jury Subpoena*, 357 F.3d 900, 908 (9th Cir. 2004).)[7]  The decision Uber cites does not address the joint defense privilege at all.  But even if that standard were applicable, Magistrate Corley found that the purpose of the Stroz investigation was to advise Uber on whether to complete the merger and to determine the scope of any indemnification obligations.  (Dkt. 566, 15-16.)  There is no indication that the Stroz investigation would not have occurred in substantially similar form even if there was no expected litigation.  And they certainly have not shown Magistrate Corley's opposite conclusion was clear error.

Levandowski argues (Dkt. 574, 4) that Magistrate Corley erred by not giving dispositive weight to the fact that the Stroz retention agreement states that its purpose is to allow the parties "to understand certain factual matters potentially relevant to potential litigation . . ."  (Dkt. 370-3, 2 (emphasis added).)  As an initial matter, Levnadowski makes this argument only by ignoring that the Stroz retention agreement explicitly states that its purpose includes other "related matters,"

---

[7]  Otto Trucking relies on the same case for its articulation of the joint defense interest standard.  (Dkt. 572, 4.)

1  *i.e.*, the business purposes identified by Magistrate Corley, including deciding whether to

2  complete the acquisition and determine the scope of any indemnification obligations.[8]  What is

3  more, the "potential litigation" relied on by Levandowski is litigation in which he and Uber would

4  have *adverse* interests, examples of which include this litigation as well as litigation between Uber

5  and Levandowski concerning the indemnification provisions themselves.  The retention

6  agreement, therefore, does not compel a finding that the Stroz Report "would not have been

7  created in substantially similar form but for the prospect of litigation" in which Levandowski and

8  Uber would have a common legal interest.  *In re Grand Jury Subpoena*, 357 F.3d at 908.

9         OT and Levandowski also contend that Magistrate Corley did not sufficiently credit their

10  self-serving and conclusory attorney declarations stating that the purpose of Stroz's investigation

11  was to obtain litigation advice.  (Dkt. 572, 4; Dkt. 574, 4-5.)  But they do not show clear error in

12  Magistrate Corley's finding that the declarations were "not persuasive evidence" and to be

13  afforded "little weight" because the declarations went out of the way to ignore all the contrary

14  evidence.  (Dkt. 566, 20.)  Magistrate Corley noted that although the attorney declarations

15  discussed and relied on the Term Sheet extensively, they conspicuously failed to attach it, "a key

16  hole in Uber's argument."  (Dkt. 566, 20; 5/25/17 Hearing Tr., 17.)  Such weighing of the

17  evidence and credibility findings are owed deference.[9]

18         Levandowski further argues that Magistrate Corley erred when she found that the Stroz

19  investigation was for due diligence purposes because Uber had what it refers to as a "litigation"

20  attorney retain Stroz.  (Dkt. 574, 4.)  While it is true that this attorney, Eric Tate of Morrison &

21  Foerster, has appeared for Uber in this litigation, Tate stated in his declaration that Uber retained

---

22  [8]  Magistrate Corley further noted that Defendants failed to explain why the Stroz Engagement

23  letter is dated "[a]s of March 4, 2016" (Dkt. 370-3), which implies that there is some unexplained

24  earlier version.  (Dkt. 566, 18.)  Evidence that the parties "back dated" the retention agreement
suggests, if anything, that any concern about litigation post-dated the start of the Investigation.

25  [9]  Even if Levandowski's attorney's declaration were credible, Levandowski does not

26  accurately represent its contents.  Contrary to his assertion, the declaration nowhere states that the
reason Levandowski spoke to Stroz was "to evaluate litigation risks and generate litigation

27  strategy." (Dkt. 381.)  At best, the declaration states there was "litigation risk."  (*Id*. ¶3.)

28

him "to provide legal advice regarding a potential *corporate transaction*."[10]  (Dkt. 370 ¶2 (emphasis added).)  And Levandowski cites no authority that places any relevance as to the specialty of a lawyer on this issue.[11]

## IV. MAGISTRATE CORLEY DID NOT CLEARLY ERR IN REJECTING LEVANDOWSKI'S ARGUMENT THAT A JOINT DEFENSE AGREEMENT CREATES A NEW PRIVILEGE WHERE NONE EXISTED

Magistrate Corley held, citing extensive authority, that the joint defense doctrine does not, by itself, create a privilege, but instead "prevents waiver of a pre-existing privilege if the privileged information is shared only with those with a common legal interest."  (Dkt. 566, 12.)  "Rather than a separate privilege, the 'common interest' or 'joint defense' rule is an exception to ordinary waiver rules designed to allow attorneys for different clients pursuing a common legal strategy to communicate with each other."  *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1129 (9th Cir. 2012).  Levandowski's opposition to Waymo's Motion similarly characterized the common interest privilege as "[a]n exception to the waiver of privilege."  (Dkt. 379, 7.)  Levandowski's attorney agreed with this statement at the hearing.  (5/25/17 Hearing Tr., 41, 46-47.)

Nevertheless, Levandowski now claims that his communications with Stroz are privileged, not because he was communicating with Stroz to obtain legal advice, but instead because he shared a common legal interest with Uber, Stroz's principal.  (Dkt. 574, 1.)  Levandowski relies on the Second Circuit decision *United States v. Schwimmer,* 892 F.2d 237, 243 (2d Cir. 1989), a case he did not cite to Magistrate Corley.  In *Schwimmer*, one co-defendant's attorney hired an accountant "to serve [both co-defendants'] joint interests" and "on behalf of both clients."  *Id.*  But

---

[10]  In any event, Tate's website states he "counsels companies on . . . transactional matters . . . and employment aspects of mergers and acquisitions," not merely litigation. https://www.mofo.com/people/eric-tate.html.

[11]  Many of the attorneys that received the Stroz Report were not retained for litigation advice. Ron's attorney was retained to advise him "in connection with the proposed transaction."  (Dkt. 375 ¶2.)  Although they may also have given litigation advice, Ottomotto and Otto Trucking's attorneys were "hired to perform the negotiation and related corporate representation of Otto in connection with the potential transaction."  (Dkt. 376 ¶4.)  Levandowski's attorney was hired "to provide personal counsel regarding a potential corporate transaction."  (Dkt. 381 ¶2.)

Magistrate Corley found, and Levandowski does not dispute, that he agreed to speak with Stroz only on the condition that those communications **not** be shared with Uber or even his own company, Otto. (Dkt. 566, 4.) Further, Stroz was hired by Uber and Ottomotto (*id*., 2; Dkt. 370-3), not Levandowski, to serve Uber and Ottomotto's interests, not Levandowski's. Magistrate Corley further found that Levandowski only spoke to Stroz in his individual capacity (Dkt. 566, 10) and Stroz, therefore, was not his agent. *Schwimmer* and its progeny are therefore inapposite.

## V.    MOVANTS' ASSERTION THAT WORK PRODUCT WAIVER OCCURS ONLY THROUGH DISCLOSURE TO A LITIGATION ADVERSARY IS INCORRECT

Uber argues that even if no joint defense privilege applies, sharing the Stroz report among the various recipients is not a waiver of work product protection because waiver of work product protection occurs only if there is disclosure with a litigation adversary. (Dkt. 575, 3.)

As an initial matter, Uber's argument presupposes that the report is work product in the first place. But it is not. Uber contends that work product protection applies to these documents only "if it can fairly be said that the document was created because of anticipated litigation and would not have been created in substantially similar form but for the prospect of litigation." (Dkt. 575, 2 (*quoting In re Grand Jury Subpoena*, 357 F.3d at 908).) In light of Magistrate Corley's findings that the primary, if not sole, purpose of the Stroz investigation was to advise Uber on whether to acquire Ottomotto and to determine the scope of any indemnification obligations, this standard is not met.

But even if Uber could show that the report was work product, its argument that waiver of work product only occurs when disclosure is made to an actual "litigation adversary" is unavailing. (Dkt. 575, 3.) To the contrary, waiver arises from disclosure to a "potential adversary." *United States v. MIT*, 129 F.3d 681, 687 (1st Cir. 1997); *Neilson v. Union Bank of Cal., N.A.*, No. 02-6942, 2003 WL 27374179, at *5 (C.D. Cal. Dec. 23, 2003). It also arises from disclosures that merely increase the opportunity for a potential adversary to obtain the information. *Verigy US, Inc. v. Mayder, No*. 07-4330, 2008 WL 4866290, at *2 (N.D. Cal. Nov. 7, 2008); *Griffith v. Davis*, 161 F.R.D. 687, 699 (C.D. Cal. 1995). Magistrate Corley found that disclosure here was made to at least potential litigation adversaries, and Uber's argument therefore fails.

