# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

_____

## WAYMO LLC,
*Plaintiff-Appellee,*

*v.*

## UBER TECHNOLOGIES, INC., OTTOMOTTO LLC, OTTO TRUCKING LLC,
*Defendants,*

## ANTHONY LEVANDOWSKI,
*Defendant-Appellant.*

_____

2017-2235, -2253

_____

Appeal from the United States District Court for the
Northern District of California in Case No. 3:17-cv-00939
Judge William H. Alsup

_____

## OPENING BRIEF OF INTERVENOR-APPELLANT ANTHONY LEVANDOWSKI, OR IN THE ALTERNATIVE, PETITION FOR WRIT OF MANDAMUS

Ismail J. Ramsey
Miles Ehrlich
Amy Craig
RAMSEY & EHRLICH LLP
803 Hearst Avenue
Berkeley, CA  94710
Phone: (510) 548-3600

July 6, 2017

## **CERTIFICATE OF INTEREST**

Pursuant to Federal Circuit Rule 47.4, counsel of record for Intervenor-Appellant Anthony Levandowski certifies as follows:

1.      The full name of every party represented by our firm is: Anthony Levandowski.

2.      The names of the real parties in interest represented by our firm are: *Not applicable*.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties represented by our firm are: *Not applicable*.

4.      The names of all law firms and the partners or associates that appeared for the parties represented by us in the trial court, or are expected to appear in this Court, and who have not or will not enter an appearance in this case are:

        *Not applicable*.

Dated:  July 6, 2017                    Respectfully submitted,

                                        */s/ Ismail Ramsey*
                                        Miles Ehrlich
                                        Ismail Ramsey
                                        Amy Craig
                                        Ramsey & Ehrlich LLP
                                        803 Hearst Avenue
                                        Berkeley, CA 94710
                                        Tel: (510) 548-3600

                                        ***Counsel for Anthony Levandowski***

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTEREST ................................................................. ii

TABLE OF CONTENTS .......................................................................... iii

TABLE OF AUTHORITIES ......................................................................v

JURISDICTIONAL STATEMENT .......................................................... 1

INTRODUCTION ....................................................................................3

RELIEF SOUGHT ....................................................................................8

ISSUES PRESENTED...............................................................................8

STATEMENT OF THE CASE...................................................................9

   I.   Factual Background ........................................................................9

   II.  Procedural History .......................................................................14

      A.   The Order for Disclosure of the Stroz Report...........................14

      B.   The Order for Production of the Stroz Materials .....................17

      C.   Review in this Court....................................................................18

SUMMARY OF ARGUMENT .................................................................19

STANDARD OF REVIEW .......................................................................22

ARGUMENT ...........................................................................................23

   I.   THE DISTRICT COURT ERRED IN CONSIDERING THE
       APPLICATION OF THE COMMON INTEREST PRIVILEGE.................23

     A.   The Common Interest Privilege Protects Communications Between
        Parties with Common Interests In Litigation. ..........................24

     B.   The Common Interest Privilege May Apply When the Parties Are
        Considering Entering an Acquisition Agreement. ...................26

       1.   The Common Interest Privilege Protects Confidential Communications
          Within a Joint-Defense Group Even When the Parties are Adverse in
          Some Respects .......................................................................28

       2.   Uber, Ottomotto, and Levandowski Had A Common Legal Interest In
          Preparing For And Defending Against Waymo's Anticipated Suit. ....32

C.    Stroz Was Engaged To Further Uber, Ottomotto, and Levandowski's Interest In Preparing For And Defending Against Waymo's Anticipated Suit ....................................................................................................35

    1.    The Common Interest Privilege Applies Where Communications Served Both Litigation and Non-Litigation Purposes. ........................36

    2.    Stroz's Investigation Had a Litigation Purpose. ...................................39

II.   THERE WAS NO WAIVER OF THE WORK-PRODUCT PRIVILEGE. .................................................................................................47

III.  THE DISTRICT COURT ERRED IN REJECTING LEVANDOWSKI'S CLAIM OF PRIVILEGE UNDER *COUCH V. UNITED STATES* ..............49

IV. AT A MINIMUM, THE ORDER REGARDING THE STROZ SUBPOENA MUST BE REMANDED FOR FURTHER PROCEEDINGS BECAUSE THE DISTRICT COURT INAPPROPRIATELY DEFERRED TO THE MAGISTRATE JUDGE'S RULING ...........................................................53

V.   THIS CASE SATISFIES THE STANDARD FOR MANDAMUS RELIEF .........................................................................................................55

CONCLUSION ................................................................................................58

STATEMENT OF COMPLIANCE WITH FED. R. APP. PRO. 27 ......................59

STATEMENT OF RELATED CASES ...............................................................610

CERTIFICATE OF SERVICE ...........................................................................61

# TABLE OF AUTHORITIES

**Page**

## Cases

*Agster v. Maricopa Co.*,
422 F.3d 836 (9th Cir. 2005) ................................................................56

*Britesmile, Inc. v. Discus Dental Inc.*,
No. 02-cv-3220, 2004 U.S. Dist. LEXIS 20023 (N.D. Cal. Aug. 10, 2004)...........32

*Callwave Communications, LLC v. Wavemarket, Inc.*,
No. 14-cv-80112, 2015 U.S. Dist. LEXIS 22374 (N.D. Cal. Feb. 23, 2015)..........29

*Cheney v. United States District Court*,
542 U.S. 367 (2004) ...................................................................3

*Church of Scientology v. United States*,
506 U.S. 9 (1992) .....................................................................2

*Continental Oil Co. v. United States*,
330 F.2d 347 (9th Cir.1964) ..........................................................25

*Couch v. United States*,
409 U.S. 322 (1973) ..............................................................7, 50

*Doe v. United States (In re Grand Jury Subpoena)*,
383 F.3d 905 (9th Cir. 2004) ..........................................................5

*Ellis v. J.P. Morgan Chase & Co.*,
2014 U.S. Dist. LEXIS 45681 (N.D. Cal. Apr. 1, 2014) .......................................48

*FastVDO LLC v. AT&T Mobility LLC*,
No. 16-cv-385, 2016 U.S. Dist. LEXIS 146373 (S.D. Cal. Oct. 21, 2016).............31

*Fisher v. United States*,
425 U.S. 391 (1976) ............................................................ passim

*Henderson v. United States*,
135 S. Ct. 1780 (2015) ...............................................................52

v

*Hernandez v. Tanninen*,
604 F.3d 1095 (9th Cir. 2010) ................................................................57

*Hewlett-Packard Co. v. Bausch & Lomb, Inc.*,
115 F.R.D. 308 (N.D. Cal. 1987)..................................................... 21, 24

*Holmes v. Collection Bureau of America, Ltd.*,
No. 09-cv-2540, 2010 U.S. Dist. LEXIS 4253 (N.D. Cal. Jan. 8, 2010) ...............25

*Hunydee v. United States*,
355 F.2d 183 (9th Cir.1965) ................................................................25

*In re CV Therapeutics, Inc. Sec. Litig.*,
2006 U.S. Dist. LEXIS 41568 (N.D. Cal. June 16, 2006)......................................37

*In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)*,
357 F.3d 900 (9th Cir. 2003) ..................................................... 21, 37, 52

*In re Grand Jury Subpoenas*,
902 F.2d 244 (4th Cir.1990) ................................................................25

*In re Katz*,
623 F.2d 122 (2nd Cir. 1980)................................................................55

*In re MSTG, Inc.*,
675 F.3d 1337 (Fed. Cir. 2012)...................................................................3

*In re Optical Disk Drive Antitr. Litig.*,
801 F.3d 1072 (9th Cir. 2015) ................................................................2

*In re Regents of the University of California*,
101 F.3d 1386 (Fed. Cir. 1996)................................................... passim

*Lectrolarm Custom Systems, Inc. v. Pelco Sales, Inc.*,
212 F.R.D. 567 (E.D. Cal. 2002) ............................................................29

*Mohawk Industries, Inc. v. Carpenter*,
558 U.S. 100 (2009)......................................................................2, 57

*Montgomery Ward & Co. v. Zenith Radio Corp.*,
69 C.C.P.A. 96 (1982) ..........................................................................2

*Morvil Technology, LLC v. Ablation Frontiers, Inc.*,
No. 10-cv-2088, 2012 U.S. Dist. LEXIS 30815 (S.D. Cal. March 8, 2012)..........31

*Nidec Corp. v. Victor Co. of Japan*,
249 F.R.D. 575 (N.D. Cal. 2007)...........................................................................35

*North Pacifica, LLC v. City of Pacifica*,
274 F. Supp. 2d 1118 (N.D. Cal. 2003) ......................................................... 21, 38

*Owens v. Office of the Dist. Att'y*,
896 F. Supp. 2d 1003 (D. Colo. 2012)....................................................................57

*Pacemaker Diagnostic Clinic of Am., Inc. v. Instromedix, Inc.*,
725 F.2d 537 (9th Cir. 1984) ..................................................................................54

*Peretz v. United States*,
501 U.S. 923 (1991)................................................................................................54

*Perlman v. United States*,
247 U.S. 7 (1918)......................................................................................................2

*Perry v. Schwarzenegger*,
591 F.3d 1126 (9th Cir. 2010) ...............................................................................23

*Rayman v. American Charter Federal Savings & Loan Association*,
148 F.R.D. 647 (D. Neb. 1993)...............................................................................30

*Rembrandt Patent Innovations, LLC v. Apple Inc.*,
No. 14-cv-05094, 2016 U.S. Dist. LEXIS 13749 (N.D. Cal. Feb. 4, 2016)...........31

*United States v. Am. Tel. & Tel. Co.*,
642 F.2d 1285 (D.C. Cir. 1980)..............................................................................48

*United States v. Austin*,
416 F.3d 1016 (9th Cir. 2005) ...............................................................................47

*United States v. Bauer*,
132 F.3d 504 (9th Cir. 1997) ..................................................................................23

*United States v. Bergonzi*,
216 F.R.D. 487 (N.D. Cal. 2003)............................................................................49

*United States v. Deloitte LLP*,
610 F.3d 129 (D.C. Cir. 2010) ................................................................49

*United States v. Henke*,
222 F.3d 633 (9th Cir. 2000) ......................................................... 26, 47

*United States v. Hubbell*,
530 U.S. 27 (2000) ........................................................................5, 51

*United States v. Krane*,
625 F.3d 568 (9th Cir. 2010) ...................................................................2

*United States v. McPartlin*,
595 F.2d 1321 (7th Cir. 1979) ................................................................26

*United States v. Rivera-Guerrero*,
377 F.3d 1064 (9th Cir. 2004) ....................................................... 22, 53

*United States v. Ruehle*,
583 F.3d 600 (9th Cir. 2009) .................................................................23

*United States v. Schwimmer*,
892 F.2d 237 (2d Cir. 1989)........................................................... 26, 47

*United States v. Sideman & Bancroft, LLP*,
704 F.3d 1197 (9th Cir. 2013) ...............................................................54

*Velsicol Chemical Corp. v. Parsons*,
561 F.2d 671 (7th Cir. 1977) ...................................................................2

*Visa U.S.A., Inc. v. First Data Corp.*,
2004 U.S. Dist. LEXIS 17117 (N.D. Cal. Aug. 23, 2004) ......................37

*Wi-LAN, Inc. v. LG Elecs., Inc.*,
684 F.3d 1364 (Fed Cir. 2012)...............................................................23

*Zenith Elecs. Corp. v. Exzec, Inc.*,
182 F.3d 1340 (Fed. Cir. 1999)................................................................1

## **Statutes**

18 U.S.C. § 1832........................................................................................50

28 U.S.C. § 1291..........................................................................................1

28 U.S.C. § 1295(a)(1)..................................................................................1

28 U.S.C. § 1651(a) .....................................................................................3

28 U.S.C. § 636..........................................................................................53

# JURISDICTIONAL STATEMENT

On June 26, 2017, Intervenor Anthony Levandowski filed a notice of appeal seeking review of the district court's order concerning Appellee Waymo LLC's ("Waymo") demand to the party defendants in this matter for disclosure of certain materials related to an investigation that was directed by litigation counsel and conducted by the consulting firm Stroz Friedberg, LLC ("Stroz"), a non-party. ~~Ex. 19.~~ That appeal was docketed in this Court as case number 17-2235.  On June 29, 2017, Levandowski filed a second notice of appeal, seeking review of a separate order from the district court concerning a third-party subpoena to Stroz demanding disclosure of the same report, along with a broader set of communications, documents, and devices.  That appeal was docketed in this Court as case number 17-2253.  This Court consolidated the two appeals.  Venue for both appeals lies in this Court pursuant to 28 U.S.C. § 1295(a)(1) because Waymo's complaint includes claims of patent infringement.  *See* Dkt. 23;[1] *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1346 (Fed. Cir. 1999).