Specifically, Magistrate Corley found that: (1) "Uber disclosed the Stroz investigation to its then adversaries Otto, Levandowski and Ron" (Dkt. 566, 21); (2) "Otto was Uber's adversary because they were on opposite sides of a potential transaction" (*id.*); and (3) "Uber engaged Stroz to investigate Otto and its employees and the results of that investigation could have caused Uber to not proceed with the acquisition" (*id.*). Further, during the course of the Stroz investigation (and still to this date), the parties were potential litigation adversaries at least with respect to Uber's potential obligation to indemnify Otto and Levandowski for their "Bad Acts." (*Id.* 2-3 (discussing Uber's indemnification obligations).)

To support her finding of waiver, Magistrate Corley cited *United States v. Bergonzi*, 216 F.R.D. 487 (N.D. Cal. 2003), in which a company disclosed its attorneys' investigation to the SEC under a confidentiality agreement. The court held that the SEC and the company did not share a true common interest because the SEC maintained as a consideration the potential to bring charges against the company. *Id.* at 496. Uber contends that "*Bergonzi* does not stand for the proposition that parties to a potential business transaction are adversaries." (Dkt. 575, 4.) But that is not the proposition for which Magistrate Corley cited *Bergonzi*. Rather, as Magistrate Corley found: (1) "Levandowski and Ron were also Uber's adversaries as Uber was investigating them" (Dkt. 566, 21); (2) "[t]he investigation results could have led to Levandowski and Ron losing millions of dollars if Uber decided not to sign the Put Call Agreement because of what it learned" (*id.*); and (3) "the investigation could lead to Levandowski or Ron having to reimburse Uber for indemnification expenses if an arbitrator or court found that they were not truthful with Stroz" (*id.*). In short, the recipients of Uber's due diligence report potentially faced litigation with Uber concerning the scope of Uber's contractual indemnification obligations and their "Bad Acts," which were precisely the subject of the report, as well as potential litigation that could arise out of the proposed acquisition. Magistrate Corley's conclusion was not clear error.

## VI.   MAGISTRATE CORLEY DID NOT CLEARLY ERR BY ORDERING PRODUCTION OF THE STROZ REPORT BECAUSE IT POST-DATED THE PUT CALL AGREEMENT

Uber argues that Magistrate Corley clearly erred by ordering production of the Stroz report because the report post-dated the April 11, 2016 signing of the Put Call Agreement that Uber

1    contends bound Uber to purchase Ottomotto and, thus, created a joint defense interest. (Dkt. 575,

2    2-3, 5.) Uber's argument fails on multiple grounds.

3         Initially, none of the Movants argued that any common legal interest arose upon anything

4    other than the signing of the Term Sheet. None argued that a common legal interest arose as of the

5    signing of the Put Call Agreement. Having not made this argument, Uber cannot show that

6    Magistrate Corley's decision not to adopt it is clear error.[12] *See Beavers-Gabriel*, 2015 WL

7    3397859, at *4; *Boyce*, 2014 WL 7507240, at *7.

8         Moreover, Uber does not even address the alternative basis for Magistrate Corley's

9    decision that "the Stroz Investigation began well before the Put Call Agreement was signed"

10   (Dkt. 567, 18 n.2.), much less show that it was clearly erroneous. Nor does it address Magistrate

11   Corley's finding that, prior to the signing of the Put Call Agreement, Stroz provided an "interim

12   report" to Uber, including the withheld witness interviews. (Dkt. 566, 5.) Perhaps it is due to the

13   woefully inadequate privilege logs served by Defendants, but it appears that Defendants have

14   withheld and not even logged this "interim" report. Nevertheless, Movants cannot retroactively

15   cloak all of this work and related communications in privilege merely by signing an agreement.

16        Further, even crediting Uber's argument, its argument is contrary to its position that the

17   Stroz report is work product. As noted above, Uber contends that work product protection applies

18   to these documents only "if it can fairly be said that the document was created because of

19   anticipated litigation and would not have been created in substantially similar form but for the

20   prospect of litigation." (Dkt. 575, 2 (*quoting In re Grand Jury Subpoena*, 357 F.3d at 908).) In

21   light of Magistrate Corley's findings that the primary, if not sole, purpose of the Stroz

22   investigation was to advise Uber on whether to acquire Ottomotto and determine the scope of any

23   indemnification obligations, this standard is not met.

24

25        [12] Uber claims it made this argument to Magistrate Corley (Dkt. 575, 3), but it cites only its
     declarations, not any briefing (*id.*, 3 n.5). A party cannot raise arguments solely in factual
26   declarations and not in their briefs. Even if they could, the citations to those declarations merely
     establish that the date the Put Call Agreement was signed. They do not make this legal argument.
27

28

Finally, the parties remained adverse with respect to the scope of Uber's indemnification obligations even after April 11. The Term Sheet provides that even "after the Closing," Uber's obligations to indemnify were dependent on whether the "Diligenced Employees" committed certain "Bad Acts." (Dkt. 523-5, UBER00017566; Dkt. 566, 3.) Those "Bad Acts" were the subject of the Stroz investigation.

## VII. MAGISTRATE CORLEY DID NOT CLEARLY ERR IN HOLDING THAT "WAYMO HAS A SUBSTANTIAL NEED FOR PARTS OF THE STROZ REPORT"

Magistrate Corley held that even assuming portions of the Stroz report were work product, Waymo had a substantial need for production in light of Levandowski's refusal to testify or produce documents. (Dkt. 566, 22.) Neither Uber nor Levandowski challenges this holding. OT mentions it in passing, saying it "preserves its right to challenge Judge Corley's classification if this Court or the Federal Circuit reverses her waiver holding." (Dkt. 572, 5.) But the time to challenge all bases for the Opinion is now, not at some later date. Fed. R. Civ. P. 72(a). The argument is, therefore, waived and these documents should be produced.

## VIII. REVERSAL IS INAPPROPRIATE IN LIGHT OF THE ALTERNATIVE BASES FOR AFFIRMANCE

Even assuming the Movants identified some clear error, that conclusion does not warrant reversing Magistrate Corley's Order. In its motion to compel, Waymo presented other grounds for compelling production of the Stroz Report that Magistrate Corley did not reach. These grounds include: (1) that Uber's privilege log was facially deficient (Dkt. 321, 5-7); (2) application of the crime-fraud exception (*id.*, 12); (3) the "attachments" to the Stroz Report are not work product merely because Stroz selected them as exhibits to the Report (*id.*, 14-16); and (4) Defendants failed to submit the necessary declarations from Ron, Levandowski, and O'Melveny & Myers to establish that no waiver has occurred (Dkt. 445, 7-9). If any of Movants' arguments are accepted, the Court should either address Waymo's other arguments or remand them to Magistrate Corley for consideration.

## IX. NO STAY PENDING APPEAL OR MANDAMUS IS WARRANTED

Levandowski and OT argue that, if the Court denies his motion, it should stay enforcement of the Opinion pending a mandamus petition to the Federal Circuit. (Dkt. 574, 5 n.4; Dkt. 572, 5.)

1    Such a petition (the third appellate proceeding in this case already) would not justify a stay. The

2    Federal Circuit routinely denies petitions for writs of mandamus challenging privilege rulings,[13]

3    and such rulings "are unlikely to be reversed on appeal, particularly when they rest on factual

4    determinations for which appellate deference is the norm." *Mohawk Indus., Inc. v. Carpenter*, 558

5    U.S. 100, 109 (2009). Nor can Movants show irreparable harm. *Mohawk* rejected the argument

6    that the harm from adverse privilege rulings is irreparable. *Id*. at 109 ("Appellate courts can

7    remedy the improper disclosure of privileged material in the same way they remedy a host of other

8    erroneous evidentiary rulings: by vacating an adverse judgment and remanding for a new trial in

9    which the protected material and its fruits are excluded from evidence."). And here, the balance of

10   harms and public interest weigh in favor of disclosure in light of the substantial showing that

11   Waymo's trade secrets have been stolen, Levandowski's refusal to testify or produce documents,

12   and the relevance of the withheld documents.