The order relating to Waymo's subpoena to Stroz qualifies as a "final order" subject to appellate review under 28 U.S.C. § 1291.  Although a court of appeals typically lacks jurisdiction to hear an interlocutory appeal *by a party* to a civil

---

[1] References to the Northern District of California docket in *Waymo LLC v. Uber Technologies, Inc.* et al., No. 17-cv-00393-WHA (N.D. Cal.) are designated "Dkt." References to the Federal Circuit docket in this matter are designated with the case number preceding the docket number, i.e., "17-2253, Dkt. __."

matter who is ordered to produce records over an objection that the records are privileged, *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100, 107-14 (2009), that rule does not apply where, as in this case, the order requiring production of information is directed to a disinterested third-party—not the privilege holder, *United States v. Krane*, 625 F.3d 568, 573 (9th Cir. 2010); *see also Church of Scientology v. United States*, 506 U.S. 9, 18 n.11 (1992); *Perlman v. United States*, 247 U.S. 7 (1918); *Montgomery Ward & Co. v. Zenith Radio Corp.*, 69 C.C.P.A. 96, 103 (1982).

Instead, under the so-called *Perlman* doctrine, a third-party privilege holder may immediately appeal an order compelling a disinterested third party to produce privileged materials. *See In re Optical Disk Drive Antitr. Litig.*, 801 F.3d 1072, 1076 (9th Cir. 2015); *Krane*, 625 F.3d at 573 ("The *Perlman* doctrine has been applied to situations like this one where a third party . . . must rely on another third party . . . to protect his interests in the discovery process."); *c.f. Velsicol Chemical Corp. v. Parsons*, 561 F.2d 671, 674 (7th Cir. 1977) ("Basically the rationale behind the *Perlman* exception is that the second party (appealing party), who has not received the order or subpoena, should not be expected to rely on the recipient to risk contempt in order to exercise the intervenor-second party's rights."). In this case, Stroz is a disinterested third party. So Levandowski—the privilege holder— may immediately appeal any order compelling Stroz to produce privileged

2

documents.[2]  Should the Court conclude, however, that it does not have appellate

jurisdiction, we request that the Court construe this brief as a petition for a writ of

mandamus and agree to hear the matter.

As for the order compelling disclosure from the party defendants,

Levandowski petitions for a writ of mandamus, which this Court has jurisdiction to

grant.  *See* 28 U.S.C. § 1651(a); *Cheney v. United States District Court*, 542 U.S.

367, 380-81 (2004); *In re MSTG, Inc.*, 675 F.3d 1337, 1341 (Fed. Cir. 2012); *In re*

*Regents of the University of California*, 101 F.3d 1386, 1387 (Fed. Cir. 1996).

## INTRODUCTION

As part of two separate but interrelated discovery proceedings, the district

court erroneously ordered the disclosure of materials and records that are protected

by Levandowski's attorney-client, common interest, and attorney work product

privileges, as well as his Fifth Amendment right against the compelled act of

production.  These orders should therefore be reversed, whether on appeal or on

mandamus, because the court clearly misapplied multiple established principles of

---

[2] In its stay opposition, Waymo erroneously asserted that the *Perlman* doctrine
applies only in criminal cases.  17-2235, Dkt. 8 at 9.  But the case Waymo has
cited for that proposition holds only that a *party* to an ongoing civil matter—as
opposed to a third party like Levandowski—may not invoke the *Perlman*
exception.  *In re Nat'l Mortg. Equity Corp. Mortg. Pool Certificates Litig.*, 857
F.2d 1238, 1239-40 (9th Cir. 1988).  The Ninth Circuit has applied the doctrine in
civil cases where the privilege holder is a third party.  *See In re Optical Disk Drive
Antitr. Litig.*, 801 F.3d at 1076; *see also Ross v. City of Memphis*, 423 F.3d 596,
599-600 (6th Cir. 2005); *Montgomery Ward*, 69 C.C.P.A. at 103.

privilege law.

Waymo filed the underlying civil suit against Uber Technologies, Inc. ("Uber") and other defendants. Waymo did not name Levandowski as a defendant, but its complaint focuses on the period after Levandowski and Lior Ron—both former Google employees who worked on Google's driverless vehicle project— left Google to found Ottomotto LLC and Otto Trucking LLC (collectively, the "Otto" entities). Uber later acquired Ottomotto, and Levandowski and Mr. Ron joined Uber. *See generally Waymo LLC v. Uber Technologies, Inc.* et al., No. 17-cv-00393-WHA (N.D. Cal.) Dkt. 23.[3]

In February 2016, Uber and Ottomotto signed a "term sheet" stating their intent to enter into the acquisition deal. Once the term sheet was signed, the parties began bracing themselves for potential litigation with Google. The parties, including Levandowski, formed a common interest agreement—at first, the agreement was oral, but it was later memorialized in formal writings—to prepare for that potential litigation. As part of the common interest effort, Uber and Ottomotto hired an outside consultant, Stroz, to conduct an investigation to establish the underlying facts that, among other things, would allow their litigation counsel to render legal advice about anticipated litigation. The Stroz investigation

---

[3] In December 2016, after the acquisition deal at issue in the underlying lawsuit, Google's driverless vehicle project was spun off to become Waymo. Waymo is therefore the plaintiff-appellee in this lawsuit.

included interviews of Levandowski and other former Google employees and a forensic examination of materials provided by those individuals. Stroz then created a report, which was intended by litigation counsel to help the lawyers understand the relevant facts and to develop defense strategies in the event that Google sued them after the acquisition.

In its lawsuit against Uber, Waymo employed two separate mechanisms to obtain information about the Stroz investigation:

*First*, Waymo demanded production of Stroz's report from the party defendants; and

*Second,* Waymo propounded a subpoena directly to Stroz seeking materials related to Stroz's work for the common interest group, including any materials Levandowski had provided for Stroz to examine.

Levandowski intervened in each of these discovery matters to object that the records were protected by his common interest, attorney-client, and attorney work product privileges. Levandowski also argued that some of the discovery requests sought materials that—if they existed—would be protected from disclosure by his Fifth Amendment act of production privilege under *Fisher v. United States*, 425 U.S. 391, 410 (1976). *See also United States v. Hubbell,* 530 U.S. 27, 35-36 (2000)*; Doe v. United States (In re Grand Jury Subpoena),* 383 F.3d 905, 909 (9th Cir. 2004).

The district court referred the discovery disputes to Magistrate Judge Jacqueline Corley, who overruled all of Levandowski's privilege claims.

Deferring broadly to the magistrate judge's legal and factual findings, the district judge affirmed the magistrate's orders. For the reasons set forth below, however, the legal and factual bases of both orders were deeply flawed.

*First*, the district and magistrate judges both assumed mistakenly that a common interest privilege can only arise when parties have a legally enforceable (and non-contingent) arrangement that binds them to a common interest. The courts below held, as a matter of law, that parties cannot have a sufficient commonality of legal interest whenever one party to a proposed acquisition can still "walk away" from the deal without liability for breach. But this is not the law. Under longstanding precedent, the common interest privilege applies when, as here, parties enter into an arrangement that aligns their interests and creates the *potential* for such a binding relationship in the future. Even when parties remain free to back out of a proposed transaction (or leave their option unexercised), such parties can still share a common legal objective that is sufficient for purposes of the common interest privilege because of the foreseeable future obligations they would owe to one another should the transaction be concluded.

*Second*, the district court erroneously held that the common interest privilege did not apply because the communications here were made in connection with transactional due diligence, which is a business purpose. But contrary to the assumption driving the decisions below, it is well-established that the common

interest privilege is not defeated merely because certain communications may serve *both* a litigation purpose and some non-litigation purpose.   And the communications here plainly served a litigation purpose: the record evidence conclusively demonstrates that the parties (a) had a common legal interest in assessing and defending against potential litigation; (b) agreed—first orally and then in writing—to jointly pursue that interest; and (c) communicated with Stroz as part of their joint efforts to pursue this common legal interest.   The district court improperly disregarded this litigation purpose

*Third,* the district court erroneously held that the parties had waived any work-product protection by disclosing the documents to "adversaries," *i.e.*, other members of the common interest group.  But even if the common interest privilege does not apply, parties negotiating a business transaction certainly do not qualify as litigation *adversaries.*

*Fourth,* even aside from the question whether there was a valid common interest privilege, the district court failed to recognize that Levandowski had a valid Fifth Amendment privilege over the materials in Stroz's possession pursuant to *Couch v. United States*, 409 U.S. 322 (1973), given that he retained clear constructive possession of any materials he produced for Stroz to review.

*Fifth*, the district court erroneously deferred to the magistrate judge.  The constitutional issue at stake required the district court to exercise de novo review,

but the court failed to carry out the necessary review of the magistrate judge's resolution of Levandowski's assertion of his Fifth Amendment privilege under *Fisher*.

## RELIEF SOUGHT

Levandowski asks that the Court reverse the district court's two discovery orders related to Stroz and the associated materials.  Insofar as the Court treats this brief as a mandamus petition, Levandowski respectfully requests that this Court issue a writ of mandamus to the United States District Court for the Northern District of California and order that the documents and other materials Waymo seeks in discovery are protected by the attorney-client, common-interest, work-product, and Fifth Amendment privileges.

## ISSUES PRESENTED

Uncontradicted evidence in the record establishes that Uber, Ottomotto, Levandowski, and Ron all entered into a joint-defense and common-interest agreement to jointly assess and prepare for anticipated litigation from Waymo (Google) in the event that Uber completed its acquisition of the Otto entities. Thus, as pertinent to the discovery demands at issue here:

1. Were Levandowski, Uber, and Ottomotto capable of forming a common legal interest in preparing for this litigation before they undertook formal, binding obligations to carry out a business transaction—or, instead, are

parties still negotiating the terms of a commercial transaction *never* in a position to share a common legal interest sufficient to support the common interest privilege?

2. Did the common interest group hire Stroz to examine the facts underlying Google/Waymo's potential litigation in order to further their *common legal interests*—even if there was also a business purpose for the Stroz investigation?

3. Were any of the parties' privileges in Stroz's work product and/or communications with Stroz waived because that work product and those communications were shared within the common interest group?

4. Even if the materials in Stroz's possession are not covered by a valid common interest privilege, does Levandowski nevertheless have a valid Fifth Amendment privilege over those materials under *Couch*?

5. Did the district judge improperly defer to the magistrate judge on issues of constitutional dimension relating to Levandowski's Fifth Amendment privilege?