13        Further, if a stay is granted, fact discovery may close before any appeal is decided, denying

14   Waymo the ability to take further discovery related to the contents of the withheld documents.

15   This case is on an expedited discovery and trial schedule. Movants intend to use any appeal and

16   stay to obstruct the production of more than 3,500 documents they are withholding on privilege

17   and work product grounds so that Waymo may not consider any of these documents in its trial

18   preparation and potentially to cause a delay in the trial date. Both Waymo and the public have an

19   interest in timely and orderly proceeding through discovery and to trial.

20   **X.    CONCLUSION**

21        Movants have not shown clear error, and their motions should be denied.

22

23

24

---

25        [13]   *In re Rearden LLC*, 841 F.3d 1327, 1334 (Fed. Cir. 2016); *In re Taiwan Union Tech. Corp.*,
26   587 F. App'x 638, 641 (Fed. Cir. 2014); *In re Fujitsu Ltd.*, 578 F. App'x 997 (Fed. Cir. 2014); *In
     re Shelbyzme LLC*, 547 F. App'x 1001, 1002 (Fed. Cir. 2013); *In re Shukh*, 485 F. App'x 437, 438
27   (Fed. Cir. 2012).

28

DATED:  June 11, 2017                    QUINN EMANUEL URQUHART & SULLIVAN, LLP

                                          By /s/Charles K. Verhoeven
                                             Charles K. Verhoeven
                                             Attorneys for WAYMO LLC

# EXHIBIT 17

MILES EHRLICH (Bar No. 237954)
miles@ramsey-ehrlich.com
ISMAIL RAMSEY (Bar No. 189820)
izzy@ramsey-ehrlich.com
AMY CRAIG (Bar No. 269339)
amy@ramsey-ehrlich.com
RAMSEY & EHRLICH LLP
803 Hearst Avenue
Berkeley, CA 94710
(510) 548-3600 (Tel)
(510) 291-3060 (Fax)

Attorneys for Non-Party Anthony Levandowski

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>   Plaintiff,<br><br>  v.<br><br>UBER TECHNOLOGIES, INC., *et al.*,<br><br>   Defendants. | Case No.: C 17-00939 WHA<br><br>**NON-PARTY ANTHONY LEVANDOWSKI'S REPLY IN SUPPORT OF MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE**<br><br>Hon. William H. Alsup |

Waymo's response to the various objections made to the order compelling production of the Stroz report, Dkt. 585, adds little to Judge Corley's order, instead relying on the same errors Judge Corley committed in analyzing the motion in the first instance. The Court should sustain the parties' objections, overrule Judge Corley's order, and deny Waymo's motion to compel.

## I. The Common Interest Privilege Protects the Stroz Report from Disclosure

Waymo scarcely mentions the foundational legal error on which Judge Corley's order rests: the order presumes that the common interest privilege can only protect information that is initially communicated by a party to *his or her own attorney* (step 1), and then, *only later*, communicated between attorneys engaged in a common interest arrangement (step 2). Dkt. 566 at 11-13. But as discussed in our opening papers, that premise is contrary to settled law. Dkt. 574 at 1-3.

Waymo attempts to distinguish *United States v. Schwimmer*, 892 F.2d 237 (2nd Cir. 1989), emphasizing that it is a "Second Circuit decision." Dkt. 585 at 10. Yet the Ninth Circuit in *United States v. Gonzalez* relied extensively on *Schwimmer* in describing the contours of the common interest privilege. *Gonzalez*, 669 F.3d 974, 978, 980, 981, 983 (9th Cir. 2012); *see also United States v. Austin*, 416 F.3d 1016, 1021 (9th Cir. 2005) (quoting *Schwimmer*). The point of *Schwimmer*, as well as the Ninth Circuit precedents cited in our opening brief, is that parties to a common interest agreement may communicate amongst themselves in various ways—not simply in the two-step method described above—without losing the protection of the common interest and joint defense privilege. Dkt. 574 at 1-3. Hence, the fact that Stroz was formally retained (and paid) by Uber and Ottomoto, and not Mr. Levandowski, Dkt. 585 at 10-11, has no significance to the analysis. So long as Stroz was acting as an agent of counsel for one of the other parties to the common interest agreement, Mr. Levandowski's communications with the other parties' counsel—or in this case, with counsels' agent, Stroz—are similarly privileged because joint-defense parties and their respective lawyers (and the lawyers' agents) all share an implicit attorney-client relationship with one another. *See Gonzalez*, 669 F.3d at 978; *Schwimmer*, 892 F.2d at 244; Dkt. 574 at 1-2.

Further, Waymo's brief—like Judge Corley's order—places undue emphasis on isolated

LEVANDOWSKI'S REPLY RE MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE; Case No. C 17-00939 WHA

1

language that either appears in, or is omitted from, certain written communications between the joint-defense parties. But it is undisputed that "no written agreement is required" for there to be a valid joint defense agreement, and "a [joint-defense agreement] may be implied from conduct and situation, such as attorneys exchanging confidential communications from clients who are or *potentially* may be codefendants or have common interests in litigation." *Gonzalez*, 669 F.3d at 979 (emphasis added). It is uncontradicted that the parties to the common interest agreement here *acted* as though they were protected by such an agreement. Thus, the question is simply whether Mr. Levandowski and the other parties could "potentially" have had "common interests in litigation." Contemporaneous documents express that they did share such a common interest, and the numerous declarations of counsel confirm it. Dkt. 574 at 3-5.

The assertion that the interests of all the various parties to this joint-defense agreement were not then (and are not now) identical, *see* Dkt. 585 at 7, 9, does not undermine the validity of the joint-defense privilege itself. "[P]arties to an asserted JDA need not have identical interests and may even have some adverse motives," so long as so long as the parties are "work[ing] together toward a common objective." *Gonzalez*, 669 F.3d at 980; *see also id.* at 981 (observing that co-defendants in a criminal matter could have a common interest in the defense of one count even if one defendant was blaming the other with respect to liability on a different count).

Additionally, while it may be true, as Waymo suggests, that "no joint defense privilege arises *merely because* two parties contemplate a business transaction that may give rise to litigation," Dkt. 585 at 5 (emphasis added), it is also true that such a circumstance *may* support a common interest privilege if the parties "'share[ ] at least a substantially similar legal interest' in actual or potential litigation against a common adversary" and join in an agreement to act in concert to defend against the potential litigation. *See, e.g., FTC v. AbbVie, Inc.*, No. 14-5151, 2015 U.S. Dist. LEXIS 166723 at *36-37 (E.D. Penn. Dec. 14, 2015); Dkt. 575 at 1-2. The common interest doctrine applies "even if there is no 'final' agreement or if the parties do not ultimately unite in a common enterprise." *Katz v. AT&T Corp.*, 191 F.R.D. 433, 437 (E.D. Penn. 2000) (citing cases). The record evidence establishes quite plainly that the joint-defense parties (a) were engaged in "a process for Uber to potentially acquire 100% ownership of Otto," Dkt.

LEVANDOWSKI'S REPLY RE MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE; Case No. C 17-00939 WHA

2

566 at 2; and (b) jointly anticipated that they might be sued by Google, Dkt. 574 at 4-5 (citing evidence).  The record further establishes that Stroz was retained to assist the joint-defense parties in preparing for that potential litigation.  Dkt. 574 at 4-5.  Taken together, all of that evidence demonstrates that a valid common interest agreement was in place.

Waymo quibbles about the date on which a formal indemnity obligation might have arisen.  Dkt. 585 at 6-7.  But that misses the point.  As discussed, parties that jointly face potential litigation may engage in a valid common interest agreement to prepare to defend against anticipated litigation, whether or not they have formally entered a commercial transaction.  The record evidence shows that, at least as of the date the Term Sheet's execution, the parties anticipated facing a common legal adversary and they endeavored to assess and defend against this litigation risk.

In sum, the Court should find that Judge Corley erred in construing both the law and the facts.  The Stroz report is protected by the common interest, attorney-client, and attorney work product privileges, and should therefore be immune from production.

## II.    Joinder

Mr. Levandowski previously joined portions of Otto Trucking's objections.  *See* Dkt. 574 at 1 n.1.  Mr. Levandowski also joins the objections lodged by Uber.  *See* Dkt. 575.

## III.    Request for Stay

The parties are presently briefing a closely related issue: whether the Court should quash or enforce Waymo's subpoena to Stroz, which seeks materials provided for review by Stroz in the course of the same common interest agreement discussed in the present motion.  *See* Dkt. 570, 580, 581, 583.  In the interest of judicial efficiency, and given the identity of issues involved, in the event that the Court overrules the objections to Judge Corley's order, we respectfully request that the matter be temporarily stayed pending resolution of these related motions to quash and compel so that all of the issues may be appealed to the Federal Circuit together.