## STATEMENT OF THE CASE

## I.     FACTUAL BACKGROUND

In 2016, Uber considered acquiring Ottomotto and Otto Trucking.  Appx 64. Levandowski and Mr. Ron were former Google employees who formed the Otto

entities after leaving Google.   Appx 64.  Uber, the Otto entities, Levandowski, and

Mr. Ron (together, the "Common Interest Group") were concerned that Uber's

acquisition could spark intense litigation from Google (or what later came to be its

sister company, Waymo).  Appx 64-65, Appx 110.

Members of the Common Interest Group retained counsel to provide legal

advice concerning the transaction and prepare for litigation that might occur as a

result of the transaction.  In late January 2016, Levandowski retained attorney John

Gardner to "evaluate [litigation] risks, anticipate defenses, and assess legal

strategies."  Appx 110-11.  In late January and early February, the others also

retained counsel.  Mr. Ron retained attorney Alisa Baker for similar purposes.

Appx 90.  Uber retained the law firm of Cooley LLP for the overall corporate

transaction but then separately retained Morrison & Foerster LLP to advise on

"potential claims that could be brought by Google against . . . Anthony

Levandowski and Lior Ron, who had left Google to create the target companies

that ultimately became Ottomotto and Otto Trucking."  Appx 64.  The Otto entities

retained O'Melveny & Myers LLP, who "advised Otto regarding the risk of

potential litigation by Google arising out of Uber's acquisition of Otto."  Appx 95.

The Common Interest Group recognized from the outset that Google would

likely sue should the transaction be finalized.  As attorney Gardner states: "The

litigation risk was particularly high due to the intensely competitive nature of the

self-driving vehicle industry and the potentially billion dollar commercial market involved."   Appx 106.  Counsel for the various individuals and entities also recognized that they had a shared interest in defending against that potential litigation.  Appx 106.

A few weeks later, on February 22, 2016, Ottomotto and Uber signed a term sheet for the potential acquisition.   Appx 64-65.  Because of the possibility of litigation initiated by Google, upon the signing of a subsequent "put call" agreement, Uber agreed to indemnify Levandowski and Ron, among others, subject to certain carve-out conditions, whether or not the deal ultimately closed. Appx 64-65, Appx 129-33.

Further, to prepare potential defenses to litigation, the Common Interest Group understood that they needed to ensure their communications remained confidential and privileged.  Appx 110-11.  Accordingly, the Common Interest Group entered into a common interest agreement.  *See* Appx 65, Appx 70-79, Appx 90-91, Appx 96, Appx 110-11.  Initially, that agreement was oral.  Appx 65, Appx 90-91, Appx 96, Appx 110-11.  Eric Tate from Morrison & Foerster, counsel for Uber, states that he entered an oral joint defense agreement with counsel for Ottomotto at least as of February 24, 2016–as confirmed in an email.  Appx 65. He also confirmed the agreement with counsel for Ron on March 13 and counsel for Levandowski on March 22, 2016.  Appx 66.  John Gardner, counsel for

11

Levandowski, also states that he received a draft joint defense agreement on March 11, 2016, that confirmed the "prior discussions and agreement that the parties were working jointly in furtherance of a common interest in the anticipation of potential litigation."  Appx 111. Mr. Gardner additionally states that on March 22, 2016, he "sent separate e-mails to OMM, Morrison and Baker in order to confirm our understanding that we were working collaboratively under the common interest doctrine."  *Id.*

At all times, the Common Interest Group maintained the privileged and confidential nature of the information gathered and documents shared.  *See, e.g.*, Appx 66-67, Appx 90-91 (From the outset of negotiations, Ron's counsel "understood that all parties were in agreement that it was in all of their interests that their respective counsel should be in a position to share communications under the attorney-client privilege and the attorney work product protections without compromising the confidential nature of the communications.");  Appx 96 (Otto's counsel "considered my communications with counsel from MoFo and for the individual parties to be confidential and treated them as such."); Appx 111-12. The parties eventually entered a formal written Joint Defense, Common Interest, and Confidentiality Agreement on April 11, 2016.  *E.g.,* Appx 70-79, Appx 111.

After the parties signed the term sheet, and in accordance with its conditions, litigation counsel hired a consultant, Stroz, to assist in determining the facts upon

12

which counsel would render legal advice about a defense to possible litigation, which would also inform Uber about the business risks associated with the anticipated acquisition and indemnification obligations. *See* Appx 65, Appx 129. The uncontradicted record demonstrates, however, that a primary purpose for engaging Stroz was to conduct a detailed factual and forensic investigation as part of the joint effort to prepare a litigation defense should Google sue. Appx 65, Appx 90, Appx 96, Appx 10, Appx 106, Appx 110-11.

The Stroz engagement agreement, dated as of March 4, 2016, confirms the litigation purpose of the retention: "The purpose of the Engagement is to enable Uber, Ottomotto, Anthony Levandowski and Lior Ron . . . along with their respective counsel, to understand certain factual matters potentially relevant to potential litigation and related matters." Appx 82. Also in March of 2016, Levandowski's counsel sent two letters to Stroz. In a letter dated March 14, 2016, counsel recited that Levandowski would disclose requested information only if Stroz agreed to keep that information confidential. *See* Appx 24. Significantly, in a letter dated March 21, 2016, Levandowski's counsel made clear that by participating in the investigation, Levandowski understood he was acting under a common legal interest: "Levandowski and Ottomotto Inc. share a common legal interest in the subject matter of the Stroz Examination . . . All attorney-client, work product and joint defense privileges are reserved with respect to this letter." Appx

136.

In addition, the co-President of Stroz, Eric Friedberg, confirms that "Stroz agreed to keep confidential all communications with counsel for Uber, counsel for Ottomotto, Messrs. Levandowski and Ron and their respective counsel . . . to treat all information which Stroz received as protected by the attorney-client privilege, attorney work product doctrine, and/or common interest doctrine." Appx 107. After completing its investigation, Stroz summarized its findings in a report issued in August 2016 (the "Stroz report"). Appx 67, Appx 107. The report was *not* shared with the separate corporate counsel working on the business aspects of the transaction for Uber. Appx 64, 67, Appx 97, Appx 101-02, Appx 114.

## II.    PROCEDURAL HISTORY

### A.    The Order for Disclosure of the Stroz Report

Uber completed its acquisition of Ottomotto in August 2016.[4] As the joint defense parties anticipated, Waymo later sued Uber, Ottomotto, and Otto Trucking on February 23, 2017. Dkt. 1. At a hearing on March 29, 2017, it was revealed that the Common Interest Group had hired a third party to perform an investigation. Dkt. 131 at 12-13. Asserting his Fifth Amendment privilege, Levandowski moved to prevent disclosure of this third party's identity. The district court denied the motion, and Mr. Levandoswki appealed the matter to this

---

[4] Uber has not acquired Otto Trucking. *See* Appx 99.

Court. The Court construed Levandowski's appeal as a petition for mandamus, and denied the petition. *See Waymo LLC v. Uber Technologies, Inc.*, No. 17-1904, Docket No. 9.

After the conclusion of the prior proceedings in this Court, Stroz's identity was revealed to Waymo, and on May 1, 2017, Waymo moved to compel production of the Common Interest Group's communications to Stroz, as well as Stroz's report and exhibits. Appx 62. Levandowski moved to intervene to protect his attorney-client and work-product privileges, and Levandowski and other litigants filed opposition briefs and supporting documentation. *E.g.,* Appx 104. On June 5, 2017, Magistrate Judge Corley issued an order granting Waymo's motion to compel. Appx 21-44. After Levandowski and other litigants filed motions for relief from the magistrate's order, Appx 162-63, Dkt. 572 & 575, the district court denied those motions, but stayed the order until June 30, 2017 to permit emergency appellate review. Appx 13-14.

The magistrate judge's decision turned almost entirely on her conclusion that the Stroz investigation did not fall within the common-interest doctrine. According to the magistrate judge, Uber, Otto, Levandowski and Ron could not share a common legal interest for the sole reason that they were on "opposite sides of a proposed acquisition with no obligation to consummate the transaction." Appx 35. Alternatively, the magistrate judge concluded that even if the Common

Interest Group did share a common legal interest, Stroz's investigation was not intended to further that interest because the investigation also played a role in the due diligence and indemnification processes.  Appx 35-36.  The district judge's order did not overrule the magistrate judge's holding that parties on opposite sides of a commercial transaction can *never* share a common legal interest.  But the district judge embraced the magistrate judge's alternative holding that Levandowski spoke with Stroz pursuant to the due diligence process rather than "for the purpose of seeking legal advice."  Appx, 11-13. [5]

Likewise, the district and magistrate judges assumed that Stroz's report and exhibits were protected by the work-product doctrine, but held that work-product protection was waived because the report and exhibits were shared within the Common Interest Group.  Appx 40-41, Appx 9-10.  Indeed, the orders below went so far as to hold that the members of the Common Interest Group were actually *adversarial*.  Appx 41-41,  Appx 10-11.[6]

---

[5] As discussed throughout this brief, the district court adopted the magistrate's findings and reasoning.  This Court reviews such adopted findings under the same standard as it would any other finding of the district court.  *See United States v. Ruiz-Gaxiola*, 623 F.3d 684, 693 n.4 (9th Cir. 2010).  Accordingly, in some instances this brief will treat the magistrate's findings as incorporated into the district court's own orders.

[6] The court held that even if work-product protection applied, at least parts of Stroz's report and exhibits were fact, rather than opinion, work product, and that Waymo had demonstrated a substantial need for the documents.  Petitioners reserve their right to challenge any later determination by the district court that any

## B.    The Order for Production of the Stroz Materials

Separately, on May 10, 2017, Waymo served on Stroz itself a subpoena

seeking a variety of records relating to the investigation it had conducted for the

Common Interest Group.  Appx 141-63.  Stroz objected to the subpoena.  Pursuant

to an agreement between the parties, Waymo filed on June 8, 2017 a motion to

compel production of the records demanded in the subpoena, Appx 140, and

Levandowski filed on June 9, 2017 a motion to quash the subpoena insofar as it

would require production of (1) any materials Levandowski may have provided to

Stroz; (2) any statements (or records of statements) Levandowski may have made

to Stroz; or (3) any records that reference materials Levandowski may have

provided to Stroz.  Appx 164.  Magistrate Judge Corley resolved each of the

motions relating to the subpoena to Stroz in an order issued on June 21, 2017.

Appx 45-55.  The magistrate granted Waymo's motion to compel and denied

Levandowski's motion to quash.  *Id.*[7]  Levandowski sought review of the

---

specific documents or portion of documents are fact, rather than opinion, work
product.

[7] The magistrate reserved for later decision one aspect of Levandowski's
objections to the Stroz subpoena: the concern that Waymo inappropriately seeks
*entire electronic devices* that Levandowski provided to Stroz, and thereby demands
production of materials that, if they exist, could be irrelevant or private.
Levandowski requested that the district court establish a protocol for examining the
devices for relevant materials without disclosing irrelevant or private ones.  Appx
165, Appx 167.  The magistrate stated that "[t]he Court . . . recognizes that the
issue of Levandowski's attorney-client privilege is pending with the district court.

17

magistrate's order, Appx 168, but the district court affirmed it.  *See*  Appx 15-20. The district court's order relied almost entirely on its previous order relating to the Stroz report.  Appx 16, 20.