LEVANDOWSKI'S REPLY RE MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE; Case No. C 17-00939 WHA

3

1    Dated: June 13, 2017                    Respectfully submitted,

2
                                            /s/
3                                           Miles Ehrlich
                                            Ismail Ramsey
4                                           Amy Craig
                                            Ramsey & Ehrlich LLP
5
                                            *Counsel for Non-Party Anthony*
6                                           *Levandowski*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 18

United States District Court

For the Northern District of California

1
2
3
4
5          IN THE UNITED STATES DISTRICT COURT
6
7          FOR THE NORTHERN DISTRICT OF CALIFORNIA
8
9    WAYMO LLC,                                          No. C 17-00939 WHA
10                 Plaintiff,
11         v.                                            **ORDER DENYING MOTIONS
                                                         FOR RELIEF FROM JUDGE
12   UBER TECHNOLOGIES, INC., *et al.*,                  CORLEY'S NONDISPOSITIVE
                                                         PRETRIAL ORDER RE DUE
13                 Defendants.                           DILIGENCE REPORT**
14   _____/
15
16                        **INTRODUCTION**
17         The magistrate judge overseeing discovery in this action granted plaintiff's motion to
18   compel and ordered production of a due diligence report previously withheld under claims of
19   privilege.  Defendants and a non-party move for relief from the order pursuant to Civil Local
20   Rule 72.  The motions are **DENIED**.
21                         **STATEMENT**
22         The due diligence report by forensics firm Stroz Friedberg at the heart of this dispute
23   first came to light during a non-public conference on March 29, when counsel for all defendants
24   — Uber Technologies, Inc., Ottomotto LLC, and Otto Trucking LLC — explained that, before
25   Uber acquired Ottomotto, "some due diligence was done."  Counsel revealed that "[a] third
26   party prepared a report based on that due diligence," and that defendants intended to put the
27   report on a privilege log (Dkt. No. 131 at 12:23–13:1).  Non-party Anthony Levandowski then
28   moved — unsuccessfully — to prevent defendants from disclosing even the basic information
     about the due diligence report required for privilege log purposes (Dkt. No. 147).

United States District Court

For the Northern District of California

After the Federal Circuit rejected Levandowski's appeal from this Court's denial of his motion, plaintiff Waymo LLC moved to compel production of the due diligence report (Dkt. No. 321). Per the discovery referral in this action, Magistrate Judge Jacqueline Corley heard and decided Waymo's motion (*see* Dkt. Nos. 237, 350). After full briefing (*see* Dkt. Nos. 369, 379, 445, 474, 524), oral argument (Dkt. No. 516), and in camera review of the due diligence report, Judge Corley issued an order setting forth detailed findings of fact and concluding that (1) the report is not protected by any attorney-client privilege, (2) Uber waived any work-product privilege over the report, and (3) Waymo has a substantial need for parts of the report such that those parts must be produced even if privileged as work product (Dkt. No. 566).[1]

The factual background of this dispute is summarized in detail in Judge Corley's excellent order and need not be recited here. For present purposes, however, it bears repeating that, in connection with Uber's acquisition of Ottomotto, Morrison and Foerster ("MoFo") and O'Melveny and Myers ("OMM") represented Uber and Ottomotto, respectively. Levandowski individually retained John Gardner as his personal attorney in connection with Stroz Friedberg's due diligence investigation against him (*see id.* at 4). Additionally, Stroz Friedberg's investigation of Lior Ron is at issue because Ron also previously worked at Waymo, co-founded Ottomotto with Levandowski, and participated in the alleged "common interest" or "joint defense" arrangement between defendants and Levandowski.

Uber and Ottomotto (collectively, "Uber") moved for relief from Judge Corley's order pursuant to Civil Local Rule 72 (Dkt. No. 575). Otto Trucking, now represented by separate counsel, also filed its own motion for the same relief (Dkt. No. 572), as did Levandowski (Dkt. No. 574). This order follows full briefing, including replies.

## ANALYSIS

### 1.    STANDARD OF REVIEW.

Under FRCP 72, a district judge considering timely objections to a magistrate judge's nondispositive order must defer to the order unless it is "clearly erroneous or contrary to law."

---

[1]  This dispute actually concerns both the due diligence report and its exhibits. For brevity's sake, unless otherwise specified, this order refers to both collectively as "the due diligence report."

United States District Court

For the Northern District of California

1    *Grimes v. City & Cty. of San Francisco*, 951 F.2d 236, 241 (9th Cir. 1991). "The reviewing

2    court may not simply substitute its judgment for that of the deciding court." *Ibid.* (citing *United*

3    *States v. BNS Inc.*, 858 F.2d 456, 464 (9th Cir. 1988)). This order does not attempt to retread all

4    the factual findings and legal analysis in Judge Corley's order but merely addresses key points

5    raised in the instant motions for relief.[2]

6    **2.    ATTORNEY-CLIENT PRIVILEGE.**

7    **A.    Legal Framework.**

8    The attorney-client privilege protects confidential disclosures made by a client to an

9    attorney in order to obtain legal advice, as well as an attorney's advice in response to such

10   disclosures. Because it impedes full and free discovery of the truth, the attorney-client privilege

11   is strictly construed, and the party asserting the privilege bears the burden of proving each

12   essential element. *United States v. Ruehle*, 583 F.3d 600, 607–08 (9th Cir. 2009) (citations and

13   quotations omitted). The privilege may extend to communications with third parties who have

14   been engaged to assist the attorney in providing legal advice. *United States v. Richey*, 632 F.3d

15   559, 566 (9th Cir. 2011). Voluntary disclosure of the contents of a privileged communication

16   waives the privilege as to all other communications on the same subject. *Ibid.* (citing *Weil v.*

17   *Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981)). There is, however, a

18   "common interest" or "joint defense" exception to ordinary waiver principles where two or

19   more parties "make the communication in pursuit of a joint strategy in accordance with some

20   form of agreement." *See, e.g.*, *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1129 (9th Cir. 2012)

21   (citing *Cont'l Oil Co. v. United States*, 330 F.2d 347, 350 (9th Cir. 1964)).

22   **B.    Uber's Objections.**

23   Judge Corley held that Uber has no attorney-client privilege over the contents of the due

24   diligence report (Dkt. No. 566 at 10–11). Uber objects to her order on the basis that the report

25   "reflects information communicated in confidence to an agent of OMM and MoFo, at the

26   _____

27       [2] The law of our circuit applies to questions of privilege and waiver that do not implicate substantive

28   issues unique to patent law. *See Wi-LAN, Inc. v. Kilpatrick Townsend & Stockton LLP*, 684 F.3d 1364, 1368 (Fed. Cir. 2012); *Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1346 (Fed. Cir. 2005); *In re Pioneer Hi-Bred Int'l, Inc.*, 238 F.3d 1370, 1374 (Fed. Cir. 2001).

United States District Court

For the Northern District of California

direction of OMM and MoFo, for the purpose of obtaining legal advice from OMM and MoFo"
(Dkt. No. 575 at 4–5). Uber's objection conspicuously omits who the "client" seeking to obtain
legal advice is supposed to be in its attorney-client privilege theory. The "information
communicated in confidence" ostensibly refers to interviews given by Levandowski and Ron to
Stroz Friedberg during the course of its due diligence investigation. But Judge Corley correctly
found that "MoFo and OMM were not Levandowski's attorneys" (Dkt. No. 566 at 10). For
example, the engagement letter cited in Uber's motion expressly stated that MoFo and OMM
represented Uber and Ottomotto, respectively (*see* Dkt. No. 370-3). And counsel from MoFo
declared that the purpose of Stroz Friedberg's investigation "was to aid MoFo and OMM in
providing legal advice *to their respective clients*" (Dkt. No. 370 ¶ 9 (emphasis added)).

In other words, Uber's theory is not that Levandowski, *as a client of MoFo and OMM*,
communicated in confidence to Stroz Friedberg so that *he* could obtain legal advice from MoFo
and OMM. Nor is it that the due diligence report reflects any information communicated in
confidence to Stroz Friedberg by *Uber or Ottomotto* for the purpose of obtaining legal advice
from their attorneys. Instead, Uber's carefully-worded objection suggests the remarkable
proposition that information communicated in confidence by *anyone* to Stroz Friedberg for the
purpose of enabling *Uber and Ottomotto* to obtain legal advice from MoFo and OMM should be
covered by the attorney-client privilege. That suggestion has no basis in the law.