On June 26, 2017, in resolving a related discovery dispute, Magistrate Judge Corley shed further light on the reasoning underlying her orders concerning the common interest privilege. She found that the Common Interest Group *did* have a valid joint-defense agreement beginning on April 11, 2016—the date on which the various parties signed the "put call" agreement obligating Uber to indemnify Levandowski and others against any misappropriation lawsuits by Google or Waymo—and that the common interest privilege therefore applied to any subsequent communications between the parties.  Appx 58-59, *see also* Appx 18 (district court recognizing that the magistrate had "ruled in favor" of the claim "that defendants, Levandowski, and Ron 'shared a common legal interest at least as of April 11, 2016'").[8]

## C.    Review in this Court

On June 26, 2017, Levandowski filed a notice of appeal seeking review of

---

Once that issue is finally resolved, the Court will address whether a protocol is appropriate to protect any privacy interests."  Appx 53.  As the issue remains unresolved, Levandowski intends to address the matter with the district court after the resolution of this appeal.

[8] Waymo has sought relief from the district court from the magistrate's conclusion that the common interest privilege applied after April 11, 2016.  Dkt. 779.  This motion remains pending before the district court.  *See* Dkt. 781.

the district court's order concerning Waymo's demand to the party defendants for disclosure of the Stroz report. The appeal was docketed in this Court as case number 17-2235. On June 29, 2017, this Court issued an order in that case staying the district court's order and requiring Levandowski to "file his opening brief/petition for a writ of mandamus along with any appendix materials no later than Thursday, July 6, 2017." 17-2235, Dkt. 4 at 2.

On June 29, 2017, Levandowski filed a notice of appeal seeking review of the district court's order concerning the subpoena to Stroz. That appeal was docketed in this Court as case number 17-2253. Levandowski filed a motion to consolidate the appeal with case number 17-2235. 17-2253, Dkt. 3. This Court granted the motion to consolidate, temporarily stayed the district court's order requiring production of the records in question, and ordered that the existing briefing schedule remain in effect. 17-2253, Dkt. No. 5.

Levandowski has also filed motions for a stay of both orders pending appellate review. *See* 17-2235, Dkt. No. 3, 17-2253, Dkt. No. 3

## <u>SUMMARY OF ARGUMENT</u>

The district court's orders are the products of numerous legal errors.

*First*, the district court erroneously held as a matter of law that parties to a proposed acquisition cannot have common legal interests so long as one of the parties can still walk away from the deal without breaching any commitments.

This legal ruling runs afoul of multiple lines of longstanding precedent.  *E.g.*, *In re Regents*, 101 F.3d at 1389.  Even if parties to a transaction might have some adverse interests, partial adversity does not defeat the common interest privilege where, as here, the parties' interests with respect to anticipated litigation are aligned.  Were it otherwise, parties to a transaction would be unable to begin working together to address anticipated legal issues until after the agreement was completed, potentially diminishing their willingness to follow through on the deal and undermining the purpose of the common interest privilege to facilitate collaboration toward a common legal end.

*Second*, the district court improperly determined that Levandowski's communications with Stroz fall outside the attorney-client privilege because those communications served due diligence and indemnification purposes.  But the district court ignored that communications often serve both litigation and non-litigation purposes, and the mere existence of a non-litigation purpose does not defeat the attorney-client privilege.  To determine whether the attorney-client privilege protects dual-purpose communications, courts apply a number of tests, including whether the purpose of the communication was "solely commercial" rather than for litigation, *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 115 F.R.D. 308, 310-11 (N.D. Cal. 1987), whether the communications were made "because of" litigation, *In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)*, 357 F.3d

900, 908 (9th Cir. 2004), and whether litigation was the "primary purpose" of the communications, *North Pacifica, LLC v. City of Pacifica*, 274 F. Supp. 2d 1118, 1128 (N.D. Cal. 2003).  Contrary to the district court, the record conclusively demonstrates that the communications at issue here satisfy all of these tests: Stroz was retained to assist with anticipated litigation, and Levandowski spoke with Stroz for this purpose.

*Third*, and despite assuming that the communications qualify as attorney work product, the district court improperly determined that the joint defense parties had waived the work product privilege by disclosing the documents to "adversaries," *i.e.*, other members of the joint defense group.  But even if the parties did not share a common legal interest at the time of the communications at issue, they certainly did not qualify as "adversaries" in the anticipated Google/Waymo suit.

*Fourth*, compelled disclosure from Stroz would violate Mr. Levandowski's Fifth Amendment right against self-incrimination because this case conjures a threat of criminal sanctions against him.  Under *Couch*, a subpoena to a third party may violate an individual's Fifth Amendment privilege if that individual retained "constructive possession" of the records at issue after providing them to the third party.  Here, Mr. Levandowski surely retained constructive possession of the

records: Stroz promised to "promptly return or destroy" the materials upon Mr. Levandowski's request and to hold the materials in the strictest confidence.

*Fifth*, even if this Court finds no basis for reversing the district court's order to Stroz, the Court should nonetheless remand that order.   Because Stroz is an agent of the common interest group, compelling Stroz to disclose records transferred as part of a privileged joint-defense communication would itself directly implicate Mr. Levandowski's Fifth Amendment rights.  *See Fisher v. United States*, 425 U.S. 391, 405 (1976).  The district judge thus should have reviewed de novo whether those records were part of a privileged joint-defense communication.  *See United States v. Rivera-Guerrero*, 377 F.3d 1064, 1070-71 (9th Cir. 2004).  But the district court instead improperly deferred to the magistrate judge on questions of constitutional significance.

In the event that the Court treats these appeals as mandamus petitions, Mr. Levandowski has clearly satisfied the mandamus standard.  The district court's orders are clearly erroneous, and allowing disclosure of privileged information would cause Mr. Levandowski to suffer irreparable harm.

## STANDARD OF REVIEW

Because this appeal does not raise issues that are unique to patent law, this Court applies the law of the regional circuit—in this case, the Ninth Circuit.  *See Wi-LAN, Inc. v. LG Elecs., Inc.*, 684 F.3d 1364, 1368 (Fed Cir. 2012).

22

The district court's determination of Levandowski's privilege claims is "a mixed question of law and fact which this [C]ourt reviews independently and without deference to the district court." *United States v. Ruehle*, 583 F.3d 600, 606 (9th Cir. 2009) (en banc) (quoting *United States v. Bauer*, 132 F.3d 504, 507 (9th Cir. 1997)). "That is, whether the party has met the requirements to establish the existence of the . . . privilege is reviewed de novo." *Id.*; *see also Perry v. Schwarzenegger*, 591 F.3d 1126, 1139 n.3 (9th Cir. 2010). "Factual findings are reviewed for clear error." *Ruehle*, 583 F.3d at 606.

This Court can overturn a district court decision by mandamus where there has been "a clear abuse of discretion," and the petitioner "lacks adequate alternative means to obtain the relief sought." *In re Regents*, 101 F.3d. at 1387. This Court has recognized that a writ of mandamus is appropriate "to prevent the wrongful exposure of privileged communications," especially when "immediate resolution would avoid the development of doctrine that would undermine the privilege." *Id.* at 1388.

## **ARGUMENT**

## I.    **THE DISTRICT COURT ERRED IN CONSIDERING THE APPLICATION OF THE COMMON INTEREST PRIVILEGE.**

The orders below turned almost entirely on the conclusion that Uber, Ottomotto, and Levandowski (a) could not have a common legal interest in

23

defending against potential litigation from Google/Waymo, and (b) did not engage Stroz to further that legal interest. The district court's conclusion that the members of the Common Interest Group could not share any common legal interest, because they were still negotiating Uber's acquisition of Ottomotto, and had not bound themselves to an indemnification arrangement, is wrong as a matter of law, as decades of precedent from this Court and others make clear. *See, e.g.*, *In re Regents*, 101 F.3d at 1386-87; *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 115 F.R.D. 308, 310-11 (N.D. Cal. 1987). The court's alternative holding that Stroz was not actually engaged in furtherance of any common legal interest—and, thus, that Levandowski's communications with Stroz were not part of any effort to seek joint legal advice—fares no better. Regardless of whether the members of the Common Interest Group had business-related reasons to engage Stroz, the uncontroverted documentary and declaratory evidence makes clear that the Common Interest Group also engaged Stroz to develop the factual record so that counsel could render legal advice in anticipation of potential litigation from Waymo.

### A.    The Common Interest Privilege Protects Communications Between Parties with Common Interests In Litigation.

The "joint defense" or "common interest" doctrine is an exception to the rule that a claim of privilege is waived by disclosure to a third party—*i.e.*, to someone other than the client, counsel, or counsel's agent. *Gonzalez*, 669 F.3d at 977-78.

The rationale behind the doctrine is that "persons who share a common interest in litigation," whether or not that litigation has "commenced," "should be able to communicate with their respective attorneys and with each other to more effectively prosecute or defend their claims." *Id.* at 978 (quoting *In re Grand Jury Subpoenas*, 902 F.2d 244, 249 (4th Cir.1990)); *see also Continental Oil Co. v. United States*, 330 F.2d 347, 350 (9th Cir.1964); *Holmes v. Collection Bureau of America, Ltd.*, No. 09-cv-2540, 2010 U.S. Dist. LEXIS 4253, at *6 (N.D. Cal. Jan. 8, 2010).    There is no requirement in the law that the interests of common interest parties coincide completely, or that there be no conflicts between the parties' legal or non-legal interests and objectives.  On the contrary, it is well-established that the "interests of the parties involved in a common defense need not be identical, and, indeed may even be adverse in some respects." *Holmes*, 2010 U.S. Dist. LEXIS 4253, at *6; *see also Hunydee v. United States*, 355 F.2d 183, 185 (9th Cir.1965).

Where parties genuinely share a common legal interest, the common-interest privilege "establishes an implied attorney-client relationship with the co-defendant." *United States v. Henke*, 222 F.3d 633, 637 (9th Cir. 2000).  Thus, where parties are "engage[d] in a common legal enterprise," communications and disclosures between parties and counsel—and the agents of counsel—within that common enterprise remain privileged so long as they are "part of [the] on-going

and joint effort to set up [the] common defense strategy." *Holmes*, 2010 WL 143484, at *2.

Notably, and of critical relevance here, for the common interest privilege to apply, it is *not* "necessary for the attorney representing the communicating party to be present when [a] communication is made to the other party's attorney." *United States v. Schwimmer*, 892 F.2d 237, 244 (2d Cir. 1989); *see also United States v. McPartlin*, 595 F.2d 1321, 1336-37 (7th Cir. 1979). This flows from the recognition that "the rationale for the joint defense rule" is that "persons who share a common interest in litigation should be able to communicate with their respective attorneys *and with each other* to more effectively prosecute or defend their claims." *Gonzalez*, 669 F.3d at 978 (emphasis added).

### B. The Common Interest Privilege May Apply When the Parties Are Considering Entering an Acquisition Agreement.

In resolving these related discovery disputes, the district court adopted a blanket rule that parties with "separate counsel on opposite sides of a proposed transaction" do not share a common legal interest sufficient to protect against waiver of the attorney-client privilege, Appx 30-31, or work-product privilege, Appx 35, *unless and until* they become legally obligated to consummate the transaction, *id.* at 15, or to indemnify the other party (as the magistrate judge later clarified). Appx 58-59. This rule holds, according to the district court, even when the parties are communicating (as here) about litigation that they believe will likely

26

result from the successful consummation of their transaction and are preparing to defend such potential litigation.  Thus, the magistrate judge held that the members of the Common Interest Group were adverse and therefore could not have had a valid common interest agreement during the early weeks of the Stroz investigation. Appx 59 ("[U]ntil th[e] indemnification obligation arose, and until Uber and Otto had exclusive options to make the acquisition happen, they did not share a common legal interest."); *see also* Appx 35 ("[A]s the Term Sheet demonstrates, no acquisition obligation existed until the subsequent execution of the  put call Agreement.  Thus, Uber and Otto did not share a common legal interest . . . ."); Appx 10 (district court agreeing with the magistrate that "defendants, Levandowski, and Ron had adverse rather than common interests in [the Stroz] investigation"). [9]  The rule the district court applied in this case is inconsistent with settled precedent; if such a rule is allowed to stand, it would severely erode the important protections of the common interest privilege for all future businesses contemplating acquisitions in highly-competitive and litigious industry sectors.