Uber further argues that its "common legal interest" and "joint defense privilege" with
Ottomotto, Levandowski, and Ron preserved its attorney-client privilege. But "[t]he joint
defense and common interest doctrines are not privileges in and of themselves. Rather, they
constitute exceptions to the rule on waiver where communications are disclosed to third
parties." *See Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 578 (N.D. Cal. 2007) (Judge
Edward Chen); *see also Pac. Pictures*, 679 F.3d at 1129 ("Rather than a separate privilege, the
'common interest' or 'joint defense' rule is an exception to ordinary waiver rules designed to
allow attorneys for different clients pursuing a common legal strategy to communicate with
each other."). Uber's argument is thus unresponsive to Judge Corley's decision that it had no
attorney-client privilege over the contents of the due diligence report in the first place. Since

United States District Court

For the Northern District of California

1  Uber has not shown that her conclusion is "clearly erroneous or contrary to law," this order

2  need not reach Uber's further argument that it did not waive any attorney-client privilege over

3  the contents of the due diligence report.

4        **C.    Otto Trucking's Objections.**

5        In rejecting Uber's claim of attorney-client privilege over the contents of the due

6  diligence report, Judge Corley relied in part on her finding that "Stroz's interview of

7  Levandowski was performed in Levandowski's individual capacity, and not as an Otto

8  executive" (Dkt. No. 566 at 10). In its motion for relief, Otto Trucking argues for the first time

9  that it has a claim of attorney-client privilege over Levandowski's interview with and

10  disclosures to Stroz Friedberg because OMM represented Otto Trucking, and Stroz Friedberg

11  — acting as OMM's agent — interviewed Levandowski in his capacity as a principal of Otto

12  Trucking (Dkt. No. 572 at 1–2). This argument could have been, but was not, made before

13  Judge Corley in the first instance. This order declines to consider it now.

14        In its reply brief, Otto Trucking claims it presented this argument to Judge Corley by

15  joining in Uber's opposition to Waymo's motion to compel, which "argued that Stroz's report

16  and exhibits were privileged because they 'reflect information provided in confidence to an

17  agent of counsel, at the direction of counsel, for the purpose of obtaining legal advice from

18  OMM and MoFo'" (Dkt. No. 609 at 1 (quoting Dkt. No. 369 at 5)). This is incorrect. Uber's

19  opposition brief never articulated the theory now asserted by Otto Trucking. Indeed, Uber's

20  opposition brief never even once cited *Upjohn Co. v. United States*, 449 U.S. 383 (1981), which

21  forms the legal foundation for Otto Trucking's theory and which Otto Trucking wrongly

22  accuses Judge Corley of ignoring (*see* Dkt. No. 572 at 1). The specific sentence quoted by Otto

23  Trucking simply echoes Uber's carefully-worded objection, rejected above, which studiously

24  avoids anchoring the purported claim of privilege to any specific explanation about the

25  underlying attorney-client relationship. In short, it is uselessly vague boilerplate. It is wholly

26  unreasonable, and most disappointing, for Otto Trucking to suggest that Judge Corley should

27  have surmised from that single sentence that it was asserting attorney-client privilege under

28

*Upjohn* on the basis that Levandowski gave an interview and made disclosures to Stroz Friedberg in his capacity as Otto Trucking's principal.

Like Uber, Otto Trucking also argues that defendants, Levandowski, and Ron shared a "common interest" such that none of them waived any privilege by disclosing information to each other (Dkt. No. 572 at 2–5). Again, Judge Corley determined that no attorney-client privilege covered the contents of the due diligence report in the first place. Like Uber, Otto Trucking has not shown that this determination was "clearly erroneous or contrary to law." This order therefore does not reach Otto Trucking's further argument that a "common interest" protected its attorney-client privilege from waiver.

### D. Levandowski's Objections.

Judge Corley considered and rejected Levandowski's argument that the attorney-client privilege protects his interview with and disclosures to Stroz Friedberg because of a "common interest in preparing for potential litigation against Waymo." Her order explained, "The common interest/joint defense doctrine does not make a document or communication privileged; rather, it is a doctrine that prevents waiver of a pre-existing privilege if the privileged information is shared only with those with a common legal interest." Thus, "[t]hat Otto, Uber, Levandowski and Ron purportedly shared a common legal interest at the time of Levandowski's communications does not make Levandowski's communications with Uber's attorney's agent an attorney-client privileged communication" (Dkt. No. 566 at 11–13).

In his motion, Levandowski describes Judge Corley's order as holding "that the common interest privilege solely protects information that is initially communicated by a party to *his or her own attorney* in an attorney-client privileged manner and only *later* communicated between attorneys engaged in a common interest arrangement" (Dkt. No. 574 at 1). But Judge Corley did not so hold. The portion of her order cited by Levandowski simply observed that Uber and Levandowski had only cited decisions where "the document or communication was protected by the attorney-client privilege before counsel provided it to another party," and that "[t]he circumstances here are different" (Dkt. No. 566 at 12–13). This, in turn, factored into Judge Corley's conclusion that Levandowski had not carried his burden to establish the

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    existence of a valid privilege. Indeed, Judge Corley expressly clarified this exact point in

2    another recent order on a related discovery dispute (*see* Dkt. No. 670 at 2 n.1).

3        Levandowski's argument is unresponsive to a more basic point. As Judge Corley

4    explained, a common interest or joint defense does not create attorney-client privilege where

5    that privilege otherwise does not exist. *See, e.g.*, *Pac. Pictures*, 679 F.3d at 1129 ("Rather than

6    a separate privilege, the 'common interest' or 'joint defense' rule is an exception to ordinary

7    waiver rules designed to allow attorneys for different clients pursuing a common legal strategy

8    to communicate with each other.") Thus, whether Levandowski gave an interview and made

9    disclosures to Stroz Friedberg directly (within the context of a purported "common interest" or

10   "joint defense" arrangement) or through his own attorney, the bottom line is that the interview

11   and disclosures must still, as an initial matter, qualify for the attorney-client privilege.

12       As stated, the attorney-client privilege protects confidential disclosures made by a client

13   to an attorney in order to obtain legal advice, as well as an attorney's advice in response to such

14   disclosures. *Ruehle*, 583 F.3d at 607–08. The decisions cited by Levandowski merely confirm

15   that the "common interest" or "joint defense" exception extends the privilege to protect "not

16   only the confidentiality of communications passing from a party to his or her attorney but also

17   from one party to the attorney for another party where a joint defense effort or strategy has been

18   decided upon and undertaken by the parties and their respective counsel." *See, e.g.*, *United

19   States v. Gonzalez*, 669 F.3d 974, 978 (9th Cir. 2012) (citations omitted). Put differently, those

20   decisions do not purport to water down the elements of attorney-client privilege, in the

21   "common interest" or "joint defense" context or otherwise. On the contrary, the "common

22   interest" or "joint defense" exception requires both that the elements of attorney-client privilege

23   are met *and* that the communication in question "was made for the 'limited and restricted

24   purpose to assist in asserting . . . common claims.'" *See id.* at 977–78 (discussing *Cont'l Oil*);

25   *see also Pac. Pictures*, 679 F.3d at 1129 ("[A] shared desire to see the same outcome in a legal

26   matter is insufficient to bring a communication between two parties within this exception.");

27   *Ruehle*, 583 F.3d at 608–09 (rejecting the proposition that communications made in the course

28   of an attorney-client relationship are presumed privileged).

United States District Court
For the Northern District of California

Significantly, Judge Corley found that "Levandowski was complying with the Term Sheet," which laid out steps for Uber's acquisition of Ottomotto, "rather than seeking OMM's legal advice, when he participated in Stroz's investigation" (Dkt. No. 566 at 8). This finding goes directly to the question of whether, as an initial matter, Levandowski's interview with and disclosures to Stroz even qualify for standard attorney-client privilege. Levandowski objects to Judge Corley's finding, citing his own attorney's declaration for the proposition that he "participated in the investigation in order to evaluate litigation risks and generate litigation strategy" (Dkt. No. 574 at 5 (citing Dkt. No. 381 ¶¶ 3–6, 11)). The cited portions of Attorney Gardner's declaration, however, simply assert that *Attorney Gardner* subjectively believed a "common interest" or "joint defense" exception applied to Stroz Friedberg's investigation, and that he worked with other counsel to prepare for future litigation. The declaration does not support the very different proposition that *Levandowski* gave an interview to Stroz Friedberg for the purpose of seeking legal advice. Even assuming that Judge Corley would have credited the declaration of Levandowski's attorney in this context, that declaration does not show that she clearly erred in finding that Levandowski did not give an interview or make disclosures to Stroz Friedberg for the purpose of seeking legal advice.[3]

In short, because Judge Corley held that Levandowski's interview with and disclosures to Stroz Friedberg did not qualify for attorney-client privilege in the first place, she did not err in further concluding that his interview and disclosures did not become privileged merely by virtue of his participation in a purported "common interest" or "joint defense" arrangement.