---

[9] In a recent order, the magistrate judge has now clarified that once Uber signed the "Put Call" agreement on April 11, 2016, thereby accepting the indemnity obligation and agreeing to purchase Ottomotto, the Common Interest Group had a joint legal interest and the common interest privilege applied.  Appx 59, *see also* Dkt. 734 (6/23/2017 Tr.) at 27-43; Appx 18 (recognizing that the magistrate had "ruled in favor" of the claim that "that defendants, Levandowski, and Ron 'shared a common legal interest at least as of April 11, 2016'").

    1.    <u>The Common Interest Privilege Protects Confidential</u>
<u>Communications Within a Joint-Defense Group Even When the</u>
<u>Parties are Adverse in Some Respects</u>

As the district court acknowledged, *see* Ex. 14 at 14, courts have long recognized that parties can have a common legal interest even where they are still, in important ways, adverse. In *Gonzalez*, the Ninth Circuit ruled that two spouses could have a joint defense agreement with respect to one count in a criminal trial even though their defenses on another count were "completely antagonistic." 669 F.3d at 980. And in *Hunydee*, the Ninth Circuit held that a defendant who had separate counsel from his co-defendant, and whose interests largely conflicted with his co-defendant's, could nevertheless claim attorney-client privilege over statements made in the presence of his co-defendant because those statements were made to help both co-defendants determine their legal strategy. 355 F.2d at 184-85.

Similarly, when an insurer defends litigation under a reservation of rights, the insurer and insured undoubtedly share a common legal interest in defending the litigation even though they have separate counsel, may have differing objectives, and are directly antagonistic as to the insurer's obligation to defend the suit. *E.g.*, *Lectrolarm Custom Systems, Inc. v. Pelco Sales, Inc.*, 212 F.R.D. 567, 572-73 (E.D. Cal. 2002). More generally, parties who are potentially adverse concerning indemnification for the costs of defending a suit still share a common legal interest

28

in defending that suit.  *E.g.*, *Callwave Communications, LLC v. Wavemarket, Inc.*, No. 14-cv-80112, 2015 U.S. Dist. LEXIS 22374, at *11-12 (N.D. Cal. Feb. 23, 2015).

It is no surprise, then, that courts regularly hold that parties to a commercial transaction share a common legal interest in litigation that is likely to arise from that transaction, even while the parties are still negotiating certain aspects of the transaction in an arms-length, adverse manner.  This principle holds true even in the context of mergers and acquisitions like this case, and where there is no guarantee the deal will close.  For instance, in *Hewlett-Packard*, the court held that Bausch & Lomb did not waive its attorney-client privilege in an attorney opinion letter by disclosing the letter to a third party that was considering acquiring part of Bausch's business.  Because there was a "real possibility" that the purchase would go through, and in that case the "odds were quite strong" that the companies would face joint litigation, the two entities shared a "common legal interest" in the subject of the letter.  115 F.R.D. at 309-10.  Moreover, the parties in *Hewlett-Packard* retained the privilege even though the transaction (unlike the one at issue here) ultimately did *not* go through.

Similarly, in *Rayman v. American Charter Federal Savings & Loan Association*, 148 F.R.D. 647 (D. Neb. 1993), the court held that when parties negotiating a merger exchanged privileged information about joint litigation so that

29

one party "would be more fully informed of the potential liability it would take on by merging" with the other party, that exchange was undertaken pursuant to a common legal interest and did not waive any privilege.  *Id.* at 639-40.

This Court has reached the same conclusion in the context of negotiations for patent licenses.  In *In re Regents*, attorneys for Eli Lilly and the University of California exchanged communications regarding patent prosecution at a time when Lilly had an exclusive option to acquire patent rights from the University, but was not *obligated* to acquire those rights.  101 F.3d at 1389.  This Court held that even though the transaction was not complete—and Lilly had undertaken no legally binding obligations to defend the patents—because Lilly "had the *potential to become*" the exclusive licensee of the patent, the parties had a "common legal interest" in "[v]alid and enforceable patents."  *Id.* at 1390 (emphasis added).  Thus, even recognizing Lilly had the right to "walk away" from the deal, this Court upheld the common interest privilege and granted a writ of mandamus, ordering the district court not to compel discovery of the privileged communications.

Numerous courts have similarly held that the common-interest doctrine applies to parties in the late stages of negotiations concerning patent sales and licenses when the parties anticipate joint post-transaction litigation.  For instance, in *Morvil Technology, LLC v. Ablation Frontiers, Inc.*, No. 10-cv-2088, 2012 U.S. Dist. LEXIS 30815 (S.D. Cal. March 8, 2012), the court held that "shared legal

analysis" between parties negotiating the sale of patents fell within the common-interest doctrine even though the parties were still negotiating key terms—like the "purchase price"—and, thus, there was no certainty that the deal would close. *Id.* at *5, *8-9.

Similarly, in *Rembrandt Patent Innovations, LLC v. Apple Inc.*, No. 14-cv-05094, 2016 U.S. Dist. LEXIS 13749 (N.D. Cal. Feb. 4, 2016), the court agreed that once parties had entered into an exclusive option to purchase a patent, but before the party with the option had actually completed the purchase, the parties had a common interest in "conducting due diligence, perfecting title in the patent, identifying targets for litigation, and developing specific legal strategies." *Id* at *21. And in *FastVDO LLC v. AT&T Mobility LLC*, No. 16-cv-385, 2016 U.S. Dist. LEXIS 146373 (S.D. Cal. Oct. 21, 2016), the court held that parties negotiating the sale of a patent had a common legal interest even though they were continuing to negotiate certain terms of the sale. *Id.* at *13-14; *see also Britesmile, Inc. v. Discus Dental Inc.*, No. 02-cv-3220, 2004 U.S. Dist. LEXIS 20023, at *9 (N.D. Cal. Aug. 10, 2004) (parties negotiating sale of technology "share a common legal interest in the issue of whether the technology … was patentable and whether it infringed any patent").

These decisions are entirely consistent with the purpose of the common-interest doctrine:  to encourage free communication between parties who agree to

31

collaborate to seek a common legal end. *Gonzalez*, 669 F.3d at 977-78. Parties negotiating a commercial agreement will often want to begin collaborating on legal issues that could arise from the agreement so that they are not caught off-guard or flat-footed if, and when, the agreement is completed. The *possibility* (as in *In re Regents, Hewlett Packard, Rayman, Morvil, Rembrandt, FastVDO, and Britesmile)* that the sale in question might not close—much like the possibility that anticipated litigation might not occur—does not negate the fact that, at the time of the parties' communications, they are acting in pursuit of a genuine, common legal interest. *See Gonzalez,* 669 F.3d at 978. As many courts have opined, refusing to recognize negotiating parties' common legal interest in post-transaction legal issues would create a needless impediment to the negotiation of commercial agreements. *E.g.*, *Hewlett-Packard*, 115 F.R.D. at 311; *BriteSmile*, 2004 U.S. Dist. LEXIS 20023, at *9-10.

 2.  Uber, Ottomotto, and Levandowski Had A Common Legal Interest In Preparing For And Defending Against Waymo's Anticipated Suit.

There is no meaningful way to distinguish this case from the myriad cases applying the common-interest doctrine to parties on opposite sides of a yet-to-be-completed transaction. Like the parties in those cases, Uber, Ottomotto, and Levandowski unquestionably had a common interest in preparing to combat an anticipated suit. Uber and Ottomotto were in the late stages of negotiations for

Uber to acquire Ottomotto, and all involved in the acquisition knew that, if the acquisition went forward, there was a reasonable likelihood that Google (later Waymo) would bring suit.

The conduct of the members of the Common Interest Group makes clear that they had a joint litigation purpose in mind when they hired separate litigation counsel to investigate and prepare to defend a possible lawsuit. Uber, for instance, had previously hired Cooley "to advise it on the standard diligence, negotiation and other corporate aspects of the potential transaction," but it then hired a separate firm, Morrison Foerster, when it "[sought] legal advice as to potential litigation exposure arising out of the transaction."  Appx 64, A64; Appx 114.  And O'Melveny & Myers, representing the Otto entities, similarly assigned "specialized legal teams" to handle different aspects of the transaction.  Appx 110, A41-42. Levandowski also had his counsel bring in other lawyers with experience supervising lawsuits of precisely the type Waymo could be expected to bring. Appx 110.

That the litigation attorneys representing Uber and Ottomotto decided to jointly engage Stroz to develop the facts relevant to a potential suit by Waymo further evinces the parties' common legal interest in preparing for litigation.  In fact, Uber's in-house attorney declared that retaining a consultant like Stroz is "atypical when aiding in the provision of legal advice for most acquisition

33

diligence," and that Uber would not have undertaken the "unique step of authorizing the Stroz investigation … absent the litigation risk." Appx 101.

In her latest order, the magistrate judge has now clarified that, once the put call agreement was signed on April 11, 2016, Uber, Ottomotto, and Levandowski did "all shar[e] a joint common legal interest in defending claims brought by Waymo for misappropriation of trade secrets, among other things." Appx 59. But again, the artificial distinction drawn by the court is inconsistent with the cases holding that parties can have a current, bona fide joint legal interest even if the deal they are still negotiating may not come to fruition. *See supra* at 29-32. Thus, if a formal indemnity obligation can serve as the basis for a common legal interest, there is no sound reason in logic why a clearly *anticipated* indemnity obligation— which the parties knew to be highly likely when they signed the term sheet in February 2016—would not create the same common legal interest.

Ultimately, the magistrate judge acknowledged that she "simply disagree[d]" with the myriad cases finding a common legal interest in the context of unconsummated commercial negotiations. Appx 27. And the magistrate judge incorrectly relied on *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 579 (N.D. Cal. 2007), a district court decision, as the basis for its concern that applying the common interest privilege to the Stroz investigation would "remove the common interest doctrine far from its historical antecedent, the joint defense

34

doctrine." Appx 37. But *Nidec* stands only for the proposition that the protection of the common interest privilege is not unbounded, and that it cannot be used to shield from discovery documents that were exchanged for *solely* commercial purposes. 249 F.R.D. at 579-80. But here, as discussed below, the record established that the Stroz investigation was not undertaken for a solely commercial purpose, but for a genuine, legal purpose, as well.

Put simply, the district court's decisions cannot be squared with the many precedents holding that parties negotiating a not-yet-completed acquisition can be adverse in certain respects, but still share a common legal interest in evaluating and defending post-acquisition litigation. If the district court's decision is permitted to stand, it will undermine these consistent lines of precedent, disrupt the reasonable expectations of commercial parties, and impose unnecessary obstacles to future corporate transactions.

## C.    Stroz Was Engaged To Further Uber, Ottomotto, and Levandowski's Interest In Preparing For And Defending Against Waymo's Anticipated Suit

The district court's secondary, or alternative, holding that Stroz was not retained to further the parties' common *legal* interest is no more defensible. The court's conclusion rested on the premise that, because Stroz's investigation played *some role* in due diligence and indemnification (under the provisions of the term

sheet), it therefore must follow that Stroz's investigation was not intended in any way to further the joint defense parties' common legal interest in combatting against a potential lawsuit. Appx 28, 32. The district court affirmed the magistrate judge's cursory analysis, crediting her conclusion that "'Levandowski was complying with the Term Sheet' which laid out steps for Uber's acquisition of Ottomotto, 'rather than seeking OMM's legal advice, when he participated in Stroz's investigation." Appx 18 (quoting Appx 28).