### 3. WORK-PRODUCT PRIVILEGE.

#### A. Legal Framework.

The work-product privilege protects from discovery "documents and tangible things prepared by a party or his representative in anticipation of litigation," and "covers documents or the compilation of materials prepared by agents of the attorney in preparation for litigation." *Richey*, 632 F.3d at 567. Where a document was not prepared exclusively for litigation but

---

[3] Judge Corley's factual finding on this point is also fatal to Levandowski's argument, asserted in a footnote to his motion, that "any records provided by [him] to Stroz must likewise be protected from disclosure under the reasoning of *Fisher v. United States*, 425 U.S. 391, 405 (1975)" (Dkt. No. 574 at 3 n.2).

United States District Court

For the Northern District of California

1    serves a "dual purpose," it is protected if, "in light of the nature of the document and the factual

2    situation in the particular case, the document can be fairly said to have been prepared or

3    obtained because of the prospect of litigation." In applying this "because of" standard, courts

4    must consider the totality of the circumstances and determine whether the document "was

5    created because of anticipated litigation, and would not have been created in substantially

6    similar form but for the prospect of litigation." *Id.* at 567–68 (citations and quotations omitted).

7    The work-product privilege is qualified and may be waived. *Hernandez v. Tanninen*, 604 F.3d

8    1095, 1100 (9th Cir. 2010) (quotations and citations omitted). "What constitutes a waiver with

9    respect to work-product materials depends, of course, upon the circumstances." *United States v.*

10   *Nobles*, 422 U.S. 225, 239 n.14 (1975).

11                    **B.    Uber's Objections.**

12        Judge Corley found that Uber waived any work-product privilege it may have had over

13   the contents of the due diligence report by disclosing it to then-adversaries Ottomotto,

14   Levandowski, and Ron, and that no "common interest" prevented such waiver (Dkt. No. 566 at

15   13–22). Uber objects that it did not disclose the due diligence report to an adversary, as

16   required for waiver of work-product privilege, because defendants, Levandowski, and Ron

17   shared a "common interest" in that they all "knew they faced litigation risk from Waymo even

18   prior to the signing of the Put Call Agreement on April 11, 2016," and "irrespective of whether

19   the deal closed" (Dkt. No. 575 at 1–4).

20        Uber cites *In re Grand Jury Subpoena (Mark Torf/Torf Envt'l Mgmt.)*, 357 F.3d 900 (9th

21   Cir. 2004), for the proposition that "***dual purpose documents*** are protected work product if 'it

22   can fairly be said that the document was created because of anticipated litigation, and would not

23   have been created in substantially similar form but for the prospect of that litigation'" (Dkt. No.

24   575 at 2). The citation is correct as far as it goes, but is inapposite to Uber's argument. *In re*

25   *Grand Jury Subpoena* discussed "dual purpose" only within the context of explaining what

26   kinds of documents qualify as work product in the first place. *See* 357 F.3d at 907–08. It did

27   not even mention the issue of waiver, let alone the "common interest" or "joint defense"

28

1    exception to waiver. In short, Uber's argument in reliance on *In re Grand Jury Subpoena*

2    misapplies the "dual purpose" work product analysis and is unavailing.

3         Uber also cites non-binding decisions for the proposition that parties on opposite sides

4    of a transaction are not "adversaries" for purposes of work-product privilege waiver. Judge

5    Corley considered and rejected this proposition. For example, she specifically considered

6    Uber's primary reliance on *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 115 F.R.D. 308 (N.D.

7    Cal. 1987) (Judge Wayne Brazil), which held that disclosure of a privileged opinion letter in

8    connection with the attempted sale of a business did not waive attorney-client privilege. Judge

9    Brazil actually observed, with good reason, that *Hewlett-Packard* presented a "close question"

10   on the waiver issue. Although Uber continues to urge that *Hewlett-Packard* is persuasive

11   authority, numerous subsequent decisions have disagreed with its suggestion that "the common

12   interest privilege extends generally to disclosures made in connection with the prospective

13   purchase of a business." *See Nidec*, 249 F.R.D. at 579 (summarizing decisions). Under the

14   facts of our case, Judge Corley found *Hewlett-Packard* both distinguishable and unpersuasive.

15        Uber also criticizes Judge Corley's reliance on *United States v. Bergonzi*, 216 F.R.D.

16   487 (N.D. Cal. 2003) (Judge Martin Jenkins), because "*Bergonzi* does not stand for the

17   proposition that parties to a potential business transaction are adversaries" (Dkt. No. 575 at 4).

18   This criticism attacks a strawman. Judge Corley cited *Bergonzi* for the very different

19   proposition that two parties have adverse rather than common interests where one party is

20   investigating the other and the results of that investigation threaten adverse consequences (*see*

21   Dkt. No. 566 at 21). The comparison is apt here.

22        It also bears repeating that Judge Corley made extensive factual findings in reaching her

23   conclusion that, under the circumstances of our case, defendants, Levandowski, and Ron had

24   adverse rather than common interests in Stroz Friedberg's investigation, and that Uber therefore

25   waived any work-product privilege it may have had over the due diligence report by disclosing

26   the contents of that report to adversaries. Those factual findings, which need not be repeated

27   here, took into account evidence both in the record and in camera and are not clearly erroneous.

28

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    Uber contends that, at the very least, any work-product privilege it had over the due

2    diligence report remained intact after the signing of the Put Call Agreement on April 11, 2016

3    (Dkt. No. 575 at 2–3).  Uber did not properly raise this argument before Judge Corley in the

4    first instance and cannot now rely on it for the first time to establish work-product privilege

5    over the due diligence report (*see* Dkt. Nos. 566 at 17–18 n.2; 585 at 13 n.12; 670 at 7–8).

6    **C.    Otto Trucking's Objections.**

7    Otto Trucking briefly echoes Uber's arguments that Judge Corley clearly erred in

8    finding a waiver of any work-product privilege that may have covered the due diligence report,

9    and in relying on *Bergonzi* (Dkt. No. 572 at 5).  Otto Trucking's arguments on these points also

10   fail for the reasons stated above.

11   Judge Corley also concluded that, even if the due diligence report constitutes non-

12   waived work product, at least some parts thereof — including Stroz Friedberg's memorandum

13   about its interview of Levandowski — must nevertheless be produced because they constitute

14   ordinary fact work product as opposed to opinion work product (Dkt. No. 566 at 22–23).  Otto

15   Trucking makes a bald assertion, styled as an objection, that Judge Corley erred in her

16   conclusion (Dkt. No. 572 at 5).  This assertion shows no error and merits no further discussion.

17   **D.    Levandowski's Objections.**

18   Judge Corley held that, "even if Otto and Uber shared a common legal interest

19   notwithstanding the lack of any acquisition agreement," Stroz Friedberg's investigation and

20   communications made therein are not privileged because the investigation was not designed to

21   further the common legal effort (Dkt. No. 566 at 15–21).  Again, this conclusion resulted from

22   extensive factual findings, including factual findings based on Judge Corley's in camera review

23   of the due diligence report.  Levandowski styles as an objection his various disagreements with

24   Judge Corley's weighing of the evidence in reaching her factual findings (Dkt. No. 574 at 4–5).

25   The objection is unavailing.  *See, e.g.*, *United States v. Christensen*, 828 F.3d 763, 779 (9th Cir.

26   2015) (explaining that clear error review is deferential, and where there are two permissible

27   views of the evidence, the factfinder's choice between them cannot be clearly erroneous).

28

*First*, Levandowski complains that Judge Corley ignored the "sworn declarations of five attorneys and Stroz's president, each of whom attests that Stroz *was* retained for a litigation purpose." Levandowski is wrong. Judge Corley expressly noted that "[c]ounsel's declarations are . . . not persuasive evidence that Otto and Uber retained Stroz to pursue a common legal strategy," and went on to explain why. For example, she pointed out that "[t]he only objective contemporaneous evidence as to the purpose of the Stroz engagement . . . is omitted from all of the counsel declarations." She therefore decided to "accord[] them little weight" (Dkt. No. 566 at 20). Judge Corley's decision to credit objective evidence in the record over attorney declarations submitted in support of their clients' arguments was not clearly erroneous.