But courts have repeatedly held that disclosures of information that play a *dual role*—in preparing for post-transaction litigation a well as in due diligence— fall within the common-interest doctrine. And to the extent the orders below rested on a conclusion that combatting a potential lawsuit by Waymo was not a significant part of the Common Interest Group's motivation for retaining Stroz, that conclusion conflicts with all of the uncontroverted documentary and declaratory evidence in the record.

>    1.    The Common Interest Privilege Applies Where
>           Communications Served Both Litigation and Non-Litigation
>           Purposes.

Communications shared and documents created to prepare a joint defense to anticipated litigation do not lose common-interest protection simply because they are *also* separately used for a separate commercial purpose. In the related work-product context, the Ninth Circuit has recognized that so long as a document was

created "because of" litigation—which is determined by taking into account the "totality of circumstances"—the document does not lose its protection simply because it was *also* used for some *other* purpose. *In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)*, 357 F.3d 900, 908 (9th Cir. 2003); *see also, e.g.*, *In re CV Therapeutics, Inc. Sec. Litig.*, 2006 U.S. Dist. LEXIS 41568, at *8 (N.D. Cal. June 16, 2006) (applying *In re Grand Jury Subpoena* in the attorney-client privilege context); *Visa U.S.A., Inc. v. First Data Corp.*, 2004 U.S. Dist. LEXIS 17117, at *14-15 (N.D. Cal. Aug. 23, 2004) (same). This "'because of' standard does not consider whether litigation was a *primary or secondary motive* behind the creation of a document." *In re Grand Jury Subpoena*, 357 F.3d at 908 (emphasis added). Although, in the attorney-client context, some district courts have held that communications are privileged only where the "primary purpose" of the communications was litigation advice, none has held that the mere existence of a non-litigation purpose is sufficient to defeat the privilege. *E.g.*, *North Pacifica, LLC v. City of Pacifica*, 274 F. Supp. 2d 1118, 1127 (N.D. Cal. 2003).

Moreover, in the context of business transactions, other district courts have applied tests even more permissive than the "because of" standard. For instance, in *Hewlett-Packard*, the court held that a common legal interest requires only that the interest not be "*solely* commercial"; disclosures and communications intended to further *both* commercial *and* legal interests still fall within the common-interest

doctrine.  115 F.R.D. at 309 (emphasis added).  In *Morvil*, the court recognized

that the exchange of privileged documents may have served both "commercial and

legal interests given the purpose of the disclosure …. But this overlap does not

negate the effect of the legal interest in establishing a community of interest."

2012 U.S. Dist. LEXIS 30815, at *9.

Finally, in *Rayman* the court held that parties negotiating a merger had a

valid, common legal interest in addressing litigation—and thus a valid and

enforceable common interest privilege—even though the sharing of the documents

*also* served an important role in due diligence: specifically, it allowed one of the

entities to "be more fully informed of the potential liability it would take on by

merging with" the other company.  148 F.R.D. at 653.

These decisions are grounded in common sense reality that virtually every

joint defense effort to prepare for post-transaction litigation would also play some

role in business due diligence for the transaction itself.  After all, legal analysis as

to the likely outcome of post-transaction litigation will inevitably shape the parties'

understanding of the values of the assets at issue in the transaction.  But, as the

above authorities consistently recognized, the fact that disclosures or

communications may have *some* business implications does not remove those

disclosures or communications from the common-interest doctrine when they *also*

further the negotiating parties' common legal interest in preparing for post-

transaction litigation.

### 2.    Stroz's Investigation Had a Litigation Purpose.

To the extent the district court concluded that Stroz's investigation was not intended to further the joint defense parties' common legal interest, the court's decision is clearly wrong.  As discussed, the magistrate judge recently clarified that a common interest privilege *did* validly apply to communications with Stroz that occurred after April 11, 2016, the date on which the parties signed the put call agreement.  Appx 59; *see also* Appx 18.  Hence, the magistrate judge has accepted that the Stroz engagement was undertaken in furtherance of a genuine, common legal purpose. Appx 58-59. (Despite this acknowledgement, for reasons that are not yet clear, the district court has still ordered production of the Stroz final report, even though it was not completed until August 2016, four months after the put call agreement was signed).

Given the court's clarification that post-April 11, 2016, communications with Stroz are protected by the common interest privilege, the only remaining dispute is whether there was a valid common interest agreement which covered Levandowski's pre-April 11, 2016 communications with Stroz. As discussed below, the unrebutted testimony in the record conclusively shows that Stroz's investigation was undertaken to further a common litigation interest that was shared by Uber, Ottomotto, Levandowski, and Ron, and it began only after they

had already entered into a valid common interest agreement. The attorney-client privilege therefore applies no matter which legal test this Court decides to employ: the purpose for Stroz's retention was not "solely commercial," *Hewlett Packard*, 115 F.R.D. at 309; in light of the "totality of circumstances," Stroz was retained "because of" anticipated litigation, *Grand Jury Subpoena*, 357 F.3d at 908; *and* seeking litigation advice was the common interest group's "primary purpose" for retaining Stroz, *North Pacifica*, 274 F. Supp. 2d 1118, 1128.

*First*, five attorneys who participated in the common interest agreement and a chief executive of Stroz each attested under oath that (a) by the time Stroz was retained, there was already an oral common interest agreement between the members of the Common Interest Group; and (b) the purpose of the Stroz retention was to help the group prepare for potential litigation by collecting relevant facts and information. Appx 65, Appx 90, Appx 96, Appx 10, Appx 106, Appx 110-11. Eric Friedberg, the co-founder and co-president of Stroz, declared that he was retained to "develop the facts necessary to assist MoFo and OMM in providing legal advice about potential litigation by Google related to Uber's potential acquisition of Ottomotto and Otto Trucking, LLC." Appx 99. Uber's in-house counsel declared that "the retention of a consultant like Stroz … is atypical when aiding in the provision of legal advice for most acquisition diligence." Uber "would not have" undertaken "the additional, unique step of authorizing the Stroz

investigation" "absent the litigation risk." Appx 101. Uber's attorney at MoFo declared that "[t]he purpose of the [Stroz] investigation was to aid MoFo and OMM in providing legal advice to their respective clients about litigation risks and potential claims that could be brought by Google in connection with Uber's acquisition of Otto." Appx 65. And Levandowski's attorney stated that Stroz's work was used to determine "how to approach various possible litigation scenarios, legal theories Google might assert against Uber, Otto, Levandowski and/or Mr. Ron, and how best to refute and defend against any claims that might arise." Appx 111. There is not a single piece of contrary testimony in the record.

But the magistrate judge and district court simply declined to credit those uncontradicted, sworn attestations from numerous experienced counsel with decades of experience and distinguished backgrounds.

*Second*, as its ground for sweeping aside the declarations, the district court proclaimed them "unpersuasive." Appx 12-13; *see also* Appx 40, Appx 50. This conclusion rested primarily on the magistrate judge's perception that the declarations failed to mention that Stroz's investigation was also required under the term sheet for due diligence purposes. Appx 40. The district judge deferred to the magistrate judge's conclusion, emphasizing that it was reasonable to "credit objective evidence in the record"—*i.e.*, the fact that Stroz had been retained in part for due diligence purposes—"over attorney declarations in support of their clients'

arguments." Appx 12.

Not only does the district judge's conclusory statement ignore the declaration from Stroz's president, who does not represent a party in this case, but it also ignores the broader context of the declarations. There was no reason for these witnesses to discuss the Stroz investigation's due-diligence function because, as discussed previously, pp. 36-39, *supra*, a given document or communication can play a role *both* in due diligence *and* in furthering parties' preparations for post-transaction litigation without losing its privileged status. The purpose of the declarations submitted to support the privilege claim was to establish the common legal interest—there was thus no reason to discuss any additional role the Stroz investigation may have served in due diligence. The declarants had particular knowledge of the litigation-related purpose of Stroz's investigation, and that is the only issue they addressed. *See* pp. 10-11, *supra*.

*Third*, the attorneys representing Uber who engaged Stroz and participated in its investigation were *litigation* counsel, *not* the separate corporate transactional counsel who had been engaged to handle the Uber-Otto deal, and the Stroz materials were not shared with Uber's transactional counsel. *See, e.g.*, Appx 64-65, Appx 114. The only reasonable inference from this evidence is that Stroz was engaged from the beginning to gather information relevant to potential litigation, not—or at the very least, *not primarily*—to guide the decision on whether to enter

42

into the business deal.

*Fourth*, the term sheet actually constitutes strong evidence in favor of the privilege. This agreement created a potential obligation for Uber to indemnify Levandowski and other members of the Common Interest Group against trade-secret misappropriation claims arising from the transaction under consideration; the indemnity obligation would arise if the parties later executed the contemplated put call agreement. Appx 22-23. This potential indemnity obligation demonstrates that, by February 22, 2016, the parties were already concerned about potential litigation, and this gave Uber and the other parties a joint legal interest—for it was reasonably foreseeable and actually foreseen that Uber might have to defend Levandowski and others against a misappropriation lawsuit.

*Fifth*, the district court misconstrued the importance of letters sent in March 2016 by Levandowski's counsel to Stroz. Appx 13; Appx 49 at 4. The letters expressly stated that Levandowski and Ottomotto shared a "common legal interest in the subject matter of the Stroz Examination." Appx 136. The district court emphasized that the letters did not expressly mention Uber, Appx 24, 17; Appx 49; Appx 13, but that observation does not detract from the relevance of these letters:

- As even the magistrate observed, Stroz was hired by *both* Uber and Ottomotto to conduct its investigation. *Id.* at 4. The expressions in the

43

March 2016 letters that Levandowski shared a common legal interest in the examination were thus "contemporaneous evidence," *see* Appx12, that Levandowski and his counsel believed at the time that they had a common legal interest with Stroz' clients—Uber and Ottomotto.

- Similarly, Ottomotto—a company founded by Levandowski—plainly had a joint interest with Uber in the Stroz engagement from the beginning, since Ottomotto joined Uber in undertaking the engagement. The March 2016 letters demonstrate that Levandowski and his attorney believed he had a legal interest in the engagement that was consonant with that of his company.

- Finally, if Uber and Levandowski were, as the magistrate contended, merely adverse parties on different "side[s] of [a] proposed transaction," Appx 49, then the operative phrase in the letters would make no sense: Levandowski would have no "common legal interest" at all in the Stroz investigation.

Thus, the district court was correct that the letters were important evidence relating to the common interest agreement, but it drew entirely unreasonable conclusions from that evidence. Contrary to the district court's conclusions, the letters cut strongly *in favor* of the conclusion that Stroz was retained at least primarily to help the Common Interest Group pursue a shared legal interest.

*Sixth*, again contrary to the district court's conclusion, the letter in which

Uber and Ottomotto engaged Stroz *does* "support Levandowski's assertion of a March 2016 joint defense agreement."  Dkt. Appx 49; *see also* Appx 12-13.  The engagement letter expressly recited that the engagement was designed to help the parties "understand certain factual matters potentially related to potential litigation."  Appx 83.  The district court found that the engagement was executed in April 2016—not, as reflected in the letter, March 4, 2016—and concluded that the letter was therefore "not probative of an earlier common interest" agreement. Appx 18-19.  But the magistrate's conclusion implies that in April 2016, the Common Interest Group (1) for the first time anticipated jointly defending litigation; (2) drafted a letter reciting a false joint legal interest; and (3) backdated the letter in a cynical attempt to retroactively apply a privilege where none had previously existed.  No evidence supports those findings, which are completely contradicted by the numerous sworn declarations before the court.

*Seventh*, the district court faulted Levandowski for failing to point to "contemporaneous" or "objective" evidence of the existence of the common interest agreement in March 2016.  Appx 12; Appx 49.  As discussed above, this conclusion is factually incorrect—Levandowski *did* cite contemporaneous evidence, including the term sheet agreement, Levandowski's counsel's March 2016 letters, and the Stroz engagement letter.