*Second*, Levandowski complains that Judge Corley "disregard[ed] the fact that the attorneys involved in the Stroz investigation efforts and communications were Uber's *litigation* counsel, *not* separate corporate transactional counsel." True, Judge Corley did not explicitly mention this point in her order. Her ultimate conclusion about the purpose of Stroz Friedberg's investigation, however, took into account ample evidence weighing both in favor of and against Levandowski's position. It is well-supported by her factual findings and not clearly erroneous even if her order did not specifically address Levandowski's point about the distinction between Uber's litigation and corporate counsel.

*Third*, Levandowski accuses Judge Corley of incorrectly interpreting the significance of Stroz Friedberg's engagement letter. Levandowski acknowledges, however, that Judge Corley considered the letter and found it unpersuasive for reasons clearly explained in her order. As just one example, Judge Corley found that the engagement letter "was most likely revised on April 11, 2016 and then given the date 'as of March 4, 2016,'" so it is "not evidence of the parties' intent when Stroz began its investigation in early March 2016" (Dkt. No. 566 at 19). Levandowski attempts to gloss over this backdating problem by suggesting that it "merely confirmed an existing oral understanding that was reached no later than March 11, 2016" (Dkt. No. 574 at 4–5). But this argument is nothing more than Levandowski's disagreement with Judge Corley's weighing of the actual evidence. Contrary to Levandowski, Judge Corley's

12

1   decision to not credit Stroz Friedberg's engagement letter as evidence of the parties' prior intent

2   was not clearly erroneous.

3   *Fourth*, Judge Corley found probative the fact that, "on March 14 and March 21,

4   Levandowski's counsel told Stroz that Levandowski shared a common legal interest with Otto,

5   but did not also claim to share a common interest with Uber" (Dkt. No. 566 at 17). Judge

6   Corley construed this omission as supportive of her conclusion that no common interest existed

7   between defendants. According to Levandowski, Judge Corley should have instead inferred

8   that "the Stroz work was done in service of a common interest agreement including

9   Levandowski." Again, despite Levandowski's disagreement, Judge Corley's inferences from

10  the evidentiary record are not clearly erroneous.

11  Levandowski also objects that, by denying his request to file an in camera submission in

12  support of his opposition to Waymo's motion to compel, Judge Corley "deprived [him] of a

13  significant opportunity to support his opposition without waiving his privileges" (Dkt. No. 574

14  at 5 n.3). Levandowski implies, as he did before Judge Corley, that he is somehow entitled to

15  every "significant opportunity" to support his position, even via in camera submissions that

16  would use his privileges as both sword and shield and be patently unfair to Waymo. Judge

17  Corley's refusal to consider such submissions was neither clearly erroneous nor contrary to law.

18  Finally, Levandowski requests additional briefing to challenge Judge Corley's order.

19  The request is **DENIED**. Levandowski, a non-party, has already been afforded ample

20  opportunity to brief the issues raised on Waymo's motion. Judge Corley has already allowed

21  him to intervene and be heard. He has filed and briefed his own motion for relief from her

22  order, subject to the same constraints that are applicable to defendants and Waymo. In addition,

23  he has expressly joined both Uber and Otto Trucking's objections to Judge Corley's order (Dkt.

24  No. 607 at 3). He is entitled to nothing more.

### CONCLUSION

26  For the foregoing reasons, all motions for relief from Judge Corley's order granting

27  Waymo's motion to compel production of Stroz Friedberg's due diligence report are **DENIED**.

28  All stated objections to Judge Corley's order are **OVERRULED**.

**United States District Court**
For the Northern District of California

1   Judge Corley had stayed her order pending resolution of these motions for relief (Dkt.

2   No. 566 at 24).  This order continues that stay until **JUNE 30 AT NOON** to give defendants and

3   Levandowski an opportunity to seek emergency relief from the Federal Circuit.  In light of the

4   pressing need for discovery based on the due diligence report to be provided to meet the agreed-

5   upon trial date of October 10, 2017, any further stay must be requested from the Federal Circuit.

6   On appeal, counsel are urged to be fair and accurate in reciting what was or was not

7   argued before Judge Corley.  The due diligence report submitted for Judge Corley's in camera

8   review shall be preserved for the Federal Circuit.

10   **IT IS SO ORDERED.**

12   Dated:  June 21, 2017.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

14

# EXHIBIT 19

MILES EHRLICH (Bar No. 237954)
miles@ramsey-ehrlich.com
ISMAIL RAMSEY (Bar No. 189820)
izzy@ramsey-ehrlich.com
AMY CRAIG (Bar No. 269339)
amy@ramsey-ehrlich.com
RAMSEY & EHRLICH LLP
803 Hearst Avenue
Berkeley, CA 94710
(510) 548-3600 (Tel)
(510) 291-3060 (Fax)

Attorneys for Non-Party Anthony Levandowski

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC, | Case No.: 3:17-cv-00939-WHA |
| Plaintiff, | |
| v. | **ANTHONY LEVANDOWSKI'S NOTICE OF APPEAL** |
| UBER TECHNOLOGIES, INC., *et al.*, | |
| Defendants. | |

Notice is hereby given that Anthony Levandowski, intervenor in the above-captioned case, appeals to the United States Court of Appeals for the Federal Circuit from the district court's order denying Mr. Levandowski's motion for relief from nondispositive pretrial order of the magistrate judge entered in this action on June 21, 2017. (Dkt. No. 685).

Date:     June 23, 2017                          Respectfully submitted,


/s/
Miles Ehrlich
Ismail Ramsey
Amy Craig
Ramsey & Ehrlich LLP
803 Hearst Avenue
Berkeley, CA 94710
Tel: (510) 548-3600
Fax: (510) 291-3060

miles@ramsey-ehrlich.com
izzy@ramsey-ehrlich.com
amy@ramsey-ehrlich.com

**_Counsel for Intervenor Anthony Levandowski_**

ANTHONY LEVANDOWSKI'S NOTICE OF APPEAL
Case No.: 3:17-cv-00939-WHA

# EXHIBIT 20

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WAYMO LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>UBER TECHNOLOGIES, INC., et al.,<br><br>        Defendants. | Case No. 17-cv-00939-WHA  (JSC)<br><br>**ORDER RE: UBER PRIVILEGE LOG**<br><br>Re: Dkt. Nos. 634, 637 |

Waymo accuses Uber of misappropriation of Waymo's driverless vehicle trade secrets. The district court ordered Uber to produce all files and documents downloaded by then-Uber employee Anthony Levandowski and others before they left Waymo's employ, as well "all subsequent emails, memoranda, PowerPoints, text messages, or notes that have been forwarded, used, or referred to any part of said downloaded material." (Dkt. No. 61 ¶ 4.) In response, Uber produced a privilege log with more than 3400 entries. According to Uber, "[w]here a privileged document 'referred' to Google [Waymo] information (whether actual or potential thereof) or material that one of the three employees may have had in their possession, it was identified on the log." (Dkt. No. 657-3 at 2.) Since the log was originally produced, it has been amended with some of the originally logged documents produced. Most recently, in response to this Court's Order directing Uber to produce the Stroz Report (Dkt. No. 566), it has identified log entries that it will have to produce if the Court's Motion to Compel Order ("MTC Order") becomes final. Waymo contends that the remaining logged documents should be ordered produced as well. As explained at oral argument, the Court declines to order additional production of the logged documents. This Order briefly summarizes the Court's reasoning, and incorporates its two previous orders on privilege issues. (Dkt. Nos. 566, 670.)

### A. MoFo/Uber Communications

Over 1000 of the logged entries involve communications between Uber and its attorneys at MoFo and/ Cooley and no one else. Waymo does not dispute that these communications are as an initial matter protected by the attorney-client and attorney work-product privileges; instead, it argues that the crime-fraud exception to the privileges requires their production.

#### 1. The Crime/Fraud Exception does not Apply

A party seeking disclosure of attorney-client communications or attorney work product under the crime-fraud exception must show by a "preponderance of the evidence" that a two-part test is satisfied. First, that the "the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel." Second, the attorney-client communications for which production is sought are "sufficiently related to" and were made "in furtherance of [the] intended, or present, continuing illegality." *In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1090 (9th Cir. 2007) (emphasis in original), abrogated on other grounds by *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009).