More broadly, the district court's approach runs counter to the Ninth

Circuit's holding that a common interest agreement may be established orally or even "implied from conduct and situation." *Gonzalez*, 669 F.3d at 979.  By definition, of course, an oral agreement will not be evidenced by contemporaneous writings.  The only way to properly implement *Gonzalez* is to permit parties to prove a common interest agreement through subsequent declarations—which is exactly what was done here.

Further, the district court at one point suggested that Levandowski had no attorney-client privilege in his communications with Stroz because Gardner, Levandowski's attorney, had not retained Stroz and was not present at Levandowski's interviews with Stroz.  Appx 3-4.  But given that Stroz was retained by counsel for other joint defense parties to further the joint defense parties' common legal interest, the district court's conclusion is wrong under controlling Ninth Circuit precedent.  A joint-defense or common-interest agreement "establishes an implied attorney-client relationship" between each of the attorneys and parties involved in the joint defense.  *United States v. Henke*, 222 F.3d 633, 637 (9th Cir. 2000).  Once the common-interest relationship is established, that implied attorney-client relationship "protects not only the confidentiality of communications passing from a party to his or her attorney but also 'from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their

respective counsel.'" *United States v. Austin*, 416 F.3d 1016, 1021 (9th Cir. 2005) (quoting *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989)); *see also Gonzalez*, 669 F.3d at 978. It is not "necessary for the attorney representing the communicating party to be present when the communication is made to the other party's attorney." *Schwimmer*, 892 F.2d at 244. Thus, because Stroz was retained by attorneys within the Common Interest Group, Levandowski's communications with Stroz to promote the common legal interest were privileged.

In sum, the record evidence—including numerous sworn, uncontradicted declarations—established the existence of a common interest agreement prior to Stroz's engagement and established that Levandowski's communications with Stroz were made in furtherance of the Common Interest Group's joint legal effort. No contrary evidence suggests that the "primary" purpose for retaining Stroz, and for Levandowski's communications with Stroz, was to assist with the due diligence and indemnification processes. The law and evidence cited by the district court is not to the contrary, and the court erred in finding that Levandowski's communications with Stroz were not privileged.

## II.    THERE WAS NO WAIVER OF THE WORK-PRODUCT PRIVILEGE.

The Stroz report and exhibits are also protected by the work product privilege. The district court did not dispute that the Stroz materials constitute attorney work product. Rather, the district court concluded that the work-product

protection was waived by disclosure within the Common Interest Group. But waiver of work-product protection requires that the information be disclosed not just to *any* third party—but to an *adversary*. *Ellis v. J.P. Morgan Chase & Co.*, 2014 U.S. Dist. LEXIS 45681, at *16 (N.D. Cal. Apr. 1, 2014) (emphasis added). Because "[t]he policy underlying work-product protection is to promote the adversary system by safeguarding the fruits" of an attorney's preparations for litigation, waiver of attorney work product requires an act inconsistent with maintaining secrecy against an adversary. *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1299 (D.C. Cir. 1980).

Disclosure to a party on the opposite side of a business transaction does not constitute disclosure to an adversary, especially where the party on the opposite side is likely ultimately to be a co-defendant in litigation for which the attorney work product is prepared. Courts have held that an "adversary" is not simply a party with somewhat-divergent interests—instead, it is an adversary in *litigation*, or at least likely litigation. *See Nidec Corp.*, 249 F.R.D. at 578 (having different interests with respect to the purchase and sale of the majority interest in the company did not make the company and the prospective buyers adversaries for purposes of work product analysis); *United States v. Deloitte LLP*, 610 F.3d 129, 140 (D.C. Cir. 2010) (disclosure to independent auditor was not disclosure to an adversary because that was not "the sort of litigation adversary contemplated by

48

the waiver standard"). Here, in the relevant litigation context, the interests of the Common Interest Group were always *aligned*, not adversarial.

And indeed, as noted above, the magistrate judge has now clarified that as of April 11, 2016—four months before Stroz's August report was even prepared—Levandowski, Uber, the Otto entities, and Ron all shared a valid common interest privilege. [Cite] Sharing work product among the members of a common interest group is the antithesis of sharing it with an adversary, and thus it cannot be deemed a waiver of the parties' work product protection.

*United States v. Bergonzi*, 216 F.R.D. 487 (N.D. Cal. 2003), the only case on which the district court relied, is completely inapplicable here. In that case a company disclosed the results of its internal investigation *to government investigators* who were investigating the company and ultimately recommended filing charges. Disclosure to a government investigating body is precisely the type of disclosure that triggers a waiver of work-product protection; disclosure to a potential business partner and litigation co-defendant is not.[10]

## III.   THE DISTRICT COURT ERRED IN REJECTING

---

[10] Rather than engage with Levandowski's arguments, the district judge merely asserted without explanation that the "comparison" to *Bergonzi* is "apt here." Ex. 18 at 10. The district judge also credited the magistrate judge's "extensive factual findings in reaching her conclusion" that the work-product privilege was waived. *Id.* But these "factual findings" merely established the undisputed premise that the parties were on opposite sides of a transaction. As explained above, that is insufficient to qualify those parties as adversaries.

## LEVANDOWSKI'S CLAIM OF PRIVILEGE UNDER *COUCH V. UNITED STATES*

The district court also erred because it should have found the materials in Stroz's possession were protected by Levandowski's Fifth Amendment privilege pursuant to *Couch*, 409 U.S. 322—regardless of whether there was a valid common interest privilege.

There is no question that the issue before the district court in this case implicated Levandowski's Fifth Amendment privilege. The complaint alleges that Levandowski was involved in "steal[ing]" and "misappropriat[ing]" intellectual property. *See, e.g.*, Dkt. 23 ¶¶ 10, 11 & p. 11 § IV.D. This plainly conjures the threat of criminal sanction under 18 U.S.C. § 1832 and other similar federal or state statutes.[11] On May 11, 2017, the district court judge formally referred this case to the United States Attorney's Office "for investigation of possible theft of trade secrets." Appx 171. And on July 5, 2017, the magistrate judge issued an order holding that "Levandowski has properly asserted his Fifth Amendment privilege" in the context of Waymo's motion to compel his compliance with a

---

[11] The question whether the allegations in the complaint are accurate, of course, remains to be litigated—but that question is irrelevant here, as "one of the Fifth Amendment's basic functions . . . is to protect innocent men . . . who otherwise might be ensnared by ambiguous circumstances." *Ohio v. Reiner*, 532 U.S. 17, 21 (2001) (quoting *Grunewald v. United States*, 353 U.S. 391, 421 (1957), quotation marks omitted). "[T]ruthful responses of an innocent witness, as well as those of a wrongdoer, may provide the government with incriminating evidence from the speaker's own mouth." *Id.*

subpoena Waymo directed to him.  Appx 172-177.  Levandowski is thus faced

with a clear "possibilit[y ] of prosecution" and his Fifth Amendment privilege

against self-incrimination is implicated.  *Glanzer*, 232 F.3d at 1263.

One aspect of the Fifth Amendment privilege is particularly relevant in these

appeals: the Constitution protects an individual like Levandowski from being

compelled to implicitly testify against himself through the production of records.

Even when the contents of a document are themselves not privileged, the act of

producing the document may implicate the Fifth Amendment privilege.  *Hubbell*,

530 U.S. at 32-36; *Fisher*, 425 U.S. at 410 (1976).  "By producing documents in

compliance with a subpoena, the witness admits that the documents exist, are in his

possession or control, and are authentic.  These types of admissions implicitly

communicate statements of fact that may lead to incriminating evidence."  *In re*

*Grand Jury Subpoena,* 383 F.3d at 909.

In *Couch*, the Supreme Court found that, while in general a subpoena that

demands production of records from a third party does not violate an individual's

Fifth Amendment privilege, *id*. at 328-29, 333-34, there is an exception to that

general rule: "[S]ituations may well arise where constructive possession is so clear

. . . as to leave the personal compulsions upon the accused substantially intact."  *Id.*

at 333; *see also id*. at 333 n.16; *Fisher*, 425 U.S. at 398; Appx 165.  Such a

situation arose here: before Levandowski provided any materials to Stroz, Stroz

expressly agreed to (a) "promptly return or destroy" the materials upon request, and (b) hold in strict confidence all information derived from the materials.  Dkt. 786-2 at 2 Surely Levandowski's ability to demand the return or destruction of the materials—combined with Stroz's promise to use the materials only as directed—meets the "constructive possession" standard.  *See Henderson v. United States*, 135 S. Ct. 1780, 1784 (2015) (a person retains constructive possession where he "still has the power and intent to exercise control over the object").

The magistrate judge refused to apply the *Couch* exception based solely on her conclusion that Levandowski "provided the statements and documents to an unrelated party on the other side of a proposed acquisition to enable the unrelated party to decide whether to agree to the acquisition and to create an evidentiary record to govern indemnification rights if a certain agreement is executed."  Ex. __ Appx 50.  The district court affirmed this holding.  Appx 20.  But as demonstrated above, pp. 48-49, the magistrate judge's description of the facts is not accurate—Stroz was not acting on behalf of an adversary, but instead on behalf of a co-participant in a joint-defense agreement and was contractually restricted by Levandowski as well. Appx 136.  And in any event, the magistrate judge's reasoning does not address the basis for the *Couch* rule: so long as Levandowski maintained constructive possession of the materials in question, so that the act of production would potentially make him an unwilling witness against himself, it

does not matter why he provided those materials to Stroz.

## IV. AT A MINIMUM, THE ORDER REGARDING THE STROZ SUBPOENA MUST BE REMANDED FOR FURTHER PROCEEDINGS BECAUSE THE DISTRICT COURT INAPPROPRIATELY DEFERRED TO THE MAGISTRATE JUDGE'S RULING

The district court erred by deferring to the determinations of the magistrate judge concerning the subpoena to Stroz. *See* Appx 17. The district court was required to conduct a *de novo* review of those determinations.

As the Ninth Circuit observed in *United States v. Rivera-Guerrero*, 377 F.3d 1064 (9th Cir. 2004), 28 U.S.C. § 636 "delineates the jurisdiction and powers of magistrate judges." *Id.* at 1067. "[T]he principle of constitutional avoidance requires that [§ 636] be interpreted to prevent the delegation to the magistrate judge of final determinations regarding" questions of constitutional import. *Id.* at 1070; *see also Peretz v. United States*, 501 U.S. 923, 929-30 (1991); *cf. Pacemaker Diagnostic Clinic of Am., Inc. v. Instromedix, Inc.*, 725 F.2d 537, 545 (9th Cir. 1984) (en banc). Thus, "delegation to magistrate judges of matters that implicate constitutional rights for proposed findings and recommendations is constitutional" only "so long as the findings and recommendations are subject to de novo review by an Article III judge." *Rivera-Guerrero*, 377 F.3d at 1070.

As explained above, ordering Levandowski to disclose the Stroz materials would directly implicate his Fifth Amendment rights. And the Fifth Amendment

53

protection against the compelled disclosure of records "extends to prevent an individual's attorney from being compelled to produce documents if that production would violate the individual's Fifth Amendment rights." *United States v. Sideman & Bancroft, LLP*, 704 F.3d 1197, 1201-02 (9th Cir. 2013). "[W]here an individual transfers documents to his or her attorneys to obtain legal assistance . . . , those documents, 'if unobtainable by summons from the client, are unobtainable by summons directed to the attorney by reason of the attorney-client privilege.' Accordingly, [the attorney] does not have to produce the . . . records if doing so violates [the individual]'s Fifth Amendment rights." *Fisher*, 425 U.S. at 405; *see also Sideman & Bancroft, LLP*, 704 F.3d at 1201-02; *In re Katz*, 623 F.2d 122, 126 (2nd Cir. 1980).