Waymo contends (1) Uber was engaged in or planning the crime of receipt of Waymo's stolen property; and (2) that its communications with MoFo were in furtherance of that scheme. It cites the evidence that Levandowski took 14,000 of Waymo's files and that Uber knew that Levandowski took some material as evidence that satisfies its burden. The Court is not persuaded. That Uber knew Levandowski took some of Waymo's files is not a showing by a preponderance of the evidence that Uber retained MoFo in January/February 2016 to assist it with the crime of receiving stolen property. Further, based on the Court's review of the entire record in this case, including the *in camera* Stroz Report, the Court found that Uber retained MoFo to conduct an investigation into Levandowski and Otto and to create an evidentiary record that would govern Uber's obligation to indemnify Levandowski and Otto in any lawsuit brought by Waymo. The Court does not find that Uber retained MoFo to assist with obtaining Waymo's trade secrets. That in the course of that investigation MoFo received documents that may be Waymo's trade secrets, does not mean that Waymo has shown by a preponderance of the evidence that Uber's and MoFo's communications were made in furtherance of a criminal scheme. Evidence developed

later may show otherwise, but that is the state of the record at this time. Further, Waymo has not established that the crime/fraud exception applies to an attorney's purported violation of an ethical rule.

Waymo's request for expedited crime/fraud discovery is denied. The Court notes that Waymo did not seek to satisfy the lower standard for *in camera* review of the documents. *See Roe v. White*, 2014 WL 842790 *3 (N.D. Cal. Feb. 28, 2014).

### 2. Fact Work Product

As previously held, in light of Levandowski's refusal to answer questions or produce documents on the basis of his Fifth Amendment privilege, Waymo has demonstrated a substantial need for fact work product reciting Levandowski's statements or attaching documents/materials found on Levandowski's devices or that Levandowski otherwise provided Stroz. (Dkt. No. 566 at 22-23.) To the extent any such work product is attached to a communication shared only among Uber/MoFo/Cooley, that work product must be produced. For example, if an email attaches material that Levandowski provided Stroz, the attached material must be produced. Doing so will not reveal opinion work product as any email or discussion of the material or even the context of the communication will not be disclosed: the only disclosure is the material found on Levandowski's devices or otherwise provided by Uber. Uber does not have to produce this fact work product unless and until the MTC Order becomes final. In the meantime, however, the privilege log must be amended to reflect any such possible fact work product consistent with the Court's MTC Order. So long as it is arguably fact work product, the privilege log must reflect this possibility. The log must be amended to reflect this fact work product attached to or part of an Uber/MoFo or Cooley communication by **June 30, 2017.**

### B. Post Put Call Agreement Log Entries

The Court's MTC Order found that Uber had waived any attorney work-product protection for documents shared with Otto, Levandowski or Ron, at least before the Put Call Agreement was signed. (Dkt. No. 566 at 17 n.2, 21.) Waymo argues that Uber also waived the attorney-client privilege and work-product privilege for documents shared after the Put Call Agreement was signed but before Uber's acquisition of Otto closed on August 23, 2016. The Court disagrees.

United States District Court
Northern District of California

Once Uber and Otto signed the Put Call Agreement, Uber was no longer investigating Otto and its employees to determine whether to enter into the Agreement; rather, upon execution of the Agreement Uber was required to indemnify Levandowski, Ron and Otto even if neither Uber nor Otto ever exercised its option to buy/sell. Sharing confidential information with a party one is required to indemnify is not inconsistent with the adversary system, provided the information concerns the subject matter of the indemnification right as it does here. *See Great Am. Assur. Co. v. Liberty Surplus Ins. Corp.*, 669 F. Supp. 2d 1084, 1092 (N.D. Cal. 2009) (holding that waiver of attorney work-product requires disclosure of confidential information in a manner that is inconsistent with the adversary system).

Waymo insists that following the signing of the Put Call Agreement Otto, Levandowski and Ron still did not share a "common interest." Such an argument, however, is relevant to waiver of attorney-client privileged material, not attorney work-product. *See id.* In any event, to the extent any post Put Call Agreement log entries contain only attorney-client privileged information, and not also attorney work-product, the common interest doctrine applies. At the time Otto and Uber executed the Put Call Agreement, Otto, Uber, Levandowski, Ron and Otto Trucking executed the "Joint Defense, Common Interest and Confidentiality Agreement." (Dkt. No. 266 at 5.) With the indemnification obligation, they all shared a joint common legal interest in defending claims brought by Waymo for misappropriation of trade secrets, among other things. As the Court previously found, until this indemnification obligation arose, and until Uber and Otto had exclusive options to make the acquisition happen, they did not share a common legal interest. (Dkt. No. 566 at 14-21.) But once the indemnification obligation arose, they shared a common legal interest in defending claims brought by Waymo. Waymo's arguments to the contrary are not persuasive.

### C.    Privilege Log Entry Issues

As the Court noted at oral argument, there is ambiguity as to some of the documents Uber has logged as only being shared among Uber and MoFo. For example, entry 59 is a questionnaire regarding information obtained by Levandowski that is logged as only having been shared among MoFo and Uber and thus is identified as "privileged," even if the Court's MTC Order becomes

United States District Court
Northern District of California

United States District Court
Northern District of California

final.  Entry 107 is the same questionnaire, again identified as shared only among MoFo and Uber, but this time is marked as "Produce-in-Part."  Uber explains that this version of the questionnaire was subsequently circulated to the "joint defense team" and thus if the Court's MTC Order is affirmed, will have to be produced in full.  (Dkt. No. 659 ¶ 17.)  At oral argument, however, Uber was unable to explain why entry 107 did not reflect that it had been shared with the joint defense team.  It also did not explain why the log says "produce-in-part" but its declaration to this Court says it will be produced in full.

Further, for many of the entries for whom the authors, senders and recipients are all MoFo/Uber the log reflects that the document is being withheld pursuant to attorney-client, attorney work-product, and confidential interest privileges.  As the confidential interest privilege is a non-waiver doctrine that applies when a document is shared with a third party, designating the document as "confidential interest" does not make sense.  At oral argument Uber explained that it so designated a document if another version of the document had been shared with the joint defense group and that such version would be produced.  This explanation still does not makes sense.

Uber must again review and amend the log.  The first step is to carefully review every entry through April 11, 2016.  If a document was shared with anyone from the joint defense group, and thus discoverable under the Court's MTC Order, the log entry must reflect with whom the document was shared and identify it as a document to be produced.  Further, if a document was not shared among the joint defense group, then it should not be designated as "confidential information" and the log must be so amended.   Further, Uber's log must explain why it is noting a document as "produce in part" rather than "produce in full."  Uber's amended log must be produced to Waymo **by June 30, 2017**.  To the extent Waymo has questions regarding the amended log, the parties shall attempt to resolve the issues among themselves and, failing that, with the benefit of the Special Master. Uber must produce the compelled documents if and as soon as the District Court's Order (Dkt. No. 685) is no longer stayed.  This means any issues regarding whether a document will be produced in full or in part, whatever that means, must be resolved in advance, to the extent possible.

While the above discussion shows there are deficiencies with the current log, the Court does not find them so egregious that Uber should have to produce otherwise protected material, especially given the volume of log entries and the brief period Uber had to reevaluate the privilege log in light of the MTC Order.

**D.    Documents Required for *In Camera* Review**

As stated at oral argument, Uber shall produce to Judge Alsup for his *in camera* review any Stroz protocols other than the one previously produced. This production shall occur by **Wednesday, June 28, 2017**.

Also, at oral argument Uber represented that the Put Call Agreement was signed late in the day on April 11, 2016. Yet some of the April 11, 2016 entries are designated as "privileged" following the Court's MTC Order even when they show on their face that they were shared with Levandowski or Ron. *See, e.g.,* No. 1102, 1103, 1106. Accordingly, Uber is directed to provide to the Court for *in camera* review all of the documents logged on April 11, 2016 that were shared with or authored by a party other than Uber/MoFo/Cooley. Before it provides the documents, it should review all of the entries to determine if they correctly identify with whom the document was shared in light of the concern as to entry No. 107 discussed above. These documents must be provided to the Court for *in camera* review by **June 28, 2017** so the Court can confirm whether they have been properly designated**.**

Any objections to this Order shall be filed with the District Court on or before **June 29, 2017.** This Order disposes of docket nos. 634 and 637.

**IT IS SO ORDERED.**

Dated: June 26, 2017

JACQUELINE SCOTT CORLEY
United States Magistrate Judge