Levandowski asserted in the district court that under the reasoning of *Fisher*, 425 U.S. at 405 and its progeny, any records he may have transferred to Stroz as part of a common interest privileged communication remained subject to his Fifth Amendment privilege even if they are in the possession of Stroz. Dkt. 583at 3, 6-7; Dkt. 726 at 4. Under *Rivera-Guerrero*, the district court thus should have "applied de novo review to the magistrate judge's order" compelling production from Stroz. 377 F.3d at 1071.[12] Yet, although Levandowski asked the district

---

[12] Notably, both judges below based their rulings entirely on the grounds that there was no valid common interest privilege and did not reach the Fifth Amendment issue. *See* Ex. 14, *passim*; Ex. __ (Dkt. 670) at 5; Ex. 18 at 8 n.3; Ex __ (Dkt. 745)

court to apply de novo review, *see*Dkt. 726 at 1, the court instead applied the

deferential "clearly erroneous" standard, Dkt. 745)at 2, and relied heavily on its

own prior order, which had also employed that deferential standard, *id*. at 2 & 5;

Appx 2-3.

In *Rivera-Guerrero*, the Ninth Circuit found that a remand was necessary

when the district court had deferred to a magistrate's ruling on a question of

constitutional dimension: "[I]n its analysis, the district court repeatedly

underscored its deferential stance with regard to the magistrate judge's order.

There is simply no way to read the district court's analysis as a product of its

independent judgment.  Therefore, we must vacate the district court's order and

remand."  377 F.3d at 1071.  Accordingly, even if this Court finds no other basis

for reversing the decision of the district court, it must nonetheless remand the

matter to permit the court to exercise its independent judgment.

## V.    THIS CASE SATISFIES THE STANDARD FOR MANDAMUS RELIEF

Finally, even if the Court determines that it lacks appellate jurisdiction over

one or both appeals, the Court should nonetheless grant mandamus relief.  For

reasons explained *supra*, the district court's rulings constitute a "clear abuse of

---

at 2, 5.  If this Court reverses the district court's erroneous common interest
rulings, Levandowski's assertion of the Fifth Amendment privilege will be
revived.

discretion." *In re Regents*, 101 F.3d. at 1387.  The district court's numerous legal errors undermine fundamental protections for privileged information and imperil Levandowski's constitutional rights.

Moreover, Levandowski "lacks alternative means to obtain the relief sought." *Id*.  This Court has recognized that "an appeal after disclosure of the privileged communication is an inadequate remedy." *Id.*  This is because disclosure of privileged information would irreparably taint the adversary process.  Courts cannot force litigants to unlearn information, so excluding that information at trial cannot prevent its continued indirect use.  *E.g.*, *Agster v. Maricopa Co.*, 422 F.3d 836, 839 (9th Cir. 2005) (Once information has been ordered disclosed, "the cat is already out of the bag," and "it may not be possible to get it back in."); *see also Owens v. Office of the Dist. Att'y*, 896 F. Supp. 2d 1003, 1014 (D. Colo. 2012) ("the general injury or harm caused by the improper disclosure of material subject to the attorney-client privilege is irreparable").  For instance, a litigant armed with the other side's confidential attorney-client communications, or work product produced by the other side's attorney, might be better able to preempt the other side's key arguments, or might become aware of new lines of legal argument or previously unknown facts that permit further development of its own case.

Even if this harm might not be significant enough to justify prediscolsure relief in *all* cases, it is certainly significant enough to justify such relief where, as

here, the privilege ruling is "particularly injurious or novel." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 109-10 (2009); *see also, e.g.*, *Hernandez v. Tanninen*, 604 F.3d 1095, 1101 (9th Cir. 2010) (erroneous privilege ruling threatened irreparable injury, justifying predisclosure relief).  The disclosure orders at issue are certainly novel: they hold, clearly contrary to settled precedent, that parties in ongoing transactional negotiations cannot invoke the common-interest doctrine even when they are preparing for joint, post-transaction litigation.  The orders are also "particularly injurious."  Waymo does not seek an isolated statement or memorandum, but Levandowski's confidential communications made in preparation for this very suit, to the agent of a joint-defense attorney, with the understanding that those communications were protected by the attorney-client privilege.

If Waymo gains access to these communications, it will be privy to the type of confidential attorney-client communications that lie at the heart of the privilege. Even if the court excluded use of these communications at trial, the remarkable breadth of this improper disclosure would leave the court unable to determine whether privileged information contributed to Waymo's decision to present any particular piece of evidence or legal argument. Put differently, the court could not possibly cleanse the trial of all taint from the improper disclosure.  Thus, absent mandamus relief, Waymo will receive a litigation windfall even if Levandowski

57

ultimately prevails on his privilege claims, and Levandowski will suffer serious, irreparable harm.

## CONCLUSION

For all of the reasons discussed above, we ask the Court to overturn the district court's orders with respect to Waymo's demands for the Stroz report and the records relating to Levandowski that are responsive to the subpoena to Stroz. The materials requested by Waymo are subject to valid privileges and should not be produced.

## **STATEMENT OF COMPLIANCE WITH FED. R. APP. PRO. 27**

This brief is 13,776 words in length, and therefore complies with Federal Rule of Appellate Procedure 27(d)(2)(C) and Federal Circuit Rule 8(b)(1).

Dated:   July 6, 2017                                  */s/ Ismail Ramsey*_____

                                                         Ismail Ramsey
                                                         Attorney for Intervenor-Appellant
                                                         Anthony Levandowski

# STATEMENT OF RELATED CASES PURSUANT TO FED. CIR. Rule 47.5

Pursuant to Federal Circuit Rule 47.5(a), the following are cases related to this matter:

*Waymo v. Uber Technologies, Inc.,* Case No. 17-1904
Date Docketed:          04/13/2017
Date of Decision:       04/25/2017
Composition of Panel:   N/A
Citation of Opinion in the Federal Reporter: N/A

*Waymo v. Uber Technologies, Inc.,* Case No. 17-2130
Date Docketed:          06/06/2017
Date of Decision:       Open case
Composition of Panel:   N/A
Citation of Opinion in the Federal Reporter: N/A

*Waymo v. Uber Technologies, Inc., C*ase No. 17-2235
Date Docketed:          06/27/2017
Date of Decision:       Open case. Consolidated with Case No. 17-2253.
Composition of Panel:   N/A
Citation of Opinion in the Federal Reporter: N/A

*Waymo v. Uber Technologies, Inc.,* Case No. 17-2253
(*Consolidated with Case No. 17-2235, Lead case.*)
Date Docketed:          06/30/2017
Date of Decision:       Open case.
Composition of Panel:   N/A
Citation of Opinion in the Federal Reporter: N/A

Pursuant to Federal Circuit Rule 47.5(b), the following case is pending and would be affected by this matter:
*Waymo v. Uber Technologies, Inc.,* Case No.: 3:17-cv-00939-WHA
United States District Court for the Northern District of California
Date Docketed:     02/23/2017

# CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing Brief for Intervenor-Appellant Anthony Levandowski with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system and served a copy on counsel of record, this 6th day of July, 2017, by the CM/ECF system and by electronic mail to the parties on service list below.

| Recipient | Email Address: |
|---|---|
| Charles K. Verhoeven<br>David A. Perlson<br>Melissa Baily<br>John Neukom<br>Jordan Jaffe<br>QUINN EMANUEL<br>URQUHART & SULLIVAN, LLP<br>50 California Street, 22nd Floor<br>San Francisco, CA 94111<br><br>*Attorneys for Plaintiff Waymo LLC* | qewaymo@quinnemanuel.com |

| | |
|---|---|
| Arturo J. Gonzalez<br>Daniel Pierre Muino<br>Eric Akira Tate<br>Esther Kim Chang<br>Matthew Ian Kreeger<br>Michael A. Jacobs<br>MORRISON & FOERSTER<br>LLP<br>425 Market Street<br>San Francisco, CA 94105<br><br>Michelle Ching Youn Yang<br>MORRISON FOERSTER LLP<br>2000 Pennsylvania Avenue, NW<br>Washington, DC 20006<br><br>Rudolph Kim<br>MORRISON & FOERSTER<br>LLP<br>755 Page Mill Road<br>Palo Alto, CA 94304<br><br>Wendy Joy Ray<br>MORRISON & FOERSTER<br>LLP<br>707 Wilshire Boulevard<br>Suite 6000<br>Los Angeles, CA 90017<br><br>*Attorneys for Defendants*<br>*Uber Technologies. Inc. and*<br>*Ottomotto LLC* | UberWaymoMoFoAttorneys@mofo.com |

| | |
|---|---|
| Michael Darron Jay<br>BOIES SCHILLER<br>FLEXNER LLP<br>401 Wilshire Boulevard,<br>Suite 850<br>Santa Monica, CA 90401<br><br>Meredith Richardson Dearborn<br>BOIES SCHILLER<br>FLEXNER LLP<br>435 Tasso Street<br>Suite 205<br>Palo Alto, CA 94301<br><br>Hamish  Hume<br>Jessica E Phillips<br>Karen Leah Dunn<br>Kyle N. Smith<br>Martha Lea Goodman<br>BOIES SCHILLER FLEXNER<br>LLP<br>1401 New York Ave., NW<br>Washington, DC 20005<br><br>*Attorneys for Defendant*<br>*Uber Technologies, Inc.* | BSF_EXTERNAL_UberWaymoLit@bsfllp.com |
| I. Neel Chatterjee<br>GOODWIN PROCTER LLP<br>135 Commonwealth Drive<br>Menlo Park, CA 94025<br><br>*Attorneys for Defendant*<br>*Otto Trucking LLC* | nchatterjee@goodwinlaw.com |
| Brett M. Schuman<br>Shane Brun<br>Rachel M. Walsh<br>GOODWIN PROCTER LLP<br>Three Embarcadero Center<br>San Francisco, CA 94111<br><br>*Attorneys for Defendant*<br>*Otto Trucking LLC* | bschuman@goodwinlaw.com<br>sbrun@goodwinlaw.com<br>rwalsh@goodwinlaw.com |

| | |
|---|---|
| John L. Cooper<br>Matthew Cate<br>FARELLA BRAUN +<br>MARTEL LLP<br>235 Montgomery Street,<br>17th Floor<br>San Francisco, CA 94104<br><br>*Special Master* | jcooper@fbm.com<br>MCate@fbm.com |
| Robert Burkart Ellis<br>KIRKLAND AND ELLIS LLP<br>300 North LaSalle<br>Chicago, IL 60654<br><br><br>Kevin K Chang<br>KIRKLAND AND ELLIS LLP<br>555 California Street, Suite 2700<br>San Francisco, CA 94104<br><br>*Attorneys for Respondent*<br>*Stroz Friedberg, LLC* | robert.ellis@kirkland.com<br>kevin.chang@kirkland.com |
| Jonathan Alan Patchen<br>TAYLOR & PATCHEN, LLP<br>One Ferry Building, Suite 355<br>San Francisco, CA 94111<br><br>*Attorneys for Intervenor*<br>*Lior Ron* | jpatchen@taylorpatchen.com |
| Carolyn Hoecker Luedtke<br>MUNGER, TOLLES & OLSON<br>LLP<br>560 Mission Street, 27th Floor<br>San Francisco, CA 94105<br><br>*Attorneys for Lyft, Inc.* | carolyn.luedtke@mto.com |

Dated:  July 6, 2017          */s/ Ismail Ramsey*
                              ISMAIL RAMSEY
                              RAMSEY & EHRLICH LLP
                              *Counsel for Anthony Levandowski*